## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

NUCOR CORPORATION,

                   **Plaintiff,**

       v.

UNITED STATES,

                  **Defendant,**

        **and**

POSCO,

             **Defendant-Intervenor.**

</td></tr>
</table>

**Before: Hon. Mark A. Barnett, Chief Judge**

**Court No. 21-00182**

## <u>ORDER</u>

Upon consideration of the motion of Nucor Corporation for judgement on the agency record, and all other papers and proceedings herein, it is hereby

**ORDERED,** that Nucor Corporation's motion for judgement on the agency record is granted; and it is further

**ORDERED,** that this action is remanded to the U.S. Department of Commerce for proceedings consistent with this Court's opinion.

**SO ORDERED**.

_____
Hon. Mark A. Barnett, Chief Judge

Dated: _____, 2021
       New York, New York

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| **NUCOR CORPORATION,**<br><br>              **Plaintiff,**<br><br>      **v.**<br><br>**UNITED STATES,**<br><br>              **Defendant,**<br><br>           **and**<br><br>**POSCO,**<br><br>              **Defendant-Intervenor.** |

**Before: Hon. Mark A. Barnett,
Chief Judge**

**Court No. 21-00182**

## <u>NUCOR CORPORATION'S RULE 56.2 MOTION FOR JUDGEMENT ON THE AGENCY RECORD</u>

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Nucor Corporation ("Nucor") hereby moves for judgement upon the agency record with respect to the determination of the U.S. Department of Commerce ("Commerce") in the administrative review of the countervailing duty order on *Certain Carbon and Alloy Steel Cut-To-Length Plate from the Republic of Korea* for the period of January 1, 2018 through December 31, 2018. Issues and Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 86 Fed. Reg. 15,184 (Dep't Commerce Mar. 22, 2021) (final results and partial rescission of countervailing duty admin. rev.; 2018), P.R. 187.

Nucor respectfully moves, for the reasons explained in the accompanying memorandum, that this Court find that agency findings, conclusions, and/or determinations with respect to this decision are unexplained, not supported by substantial evidence, or otherwise not in accordance with law. Nucor further moves that the Court remand this determination to Commerce for disposition consistent with the Court's final opinion.

**Ct. No. 21-00182**

Respectfully submitted,

/s/ Alan H. Price
Alan H. Price, Esq.
Christopher B. Weld, Esq.
Derick G. Holt, Esq.
Adam M. Teslik, Esq.
Theodore P. Brackemyre, Esq.

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to Nucor Corporation*

Dated: September 30, 2021

NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

NUCOR CORPORATION,

                          Plaintiff,

          v.

UNITED STATES,

                          Defendant,

                   and

POSCO,

                          Defendant-Intervenor.

Before: Hon. Mark A. Barnett,
          Chief Judge

Court No. 21-00182

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information
Removed from Pages 3, 4, 8, 22,
23, 28, 34, 36, 42, and 44

## <u>NUCOR CORPORATION'S MEMORANDUM IN SUPPORT OF ITS RULE 56.2 MOTION FOR JUDGEMENT ON THE AGENCY RECORD</u>

Alan H. Price, Esq.
Christopher B. Weld, Esq.
Derick G. Holt, Esq.
Adam M. Teslik, Esq.
Theodore P. Brackemyre, Esq.

WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to Nucor Corporation*

Dated: September 30, 2021

NON-CONFIDENTIAL VERSION

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................ 1

II.    RULE 56.2 STATEMENT ................................................................. 1

    A.    Administrative Decision Under Review ................................. 1

    B.    Issues Presented and Summary of Argument ....................... 1

III.    STATEMENT OF FACTS ............................................................... 3

    A.    Initiation and Questionnaire Responses ............................... 3

    B.    New Subsidy Allegations ...................................................... 4

        1.    Plantec Allegation ................................................... 5

        2.    Off-Peak Electricity for LTAR Allegation ............. 5

    C.    Commerce's NSA Determination .......................................... 9

    D.    Preliminary Results .............................................................. 12

    E.    Case Brief and Final Determination ..................................... 12

    F.    Final Results .......................................................................... 13

IV.    STANDARD OF REVIEW .............................................................. 14

V.    ARGUMENT ................................................................................... 18

    A.    Commerce's Decision Not to Initiate an Investigation of Off-Peak Electricity for LTAR Was Unlawful and Unsupported by Substantial Evidence ................................... 18

        1.    Commerce Applied an Unlawfully High Evidentiary Standard for Initiation ......................... 18

        2.    Commerce's NSA Determination Was Based on an Unlawful LTAR Standard ...................................... 31

        3.    Commerce's Decision Not to Initiate Was Otherwise Arbitrary and Undermined by the Record ............... 34

    B.    Commerce's Determination that Subsidies to Plantec Are Not Attributable to POSCO Was Unlawful and Unsupported by the Record .................................................. 36

        1.    Commerce's Determination that Plantec Did Not Supply Steel Scrap to POSCO Was Arbitrary and Otherwise Unlawful ................................................ 39

        2.    Commerce's Determination that Plantec Did Not Supply Steel Mill Equipment and Services that Were Primarily Dedicated to Steel Production was Unlawful and Unsupported by the Record ..................... 41

**NON-CONFIDENTIAL VERSION**

VI.   CONCLUSION ................................................................................................................ 45

NON-CONFIDENTIAL VERSION

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
      35 CIT 1110, 791 F.Supp.2d 1327 (2011) ............................................................... 15

*Am. Silicon Techs. v. United States,*
      22 CIT 776, 19 F.Supp.2d 1121 (1998) ................................................................... 17

*Changzhou Wujin Fine Chem. Factory Co. v. United States,*
      701 F.3d 1367 (Fed. Cir. 2012) ............................................................................... 16

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
      467 U.S. 837 (1984) .......................................................................................... 15, 16

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
      401 U.S. 402 (1971), *abrogated on other grounds, Califano v. Sanders,*
      430 U.S. 99 (1977) ................................................................................................... 17

*Citrosuco Paulista, S.A. v. United States,*
      12 CIT 1196, 704 F.Supp. 1075 (1988) .................................................................. 17

*CS Wind Viet. Co. v. United States,*
      832 F.3d 1367 (Fed. Cir. 2016) ............................................................................... 15

*DAK Ams. LLC v. United States,*
      456 F.Supp.3d 1340 (Ct. Int'l Trade 2020) ............................................................ 17

*Eli Lilly & Co. v. Bd. of Regents of Univ. of Wash.,*
      334 F.3d 1264 (Fed. Cir. 2003) ............................................................................... 16

*Greater Bos. Television Corp. v. FCC,*
      444 F.2d 841 (D.C. Cir. 1970) ................................................................................ 16

*Hyundai Elecs. Indus. Co. v. U.S. Int'l Trade Comm'n,*
      899 F.2d 1204 (Fed. Cir. 1990) ............................................................................... 16

*Jilin Henghe Pharm. Co. v. United States,*
      28 CIT 969, 342 F.Supp.2d 1301 (2004), *vacated and remanded,* 123 F.App'x
      402 (Fed. Cir. 2005) ................................................................................................ 15

*Jinan Yipin Corp. v. United States,*
      31 CIT 1901, 526 F.Supp.2d 1347 (2007) .............................................................. 15

**NON-CONFIDENTIAL VERSION**

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .......................................................................................16, 17

*N.Y. State Bar Ass'n v. FTC,*
  276 F.Supp.2d 110 (D.D.C. 2003) ...........................................................................16

*NSK Corp. v. United States,*
  32 CIT 1497, 593 F.Supp.2d 1355 (2008) ...............................................................17

*Nucor Corp. v. United States,*
  927 F.3d 1243 (Fed. Cir. 2019)...............................................................31, 32, 36

*Nucor Fastener Div. v. United States,*
  35 CIT 1074, 791 F.Supp.2d 1269 (2011) ...............................................................16

*Penobscot Air Servs., Ltd. v. FAA,*
  164 F.3d 713 (1st Cir. 1999) .....................................................................................17

*POSCO v. United States,*
  977 F.3d 1369 (Fed. Cir. 2020).........................................................19, 32, 34

*PS Chez Sidney, LLC v. U.S. Int'l Trade Comm'n,*
  684 F.3d 1374 (Fed. Cir. 2012).............................................................15, 16

*RZBC Grp. Shareholding Co. v. United States,*
  100 F.Supp.3d 1288 (Ct. Int'l Trade 2015) ................................................. *passim*

*SKF USA Inc. v. United States,*
  263 F.3d 1369 (Fed. Cir. 2001).................................................................................17

*Stephens v. Off. of Pers. Mgmt.,*
  527 F.App'x 843 (Fed. Cir. 2013) .............................................................................15

*Suramerica de Aleaciones Laminadas, C.A. v. United States,*
  44 F.3d 978 (Fed. Cir. 1994).....................................................................................14

*Torrington Co. v. United States,*
  15 CIT 456, 772 F.Supp. 1284 (1991) ......................................................................19

*Tung Mung Dev. Co. v. United States,*
  25 CIT 752 (2001) .....................................................................................................17

*U.S. Steel Corp. v. United States,*
  33 CIT 1935 (2009) ...................................................................................................35

*Universal Camera Corp. v. NLRB,*
  340 U.S. 474 (1951)...................................................................................................15

*USX Corp. v. United States*,
    11 CIT 82, 655 F.Supp. 487 (1987) ........................................................................15

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ...........................................................................14, 15

19 U.S.C. § 1671a(b)(1) .....................................................................................18, 27

19 U.S.C. § 1677(5)(A) .............................................................................................18

19 U.S.C. § 1677(5)(B) .............................................................................................18

19 U.S.C. § 1677(5)(E) .......................................................................................18, 21

19 U.S.C. § 1677(5)(E)(iv) .................................................................................18, 31

Tariff Act Section 516A(b)(1)(B)(i) .........................................................................15

**Regulations**

19 C.F.R. § 351.301(c)(2)(iv)(B) ..............................................................................18

19 C.F.R. § 351.511(a)(2)(iii) ...................................................................................31

19 C.F.R. § 351.525(b)(6)(i) .....................................................................................36

19 C.F.R. § 351.525(b)(6)(iv) .......................................................................36, 37, 45

**Administrative Materials**

*Certain Seamless Carbon Alloy Steel Standard, Line, and Pressure Pipe from the
    People's Republic of China*, 75 Fed. Reg. 57,444 (Dep't Commerce Sept. 21,
    2010) ...................................................................................................................38

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*,
    82 Fed. Reg. 16,341 (Dep't Commerce Apr. 4, 2017) ....................................21, 30

*Certain Cold-Rolled Steel Flat Products from Brazil*,
    81 Fed. Reg. 49,940 (Dep't Commerce July 29, 2016) .........................................39

*Certain Cold-Rolled Steel Flat Products from Brazil*,
    80 Fed. Reg. 79,569 (Dep't Commerce Dec. 22, 2015) .............................39, 43, 44

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea*,
    81 Fed. Reg. 49,946 (Dep't Commerce July 29, 2016) .........................................32

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea*,
    85 Fed. Reg. 38,361 (Dep't Commerce June 26, 2020) ........................................43

NON-CONFIDENTIAL VERSION

*Certain Frozen Warmwater Shrimp from Thailand*,
78 Fed. Reg. 50,379 (Dep't Commerce Aug. 19, 2013) .........................................................38

*Certain Lined Paper Products from Indonesia*,
71 Fed. Reg. 47,174 (Dep't Commerce Aug. 16, 2006) .........................................................37

*Certain Oil Country Tubular Goods from the Republic of Turkey*,
79 Fed. Reg. 41,964 (Dep't Commerce July 18, 2014) ....................................................38, 40

*Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*,
73 Fed. Reg. 31,966 (Dep't Commerce June 5, 2008) ..........................................................35

*Common Alloy Aluminum Sheet from India*,
86 Fed. Reg. 13,285 (Dep't Commerce Mar. 8, 2021) ..........................................................19

*Countervailing Duties*,
63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998) .................................................2, 37, 40

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
84 Fed. Reg. 33,739, 33,749 (Dep't Commerce July 15, 2019) .................................................3

*Light-Walled Rectangular Pipe and Tube from the People's Republic of China*,
73 Fed. Reg. 35,642 (Dep't Commerce June 24, 2008) at 36 .................................................35

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
85 Fed. Reg. 3,030 (Dep't Commerce Jan. 17, 2020) ..........................................................38

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
85 Fed. Reg. 42,353 (Dep't Commerce July 14, 2020) .........................................................38

## I.        INTRODUCTION

On behalf of Plaintiff Nucor Corporation ("Nucor"), we hereby submit the following brief in support of Nucor's Rule 56.2 motion for judgment on the agency record.

