**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | |
|---|---|
| NUCOR CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) **PUBLIC VERSION** |
| | ) Court No. 21-00182 |
| Defendant, | ) |
| | ) Business Proprietary Information |
| and | ) Removed From Pages 13, 20, and 22 |
| | ) |
| POSCO, | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade,
defendant, the United States, respectfully submits this response to the motion for judgment on
the agency record filed by plaintiff Nucor Corporation (Nucor).  Nucor challenges certain aspects
of the Department of Commerce's final results in the administrative review of the countervailing
duty order covering certain carbon and alloy steel cut-to-length plate (CTL plate) from the
Republic of Korea (Korea).  For the reasons explained below, the motion should be denied
because Commerce's determination is supported by substantial evidence and is otherwise in
accordance with law.

**RULE 56.2 STATEMENT**

**I.     The Administrative Determination Under Review**

The administrative determination under review is *Certain Carbon and Alloy Steel Cut-to-*

*Length Plate From the Republic of Korea*, 86 Fed. Reg. 15,184 (Dep't of Commerce Mar. 22, 2021) (final admin. review & partial rescission), P.D. 192,[1] and accompanying Issues and Decision Memorandum (Dep't of Commerce Mar. 16, 2021) (IDM), P.D. 187 (collectively, *Final Results*).  The period of review is January 1, 2018, through December 31, 2018.

II.   **Issues Presented**

1.      Whether Commerce lawfully decided not to initiate an investigation on "Off-Peak Electricity for Less Than Adequate Remuneration (LTAR)."

2.      Whether Commerce lawfully decided that POSCO Plantec (Plantec) is not POSCO's cross-owned input supplier.

**STATEMENT OF FACTS**

On May 25, 2017, Commerce published a countervailing duty order covering Korean CTL plate.  *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 82 Fed. Reg. 24,103 (Dep't of Commerce May 25, 2017) (order).  In May 2019, Commerce issued a notice of opportunity to request an administrative review of that order for the period January 1, 2018, through December 31, 2018.  *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 84 Fed. Reg. 18,479 (Dep't of Commerce May 1, 2018).  Plaintiff and POSCO each requested an administrative review of POSCO's sales and shipments of subject merchandise during the period of review.  *See* Letter re: Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Request for Administrative Review (May 31, 2019), P.D. 2; and Letter re: Carbon and Alloy Steel Cut-To-Length Plate from the Republic of Korea, Case No. C-580-888:  Request for

---

[1]  Citations to the public documents (P.D.) and confidential documents (C.D.) refer to the record of the countervailing duty administrative review.  Citations to the motion for judgment on the agency record filed by Nucor is referenced as "Pl. Br."

Administrative Review (May 24,2019), P.D. 1.

In July 2019, Commerce initiated an administrative review of 37 producers and exporters of Korean CTL plate, and, pursuant to 19 U.S.C. § 1677f-1(e)(2)(A)(ii), subsequently limited its individual examination to POSCO. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 33,739, 33,749 (Dep't of Commerce July 15, 2019) (*Initiation Notice*), P.D. 4; and Memorandum re:  Countervailing Duty Administrative Review: Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea (Aug. 2, 2019), P.D. 14, C.D. 3.

On November 4, 2019, Nucor submitted new subsidy allegations requesting that Commerce initiate investigations on: (1) the debt workout program of Plantec (POSCO's alleged cross-owned input supplier), and (2) the Korean government's provision of off-peak electricity for LTAR.  Letter re:  Certain Carbon and Alloy Steel Cut-To-Length Plate from the Republic of Korea:  New Subsidy Allegations (Nov. 4, 2019) (New Subsidy Allegations), P.D. 76-78, C.D. 182-184.

Upon consideration, Commerce declined to initiate an investigation into either allegation. Memorandum re:  Second Administrative Review of Countervailing Duty Order on Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea (Apr. 1, 2020) (NSA Memorandum), P.D. 144.  Specifically, Commerce determined that: (1) the debt workout program was already under examination as a self-reported program, and (2) Nucor failed to provide sufficient evidence to support its allegation that a benefit is conferred on POSCO in the form of off-peak electricity for LTAR.  *See* NSA Memorandum at 2-9.  Because Nucor presented no new information warranting reconsideration, Commerce declined Nucor's request to revisit its determination.  Letter re:  Certain Carbon and Alloy Steel Cut-To-Length Plate from the

3

Republic of Korea:  Request for Reconsideration of New Subsidy Allegation (Apr. 9, 2020), P.D. 148, C.D. 254

On July 20, 2020, Commerce issued its preliminary results.  *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 85 Fed. Reg. 45,185 (Dep't of Commerce July 27, 2020) (prelim. admin. review and intent to rescind), P.D. 170, and accompanying Preliminary Decision Memorandum (PDM), P.D. 161 (collectively, *Preliminary Results*). Relevant here, Commerce preliminarily determined that Plantec was not POSCO's cross-owned input supplier, and that attributing subsidies received by Plantec to POSCO was not appropriate. PDM at 13.  Commerce made no change to this decision for its final results.  *See* IDM at 31-36. *Id.*  Because of changes unrelated to this appeal, Commerce ultimately calculated a *de minimis* net countervailable subsidy rate for POSCO.  *Final Results*, 86 Fed. Reg. at 15,185.