## II.       RULE 56.2 STATEMENT

### A.        Administrative Decision Under Review

The administrative determination challenged herein is the final results of the U.S. Department of Commerce's ("Commerce") administrative review of the countervailing duty order on *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea* for the period of review ("POR") from January 1, 2018 through December 31, 2018. *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 86 Fed. Reg. 15,184 (Dep't Commerce Mar. 22, 2021), P.R. 192 ("Final Results"), and accompanying Issues and Decision Memorandum, P.R. 187 ("IDM").

### B.        Issues Presented and Summary of Argument

#### 1.        Whether Commerce's Decision Not to Initiate an Investigation of Off-Peak Electricity for Less Than Adequate Remuneration Was Lawful and Supported by the Record.

No.  In determining that Nucor's new subsidy allegation ("NSA") regarding the provision of off-peak electricity for less than adequate remuneration ("LTAR") contained insufficient evidence that a benefit was conferred, Commerce applied an unlawfully high initiation standard. The statute requires Commerce to initiate an investigation into alleged countervailable subsidies where a petitioner alleges each element and provides reasonably available evidence in support thereof.  Here, Nucor's allegation included detailed evidence that a benefit was conferred. Commerce decided not to initiate because it questioned whether that evidence would be suitable as a benchmark to quantify the precise amount of the benefit.  In doing so, Commerce faulted

counsel for Nucor for not providing evidence at a level of detail and granularity that was not reasonably available in the public domain.

Commerce also considered the evidence in Nucor's allegation under an "adequate remuneration" standard that is unlawful in light of recent opinions of the Court of Appeals for the Federal Circuit ("CAFC"). Finally, Commerce based its determination in part on arbitrary considerations of the government supplier's financial performance as a whole, while ignoring evidence that the supplier's prices to the respondent were insufficient to cover the cost of production and supply plus a reasonable amount for profit.

> **2. Whether Commerce's Determination that POSCO Plantec Was Not POSCO's Cross-Owned Input Supplier Was Lawful and Supported by Substantial Evidence.**

No. Commerce's rules provide that subsidies to a cross-owned affiliate that supplies inputs that are primarily dedicated to production of a downstream product should be attributed to production of both the input and the downstream product. Here, POSCO's cross-owned affiliate POSCO Plantec ("Plantec") supplied both steel scrap and steelmaking equipment and related services to POSCO during the POR. Commerce has previously determined that both steel scrap and steelmaking equipment and related services are inputs that are primarily dedicated to steel production.

Commerce's Its decisions to the contrary here were arbitrary, unlawful, and unsupported by the record. The agency's determination that Plantec did not "supply" steel scrap because Plantec neither produced nor processed the scrap and supplied it through a second cross-owned affiliate undermines the express purpose of the cross-owned input supplier rule as articulated in the *CVD Preamble*. *Countervailing Duties*, 63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998) ("*CVD Preamble*"). It is also arbitrary in light of previous determinations regarding cross-owned

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

affiliates that generate scrap. The agency's finding that Plantec did not supply steel mill equipment, but only services related to that equipment, is directly undermined by the record and otherwise arbitrary in light of previous determinations in nearly identical factual scenarios. Finally, Commerce's requirement that the sole purpose of the input supplier's operations must be to supply the respondent's downstream operations has no basis in the rule or agency practice and is therefore unlawful.

## III.   STATEMENT OF FACTS

### A.   Initiation and Questionnaire Responses

On July 15, 2019, Commerce initiated the second administrative review of the countervailing duty order on *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, covering the calendar-year 2018. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 33,739, 33,749 (Dep't Commerce July 15, 2019), P.R. 4. On August 2, 2019, Commerce selected POSCO as the sole mandatory respondent to the proceeding. Memorandum from Robert Palmer to Irene Darzenta Tzafolias, re: *Countervailing Duty Administrative Review: Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea – Respondent Selection* (Aug. 2, 2019) at 1, C.R. 3, P.R. 14.

POSCO filed its response to the affiliated companies portion of Commerce's initial questionnaire on August 19, 2019. Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: Response to the Affiliated Companies Section of the Initial Questionnaire* (Aug. 19, 2019), C.R. 4-15, P.R. 20-23 ("POSCO Aff. Cos. QR"). In its response, POSCO reported that its cross-owned affiliate Plantec generated [                                    ], which it sold to a second cross-owned affiliate, POSCO Daewoo Corporation ("PDC"), which, in turn, sold the

**BUSINESS PROPRIETARY INFORMATION**
                                         **HAS BEEN DELETED**

[      ] to POSCO for use as a steelmaking raw material. *Id.* at 12-13. POSCO also reported that Plantec supplied [      ] to POSCO during the POR. *Id.* at Exhibit 5.

Nucor filed comments on POSCO's affiliated companies questionnaire response on September 10, 2019. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Comments on POSCO's Affiliated Companies Questionnaire Response* (Sept. 10, 2019) at 1, C.R. 16-17, P.R. 33-34. Nucor pointed out that, in addition to the [      ] that POSCO discussed in its questionnaire response, POSCO's financial statements showed that POSCO's [



]. *Id.* at 3. Because this evidence suggested that Plantec was POSCO's cross-owned input supplier, Nucor requested that Commerce require a complete questionnaire response from Plantec. *Id.* at 4. Commerce did not ask POSCO to file a complete questionnaire response on behalf of Plantec in this review.

**B.    New Subsidy Allegations**

Nucor timely filed its NSA on November 4, 2019. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: New Subsidy Allegations* (Nov. 4, 2019) at 1-2, C.R. 182-184, P.R. 76-78 ("Nucor's NSA"). Nucor alleged (i) that Plantec received countervailable benefits through a government-led debt restructuring program during the POR, and that those benefits were attributable to POSCO because of a cross-owned input supplier relationship, and (ii) that the Korean government provided electricity to industrial users, including steel producers, for LTAR during "off-peak" hours, from 11:00pm to 9:00am. *Id.* at 2-17.

### 1. Plantec Allegation

With respect to Plantec, Nucor's allegation established that Plantec's financial performance deteriorated rapidly following its acquisition of an insolvent company, and that it suffered continued losses until its shares were suspended from trading on the Korean stock market. *Id.* at 2-3. As a result, Plantec entered a debt restructuring program through which state-owned banks, led by the Korea Development Bank, extended loan maturities and reduced interest rates on Plantec's outstanding debt. *Id.* at 3. Nucor's allegation also established that Plantec was POSCO's cross-owned affiliate, that Plantec supplied scrap and steelmaking equipment to POSCO during the POR. The NSA argued that Plantec should be treated as POSCO's cross-owned input supplier as a result. *Id.* at 6-7.

### 2. Off-Peak Electricity for LTAR Allegation

With respect to the provision of off-peak electricity for LTAR, Nucor's allegation showed that Korea's state-owned electricity supplier, the Korea Electric Power Corporation ("KEPCO"), implements an electricity pricing structure characterized by drastic differences between prices for industrial users during "on-peak" daytime hours and "off-peak" hours between 11:00pm and 9:00am. *Id.* at 8-9. Specifically, on-peak prices for industrial users were as high as KRW 196.6 per kilowatt-hour ("kWh"), while off-peak prices were as low as KRW 53.7/kWh. *Id.* at 9, Exhibit 4. Pointing to this pricing structure, Nucor alleged that "the Korean government cross-subsidizes large industrial electricity consumers that are able to shift consumption to off-peak hours . . . by charging prices that are . . . substantially below cost during this time of day." *Id.* at 8. The allegation added that "KEPCO recoups these losses," if at all, "by charging prices that are above cost for consumers that use electricity primarily during the daytime." *Id.*

Nucor's allegation included evidence showing that this pricing structure was unjustified based on supply and demand trends, that it was designed explicitly to enhance the competitiveness of large manufacturing industries, and that the provision of below-cost electricity to large industrial users was a significant factor in KEPCO's deteriorating financial performance.  The allegation first quoted KEPCO officials stating that the majority of industrial electricity consumption occurs during off-peak hours and provided reports explaining that off-peak consumers tend to be large industrial enterprises, while small and medium enterprises consume electricity primarily during the day.  *Id.* at 9, 12.  The allegation corroborated this with official Korean government data from the Korea Power Exchange ("KPX").  *Id.* at Exhibit 9.

KEPCO itself does not generate the electricity that it sells.  Rather, it purchases electricity generated by its wholly owned subsidiary generators and several large independent electricity generators through a "cost-based pool" system operated by the KPX.  Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: New Subsidy Allegations Supplemental Questionnaire Response* (Dec. 31, 2019) at Exhibit 1, p. 34, P.R. 94 ("Nucor's NSA SQR").  The prices at which KEPCO purchases electricity through the KPX are determined by a formula consisting of three elements: (i) the "system marginal price" ("SMP"), which "represents the principal component of the variable costs of generating electricity" and "in effect, the marginal price of electricity at a given hour at which the projected demand for electricity and the projected supply of electricity for such hour intersect"; (ii) the "capacity price," which is "to compensate {generators} for the fixed costs of constructing generation facilities"; and (iii) the "adjusted coefficient" factor, which is intended "to prevent electricity trading from resulting in undue imbalances as to the relative financial results among generation subsidiaries as well as between {KEPCO} and {its} generation subsidiaries . . . ."  *Id.* at Exhibit 1, pp. 35-37.