## ARGUMENT

## I.   Standard Of Review

This Court upholds any determination, finding, or conclusion by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Corus Staal BV v. United States,* 395 F.3d 1343, 1346 (Fed. Cir. 2005); *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)); *see also United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).  "Substantial evidence" consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Even if two inconsistent conclusions may be drawn from record evidence, it does not mean that Commerce's findings are not supported by substantial evidence.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Thus, "the court may not substitute its judgment for that of the {agency} when the choice is

between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (citation and quotation marks omitted); *see also Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (stating that it is "not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record"). Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006), and the Court will sustain Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from them. *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

When determining whether Commerce's interpretation and application of the countervailing duty statutes are in accordance with law, this Court applies the two-step analysis set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). Pursuant to *Chevron*'s framework, a court must first "consider 'whether Congress has directly spoken to the precise question at issue,' and, if not, whether the agency's interpretation of the statute is reasonable." *Hangzhou Spring Washer Co. v. United States*, 387 F. Supp. 2d 1236, 1240 (Ct. Int'l Trade 2005) (quoting *Chevron,* 467 U.S. at 842-43)).  When "the statute leaves a gap for the agency to fill," and when an agency's regulation "fills that gap, the Court owes *Chevron* deference to the agency, and will overturn its regulation only if it is unreasonable, arbitrary, or capricious." *Mittal Can., Inc. v. United States*, 461 F. Supp. 2d 1325, 1330 (Ct. Int'l Trade 2006).

II.   **Commerce's Decision Not To Initiate An Investigation On "Off-Peak Electricity For LTAR" Is Supported By Substantial Evidence And In Accordance With Law**

Nucor contends that Commerce erred in failing to initiate an investigation on the alleged provision of "Off-Peak Electricity for LTAR" program.  Pl. Br. at 24-36.  According to Nucor, Commerce was statutorily obligated to investigate the allegation because Nucor alleged the necessary elements of a countervailable subsidy (that is, financial contribution, specificity, and benefit) and supported the allegation with information "reasonably available" to it.  *Id.* Commerce's determination that Nucor's allegation did not satisfy the statutory criteria for initiation is supported by substantial evidence and in accordance with the law.

A.   **Legal Framework**

Commerce shall initiate a countervailing duty investigation if the domestic industry's petition for relief alleges the elements necessary for the imposition of countervailing duties — financial contribution, benefit, and specificity.[2]  *See* 19 U.S.C. § 1671a(b)(1); *see also* 19 U.S.C. § 1671(a).  The allegation must be accompanied by information "reasonably available" to petitioners, supporting those allegations.  19 U.S.C. § 1671a(b)(1).  Commerce must then "examine the accuracy and adequacy of the evidence provided in the petition."  19 U.S.C. § 1671a(c)(1)(A).

With regard to the standard for initiation, Commerce has clarified that "the mere provision of any documentation is not necessarily sufficient," and that it would require additional information "where *support for a particular allegation is weak* or information appears

---

[2]  A subsidy shall be deemed to exist if:  (1) there is a financial contribution by a government or a government entrusts or directs a private party to make a financial contribution to an entity, and (2) a benefit is there by conferred.  19 U.S.C. § 1677(5)(B).  To be countervailable, the subsidy must also be specific within the meaning of § 1677(5A).  Thus, when submitting a subsidy allegation, the petitioner must allege all three elements necessary for the subsidy to be countervailable.

aberrational." *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,307 (Dep't Commerce, May 19, 1997) (emphasis added).  Indeed, as this Court has explained, "it is not for Commerce to seek out evidence supporting the interested party's petition." *SolarWorld Ams., Inc. v. United States*, 125 F. Supp. 3d 1380, 1330 (Ct. Int'l Trade 2015).

### B.   Nucor's Allegation Failed To Satisfy The Statutory Criteria For Initiation

Nucor contests Commerce's finding that its new subsidy allegation with respect to the provision of off-peak electricity for LTAR did not satisfy the statutory criteria for the initiation of an investigation.  Pl. Br. at 18-31.  As we demonstrate below, Nucor failed to provide the requisite evidence to support its allegation that a benefit was conferred on POSCO in the form of off-peak electricity for LTAR.  IDM at 26.

### 1.   Legal Framework For Determining Whether Goods Or Services Are Provided For Less Than Adequate Remuneration

As explained above, Commerce determines that a countervailable subsidy exists where an authority provides a financial contribution, a benefit is thereby conferred, and the subsidy is specific.  19 U.S.C. § 1677(5).  In cases where an authority provides a financial contribution through the provision of goods or services, a benefit is conferred where those goods or services "are provided for less than adequate remuneration."  19 U.S.C. § 1677(5)(E)(iv).  The adequacy of remuneration "shall be determined in relation to prevailing market conditions for the good or service being provided" in the country which is subject to the investigation or review.  *Id.* § 1677(5)(E).  Prevailing market conditions include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale."  *Id.*  If Commerce determines that the goods or services are provided for less than adequate remuneration, then "a benefit shall normally be treated as conferred."  19 U.S.C. § 1677(5)(E)(iv).  Conversely, if the goods or services are provided for adequate remuneration, then a benefit will not be found.  *Id.*

Congress has not directed Commerce to use a specific methodology or standard to measure the adequacy of remuneration.  Therefore, Commerce has promulgated a regulation to implement the statute.  *See* 19 C.F.R. § 351.511.  The regulation sets forth three ways to measure adequacy of remuneration.  First, Commerce "will normally seek to measure the adequacy of remuneration by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question."  *Id*. § 351.511(a)(2)(i).  If market prices are not available, then Commerce measures the adequacy of remuneration "by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question."  *Id*. § 351.511(a)(2)(ii).  If a world market price also cannot be used, then Commerce will "measure the adequacy of remuneration by assessing whether the government price is consistent with market principles." *Id*. § 351.511(a)(2)(iii).