Each of these factors is determined by a "cost evaluation committee" within the KPX.  *Id.* at Exhibit 1, pp. 35-36.  This "KPX formula" affects only the price at which KEPCO buys electricity through the KPX and does not affect the prices that KEPCO charges electricity consumers.  *Id.* at 4, Exhibit 1, p. 35.

The SMP reflects not only the marginal price of electricity at the KPX at any given hour, but also the level of electricity demand at that hour.  Under the KPX "merit order system," electricity is first supplied by lower variable-cost generators, with higher variable-cost generators supplying electricity as demand increases.  *Id.* at Exhibit 1, p. 35.  The SMP is established by the highest variable-cost generator supplying electricity at any given hour.  *Id.*  Thus, higher SMPs reflect both higher demand and a higher cost of purchase for KEPCO, while lower SMPs reflect lower demand and a lower cost of purchase for KEPCO.  Nucor's allegation provided hour-by-hour SMP data for the entire period of investigation ("POI") to establish that the average hourly SMP remained relatively stable over the course of the day, meaning that neither demand nor KEPCO's cost of purchase fluctuated significantly between on-peak and off-peak hours.  Nucor's NSA at 11, Exhibit 9.  During the POR, the average SMP during off-peak hours was KRW 93.17/kWh, compared to KRW 95.11/kWh during the daytime.  *See id.* at 14, Exhibit 9.  Nucor's allegation thus showed that the disparity between KEPCO's on-peak and off-peak prices created a system in which "companies that use electricity mainly during the daytime," primarily small and medium enterprises, "will provide a subsidy to companies that charge a lot of electricity at night time," primarily large industrial companies.  *Id.* at 12, Exhibit 12.

Nucor's allegation tied KEPCO's provision of below-cost, off-peak electricity to the company's poor financial performance during the POR.  *Id.* at 12-13, Exhibits 7, 16, 17.  Despite

**BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED**

KEPCO's attempts to raise off-peak prices, however, the Korean government intervened because of the concerns of large industrial users like steel companies.  *Id.*

As quantitative evidence that a benefit was conferred, Nucor's allegation included the electricity purchase data that POSCO reported during the original investigation, in accordance with 19 C.F.R. § 351.306(b).  *Id.* at 14, Exhibit 5.  Nucor's allegation established that [

] and [

] during the POR.  *Id.* at 14-15.  These were conservative estimates rather than formal benchmarks because neither included a reasonable amount for profit, and each reflected only KEPCO's purchase prices, primarily from wholly owned affiliates, based on costs determined by other government entities rather than the actual costs of generating and supplying electricity. *Id.*

Commerce issued a supplemental questionnaire requesting additional information about this allegation on December 20, 2019.  Letter from Kathleen Marksberry to Wiley Rein LLP, re: *Countervailing Duty Administrative Review of Certain Carbon and Alloy Cut-To-Length Plate from the Republic of Korea: New Subsidy Allegation Supplemental Questionnaire* (Dec. 20, 2019), P.R. 90.  In relevant part,[1] Commerce asked counsel for Nucor to provide KEPCO's complete Form 20-F, rather than excerpts, and to explain, based on the factors in the KPX pricing formula, "how the SMP only impacts pricing at off-peak times."  *Id.* at 3.  Nucor's response provided KEPCO's Form 20-F, as well as additional explanation regarding the operation of the SMP. Nucor's NSA SQR at 4-5, Exhibit 1.  Nucor's response clarified that, although the KPX pricing formula includes the "adjusted coefficient" factor and the "capacity price," these factors "are

---

[1]    The supplemental questionnaire also asked for additional information regarding the element of specificity, which is not at issue in this appeal.

relevant only to transactions between the KPX and electricity generators" and that "they do not affect the actual prices that end-users pay," whether at off-peak times or otherwise. *Id.* at 4. The response explained that the adjusted coefficient factor, for example, was merely "an *ad hoc* means of adjusting the distribution of profits or losses among KEPCO and its generating subsidiaries." *Id.* Nucor's response reiterated that the SMP represents both (i) the variable cost of electricity and thus a conservative proxy for the cost of electricity at any time of day, and (ii) demand trends over the course of the day. *Id.* at 4-5.

C.     **Commerce's NSA Determination**

Commerce issued its determination regarding Nucor's NSAs in its April 1, 2020 NSA memorandum. Memorandum from Robert Palmer and Farris Montgomery to Irene Darzenta Tzafolias, re: *Decision Memorandum on New Subsidy Allegations* (Apr. 1, 2020), P.R. 144 ("DOC NSA Memo"). With respect to Plantec, Commerce explained that it was "not necessary for Commerce to separately initiate an investigation of this allegation" because it was "examining this alleged subsidy as a self-reported program in this review." *Id.* at 4. As a result, the agency did not issue an NSA questionnaire regarding this program to either POSCO or the Korean government.

Commerce declined to initiate an investigation of the alleged provision of off-peak electricity for LTAR because it found that "Nucor has not adequately supported its allegation with respect to the existence of a benefit." *Id.* at 7. Commerce explained that "{t}he CVD regulations call for Commerce to base its LTAR benefit calculation on a comparison of the price the respondent firm paid to the government for the good in question to a market-determined benchmark price for the good that would have been available in the country of provision." *Id.*

Commerce, however, found that the "assertion that the SMP is an effective proxy for a market price is inconsistent with information on the record" in KEPCO's Form 20-F for the POR. *Id.* According to Commerce, the SMP was "not an appropriate proxy for a market price" because it "reflects the generation unit with the highest variable cost" supplying electricity at a given hour, and because "the SMP is only one variable in the formula used by KEPCO to determine market payment to generators . . . ." *Id.* It did not, the agency reasoned, "account for the quantity of electricity provided by various generators that would affect the overall cost of the provision of electricity . . . ." *Id.* Commerce added that "{e}vidence on the record demonstrates that the SMP's primary purpose is not to function as an estimate of marginal market price, but is to determine the '*ad hoc* means of adjusting the distribution of profits or losses among KEPCO's subsidiaries.'" *Id.* at 8 (citations omitted). Because "KEPCO primarily utilizes the SMP in conjunction with the adjusted coefficient factor and the capacity price to calculate amounts owed to electricity generators," Commerce found that "any cost-based, market benchmark for the provision of electricity should include these factors, because under Korea's system of electricity pricing, KEPCO's cost of electricity is based on that formula." *Id.*

With respect to KEPCO's financial performance during the POR, Commerce found that "poor financial performance by a government-owned company in a particular year does not necessarily indicate that an input was being provided for LTAR." *Id.* Finally, Commerce found that Nucor's allegation did not provide a basis for examining off-peak electricity prices because there was "{in}sufficient information demonstrating that KEPCO's {time-of-use} operations are outside of the prevailing market conditions of an electricity utility in Korea." *Id.* at 9. Commerce addressed neither the average cost of sale data in Nucor's allegation, nor the evidence of the prices that POSCO actually paid to purchase electricity from KEPCO.

On April 9, 2020, Nucor filed a request for reconsideration of the decision not to initiate an investigation of off-peak electricity for LTAR, pointing out both legal and factual flaws in Commerce's NSA memorandum.  Letter from Wiley Rein LLP to Sec'y Commerce, re*: Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Request for Reconsideration of New Subsidy Allegation* (Apr. 9, 2020), C.R. 254, P.R. 148 ("Nucor's Req. for Reconsideration").  First, the request explained that even though the SMP alone did not "reflect the average cost of electricity provision" during the POR, DOC NSA Memo at 7, Nucor's allegation also included KPX data for the annual average cost of sale, which Commerce did not address in the NSA memorandum.  Nucor's Req. for Reconsideration at 3.  Second, Nucor's request pointed out that, contrary to Commerce's determination, both the statements of KEPCO officials and the stability of the SMP over the course of the average day "account{ed} for the quantity of electricity provided by various generators that would affect the overall cost of the provision of electricity at that given hour."  *Id.* at 4.  This was corroborated by evidence that a benefit was conferred even assuming that the lowest-cost generator supplied <u>all</u> electricity during off-peak hours, which it did not.  *Id.* at 7-8.  Third, Nucor's request explained that Commerce had misquoted Nucor's response to the NSA supplemental questionnaire and thus inaccurately characterized both the role of the SMP in the KPX pricing formula and its significance to Nucor's allegation.  *Id.* at 5-6.  Finally, Nucor argued that Commerce's determination was legally flawed because it recreated a price discrimination or preferentiality standard that the CAFC had recently found to be insufficient under the "adequate remuneration standard."  *Id.* at 6-7, 9-10.  Commerce did not respond to Nucor's request for reconsideration.

### D.     Preliminary Results

Commerce issued the preliminary results on July 27, 2020.   Preliminary Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 85 Fed. Reg. 45,185 (Dep't Commerce July 27, 2020), P.R. 161.   The preliminary results did not address Nucor's request regarding the off-peak electricity subsidy allegation.  *See generally id.*  With respect to Plantec, the agency preliminarily determined that the "fixed assets and the services provided to POSCO during the POR were not primarily dedicated to the steel production process," so that "the production of POSCO Plantec's 'input' is not primarily dedicated to the production of the downstream product, including the subject merchandise."  *Id.* at 13.  Citing the final results of the 2017 administrative review of *Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, Commerce found that "Plantec does not meet the criteria for a cross-owned input supplier," and it did not include subsidies received by Plantec in POSCO's preliminary subsidy rate.  *Id.*

### E.     Case Brief and Final Determination

Nucor filed its case brief on August 26, 2020. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Case Brief* (Aug. 26, 2020), C.R. 300, P.R. 174.  Nucor reiterated the arguments made in its request for reconsideration of Commerce's NSA determination, namely that the agency had ignored or misconstrued key evidence and applied an unlawful standard by requiring a benchmark that is consistent with the government supplier's pricing methodology and operations. *Id.* at 3-11.  Nucor also argued that Commerce's preliminary results erred by finding that Plantec was not POSCO's cross-owned input supplier.  *Id.* at 12-21.  Nucor's case brief noted that Commerce had previously determined that identical inputs were primarily dedicated to steel production and argued that there

was no basis for deviating from those findings.  *Id.* at 13-19.   Nucor also argued that the preliminary results relied on an unlawful standard that departed from prior applications of the cross-owned input supplier rule and was otherwise inconsistent with the regulation.  *Id.* at 19-21.

### F.   <u>Final Results</u>

Commerce published the final results on March 22, 2021.  IDM.  With respect to the NSA determination for off-peak electricity, Commerce "continue{d} to find that Nucor provided insufficient evidence {of a benefit} to initiate an investigation into the alleged provision of off-peak electricity for LTAR."  *Id.* at 20.   With respect to the SMP and KEPCO's financial performance, Commerce reiterated the findings articulated in the NSA memorandum.  *Id.* at 22. Commerce's final results addressed the "average cost of sale" data, finding that it could not be a "suitable benchmark" because it was not "isolated to off-peak hours."  *Id.*  Commerce added that the agency "found that there was insufficient evidence in the allegation indicating the existence of a benefit from price discrimination in the GOK's provision of off-peak electricity."  *Id.* at 24.