In the preamble to the final rules that included § 351.511, Commerce explained that the last approach, known as a tier three benchmark, "may be necessary for such goods or services as electricity, land leases, or water, and the circumstances of each case may vary widely."  *See Countervailing Duties*, 63 Fed. Reg. 65,348, 65,378 (Dep't of Commerce Nov. 25, 1998) (*CVD Preamble*).  When using a tier three benchmark, Commerce assesses whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination.  19 C.F.R. § 351.511(a)(2)(iii).  These tier three factors are not hierarchical in application, and Commerce may rely on one or more of these factors in any particular case.  *CVD Preamble*, 63 Fed. Reg. at 65,378.

   **2.   Commerce's Determination That No Benefit Was Conferred Under Nucor's Alleged "Off-Peak Electricity For LTAR" Program Was Reasonable**

On November 4, 2019, Nucor filed new subsidy allegations, including an allegation of the Korean government's provision of off-peak electricity for LTAR.  *See* New Subsidy Allegations.  On December 20, 2019, Commerce issued supplemental questions regarding that allegation to which Nucor timely responded.  IDM at 20.  Commerce declined to initiate an investigation into the alleged program because Nucor did not sufficiently support its allegation of a benefit.  NSA Memorandum at 7-9; IDM at 20.  Specifically, Commerce examined the allegation for evidence of both cost recovery and inconsistency with prevailing market conditions and found insufficient support in the allegation.  *Id.*

Nucor criticizes Commerce's decision, and argues its allegation included detailed evidence that the provision of off-peak electricity conferred a benefit.  Pl. Br. 19-24.  Nucor's arguments amount to nothing more than disagreement with how Commerce weighed the record evidence.  And it is not this Court's role to reweigh that evidence.  *Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F. 2d 927, 933 (Fed. Cir. 1984); *Zhejiang DunAn Hetian Metal Co.*, 652 F.3d at 1341; *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (stating that "it is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record.").

In declining to investigate Nucor's allegation, Commerce explained that the system marginal price, the basis of Nucor's price comparison (*i.e.*, benchmark), was the accepted bid price from the generation unit with the highest variable cost that received a purchase order at any given hour (*i.e.*, the highest price at which electricity was supplied at any given time) and that a

"maximum variable cost of electricity at any given hour " could not be statistically reflective of an average electricity price which the agency could use to determine the existence of a benefit. NSA Memorandum at 7 ("The {system marginal price} reflects the generation unit with the highest variable cost that receives a purchase order at any given hour, which is, in effect, the highest price at which electricity is supplied at any given time.").  Furthermore, Commerce found that the system marginal price was only one variable in the formula used by the Korea Electric Power Corporation (KEPKO) – the government-owned provider of electricity to POSCO – to determine the market price paid to electricity generators.  *Id.* at 7-8.

On that basis, Commerce concluded that the system marginal price was "not an appropriate proxy for a market price" or, without adjustment from a coefficient, reflective of a rate that KEPCO would pay electricity generators.  *Id.*  In short, Nucor's proffered benchmark "was not an appropriate proxy benchmark price for purposes of determining whether KEPCO's off-peak electricity tariffs {constituted} adequate remuneration."  NSA Memorandum at 8 ("Evidence on the record demonstrates that the {system marginal price's} primary purpose is not to function as an estimate of marginal market price, but is to determine the 'ad hoc means of adjusting the distribution of profits or losses among KEPCO's subsidiaries.'"); IDM at 21-22.

Additionally, to determine if Nucor sufficiently alleged the existence of a benefit under a tier-three analysis of market principles, Commerce examined whether the provision of off-peak electricity, in isolation within the time-of-use pricing system, was inconsistent with prevailing market conditions.  NSA Memorandum at 9; *see also* 19 U.S.C. § 1677(5) (E)(iv), and 19 C.F.R. § 351.511(a)(2)(iii).  Commerce found, however, that the record lacked sufficient information to demonstrate that KEPCO's time-of-use pricing system was inconsistent with prevailing market conditions.  NSA Memorandum at 9.  In fact, record evidence indicated that the prevailing

10

market condition in Korea *was* a time-of-use system, and that "normal market operations for

{time-of-use} electricity distribution systems such as the system used by KEPCO include

electricity tariff schedules which change depending on the electricity demand, supply

environment, sales conditions, and seasons" which ensured that electricity was supplied

consistently throughout a 24-hour period and that costs were recovered to the extent necessary to

ensure future operations.  *Id.*

In other words, Nucor failed to provide sufficient evidence that KEPCO's operations

were outside of the prevailing market conditions of an electricity utility in Korea.  *Id.*  Rather, as

the Government of Korea explained in its response to Nucor's allegation, time-of-use pricing "is

a form of demand management for efficient use of limited electricity and that such pricing

schemes, which incorporate a lower off-peak price, are used worldwide, including by power

companies in the United States."  *Id.* at 5.