Commerce also found that it did not "set an unreasonably high standard for"  initiation of subsidy investigations.  *Id.* at 25.  Commerce explained that "{p}arties are obligated to support their subsidy allegations and must identify the elements of a countervailable subsidy . . . it is not the responsibility of Commerce to amend insufficient allegations."  *Id.*  According to Commerce, the agency "gave Nucor an opportunity to amend, clarify, and provide additional supporting documentation in regard to the existence of a benefit," and in response "Nucor did not provide explanations or sufficient evidence to support its allegation . . . ."  *Id.* at 26.  Commerce added that "{t}he lack of detailed administrative procedure for conducting a tier three market analysis not only allows Commerce leeway in determining the existence of a countervailable subsidy, but also allows a party flexibility in making the allegation."  *Id.*  Commerce suggested that "there was a

substantial amount of information available to Nucor" and concluded that "it is reasonable to assume that Nucor would have familiarity with the electricity system in Korea." *Id.*

Commerce also continued to find that Plantec did not supply inputs to POSCO that were primarily dedicated to the downstream product. With respect to scrap, Commerce explained that "Plantec generated the scrap, but neither produced nor provided the scrap to POSCO." *Id.* at 34. With respect to steelmaking equipment and services, Commerce found that "Plantec provided certain services to POSCO," which "are not the type of input product that would be considered merely a link in the overall production chain of POSCO actual production of steel." *Id.* at 35. Commerce distinguished prior cases based on a finding that "record evidence does not demonstrate that Plantec provided steelmaking machinery or equipment; it only provided services <u>related</u> to such equipment." *Id.* The agency explained that "it is not reasonable to assume the purpose of a subsidy to Plantec is to benefit POSCO's products" because "Plantec's production is not 'dedicated almost exclusively to the production of a higher value product' (*i.e.*, POSCO's steel production) . . . ." *Id.* at 33.

Based in part on these findings, Commerce calculated a *de minimis* subsidy rate of 0.49% in the final results. Final Results, 86 Fed. Reg. at 15,185. This appeal followed.

## IV.    <u>STANDARD OF REVIEW</u>

The Court considers whether Commerce's final determinations are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and requires "more than a mere scintilla." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)). Whether a

determination is supported by substantial evidence is evaluated based on the record as a whole and must take into account any evidence that fairly detracts from the determination.  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951).  The agency may not consider only evidence supporting its conclusion, but must also consider the evidence that undermines it.  *See CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 35 CIT 1110, 1117, 791 F.Supp.2d 1327, 1334 (2011).  Nor may the agency rely upon "isolated tidbits of data" that are devoid of proper context, *USX Corp. v. United States*, 11 CIT 82, 84, 655 F.Supp. 487, 489 (1987), or "mere assumptions" in lieu of appropriate findings of fact, *Jinan Yipin Corp. v. United States*, 31 CIT 1901, 1933, 526 F.Supp.2d 1347, 1375 (2007).

An agency determination must also be "in accordance with the law."  Section 516A(b)(1)(B)(i) of the Tariff Act of 1930, *codified at* 19 U.S.C. § 1516a(b)(1)(B)(i).  This requirement assesses both the legal soundness of the determination and the adequacy of the agency's explanations.  An agency decision is not in accordance with law if it conflicts with governing legal standards, including statutes, binding court decisions, *Jilin Henghe Pharm. Co. v. United States*, 28 CIT 969, 977, 342 F.Supp.2d 1301, 1309 (2004), *vacated and remanded*, 123 F.App'x 402 (Fed. Cir. 2005) (vacated because appeal was mooted after this Court's decision), or the agency's own regulations, *Stephens v. C.f. cf Pers. Mgmt.*, 527 F.App'x 843, 844-45 (Fed. Cir. 2013).

Where a determination rests on an interpretation of the Tariff Act of 1930, that interpretation is reviewed under the two-step analysis established in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *PS Chez Sidney, LLC v. U.S. Int'l Trade Comm'n*, 684 F.3d 1374, 1380 (Fed. Cir. 2012).  Courts "must determine if there is an

ambiguity in the statute such that an agency has room to interpret.  If so, then the court must

determine whether the agency's action is a reasonable interpretation of Congress's intent."  *Id.*  If

"the intent of Congress is clear," however, "that is the end of the matter; for the court, as well as

the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467

U.S. at 842-43.  With respect to agency regulations, remand is warranted where "{the} agency's

interpretation . . . is plainly erroneous or inconsistent with the regulation." *Eli Lilly & Co. v. Bd.

of Regents of Univ. of Wash.*, 334 F.3d 1264, 1266 (Fed. Cir. 2003).

An agency determination is also unlawful if it is arbitrary and capricious.  *See Nucor

Fastener Div. v. United States*, 35 CIT 1074, 1079, 791 F.Supp.2d 1269, 1276-77 (2011);

*Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1374 (Fed. Cir. 2012).

The "touchstone" of arbitrary and capricious review is rationality.  *Hyundai Elecs. Indus. Co. v.

U.S. Int'l Trade Comm'n*, 899 F.2d 1204, 1209 (Fed. Cir. 1990).  To "pass muster under the

arbitrary and capricious standard," Commerce must "articulate a satisfactory explanation for its

action including a rational connection between the facts found and the choice made." *Motor

Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30, 43, 56 (1983)

(internal quotation omitted).

Remand is warranted where the agency "has not really taken a 'hard look' at the salient

problems, and has not genuinely engaged in reasoned decision-making." *Greater Bos. Television

Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970); *accord N.Y. State Bar Ass'n v. FTC*, 276

F.Supp.2d 110, 141 (D.D.C. 2003).  In particular, a determination should be remanded "if the

agency has relied on factors which Congress has not intended it to consider, entirely failed to

consider an important aspect of the problem, offered an explanation for its decision that runs

counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise." *Motor Vehicle M.frs. Ass'n*, 463 U.S. at 43.

A court should engage in a "thorough, probing, in-depth review," *see Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds*, *Cal.fano v. Sanders*, 430 U.S. 99 (1977); *accord Penobscot Air Servs., Ltd. v. FAA*, 164 F.3d 713, 720 (1st Cir. 1999), and "should not attempt itself to make up for {any} deficiencies," *Motor Vehicle M.frs. Ass'n*, 463 U.S. at 43. The Court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

An agency also acts arbitrarily when it treats similar cases differently with inadequate explanation. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001). "It is a general rule that an agency must either conform itself to its prior decisions or explain the reasons for its departure{.}" *Am. Silicon Techs. v. United States*, 22 CIT 776, 777, 19 F.Supp.2d 1121, 1123 (1998) (internal quotation omitted); *accord Motor Vehicle M.frs. Ass'n*, 463 U.S. at 57. This rule ensures that an agency will be "consisten{t} in {its} administration of a statute," *Citrosuco Paulista, S.A. v. United States*, 12 CIT 1196, 1209, 704 F.Supp. 1075, 1088 (1988), and "faithful and not indifferent to the rule of law," *Tung Mung Dev. Co. v. United States*, 25 CIT 752, 771 (2001) (quotation omitted). Commerce "may not disregard previous findings of a general nature that bear directly upon the current {proceeding}." *NSK Corp. v. United States*, 32 CIT 1497, 1511, 593 F.Supp.2d 1355, 1369 (2008) (quoting *Usinor v. United States*, 26 CIT 767, 792 (2002)). "{I}f there are distinguishing factors between the prior determinations in question and the instant case, the burden is on {Commerce} to reasonably address them." *DAK Ams. LLC v. United States*, 456 F.Supp.3d 1340, 1354 (Ct. Int'l Trade 2020).

## V.    ARGUMENT

### A.    Commerce's Decision Not to Initiate an Investigation of Off-Peak Electricity for LTAR Was Unlawful and Unsupported by Substantial Evidence

#### 1.    Commerce Applied an Unlawfully High Evidentiary Standard for Initiation

The statute defines a countervailable subsidy as "the case in which an authority provides a financial contribution . . . to a person and a benefit is thereby conferred," where the subsidy is "specific" to an industry or enterprise.  19 U.S.C. § 1677(5)(A)-(B).  A "financial contribution" includes an authority "providing goods or services, other than general infrastructure," *id.* § 1677(5)(D)(iii), in which case a benefit is conferred "if such goods or services are provided for {LTAR} . . . ."  *Id.* § 1677(5)(E)(iv).  The statute provides that Commerce should determine the adequacy of remuneration "in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation," including "price, quality, availability, marketability, transportation, and other conditions of purchase or sale."  *Id.* § 1677(5)(E).

Commerce's rules permit parties to a countervailing duty administrative review to submit NSAs within 20 days of the filing of the last initial questionnaire response.  19 C.F.R. § 351.301(c)(2)(iv)(B).  The statute provides that Commerce "shall" initiate an investigation when an allegation "alleges the elements necessary for the imposition of the duty," *i.e.*, financial contribution, benefit, and specificity, and the allegation is "accompanied by information reasonably available to the petitioner supporting those allegations."  19 U.S.C. § 1671a(b)(1).

This standard is not intended to place a high evidentiary burden on petitioners.  To the contrary, "Congress intended that Commerce decline to initiate investigations only where they are 'clearly frivolous' or where the petitioner has not provided information reasonably available to it."

*Torrington Co. v. United States*, 15 CIT 456, 460, 772 F.Supp. 1284, 1288 (1991).  Commerce has

likewise explained that "the 'reasonably available' standard does not set the evidentiary bar

high . . . ."  Issues and Decision Memorandum accompanying *Common Alloy Aluminum Sheet*

*from India*, 86 Fed. Reg. 13,285 (Dep't Commerce Mar. 8, 2021) at 19.  Commerce thus may not

"refuse to investigate based on conjecture that the subsidy does not exist."  *RZBC Grp.*

*Shareholding Co. v. United States*, 100 F.Supp.3d 1288, 1295 (Ct. Int'l Trade 2015).  Rather,

"most subsidy petitions are granted unless the allegations are clearly frivolous, not reasonably

supported by the facts alleged or . . . omit important facts which are reasonably available to the

petitioner."  *Id.*  "These easygoing standards {give} Commerce little choice . . . Commerce {must}

begin investigating, even if the precise contours of the subsidy {are} still unknown."  *Id.*

### a.    Nucor's Allegation Included Detailed Evidence that the Provision of Off-Peak Electricity Conferred a Benefit

In the administrative review at issue here, Nucor timely filed an NSA regarding the

provision of off-peak electricity for LTAR that met and exceeded the low evidentiary standard for

initiation.  Nucor's NSA.[2]  At the outset of the allegation, Nucor noted that the methodology

Commerce applied to address an electricity for LTAR program in the original investigation was

called into question by the CAFC.  *Id.* at 7-8.[3]  Nucor then explained that it was presenting a

modified allegation that demonstrated the prices paid by the respondents did not reflect the fair

value of the input under consideration.  *Id.* at 8.  This allegation was that "the Korean government

---

[2]    Because Commerce declined to initiate solely based on purported lack of evidence of a benefit, the following discussion focuses on that element and does not address financial contribution or specificity.