Nucor contends that its allegation was, in fact, sufficient.  Pl. Br. 19-26.  Specifically,

Nucor claims its allegation not only alleged the elements necessary under the statute (including

benefit), but was supported by "substantial and detailed evidence."  *Id.* at 24.  Nucor

misapprehends the statutory requirements as well as Commerce's authority to interpret and to

execute 19 U.S.C. § 1671a(b).  *See Smith-Corona Grp., Consumer Products Div., SCM Corp. v.*

*United States*, 713 F.2d 1568, 1571 (Fed. Cir. 1983) ("{Commerce} has been entrusted with

responsibility for implementing the {countervailing duty} law{ } {and} has broad discretion in

executing the law.") (footnote omitted); *see also* 19 U.S.C. §1671a(b)(1) (The allegation must be

accompanied by information "reasonably available" to petitioners, supporting those allegations).

As Commerce explained, Nucor did not sufficiently support its allegation of a benefit.  NSA

Memorandum at 7-9; 19 U.S.C. § 1671a(b)(1).

Nucor asserts that Commerce's decision not to initiate an investigation "applied an unreasonably high evidentiary burden that exceeded the initiation standard as articulated by the statute, the courts, and the agency itself." Pl. Br. at 26. According to Nucor, the threshold for initiating and investigating an allegation is low: the allegation need only state a claim, and need not make any showing of its likelihood, beyond not being "clearly frivolous." *Id.* Thus, Nucor suggests that the threshold for initiation is satisfied with the mere assertion of a non-frivolous allegation that a countervailable subsidy exists, thereby obliging Commerce to conduct an investigation. *Id.*

Nucor is wrong. Having a low standard for initiation is not the same as having *no* standard at all. Commerce has clarified that "the mere provision of any documentation is not necessarily sufficient" to meet the threshold for initiation. *Preamble* at 27,307. Moreover, the statute directs Commerce to examine the evidentiary support for subsidy allegations. 19 U.S.C. § 1671a(c)(1)(A). Subsidy allegations are not exercises in mere "notice pleading," and the burden to allege and provide evidentiary support for the necessary elements lies with Nucor. *Id.* Commerce may not overlook these requirements during initiation.

Still, Nucor argues that Commerce had "more than reasonably available evidence of a benefit," Pl. Br. at 28, and that any missing information could have been requested from the parties. *Id.* at 29-30. Nucor asserts that Commerce was obligated to point out deficiencies and help Nucor cure them. *Id.* This argument, however, ignores that the burden is placed on Nucor, not Commerce, to build the record. Like all interested parties participating in Commerce proceedings, it is *Nucor's* burden to submit allegations and evidence to build the administrative record. *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1277 (Fed. Cir. 2012); *see also QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011 ("the burden of creating an

adequate record lies with [                    ] and not with Commerce.") (citation omitted).

Further, Nucor misconstrues the requirements of the statute.  Section 1671a(b)(1) does not state that it is Commerce's responsibility to request the requisite information from the parties to support a subsidy allegation, or to perform research on behalf of Nucor and fill in the blanks in its allegations; rather, Nucor had the burden to provide information "reasonably available" to it to satisfy a critical element of its allegation.  As a result, Nucor was required by statute to provide the information as part of its subsidy allegation, not only "upon request" by Commerce.  Moreover, Commerce issued a supplemental questionnaire to Nucor, "including a request for further supporting documentation and information regarding steel industry electricity use in the Korean market as well as further information regarding the use of the {system marginal price} in the allegation."  NSA Memo at 2, citing Commerce's Letter, "New Subsidy Allegation Supplemental Questionnaire," dated December 20, 2019 (P.D. 90).

Indeed, by implying that the necessary evidence to support its allegation could have been provided had Commerce requested it (and justified that request), Pl. Br. at 29, Nucor acknowledges that the information is missing but was "reasonably available."  *See also* IDM at 26 ("it is reasonable to assume that Nucor would have familiarity with the electricity system in Korea…Nucor provided documents from the investigation of {the provision of electricity for LTAR} in its allegation of the provision of off-peak electricity for LTAR…. {and} KEPCO is a public entity and the nature of the transactions … are a matter of public record.").  Having failed to provide necessary information to Commerce, Nucor cannot then shift the responsibility to Commerce or ask that its burden be excused.  *See, e.g., Murata Mfg. Co. v. United States*, 820 F. Supp. 603, 607 (Ct. Int'l Trade 1993) ("{P}laintiffs … cannot expect Commerce, with its limited resources, to serve as a surrogate to guarantee the correctness of submissions."); *Sugiyama Chain*

*Co. v. United States*, 797 F. Supp. 989, 994 (Ct. Int'l Trade 1992) ("{I}f the burden of compiling, checking, rechecking, and finding mistakes in the submission of Plaintiffs were placed upon Commerce, it would transform the administrative process into a futility.").