[3]    Prior to the filing of case briefs and Commerce's final determination in this review, the CAFC remanded as unlawful and unsupported by substantial evidence an effectively identical analysis of electricity for LTAR in the investigation of *Certain Cold-Rolled Steel Products from the Republic of Korea*.  *See POSCO v. United States*, 977 F.3d 1369 (Fed. Cir. 2020).

cross-subsidizes large industrial electricity consumers that are able to shift consumption to the off-peak hours of 11:00pm to 9:00am by charging prices that are . . . substantially below cost during this time of day." *Id.* Addressing the agency's purported cost recovery finding from the original investigation, Nucor alleged that "{t}o the extent that KEPCO recoups these losses (evidence discussed below suggests that, during the POR, it did not), it does so by charging prices that are above cost for consumers that use electricity primarily during the daytime." *Id.*

Nucor first showed that this time-of-day cross-subsidization was apparent on the face of KEPCO's tariff schedule because "{o}ff-peak prices for industrial users range from KRW 53.7/kWh to KRW 68.6/kWh," while on-peak prices "increase to rates as high as KRW 196.6/kWh." *Id.* at 8-9. Nucor proceeded to demonstrate that the Korean government's explanation of this pricing structure during the original investigation had no basis in fact. Specifically, the Korean government asserted that "if one consumes electricity when the load factor is low, e.g., at night, the electricity tariff decreases since electricity could be generated by those using cheap fuels, e.g., nuclear power generators," and that "if the consumer steadily consumes electricity 24 hours and 365 days a year, the fixed costs can be kept low . . . ." *Id.* at 9.

Nucor provided both qualitative and quantitative evidence demonstrating that these dynamics could not account for the drastic variation between on-peak and off-peak industrial rates. First, Nucor provided evidence that, during off-peak hours, the "load factor" is not in fact "low." Nucor quoted the president of KEPCO as saying that total electricity consumption was evenly distributed between on-peak and off-peak hours, with industrial users consuming <u>most</u> industrial electricity during off-peak hours, such that "{t}he term 'light load' is now wrong. I don't know why it was called {that} in the past{.}" *Id.* Nucor's allegation thus included evidence that on-peak/off-peak tariff variations were not "based on supply and demand," but that "off-peak prices

are set below cost because 'the government encouraged the industry's use of late-night electricity at low rates to foster the manufacturing industry.'" *Id.* at 10.

In addition to statements from KEPCO officials, Nucor provided SMP data from the KPX, which confirmed that there was little variation in demand, and thus in KEPCO's cost of supply, over the course of an average day during the POR. Specifically, Nucor's allegation demonstrated that "the average hourly {SMP} for the POR remained within a relatively narrow range of approximately KRW 15/kWh," meaning that "{e}lectricity is generated and supplied by high-cost generators throughout the day . . . ." *Id.* at 10-11. During the POR, the average SMP during off-peak hours was KRW 93.17/kWh, compared to KRW 95.11/kWh during the daytime. *See id.* at 14, Exhibit 9. Additional KPX data confirmed that neither nuclear nor bituminous coal generators, the two lowest cost sources of electricity, established the SMP at all during the POR. *Id.* at 11. Differences in the supply mix between on-peak and off-peak hours thus could not justify the more than three-fold difference in the prices for on-peak and off-peak industrial electricity.

Because the agency's cost-recovery observation in the original investigation was based on all of KEPCO's sales of electricity to all users under the relevant industrial tariff class, and not on the prices that the mandatory respondents actually paid for electricity during the POI, *see* Issues and Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 82 Fed. Reg. 16,341 (Dep't Commerce Apr. 4, 2017) at 33 ("KEPCO more than fully covered its cost for the industry tariff applicable to our respondents."), Nucor's allegation sought to explain why this analysis was flawed in light of the "prevailing market conditions" in Korea. 19 U.S.C. § 1677(5)(E). Nucor quoted Korean sources explaining that the time-of-day tariff rate discrepancy created a system in which "companies that use electricity mainly during the daytime (over cost) will provide a subsidy to companies that charge a lot of

electricity at nighttime (below cost)."  Nucor's NSA at 12, Exhibit 12.  This is because "even though the cost difference between expensive power generation facilities and cheap power generation facilities is not more than double, the light load and peak charge are up to 3.4 times wider."  *Id.*  Korean sources explained that daytime consumers are "mainly small and medium-sized enterprises," while off-peak consumers are "largely {large companies}," including the steel industry, because smaller enterprises cannot shift their operations to off-peak hours.  *Id.*

Finally, Nucor tied the Korean government's cross-subsidization of large industrial electricity users to financial losses suffered by KEPCO during the POR, explaining that the system "has become financially unsustainable . . . ."  *Id.* at 12.  Unlike during the original investigation, during the POR at issue here, "KEPCO operated at a loss of KRW 621 billion" and "suffered its worst-ever first-quarter operating loss" in early 2019.  *Id.*  Again, citing Korean sources, Nucor showed that these losses had caused KEPCO to call for revisions to the off-peak industrial electricity price structure, but that other government agencies intervened to prevent any changes because of complaints from the industries benefitting from subsidized off-peak electricity.  *Id.* at 12-13.

Nucor then established that the mandatory respondent in the review, POSCO, benefitted from the Korean government's time-of-day cross-subsidization and provided an approximate estimate of that benefit, based on multiple potential benchmarks as corroborating points of comparison.  First, Nucor provided POSCO's electricity purchases as reported during the original investigation, which showed that POSCO paid off-peak electricity prices of approximately [

].  *Id.* at 14.  As this was proprietary information, POSCO's purchases during the POR were not reasonably available to counsel for Nucor.  The same KEPCO tariff schedule was nevertheless in effect during the original investigation and the POR, so, as Nucor's allegation

**BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**

explained, the prices that POSCO paid during the original POI were representative of POR prices.
*Id.*

Nucor compared POSCO's reported purchase prices first to the average SMP during off-peak hours of the POR. Because KEPCO characterized the SMP as "the marginal price of electricity at a given hour at which the projected demand for electricity and the projected supply of electricity for such hour intersect," *id.* at 10, it was a reasonably available, if conservative, approximation of the supply/demand market value of electricity during off-peak hours. This comparison showed a benefit of approximately [               ]. *Id.* at 15. Nucor also provided KPX data showing the "sale cost by contract classification" during the POR. *Id.* at Exhibit 13. According to this information, the sale cost for industrial electricity in 2018 was KRW 106/kWh. *Id.* Using this data as a point of comparison, Nucor's allegation showed that POSCO's benefit on electricity purchases during off-peak hours was [               ]. *Id.* at 15. In a subsequent submission, Nucor also pointed out that POSCO's reported off-peak electricity prices were [

                              ]. Nucor's Req. for Reconsideration at 7-8. The evidence thus showed a benefit even assuming the lowest cost generator supplied 100% of off-peak electricity during the POR, which it did not. *Id.*

Both benefit estimates in Nucor's allegation were conservative. First, they were both cost-based estimates that did not include an amount for a reasonable return on investment. According to KEPCO's Form 20-F, the "primary purpose of the marginal price is to compensate the generation companies for fuel costs, which represents the principal component of the variable costs of generating electricity." Nucor's NSA at Exhibit 8, p. 35. The "sale cost by contract classification" represented only "the average price that KPX charged KEPCO across all hours." *Id.* at Exhibit 13; IDM at 22. The SMP, therefore, incorporated neither fixed costs nor an amount

for profit, while the sale cost by contract classification did not include an amount for profit. Second, neither estimate was based on the <u>actual</u> costs of electricity generation and supply. Rather, both the SMP and the average cost of sale were based on costs assigned to generators by a "cost evaluation committee" within the KPX. *Id.* at 15. *See also id.* at Exhibit 8, pp. 35-36. Nucor's allegation thus likely understated the benefit to POSCO from the Korean government's provision of off-peak electricity for LTAR.

In accordance with the initiation standard for subsidy allegations, therefore, Nucor's allegation both alleged that a benefit was conferred, and it provided not only "reasonably available" evidence, but substantial and detailed evidence in support of that allegation. Nucor's allegation began with KEPCO's tariff schedule, and then analyzed Korean sources including statements from KEPCO and other Korean government officials confirming the system of cross subsidization that appeared on the face of the tariff schedule. Nucor explained, with reference to both qualitative and quantitative evidence, that the discrepancy between on-peak and off-peak prices was unjustified in light of the prevailing market conditions in Korea, except as a means for KEPCO to recoup some of the losses it incurred on subsidized off-peak prices. Nucor showed that KEPCO nevertheless incurred substantial overall losses during the POR and provided evidence that these losses were in large part related to below-cost, off-peak industrial electricity prices. Finally, Nucor provided multiple pieces of evidence establishing a conservative estimate of the benefit to the mandatory respondent in the review. The allegation was not clearly frivolous, nor did counsel to Nucor fail to provide any information that was reasonably available to it.

### b.  Nucor Thoroughly Responded to Commerce's Supplemental Questions

Notwithstanding the viability of Nucor's allegation on its face, Commerce requested certain additional information and explanation. First, the agency asked Nucor to provide KEPCO's

complete Form 20-F for the POR, and Nucor did so.  Nucor's NSA SQR at 2, Exhibit 1.  Second, Commerce asked Nucor to document the steel industry's share of total Korean electricity consumption, and Nucor did so with the most recent information available to it.  *Id.* at 2-3.  Third, Commerce asked Nucor to "explain how the SMP only impacts pricing at off-peak times," noting that "there are other factors that determine the price for electricity other than the {SMP}."  *Id.* at 4.  Counsel for Nucor explained, based on KEPCO's explanation of the SMP and other factors in its Form 20-F, that the SMP did not affect KEPCO's electricity pricing at all, but "that the factors in the KPX pricing formula are relevant only to transactions between the KPX and electricity generators . . . ."  *Id.*  Counsel for Nucor explained that these factors would thus be relevant to KEPCO's cost of supply and, potentially, to an ultimate benchmark price in a final benefit calculation, but that neither the SMP nor the other factors in the KPX formula had any "direct impact on KEPCO's end-user prices, off-peak or otherwise."  *Id.*

In light of the agency's apparent misunderstanding that Nucor's allegation intended to suggest that "the SMP only impacts pricing at off-peak times," Nucor's response also clarified the significance of the SMP data in the context of the allegation.  First, the response clarified that the SMP provided evidence of a benefit because it represented "the Korean government's own estimate of a supply/demand electricity price, such that it is reasonable to believe that any price that is substantially lower than the SMP during a particular hour reflects a subsidized price."  *Id.* at 5.  Second, Nucor's response clarified that the SMP data undermined the Korean government's prior justifications for the significant discrepancies between on-peak and off-peak industrial electricity prices.  Nucor's response explained that, because the SMP is tied to demand, it should fall significantly during off-peak hours if off-peak demand, and thus KEPCO's cost of supply,

were in fact lower.  Instead, the SMP data showed that demand was relatively stable over the course of the day, a fact that was corroborated by secondary sources in Nucor's allegation.  *Id.*

Nucor's allegation thus not only alleged and provided significant evidence of a benefit, its response to Commerce's supplemental questions provided all the additional information and explanation that the agency requested.