### 3. Commerce's Analysis Was In Accordance With Law

Nucor next alleges that Commerce's LTAR analysis was unlawful and conflicts with the United States Court of Appeals for the Federal Circuit's decisions in *Nucor* and *POSCO*.  Pl. Br. at 31-34 (citing *Nucor Corp. v. United States*, 927 F.3d 1243 (Fed. Cir. 2019); and *POSCO v. United States*, 977 F.3d 1369 (Fed. Cir. 2020)).  Nucor argues that Commerce limited its analysis to "whether a price {was} consistent with a government supplier's pricing methodology."  *Id.* at 31.  This, Nucor claims, was circular logic, "{requiring} an impossible showing that KEPCO's operations were inconsistent with themselves."  *Id.* at 34.

Commerce's determination is consistent with both *Nucor* and *POSCO*, and Nucor's assertions do not demonstrate otherwise.  First, the determination that KEPCO recovers its costs has already been reviewed and affirmed by the Federal Circuit, and the facts considered by Commerce, upon which the Federal Circuit affirmed Commerce's determination, remain the same here.  *Nucor*, 927 F.3d at 1254 (Commerce "found, and gave specific reasons for finding, that KEPCO's pricing met familiar standards of cost recovery.")  Moreover, Nucor ignores Commerce's thorough explanation as set forth in the NSA Memorandum and reiterated in the *Final Results.*  NSA Memorandum at 8 ("Further, in making its LTAR allegation, Nucor claims that KEPCO has not recovered its costs during the POR … Commerce has previously found that poor financial performance by a government-owned company in a particular year does not necessarily indicate that an input was being provided for LTAR."); IDM at 22-25.  And Commerce further explained that "KEPCO, while operating at a loss during the POR, reported a

14

profit in the previous four years."  NSA Memorandum at 9.

    In assessing Nucor's allegation of the off-peak electricity for LTAR program, Commerce explained that "{p}revailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale."  NSA Memorandum at 9 (quoting 19 U.S.C. § 1677(5)(E)(iv))..  Commerce examined Nucor's allegation for evidence of KEPCO's lack of cost recovery, as well as for evidence of inconsistency with prevailing market conditions. Commerce concluded that "{e}vidence on the record of this review indicates that normal market operations for {time-of-use} electricity distribution systems such as the system used by KEPCO include electricity tariff schedules which change depending on the electricity demand, supply environment, sales conditions, and seasons.  In other words, it appears that the prevailing market condition in Korea is a {time-of-use} system, which ensures that electricity is supplied consistently throughout a 24- hour period and that costs are recovered to the extent necessary to ensure future operations." NSA Memorandum at 9.  Commerce's determination was in accordance with law.

## III.   Commerce's Decision That Plantec Is Not POSCO's Cross-Owned Input Supplier Is Supported By Substantial Evidence And In Accordance With Law

    Commerce also reasonably determined that no cross-ownership existed between POSCO and Plantec.  IDM at 31-36.  Commerce based its determination on record evidence, as well as its determination in *Cold-Rolled Steel from Korea*, where it analyzed much of the same evidence and arguments made by Nucor.  *See Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 85 Fed. Reg. 38,361 (Dep't of Commerce June 26, 2020) (final admin. review), and accompanying IDM (Dep't of Commerce June 22, 2020) (*Cold-Rolled Steel from Korea*).  Nucor

disagrees with Commerce's conclusion and argues that it was unlawful and unsupported by the record evidence.  *See* Pl. Br. at 36-45.  As demonstrated below, Nucor's arguments fail.

### A.  Legal Framework For Attributing Subsidies To Cross-Owned Input Suppliers

Commerce calculates countervailing duties based upon the net countervailable subsidy provided "directly or indirectly" with respect to "the manufacture, production, or export of a class or kind of merchandise imported { } into the United States{.}"  19 U.S.C. § 1671(a).  The statute provides guidance for measuring any benefit conferred by such a subsidy, 19 U.S.C. § 1677(5)(E), but does not specify how Commerce is to calculate the *ad valorem* subsidy rate.

Commerce has filled that statutory gap with regulations governing the attribution of subsidy benefits.  Under those regulations, Commerce will "divid{e} the amount of the benefit allocated to the period of investigation or review by the sales value of products to which {Commerce} attributes the subsidy under paragraph (b)."  19 C.F.R. § 351.525(a).  Paragraph (b) identifies a number of attribution scenarios.  Relevant to this proceeding, the regulations provide:

> (6) *Corporations with cross-ownership.*
> …
> (iv) *Input suppliers*.  If there is {cross-ownership} between an input supplier and a downstream producer, and production of the input product is primarily dedicated to production of the downstream product, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations) ….

19 C.F.R. § 351.525(b)(6)(iv).  Cross-ownership is defined as one entity being able to use or direct the assets of the other entity as its own.  *Id.*  § 351.525(b)(6)(vi).