> **c.     Commerce Required Conclusive Proof of a Benefit Based on Evidence that Was Not Reasonably Available**

Commerce's determination not to initiate an investigation of the Korean government's provision of off-peak electricity for LTAR applied an unreasonably high evidentiary burden that exceeded the initiation standard as articulated by the statute, the courts, and the agency itself. Under the proper standard, Commerce should initiate based on a subsidy allegation "unless the allegations are clearly frivolous, not reasonably supported by the facts alleged or . . . omit important facts which are reasonably available to the petitioner." *RZBC Grp.*, 100 F.Supp.3d at 1295 (internal quotations omitted).  "These easygoing standards" require "Commerce {to} begin investigating, even if the precise contours of the subsidy {are} still unknown." *Id.*

The initiation standard, in other words, does not require an allegation to answer every question that the agency may conjure in hindsight, nor to conclusively establish each element of the subsidy to a degree necessary to support a final affirmative determination.  Here, however, Commerce effectively permitted full briefing related to the allegation and declined to initiate based on unanswered questions and speculation that the evidence of a benefit contained in the allegation might not provide a "reasonable benchmark" for a final benefit calculation.  IDM at 25. The agency, in other words, treated the decision on initiation as it would a final subsidy determination, without conducting the investigation that it was required to conduct, and to which Nucor was entitled, under the statute.

First, Commerce found that "the SMP, by itself, is not an appropriate proxy benchmark price for purposes of determining whether KEPCO's off-peak electricity tariffs constitute adequate remuneration." DOC NSA Memo at 8 (emphasis added). Second, it found that "Nucor's claim that KEPCO operated at a loss during the POR, alone, {was not} a sufficient basis for reexamination of KEPCO's cost recovery as a whole." *Id.* at 9 (emphasis added). Finally, with respect to the evidence of time-of-day cross-subsidization in Nucor's allegation, Commerce determined that "Nucor has not provided sufficient information demonstrating that KEPCO's operations are outside of the prevailing market conditions of an electricity utility in Korea." *Id.* Commerce's initial NSA memorandum ignored the additional "sale cost by contract" data in Nucor's allegation, *id.* at 7-9, but the final results found it was not a "suitable benchmark" because it was not "isolated to off-peak hours," so that "this benchmark cannot make an equivalent comparison to the tariff schedules' off-peak prices . . . ." IDM at 22.

Each of these determinations suffers from independent legal and factual flaws that are discussed in greater detail below. Combined, they reflect application of an unlawfully high standard to a determination of whether to initiate an investigation. First, the question for initiation is whether an allegation alleges each element of a countervailable subsidy and provides reasonably available evidence in support of those allegations. 19 U.S.C. § 1671a(b)(1). Nucor was thus required to allege and provide reasonably available evidence that a benefit was conferred. As discussed above, it did so. The standard does not require an allegation to provide information that, standing alone, would be "an appropriate proxy benchmark price" or a "suitable benchmark" for determining the precise numerical value of the benefit conferred, as Commerce required here. DOC NSA Memo at 8; IDM at 22.

**BUSINESS PROPRIETARY INFORMATION**
**HAS BEEN DELETED**

Whether or not any individual datapoint in the allegation would have ultimately been appropriate for a benchmark price in a final determination, the allegation demonstrated that the mandatory respondent's off-peak prices were [

], and that they were [                                                                        ]. Nucor's NSA at 14-15.   In its request for reconsideration, Nucor also pointed out that the mandatory respondent's off-peak prices were [

] based on the KPX pricing formula. Nucor's Req. for Reconsideration at 7-8.   Finally, the allegation tied KEPCO's losses during the POR to these below-cost, off-peak prices to industrial users.   Nucor's NSA at 12-13.   This was more than <u>reasonably available evidence</u> of a benefit.

Nor does the initiation standard require an allegation to answer any and all questions that the agency may conjure regarding the subsidy.   Rather, Commerce must initiate "even if the precise contours of the subsidy {are} still unknown."   *RZBC Grp.*, 100 F.Supp.3d at 1295.   Here, the agency's decision not to initiate relied heavily on questions, the answers to which were well beyond the purview of "reasonably available information" in the public domain.   Commerce determined, for example, that the gulf between the off-peak SMP and [

] was not evidence of a benefit because the agency believed the SMP "does not reflect the average value of those generation costs over the course the day" or establish "whether the generation costs would be higher than the tariff rates charged to POSCO . . . ."   IDM at 22.   The agency did not initiate because "we cannot determine what those {generation costs} are from the information provided."   *Id.*   It added that "Commerce cannot reasonably assume that the same generators were providing the electricity at similar quantities at peak and off-peak hours, or that

electricity from high-cost generators accounts for a similar proportion of electricity provided at peak and off-peak hours." *Id.* With respect to the comparison to the average cost of sale data, the final results explained that the agency did not initiate because "the average price KPX provided to KEPCO {was not} isolated to off-peak hours" in the allegation. *Id.*

In Commerce's view, then, "reasonably available information" included an hour-by-hour breakdown of the actual generation costs of Korean generators, the hour-by-hour energy mix by fuel type of the generators supplying electricity through the KPX, and the hour-by-hour breakdown of the price at which KEPCO purchased electricity through the KPX. *Id.* Commerce requested none of this information in its supplemental NSA questionnaire, *see generally* Nucor's NSA SQR, nor did it explain how information at this level of detail and granularity could possibly be "reasonably available" to a petitioner in a countervailing duty proceeding. It simply made nebulous assertions that "there was a substantial amount of information available to Nucor" that was purportedly "a matter of public record," and that "it is reasonable to assume that Nucor would have familiarity with the electricity system in Korea." IDM at 26. There is no basis in law for applying this type of party-specific initiation standard.

Regardless, there was "a substantial amount of information available to Nucor," and counsel for Nucor provided it in the NSA. Having attempted to litigate other allegations related to Korean electricity before Commerce and the courts, counsel for Nucor does indeed "have familiarity with the electricity system in Korea." *Id.* But that does not mean that counsel for Nucor can access the confidential databases of KEPCO, the KPX, and Korean electricity generators to access proprietary, hour-by-hour cost and price data, if such data even exists. It is unreasonable for the agency to place the burden of producing this type of detailed, proprietary data on a petitioner making a subsidy allegation, when Commerce itself has refused to ask the party that may actually

be able to produce it to do so.  *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 82 Fed. Reg. 16,341 (Dep't Commerce Apr. 4, 2017) at 32 ("{W}ith respect to the costs of the generators . . . {Commerce} did not request these costs because the costs of electricity to KEPCO are determined by the KPX.").  In this case, Nucor provided detailed quantitative and qualitative evidence to support its allegation.  The Korean government, in contrast, simply asserted that "the off-peak price is naturally lower than the mid-peak or on-peak price," while providing no evidence whatsoever to support that assertion.  Letter from Kim & Chang to Sec'y Commerce, re: *Administrative Review of the Countervailing Duty Order on Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Comments on Nucor's New Subsidy Allegations* (Nov. 22, 2019) at 7, P.R. 85-87 ("GOK's NSA Comments").

Finally, an allegation does not fail simply because another party may adduce arguments in opposition.  Here, however, Commerce accepted without scrutiny the Korean government's assertions regarding its "time-of-use" ("TOU") system.  *See id.*; DOC NSA Memo at 9.  Based on the Korean government's unsupported response to Nucor's allegation, Commerce found that "it appears that the prevailing market condition in Korea is a TOU system, which ensures that electricity is supplied consistently throughout a 24-hour period and that costs are recovered to the extent necessary to ensure future operations."  DOC NSA Memo at 9 (emphasis added).  The agency, in other words, refused to initiate based on what "appear{ed}" could be true based solely on an opposing party's unsupported assertions, *i.e.*, "based on conjecture" that the subsidy might not exist.  *RZBC Grp.*, 100 F.Supp.3d at 1295.

The initiation standard, however, requires Commerce to make its decision based on the contents of the allegation.  If the allegation alleges each element of the subsidy and supports those

allegations with reasonably available information, then Commerce must initiate an investigation. The Korean government did not purport to argue that Nucor's allegation either (i) failed to allege that a benefit was provided, or (ii) failed to include reasonably available information in support. *See generally* GOK's NSA Comments.  The mere existence of arguments in opposition is insufficient basis to reject a subsidy allegation under the proper standard of initiation.

Even if the Court disagrees and believes that Commerce's initiation standard was lawful, the agency applied an unlawful "adequate remuneration" standard and failed to support its findings with substantial evidence.

### 2.    Commerce's NSA Determination Was Based on an Unlawful LTAR Standard

The statute provides that a government authority's provision of goods or services confers a benefit if it is for "less than adequate remuneration."  19 U.S.C. § 1677(5)(E)(iv).  Under Commerce's regulations, where, as here, neither domestic market prices nor world market prices are available for use as a benchmark, Commerce uses a tier three benchmark analysis to determine whether the government price is "consistent with market principles."  19 C.F.R. § 351.511(a)(2)(iii).  The CAFC has explained that, as with tier one and tier two benchmark analyses, a tier three analysis requires determining whether the government's price to the respondent reflects "payment of full value" for the input under consideration.  *Nucor Corp. v. United States*, 927 F.3d 1243, 1253 (Fed. Cir. 2019).  The term "market principles" in Commerce's rules "sensibly treats the three methods as all of a piece, because the two primary methods of implementing the statutory standard rely on competitive-market prices, which, as {the statute} and our cases indicate, are tied to 'fair value.'"  *Id.*

The CAFC has thus held that an analysis limited to considering whether a price is consistent with a government supplier's pricing methodology is insufficient under the adequate remuneration

standard.  *See id.* at 1252 ("{T}he absence of discrimination (even in a rate set forth in a consistent and discernible manner) logically does not itself establish that the government authority is receiving an adequately remunerative price . . . ."); *POSCO*, 977 F.3d at 1375 (rejecting the theory that "if the foreign government authority engaged in a uniform, non-discriminatory, tariffed practice of charging a price so low that the authority consistently lost large sums of money in a way no private seller could sustain, sales pursuant to that practice would not be properly viewed as for '{LTAR}'").  Rather, the analysis requires determining whether the government supplier covered the actual costs of producing and supplying the input plus a reasonable amount for profit or return on investment.  *See, e.g., id.* at 1377 ("{I}t {is} implausible that Commerce adequately investigated Korea's prevailing market condition for electricity without a thorough understanding of the costs associated with generating and acquiring that electricity."); Final Results of Redetermination Pursuant to Court Remand Order, *POSCO v. United States*, Consol. Ct. No. 16.-00225 (Ct. Int'l Trade Apr. 19, 2021), ECF No. 128 at 31 ("{I}f the tariff charged to the respondent does not cover 'cost of production' plus 'a profitable return on the investment,' then the respondent has received a countervailable benefit . . . .").