The *Preamble* to Commerce's regulations describes the situations and rationale for attributing subsidies received by cross-owned affiliates when the inputs are primarily dedicated to the production of the downstream product:

> {t}he main concern we have tried to address is the situation where
> a subsidy is provided to an input producer whose production is
> dedicated almost exclusively to the production of a higher value
> added product – the type of input product that is merely a link in
> the overall production chain.  This was the case with stumpage
> subsidies on timber that was primarily dedicated to lumber
> production and subsidies to semolina primarily dedicated to pasta
> production….
>
> {W}e believe that in situations such as these, the purpose of a
> subsidy provided to the input producer is to benefit the production
> of both the input and downstream products.  Accordingly, where
> the input and downstream production takes place in separately
> incorporated companies with cross-ownership… and the
> production of the input product is primarily dedicated to the
> production of the downstream product, {19 CFR
> 351.525(b)(6)(iv)} requires {Commerce} to attribute the subsidies
> received by the input producer to the combined sales of the input
> and downstreamproducts…
>
> Where we are dealing with input products that are not primarily
> dedicated to the downstream products, however, it is not
> reasonable to assume that the purpose of a subsidy to the input
> product is to benefit the downstream product.  For example, it
> would not be appropriate to attribute subsidies to a plastics
> company to the production of cross-owned corporations producing
> appliances and automobiles.  Where we are investigating products
> such as appliances and automobiles, we will rely on the upstream
> subsidy provision of the statute to capture any plastics benefits
> which are passed to the downstream producer.

*Countervailing Duties: Final Rule*, 63 Fed. Reg. 65,348, 65,401 (Dep't Commerce, Nov. 25,

1998) (*Preamble*).

Because the issue of cross-ownership is fact and record-specific, Commerce makes such

determinations on a case-by-case basis.

### B.  Commerce's Decision Is Supported By Substantial Evidence

Here, POSCO self-reported purchasing materials and services from Plantec.  PDM at 12

(citing Letter Re: Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of

Korea, Case No. C-580-888:  Response to the Affiliated Companies Section of the Initial

Questionnaire (Aug. 20, 2019) (POSCO AQR), P.D. 21, C.D. 4, at 11-12 and Exh. 2).

  To determine whether Plantec was POSCO's cross-owned input supplier, Commerce

examined:  (1) whether Plantec's production was primarily dedicated to the production of

downstream product, and (2) whether the inputs provided by Plantec were primarily dedicated to

the production of subject merchandise.  *Id.* at 12-13; IDM at 33.  Commerce concluded that:

(1) Plantec's business activities were not primarily dedicated to the production of higher value

product (*i.e.*, POSCO's steel production), and (2) the inputs provided by Plantec were for typical

manufacturing processes, and not the production of the downstream product.  *Id.*; *see also*

Memorandum re: Countervailing Duty Administrative Review of Certain Carbon and Alloy Steel

Cut-to-Length Plate from the Republic of Korea: Business Proprietary Information

Accompanying the IDM (Mar. 16, 2021) (BPI Memorandum), P.D. 188, C.D. 302.

  Commerce's determinations are supported by record evidence.  First, Plantec's primary

function was "construction of industrial plant{s}," not production of higher value product (*i.e.*,

POSCO's steel production).  PDM at 12 (citing POSCO AQR at 2 and Exh. 2); IDM at 33.

Second, the inputs supplied by Plantec were for maintenance, repair and operation of pre-

existing machinery; Plantec's fixed assets and services were not primarily dedicated to the steel

production process.  PDM at 13 (citing Letter Re: Certain Carbon and Alloy Steel Cut-to-Length

Plate from the Republic of Korea, Case No. C-580-888:  POSCO's Response to Nucor's New

Subsidy Allegations (Nov. 22, 2019), P.D. 88, C.D. 185, at 8-11) (POSCO NSA Response); IDM

at 33-35; *see also* BPI Memorandum at 2-3.

**1.    Plantec Did Not Supply Any Inputs To POSCO That Were Primarily Dedicated To The Production Of Subject Merchandise**

Nucor asserts that Plantec supplied POSCO with scrap – an input primarily dedicated to the production of the subject merchandise.  Pl. Br. at 39-41.  As we explain below, Plantec did not supply scrap to POSCO, and Nucor's arguments to the contrary lack merit.

First, the input at issue – scrap – was not *supplied* by Plantec.  IDM at 34.  Rather, the scrap was *generated* from Plantec's production process as a by-product and sold to POSCO Daewoo Corporation (PDC), which in turn resold it to POSCO.  *Id.*  Given that Plantec neither *produced* nor *supplied* the scrap to POSCO, Commerce reasonably determined that Plantec was not POSCO's cross-owned input supplier.  IDM at 34.

Nonetheless, Nucor argues that Commerce's decision "was arbitrary and at odds with the purpose of the underlying rule," which was designed to prevent vertically integrated businesses from avoiding countervailing duty exposure.  Pl. Br. at 39-40.  Nucor further asserts that Commerce's interpretation of the attribution rules in this case "allow{ed} a vertically integrated producer to avoid scrutiny under the countervailing duty law simply by using a separately incorporated cross-owned trading company through which subsidized inputs {were} essentially 'laundered.'"  *Id.* at 41.  Nucor's interpretation and claims are unsupported by record evidence.