In declining to initiate based on Nucor's NSA in the review at issue here, Commerce effectively applied the analysis that the *Nucor* and *POSCO* courts held unlawful.  The methodology that the *Nucor* and *POSCO* courts rejected was one that would find adequate remuneration where a price was "consistent with the power company's standard pricing mechanism."  *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 81 Fed. Reg. 49,946 (Dep't Commerce July 29, 2016) at 46.  In the proceeding at issue here, Commerce determined that the only appropriate benchmark price would be the one that results from applying the government supplier's standard pricing mechanism.  Evidence of

cross-subsidization was rejected to the extent that it did not otherwise demonstrate that KEPCO's prices to the respondent were inconsistent with KEPCO's own operations.

Commerce determined that the SMP could not be used as a benchmark because it "is both a maximum cost not statistically reflective of an average unit cost and a variable in the formula used by KEPCO to determine market payment to electricity generators." DOC NSA Memo at 7-8; IDM at 22. According to the agency, it was therefore "not an appropriate proxy for a market price because the SMP in and of itself neither reflects a real-world average unit cost of providing electricity nor the rates that KEPCO would pay electricity generators." IDM at 22. *See also* DOC NSA Memo at 8. With respect to the evidence of KEPCO's time-of-day cross-subsidization, Commerce reasoned that "it appears that the prevailing market condition in Korea is a TOU system" and that "Nucor has not provided sufficient information demonstrating that KEPCO's operations are outside of the prevailing market conditions of an electricity utility in Korea." DOC NSA Memo at 9.

These are findings that Nucor did not demonstrate that KEPCO's prices were inconsistent with KEPCO's standard pricing mechanism, *i.e.*, with themselves. First, Commerce declined to initiate because the evidence of a benefit that Nucor provided did not necessarily reflect the price that would have resulted from running the SMP through the formula that the KPX itself uses to price the electricity that it sells to KEPCO. In other words, the agency rejected this evidence that a benefit was conferred because it was not based on prices resulting from the application of the Korean government's own standard pricing mechanism.[4] Second, Commerce rejected the evidence of cross-subsidization because this pricing structure was not "outside of" Korea's

---

[4]     As discussed above, information regarding the values of each variable in this formula was not reasonably available to counsel for Nucor, in any event.

"prevailing market conditions of an electric utility{.}"  *Id.*  Because KEPCO is the <u>only</u> electric utility in Korea, anything that KEPCO does is by definition "inside of" the "prevailing market conditions of an electric utility" in Korea.  The agency's findings were thus circular and required an impossible showing that KEPCO's operations were inconsistent with themselves.

The determination not to initiate the investigation was therefore based on findings that Nucor failed to establish that the Korean government's off-peak electricity prices were inconsistent with the manner in which the Korean government establishes off-peak electricity prices.  This effectively recreated the "standard pricing mechanism" analysis that the CAFC in *POSCO* determined was unlawful.

### 3. Commerce's Decision Not to Initiate Was Otherwise Arbitrary and Undermined by the Record

In addition to demonstrating that KEPCO's prices to POSCO were [

], Nucor's allegation included evidence that KEPCO incurred substantial financial losses during the POR, and that these losses were closely related to KEPCO's system of cross-subsidizing off-peak prices for large industrial electricity users.  Nucor's NSA at 12-13, Exhibits 7, 16, 17.  Commerce, however, found that "Nucor's claim that KEPCO operated at a loss during the POR, <u>alone</u>," was not "a sufficient basis for reexamination of KEPCO's cost recovery as a whole."  DOC NSA Memo at 8 (emphasis added).  Citing "precedent," Commerce "{did} not find one year without cost recovery sufficient to demonstrate that a government-owned entity is not recovering its costs."  IDM at 23.

This determination is arbitrary in light of Nucor's allegation.  The allegation was quite clear that it was not based on financial losses by KEPCO as a whole.  To the contrary, the allegation established that, "{t}o the extent that KEPCO has been able to cover its total costs for supplying all industrial electricity, it has done so through a system of cross-subsidization in which daytime

users pay prices that far higher than KEPCO's cost of supply." Nucor's NSA at 11. The allegation was that KEPCO was not covering cost-plus-profit on <u>off-peak sales to industrial electricity users</u>, and to POSCO in particular. KEPCO's losses during the POR simply provided additional support because the allegation included evidence tying KEPCO's poor financial performance, at least in large part, specifically to the burden of subsidizing off-peak industrial consumption. *Id.* at 12-13.

Whether KEPCO as a whole was profitable across the entirety of its global operations was simply not relevant to the allegation. Nor are such considerations relevant to determining whether a government supplies inputs for LTAR as a general matter. *See, e.g.*, Issues and Decision Memorandum accompanying *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China*, 73 Fed. Reg. 31,966 (Dep't Commerce June 5, 2008) at 65 ("{T}he profitability of Chinese {hot-rolled steel} producers is not relevant to the determination of whether {hot-rolled steel} was sold for LTAR."); Issues and Decision Memorandum accompanying *Light-Walled Rectangular Pipe and Tube from the People's Republic of China*, 73 Fed. Reg. 35,642 (Dep't Commerce June 24, 2008) at 36 ("{T}he profitability of {state-owned hot-rolled steel} producers . . . is not relevant to the determination of whether {hot-rolled steel} was sold for LTAR."); *U.S. Steel Corp. v. United States*, 33 CIT 1935, 1944 n.10 (2009) ("The overall profitability of the NMDC does not demonstrate that its prices to Essar are market-based.").

Commerce's determination here effectively ignored a critical piece of information on the record – the prices that POSCO actually paid for off-peak electricity. There was no reasonable way that Commerce could have considered the record evidence in relation to the prices that POSCO actually paid for off-peak electricity and concluded that there was <u>no evidence</u> of a benefit. As discussed above, Commerce dismissed the SMP data because it did not reflect the actual output of the KPX pricing formula, and it rejected the average cost of supply data because it reflected

**BUSINESS PROPRIETARY INFORMATION**
                                        **HAS BEEN DELETED**

KEPCO's purchases from the KPX across all hours of the day.  But the information in Nucor's allegation and responses to Commerce's questions demonstrated that KEPCO could not have covered its costs plus an amount for profit on off-peak sales to POSCO, even if the lowest cost generator supplied 100% of the off-peak electricity in Korea during the POR, at prices determined by the KPX pricing formula.  Nucor's Req. for Reconsideration at 7-8 (noting that KEPCO's off-peak prices to POSCO were approximately [

]).

The record thus included evidence that a benefit was conferred, even under specious assumptions that (i) the Korean government's pricing methodology yielded prices reflecting the fair value of electricity under competitive market conditions, *Nucor*, 927 F.3d at 1253, and (ii) KEPCO purchased all off-peak electricity at the lowest possible prices established under that methodology during the POR.  Commerce's determination not to initiate an investigation based on Nucor's allegation was arbitrary and undermined by the record.

**B.**   **Commerce's Determination that Subsidies to Plantec Are Not Attributable to POSCO Was Unlawful and Unsupported by the Record**

Commerce's rules provide that the agency "normally will attribute a subsidy to the products produced by the corporation that received the subsidy."  19 C.F.R. § 351.525(b)(6)(i).  In certain situations, however, Commerce will attribute subsidies to the combined sales of the company that received the subsidy and the mandatory respondent in an investigation or review.  One of these situations is where "there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to production of the downstream product . . . ."  *Id.* § 351.525(b)(6)(iv).  The rules provide that "cross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets."  *Id.*

§ 351.525(b)(6)(vi).  This standard is normally met "where there is a majority { } ownership interest between two corporations or through common ownership of two (or more) corporations." *Id.*

The rules do not define "input supplier" or the circumstances under which "production of the input product is primarily dedicated to production of the downstream product."  *CVD Preamble*, 63 Fed. Reg. at 65,401.  The *CVD Preamble* explains that the rule is directed at "the situation where a subsidy is provided to an input supplier whose production is dedicated almost exclusively to the production of a higher value added product – the type of input product that is merely a link in the overall production chain."  *Id.*  In these situations, agency practice presumes that "the purpose of a subsidy provided to the input producer is to benefit the production of both the input and downstream products."  *Id.*

The agency has applied the "primarily dedicated" standard broadly.  Under the agency's practice, an input may be "primarily dedicated" even where it is not a direct input into production of the downstream product, where it is an input into more than one downstream product, or where the input supplier sells the input to a variety of downstream producers.  For example, in *Lined Paper from Indonesia*, Commerce explained that the regulation "{avoids} the term 'subject merchandise'" and thus "leaves open the possibility that the 'products' benefitting from the subsidy may include subject and non-subject merchandise."  Issues and Decision Memorandum accompanying *Certain Lined Paper Products from Indonesia*, 71 Fed. Reg. 47,174 (Dep't Commerce Aug. 16, 2006) at 30.  The agency recognized "that subsidies at any step of the process, benefit every step of the process" and found that "logs harvested by the logging companies in the SMG and sold to the SMG pulp producers, are primarily dedicated to the production of pulp and, thus, to the production of the TK's downstream product, paper, which includes {Certain Lined

Paper Products}." *Id.* at 31. *See also* Issues and Decision Memorandum accompanying *Certain Seamless Carbon Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China*, 75 Fed. Reg. 57,444 (Dep't Commerce Sept. 21, 2010) at 98-99 (finding steel rounds, coke, and coking coal to be "primarily dedicated" to steel production, despite being used in numerous steel products). In *Warmwater Shrimp from Thailand*, Commerce explained that the "regulation calls for an input to be primarily dedicated to the production of the downstream product generally" and "does not require that the cross-owned producer actually use the input in the production of the downstream product." Issues and Decision Memorandum accompanying *Certain Frozen Warmwater Shrimp from Thailand*, 78 Fed. Reg. 50,379 (Dep't Commerce Aug. 19, 2013) at 28.

Critically, the agency has examined both of the inputs at issue here – steel scrap and steel mill equipment and services – and determined that both were primarily dedicated to steel production. In *Steel Concrete Reinforcing Bar from Turkey*, Commerce determined that "the production of scrap is primarily dedicated to the production of the downstream product (Icdas is a fully integrated producer that produces billet from scrap, and rebar from billet) . . . ." Preliminary Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 85 Fed. Reg. 3,030 (Dep't Commerce Jan. 17, 2020) at 10, *unchanged* in Issues and Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 85 Fed. Reg. 42,353 (Dep't Commerce July 14, 2020). *See also* Issues and Decision memorandum accompanying *Certain Oil Country Tubular Goods from the Republic of Turkey*, 79 Fed. Reg. 41,964 (Dep't Commerce July 18, 2014) at 8 ("*OCTG Turkey* IDM") ("We find that the scrap steel Tosyali Demir supplied to Toscelik Profil is primarily dedicated to production of OCTG and other downstream products . . . ."). In *Cold-Rolled Steel from Brazil*, Commerce considered steel mill equipment and services and determined that "steelmaking equipment and services are

indeed inputs into the downstream production of steel."   Issues and Decision Memorandum accompanying *Certain Cold-Rolled Steel Flat Products from Brazil*, 81 Fed. Reg. 49,940 (Dep't Commerce July 29, 2016) at 55 ("*CRS Brazil* IDM").   These inputs were "primarily dedicated" even though the cross-owned input supplier was "a heavy industries company that . . . operates in the capital goods and services areas with customers in the steel, mining, automotive, energy, petrochemical, shipbuilding and infrastructure industries . . . ."   Preliminary Decision Memorandum accompanying *Certain Cold-Rolled Steel Flat Products from Brazil*, 80 Fed. Reg. 79,569 (Dep't Commerce Dec. 22, 2015) at 18 ("*CRS Brazil* PDM").