Contrary to Nucor's claims, Plantec failed to satisfy the regulatory criteria of a cross-owned input supplier – it did not *supply* scrap to POSCO.  IDM at 33 (citing 19 C.F.R. § 351.525(b)(6)(iv)); *see also id.* at 33-35.  Commerce will attribute subsidies only where there is cross-ownership *and* "production of the input product is primarily dedicated to production of the downstream product."  19 C.F.R. § 351.525(b)(6)(iv ).  Commerce thus considered "whether Plantec's production was primarily dedicated to the production of downstream product, and whether the inputs provided by Plantec were inputs primarily dedicated to the production of

subject merchandise," concluding that Plantec's production- contrary to Nucor's assertions – is "not 'dedicated almost exclusively to the production of a higher value product' (*i.e.*, POSCO's steel production)."  IDM at 33.  In reaching this conclusion, Commerce concluded that "scrap that was generated from Plantec's production process as a by-product and sold to another POSCO input supplier, PDC, prior to being resold to POSCO."  IDM at 34.  Commerce further relied on record evidence indicating that "the sale of scrap {did} not appear in POSCO's financial statements as a transaction with Plantec; instead, POSCO {listed} purchases of [

                          ] in PDC's raw material ledger that {reconciled} to Note 36 of POSCO's financial statements."  *See* BPI Memorandum at 2 (citing POSCO AQR at 12 and Exh. 5).

As for the purpose of the rule, Commerce has explained that "where the input and downstream production takes place in separately incorporated companies with cross-ownership … and the production of the input product is primarily dedicated to the production of the downstream product, {19 C.F.R. § 351.525(b)(6)(iv)} requires {Commerce} to attribute the subsidies received by the input producer to the combined sales of the input and downstream products."  *Preamble*, 63 Fed. Reg. at 65,401.  Because Plantec's primary function was distinct from POSCO's steel production it is unreasonable to assume, as Nucor suggests, that the purpose of any subsidy to Plantec was to benefit POSCO's production.  Commerce's conclusion that any subsidies to Plantec should not be attributed to POSCO is supported by substantial evidence and in accordance with the *Preamble* and 19 C.F.R. § 351.525(b)(6)(iv).

Nucor's reliance on Commerce's decisions in *Rebar from Turkey* and *OCTG from Turkey* is also misplaced.  Pl. Br. at 38, 40 (citing *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 85 Fed. Reg. 42,353 (Dep't of Commerce July 14, 2020) (final admin. review & partial rescission), and accompanying IDM (Dep't of Commerce July 6, 2020) (*Rebar from Turkey*);

and *Certain Oil Country Tubular Goods from the Republic of Turkey*, 79 Fed. Reg. 41,964 (Dep't of Commerce July 18, 2014) (final determ.), and accompanying IDM (Dep't of Commerce July 10, 2014) (*OCTG from Turkey*)).  Unlike the affiliates in *Rebar from Turkey*, Plantec neither produced nor provided scrap to the mandatory respondent POSCO.  IDM at 34; *see also* POSCO AQR at 12 and Exh. 2.  Similarly, in *OCTG from Turkey*, the affiliate provided scrap to the mandatory respondent.  IDM at 34 (citing *OCTG from Turkey*, 79 Fed. Reg. at 41,964, and accompanying IDM at "Attribution of Subsidies" ("We find that the scrap steel Tosyali Demir supplied to Toscelik Profil is primarily dedicated to production of OCTG and other downstream steel products, pursuant to 19 CFR 351.525(b)(6)(iv)").  Given that POCSO purchased scrap from PDC, not Plantec, the scenarios in *Rebar from Turkey* and *OCTG from Turkey* are distinguishable.  IDM at 34.

Commerce's decision is consistent with its determination in *Cold-Rolled Steel from Korea*, in which Commerce analyzed some of the same evidence and arguments Nucor makes now.  *See Cold-Rolled Steel from Korea*, 85 Fed. Reg. at 38,361, and accompanying IDM at cmt.2.  In that matter, Commerce explained that it did not consider the two entities to be cross-owned because "the sole purpose of {} Plantec's production activities" is not "to provide inputs to POSCO's steel production" but rather "the record shows that {} Plantec's productions include construction of a refinery, a cargo terminal in Taiwan, a storage tank in an LNG terminal in Korea, and a luggage processing facility in Korea, etc."  *Cold-Rolled Steel IDM* at 32.  As Commerce explained, "{a}nalogous to the plastic as an input to an automobile example in the CVD Preamble, one cannot reasonably conclude that these inputs are dedicated almost exclusively to the production of downstream products and these are the type of input products that are merely a link in the overall production chain.  One also cannot reasonably conclude that

the purpose of a subsidy provided to {} Plantec is to benefit the production of POSCO's steel

production." *Id.* For the same reasons as Commerce articulated in *Cold Rolled Steel from*

*Korea*, Commerce's determination is supported by substantial evidence.

### 2. Plantec Did Not Supply POSCO With Steel Mill Equipment And Services That Were Primarily Dedicated To The Production Of Subject Merchandise

Finally, Nucor claims "the agency may not have it both ways," that "{i}t may not find

that the very same cross-owned affiliate is (i) not an input supplier of scrap because {it} did not

sell scrap that it produced to the downstream producer directly, and (ii) not a supplier of steel

mill equipment because {it} did not produce the equipment that it sold directly to the

downstream producer." Nucor Br. at 41. Nucor conflates Commerce's findings.