### 1.   Commerce's Determination that Plantec Did Not Supply Steel Scrap to POSCO Was Arbitrary and Otherwise Unlawful

In the Final Results at issue here, Commerce found that Plantec was POSCO's cross-owned affiliate, but that Plantec did not supply inputs that were primarily dedicated to production of the downstream product in accordance with the requirements of the regulation.   With respect to steel scrap, Commerce found that Plantec was not an input supplier because the scrap "was 'not produced or processed by Plantec,' but 'sold to PDC, which then resold it to POSCO.'" Memorandum from Farris Montgomery to Irene Gorelik, re: *Countervailing Duty Administrative Review of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Business Proprietary Information Accompanying the Issues and Decision Memorandum for the Final Results* (Mar. 16, 2021) at 2, C.R. 302, P.R. 188 ("BPI accompanying IDM").   According to Commerce, "Plantec generated the scrap" and sold it to a second cross-owned affiliate that ultimately sold it to POSCO, "but {Plantec} neither produced nor provided the scrap to POSCO." IDM at 34.

This determination was arbitrary and directly at odds with the purpose of the underlying rule.   First, Commerce has rejected arguments that the "generation" of scrap does not constitute

production of scrap.  In *Oil Country Tubular Goods from Turkey*, the respondent argued that its scrap-generating affiliate was not actually "producing" the scrap and thus was not covered by the cross-owned input supplier regulation.  *See OCTG Turkey* IDM at 7.  Commerce disagreed and treated the affiliate as a cross-owned input supplier.  *Id.* at 8.  Here, Commerce provided no explanation for finding that Plantec was not an input supplier because it merely "generated" but did not "produce or process" the scrap supplied to POSCO.

Second, the purpose of the cross-owned input supplier regulation was to close a loophole in the countervailing duty laws that Commerce's determination here recreates.  Prior to issuing the regulation in 1997, Commerce's practice was to attribute subsidies to production of input products only by the same corporation that produced the downstream product.  *CVD Preamble*, 63 Fed. Reg. at 65,401 (explaining that, prior to issuing the regulation, Commerce "took the position that if the input product is produced by a separately incorporated company, regardless of the level of affiliation or 'cross-ownership' . . . subsidies to the input product would only be considered in the context of an upstream subsidy investigation . . . .").  In response to concerns that this practice "creates a loophole whereby vertically integrated businesses could avoid countervailing duty exposure for input subsidies simply by separately incorporating the division that makes the input," Commerce "{modified its} practice regarding separately incorporated input and downstream producers."  *Id.* at 65,401.

Interpreting the regulation to foreclose treatment of cross-owned affiliates as input suppliers simply because they supply inputs indirectly through a second cross-owned affiliate reopens the very loophole that the *CVD Preamble* identified in explaining the regulation.  In this case, Commerce interpreted the rule to allow a vertically integrated producer to avoid scrutiny

under the countervailing duty law simply by using a separately incorporated cross-owned trading company through which subsidized inputs are essentially "laundered."

Finally, Commerce's determination regarding the scrap supplied by Plantec is directly at odds with its determination regarding the steel mill equipment supplied by Plantec.  POSCO explained that it purchased steel mill equipment from Plantec and recorded these purchases in its financial statements as purchases of fixed assets.  Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: POSCO's Response to Nucor's New Subsidy Allegations* (Nov. 21, 2019) at 10, C.R. 185, P.R. 88 ("POSCO's NSA Response").  Commerce, however, found that Plantec was not an input supplier based in part on a finding that Plantec did not produce the equipment that it sold to POSCO.  BPI accompanying IDM at 3; IDM at 36.[5]  The agency may not have it both ways.  It may not find that the very same cross-owned affiliate is (i) not an input supplier of scrap because the company did not sell scrap that it produced to the downstream producer directly, and (ii) not a supplier of steel mill equipment because the company did not produce the equipment that it sold directly to the downstream producer.

Commerce's determination that Plantec did not supply scrap to POSCO was thus arbitrary and otherwise unlawful.

> **2.      Commerce's Determination that Plantec Did Not Supply Steel Mill Equipment and Services that Were Primarily Dedicated to Steel Production was Unlawful and Unsupported by the Record**

In addition to steel scrap, Plantec supplied POSCO with steelmaking equipment and services during the POR.  POSCO explained that its purchases of "fixed assets" from Plantec

---

[5]      As discussed in greater detail below, this factual finding is undermined by substantial record evidence.

during the POR "consisted mostly of [



]."   POSCO's NSA

Response at 10.  POSCO also sourced [

      ] and [                                                          ]. *Id.* at 9-11.

    Notwithstanding its prior determination in *Cold-Rolled Steel from Brazil* that "steelmaking

equipment and services are indeed inputs into the downstream production of steel," *CRS Brazil*

IDM at 55, Commerce determined here that the steelmaking equipment and related services

supplied by Plantec were not "primarily dedicated" to steel production.   Citing its final

determination in the 2017 administrative review of *Cold-Rolled Steel from Korea*, Commerce

explained that "Plantec's production is not 'dedicated almost exclusively to the production of a

higher value product' (*i.e.*, POSCO's steel production)," such that "it is not reasonable to assume

the purpose of a subsidy to Plantec is to benefit POSCO's products."   IDM at 33.   Commerce

reasoned that the "inputs that Plantec provided to POSCO are used in a typical manufacturing

process and not in a way that they are primarily and/or exclusively dedicated to the production of

the downstream product."   *Id.*   *See also* BPI accompanying IDM at 2 ("[                              ]

provided by Plantec cannot be tied specifically to the production of any steel products; POSCO

explained that the [                                                       ] are those used in a

typical manufacturing process.").

    This determination was unlawful.  As noted above, Commerce's previous applications of

the "primarily dedicated" standard have focused on the nature of the input and whether the input,

generally speaking, is primarily dedicated to production of the downstream product, broadly defined.  It has not required that the input be used only for production of the subject merchandise or be produced solely for the benefit of the downstream producer under consideration as the respondent to a proceeding.  Here, citing to the 2017 administrative review determination of *Cold-Rolled Steel from Korea*, Commerce found that steelmaking equipment and services were not primarily dedicated because "Plantec's production" was not "dedicated almost exclusively" to "POSCO's steel production."  *See* IDM at 33.

The agency, in other words, focused not on whether the input (steelmaking equipment and services) was dedicated to production of a downstream product (steel), but on whether <u>Plantec's operations</u> were "dedicated almost exclusively" to supporting <u>POSCO's steel production operations</u>.  *See* Issues and Decision Memorandum accompanying *Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 85 Fed. Reg. 38,361 (Dep't Commerce June 26, 2020) at 30 ("If the record shows the sole purpose of POSCO Plantec's production activities is to provide inputs to POSCO's steel production, one might reasonably conclude that the purpose of a subsidy to POSCO Plantec is to benefit POSCO's steel production.").  Other than its analysis of Plantec's relationship to POSCO, Counsel for Nucor is unaware of a single case in which Commerce has required "the sole purpose" of the input supplier's operations to be supplying inputs to support the downstream operations of the respondent.  As noted above, Commerce found steelmaking equipment and services to be "primarily dedicated" in *Cold-Rolled Steel from Brazil*, even though the input supplier "operate{d} in the capital goods and services areas with customers in the steel, mining, automotive, energy, petrochemical, shipbuilding and infrastructure industries in Brazil." *CRS Brazil* PDM at 18.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Commerce's attempt to distinguish *Cold-Rolled Steel from Brazil* is seriously undermined by the record and otherwise flawed. According to the agency, "in *Cold-Rolled Steel from Brazil*, Commerce found that the actual steel mill equipment used to make steel products was an input primarily dedicated to the production of the downstream product," but it "did not find services to maintain and refurbish steel production equipment to be primarily dedicated in *Cold-Rolled Steel from Brazil*." IDM at 36. "Here," according to Commerce, "record evidence does not demonstrate that Plantec provided steelmaking machinery or equipment; it only provided services <u>related</u> to such equipment." *Id.*

These findings are incorrect with respect to both *Cold-Rolled Steel from Brazil* and the record under consideration here. In *Cold-Rolled Steel from Brazil*, the cross-owned input supplier "provided parts for Uniminas' steel mills and equipment as well as services to maintain and refurbish steel production equipment at Usiminas' plants." *CRS Brazil* PDM at 18. While Commerce preliminarily determined that the equipment was primarily dedicated, *id.*, in the final determination, the agency found that "steelmaking equipment <u>and services</u> are indeed inputs into the downstream production of steel." *CRS Brazil* IDM at 55 (emphasis added).

The record here shows that Plantec likewise supplied <u>both</u> equipment <u>and</u> services related to the construction or repair of POSCO's steel mills. As noted above, POSCO explained that its "purchase of fixed assets from POSCO Plantec during the POR consisted mostly of [

]." POSCO's NSA Response at 10. In the 2018 business report that POSCO filed with the

Korean government, POSCO identified Plantec's "main function" as "{s}teel producing facilities, infrastructure construction," POSCO Aff. Cos. QR at Exhibit 3.   POSCO has explained that "Plantec <u>manufactures</u> steel making equipment and machinery and generates minimal quantities of steel scrap as a by-product of its production process."  *Id.* at Exhibit 8, p. 3 (emphasis added). The record thus shows that Plantec produced and supplied <u>actual steelmaking equipment</u>, in addition to services related to steelmaking equipment.  Even if Commerce's characterization of *Cold-Rolled Steel from Brazil* were accurate, its attempt to distinguish the outcome would fail because Plantec produced and supplied steelmaking equipment to POSCO during the POR.

Commerce's determination that Plantec was not POSCO's cross-owned input supplier pursuant to 19 C.F.R. § 351.525(b)(6)(iv) was thus unlawful and unsupported by the record.

## VI.   **CONCLUSION**

For these reasons, Nucor respectfully requests that the Court find Commerce's final results in the 2018 administrative review of *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea* to be unlawful and unsupported by the record.  Nucor respectfully requests that the Court remand Commerce's determination not to initiate and investigation of off-peak electricity for LTAR and Commerce's determination that Plantec is not POSCO's cross-owned input supplier.

**NON-CONFIDENTIAL VERSION**

Respectfully submitted,

/s/ Alan H. Price
Alan H. Price, Esq.
Christopher B. Weld, Esq.
Derick G. Holt, Esq.
Adam M. Teslik, Esq.
Theodore P. Brackemyre, Esq.

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to Nucor Corporation*

Dated: September 30, 2021

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Nucor Corporation's Memorandum in Support of Rule 56.2 Motion for Judgment upon the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 13,885 words.


_/s/ Alan H. Price_
(Signature of Attorney)

Alan H. Price
(Name of Attorney)

Nucor Corporation
(Representative Of)

September 30, 2021
(Date)