It is uncontested that Plantec provided various materials and services to POSCO. Pl. Br.

at 41-42; IDM 34. Record evidence shows that: (1) POSCO outsourced [                    ]

including [                                        ], which Plantec then [

                            ]; (2) Plantec provided [

            ] services of [                        ] that belonged to POSCO; (3) Plantec's

services included [                    ] such as [



            ]; (4) as part of its service, Plantec provided [        ] parts that it [

                        ], as well as [

      ] at the [                        ]; and (5) Plantec provided [                    ] and

not [                            ]. *Id.* As Commerce explained, however, it would be

unreasonable to conclude these materials and services were dedicated almost exclusively to the

production of downstream product (and that they were merely a link in the overall production

chain), given they were not primarily dedicated to POSCO's production of steel, nor were they even an actual part of POSCO's steel production process.  BPI Memorandum at 2-3 (citing POSCO NSA Response at 10-11).

Notwithstanding this, Nucor asserts that Commerce's decision in *Cold-Rolled Steel from Brazil* – that steelmaking equipment and services are inputs into the downstream production of steel – must control.  Pl. Br. at 42-44 (citing *Certain Cold-Rolled Steel Flat Products from Brazil*, 81 Fed. Reg. 49,940 (Dep't of Commerce July 29, 2016) (final determ.), and accompanying IDM (Dep't of Commerce July 20, 2016) (*Cold-Rolled Steel from Brazil*).  Nucor is wrong because, as Commerce explained:

> {t}he issue of whether production of the input product is primarily dedicated to production of the downstream product depends on the specific factual situations presented to Commerce, because the nature of input and downstream products and production processes vary among cases.  For this reason we disagree with Nucor that the inputs supplied in… *Cold-Rolled Steel from Brazil*… {is} precedent{} from which Commerce can make a determination on an input supplier in the instant review.

IDM at 33.  Even if Commerce's decision in *Cold-Rolled Steel from Brazil* were applicable, the facts are distinguishable.  In *Cold-Rolled Steel from Brazil*, the cross-owned input supplier provided steel mill parts, steel mill equipment, and services to maintain and refurbish steel production equipment.  IDM at 36 (citing *Cold-Rolled Steel from Brazil*, and accompanying IDM at cmt. 16).  As Commerce explained, "given… {the input supplier's} provision of equipment… it is appropriate to attribute… the subsidies received by {the input supplier}."  *Id.*  Put simply – Commerce found the *actual steel mill equipment* used to make steel products to be an input primarily dedicated to the production of the downstream product.  *Id.*  In contrast, here, Plantec did not provide steelmaking machinery or equipment, and Commerce did not find services to maintain and refurbish steel production equipment to be primarily dedicated to the production of

subject merchandise.  Pl. Br. 43; *see also Cold-Rolled Steel from Brazil*, and accompanying IDM at cmt. 16.  *Cold-Rolled Steel from Brazil* is inapplicable.  IDM at 36; *see also* POSCO NSA Response at 9-11.

Plaintiff also claims that, other than Commerce's analysis of Plantec's relationship to POSCO in *Cold-Rolled Steel from Korea*, it is unaware of a single case in which the agency has reached similar conclusions.  Pl. Br. at 43.  However, "whether production of the input product is primarily dedicated to production of the downstream product" is necessarily fact-specific "because the nature of input and downstream products and production processes vary among cases."  IDM at 33.  Because *Cold-Rolled Steel from Korea* and this proceeding involved the same companies and inputs, *i.e.*, the same facts on the records, it was appropriate for Commerce to reach the same conclusion.  As Commerce explained in that determination, it did not find POSCO and Plantec to be cross-owned because:

> Where we are dealing with input products that are not primarily dedicated to the downstream products, however, it is not reasonable to assume that the purpose of a subsidy to the input product is to benefit the downstream product. For example, it would not be appropriate to attribute subsidies to a plastics company to the production of cross-owned corporations producing appliances and automobiles. Where we are investigating products such as appliances and automobiles, we will rely on the upstream subsidy provision of the statute to capture any plastics benefits which are passed to the downstream producer.

*Cold Rolled Steel*, IDM at 31.

Here, as Commerce explained, "in deciding whether to attribute subsidies received by Plantec to POSCO, Commerce examined Plantec's business activities as reflected in information on the record of this review, followed the guidelines mentioned above, and concluded that Plantec's production is not 'dedicated almost exclusively to the production of a higher value product' (*i.e.*, POSCO's steel production) and that it is not reasonable to assume the purpose of a

subsidy to Plantec is to benefit POSCO's products."  IDM at 33.  Commerce's determination is supported by substantial evidence and in accordance with law.

## **CONCLUSION**

For these reasons, we respectfully request that this Court sustain Commerce's final results and enter judgment in favor of the United States.

<div style="margin-left: 50%;">

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

</div>

OF COUNSEL:                                                    /s/ Kelly A. Krystyniak
REZA KARAMLOO                                     KELLY A. KRYSTYNIAK
Assistant Chief Counsel                                 Trial Attorney
Office of the Chief Counsel                            Commercial Litigation Branch
  for Trade Enforcement and Compliance    U.S. Department of Justice
U.S. Department of Commerce                      Civil Division
Washington, D.C.                                            P.O. Box 480
                                                            Ben Franklin Station
                                                            Washington, D.C. 20044
                                                            Tel: (202) 307-0163
                                                            Fax: (202) 305-2062

March 7, 2022                                                 *Attorneys for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that this motion complies with the Court's type-volume limitation rules.  According to the word count calculated by the word processing system with which the brief was prepared, the public version of the brief contains a total of 7,438 words.

<u>/s/ Kelly A. Krystyniak</u>

March 7, 2022