# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

|  |  |
|---|---|
| NUCOR CORPORATION, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and, )<br><br>POSCO, )<br><br>Defendant-Intervenor. ) | **NON-CONFIDENTIAL**<br>Proprietary Information<br>Removed from Pages 2-5, 13,<br>and 22<br><br>Court No. 21-00182 |

## DEFENDANT-INTERVENOR POSCO'S BRIEF IN RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

March 21, 2022

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 408-5153

*Counsel to Defendant-Intervenor POSCO*

# TABLE OF CONTENTS

I.      RULE 56.2 STATEMENT .................................................................................2

II.     ISSUES OF LAW PRESENTED .....................................................................2

III.    STATEMENT OF FACTS ...............................................................................2

IV.     SUMMARY OF ARGUMENT ........................................................................7

V.      ARGUMENT ...................................................................................................8

       A.      Commerce's Decision Not To Initiate Upon Nucor's Allegation With Respect To The Provision Of Off-Peak Electricity For LTAR Is Supported By Substantial Evidence And Is Otherwise In Accordance With Law...........................................8

             1.      Commerce's Determination That No Benefit Was Conferred Under Nucor's Alleged "Off-Peak Electricity for LTAR" Program Was Supported By Substantial Evidence And Is In Accordance With Law......8

             2.      Commerce's Determination That No Benefit Was Conferred Under Nucor's Alleged "Off-Peak Electricity for LTAR" Program Was In Accordance With Law.............................................................................16

       B.      Commerce's Finding That Subsidies Received By POSCO Plantec Are Not Attributable to POSCO Was Supported By Substantial Evidence And Was In Accordance With Law. .........................................................................................19

VI.     CONCLUSION AND RELIEF REQUESTED ...............................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Nucor Corp. v. United States*,
　927 F.3d 1243 (Fed. Cir. 2019) ............................................................................10, 16, 17, 18

*POSCO v. United States*,
　977 F.3d 1369 (Fed. Cir. 2021) ..................................................................................16, 17, 18

*Solarworld Ams., Inc. v. United States*,
　125 F. Supp. 3d 1318 (Ct. Int'l Trade 2015) ....................................................................8, 9

*TMK IPSCO v. United States*,
　179 F. Supp.3d 1328 (Ct. Int'l Trade 2016) ........................................................................15

**Statutes**

19 U.S.C. § 1671a(b)(1) ...........................................................................................................7, 8

19 U.S.C. § 1677(5).................................................................................................................8, 18

**Regulations**

19 C.F.R. § 351.525(b)(6)(iv)....................................................................................................20

**Other Authorities**

*Certain Carbon and Alloy Steel Cut-To-Length Plate From the Republic of
　Korea: Final Affirmative Countervailing Duty Determination and Final
　Negative Critical Circumstances Determination*, 82 Fed. Reg. 16,341 (Dep't
　Commerce April 4, 2017) ....................................................................................................10

*Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea:
　Final Results and Partial Rescission of Countervailing Duty Administrative
　Review, 2018*, 86 Fed. Reg. 15,184 (Dep't Commerce Mar. 22, 2021) ..........................*passim*

*Certain Carbon and Alloy steel Cut-to-Length Plate from the Republic of Korea:
　Preliminary Results of Countervailing Duty Administrative Review, and Intent
　to Rescind Review, in Part; 2018*, 85 Fed. Reg. 45,185 (Dep't Commerce July
　27, 2020)..................................................................................................................................6

*Certain Frozen Warmwater Shrimp from Thailand: Final Negative
　Countervailing Duty Determination*, 78 Fed. Reg. 50,379 (Dep't Commerce
　Aug. 19, 2013) ......................................................................................................................22

*Certain Seamless Carbon Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination, Final Affirmative Critical Circumstances Determination*, 75 Fed. Reg. 57,444 (Dep't Commerce Sept. 21, 2010) ......................................................21, 22

*Countervailing Duties*, 63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998).............18, 19, 22

*Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination:  Certain Lined Paper Products from Indonesia*, 71 Fed. Reg. 47,174 (Dep't Commerce Aug. 16, 2006).......................................20

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | |
|---|---|
| NUCOR CORPORATION,                  ) | |
|        Plaintiff,                  ) | |
|                                    ) | |
|     v.                            ) | **NON-CONFIDENTIAL** |
|                                    ) | Proprietary Information |
| UNITED STATES,                 ) | Removed from Pages 2-5, 13, |
|                                    ) | and 22 |
|        Defendant,               ) | |
|                                    ) | Court No. 21-00182 |
|           and,                   ) | |
|                                    ) | |
| POSCO,                              ) | |
|                                    ) | |
|        Defendant-Intervenor.     ) | |

**DEFENDANT-INTERVENOR POSCO'S BRIEF IN RESPONSE TO PLAINTIFF'S**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

      Pursuant to Rule 56.2, and the February 3, 2022, Amended Scheduling Order, ECF No.

30, Defendant-Intervenor POSCO files this brief in opposition to Plaintiff Nucor Corporation's

("Nucor") September 30, 2021 Rule 56.2 Motion for Judgment on the Agency Record, ECF No.

22 ("Nucor Br."). As discussed herein, and in Defendant United States' March 7, 2022

Response Brief, ECF No. 22 ("Def't Br."), the arguments made by Nucor challenging the U.S.

Department of Commerce's ("Commerce") *Final Results* in the countervailing duty ("CVD")

administrative review of certain carbon and alloy steel cut-to-length plate ("CTL Plate" or

"subject merchandise") from the Republic of Korea, are unpersuasive and should be rejected.[1]

---

[1] Citations to the administrative record shall be to the public or confidential record document
number ("PR" or "CR").

In accordance with the Court's Template Rule 56.2 Proposed Scheduling Order, POSCO has made its best efforts not to repeat arguments made in Plaintiff Nucor or Defendant United States' briefs.

## I.   RULE 56.2 STATEMENT

The administrative determination under review is *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review, 2018*, 86 Fed. Reg. 15,184 (Dep't Commerce March 22, 2021) ("*Final Results*") (PR 192), accompanying Issues and Decision Memorandum ("IDM") (PR 187), and Business Proprietary Information Accompanying the IDM, CR 302 (PR 188).  The period of review ("POR") is January 1, 2018 through December 31, 2018.

## II.   ISSUES OF LAW

1.      Whether Commerce's decision not to initiate a new subsidy allegation ("NSA") investigation regarding the provision of off-peak electricity for less than adequate remuneration ("LTAR") is supported by substantial evidence and is otherwise in accordance with law.

2.      Whether Commerce's decision that POSCO's cross-owned affiliate, POSCO Plantec, was not a cross-owned input supplier for reporting and subsidy attribution purposes is supported by substantial evidence and otherwise in accordance with law.

## III.   STATEMENT OF FACTS

POSCO agrees with Defendant's statement of facts, but has provided additional facts below that it believes are relevant to this appeal.

On August 19, 2019, POSCO filed its response to the affiliated companies' section of Commerce's initial questionnaire ("POSCO ACR").  CR 4-15 (PR 20-23).  POSCO explained that POSCO Daewoo Corporation ("PDC") supplied it with small amounts of [

] that was purchased from companies that are cross-owned with POSCO.  *Id.* at 12.

2

NON-CONFIDENTIAL

POSCO clarified that [                    ] is not used in the production of subject merchandise and those purchases implicate no reporting obligations for the cross-owned affiliates that generated such scrap. *Id.* POSCO also explained that POSCO Plantec generated [                    ], which can be used to produce subject merchandise, but that the quantities purchased were insignificant and that the [                    ] was in fact not produced or processed by POSCO Plantec. *Id.* Accordingly, POSCO explained its understanding that POSCO Plantec had no reporting obligations because it is not an "input producer," and the [                    ] that was sold to PDC and then later resold to POSCO was not primarily dedicated to the production of the downstream product. *Id.* at 12-13. POSCO demonstrated that the other items it purchased from POSCO Plantec were categorized as raw materials, fixed assets, outsourcing fees, and others. *Id.* at Exhibits 2 and 5. POSCO further demonstrated that the purchases categorized under "raw materials" were [       ]. *Id.*

On September 10, 2019, Nucor submitted comments on POSCO's ACR. CR 16-17 (PR 33-34). Nucor requested that Commerce require a questionnaire response from POSCO Plantec, given the various purchases from POSCO Plantec in POSCO's financial statements, as well as the scrap that was discussed in POSCO's ACR. *Id.* at 3-4.

On November 4, 2019, Nucor submitted NSAs ("Nucor NSAs"). CR 182-184 (PR 76-78). Nucor alleged that POSCO Plantec received countervailable benefits via a debt restructuring program and that those benefits were attributable to POSCO because of a cross-owned input supplier relationship. Nucor also alleged that the Korean government provided electricity to industrial users for LTAR during off-peak hours (*i.e.*, between the hours of 11:00pm and 9:00am). *Id.* at 2-17. Nucor provided potential benchmarks with the respect to the

alleged provision of off-peak electricity for LTAR: (1) the system marginal price ("SMP"), and (2) the average cost-of-sale data from the Korea Power Exchange ("KPX"). *Id.* at 14-15.

On November 21, 2019, POSCO filed comments in response to Nucor's NSAs. CR 185 (PR 88). POSCO explained that POSCO Plantec provided it with [          ], which are [                                                      ] that are not part of the steel making process but are instead [

                                                                        ]. *Id.* at 8-9.

POSCO clarified that the purchases of fixed assets, outsourced processing costs, and others noted in POSCO's financial statements are not "input products" and none of them are primarily dedicated to the production of the downstream product. *Id.* at 10. POSCO's purchases of fixed assets from POSCO Plantec during the POR consisted mostly of [




                                                                        ]. *Id.* These purchases were recorded as fixed assets because they were associated with or attached to buildings, equipment, and machinery and not because they were actual machinery or equipment used to produce the downstream product. *Id.*

The outsourced processing costs and other transactions consisted of [

**NON-CONFIDENTIAL**

]. *Id.* POSCO Plantec provided POSCO with

[                                   ] limited to [

]. *Id.* at 10-11.

The Government of Korea ("GOK") filed comments in response to Nucor's NSAs on

November 22, 2019 ("GOK NSA Comments"). PR 85-87. The GOK explained that the Korean

time-of-use ("TOU") electricity pricing scheme differentiates electricity by time frame and aims

to promote efficient use of limited electricity through demand management. *Id.* at 2. Under this

pricing structure, the off-peak price is set at a price lower than the mid-peak or on-peak prices to

encourage consumers to use electricity in an efficient manner. *Id.* at 2-4. The GOK also explained

that Korea Electric Power Corporation ("KEPCO") has consistently recovered its costs under the

tariff schedule that utilizes the TOU pricing scheme. *Id.* at 6-7. Further, the GOK clarified that

the SMP is the highest marginal price at a particular time and does not reflect the actual

generation cost in total at any given time because most electricity is generated and supplied by

low-cost generators at a lower cost than the SMP. *Id.* at 8.

On April 1, 2020, Commerce published its NSA decision memorandum ("NSA Decision

Memo"). PR Doc. 144. Commerce explained that the SMP – a benchmark upon which Nucor

relied to establish the existence of a benefit – is only one variable in the formula used by KEPCO

to determine market payments to generators and therefore, it is not appropriate as a proxy for a

market price. *See id.* at 7-8. Commerce further explained that the SMP's primary purpose is not

to function as an estimate or marginal market price and that KEPCO primarily utilizes the SMP

in conjunction with the adjusted coefficient factor and the capacity price to calculate amounts

owed to electricity generators. *Id.*

Commerce also explained that while KEPCO operated at a loss during the POR, it was profitable in the preceding four years. *Id.* at 9.  Furthermore, Commerce explained  that normal market operations for the Korean TOU system includes tariff schedules under which rates change depending on electricity demand, the supply environment, sales conditions, and seasons. *Id.*

On July 27, 2020, Commerce issued the *Preliminary Results*. *Certain Carbon and Alloy steel Cut-to-Length Plate from the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review, and Intent to Rescind Review, in Part; 2018*, 85 Fed. Reg. 45,185 (Dep't Commerce July 27, 2020) and accompanying Preliminary Decision Memorandum.  PR 160-161.  In those *Preliminary Results*, Commerce explained that it determined that "the production of POSCO Plantec's input is not primarily dedicated to the production of the downstream product, including the subject merchandise." *Id.* at 12.  Commerce noted that POSCO Plantec's category of business is the "construction of industrial plant." *Id.*  Commerce also determined that the fixed assets and services that POSCO Plantec provided were not a part of steel production that is dedicated primarily to the production of a higher value-added product. *Id.*

On August 26, 2020, Nucor filed its case brief.  CR 300 (PR 174).  Nucor argued that Commerce should reconsider its decision not to initiate on the alleged off-peak electricity for LTAR program*, id.* at 3-11, and that Commerce erred in finding that POSCO Plantec was not POSCO's cross-owned input supplier. *Id.*  On September 9, 2020, POSCO filed its rebuttal brief in support of the *Preliminary Results*.  CR 301 (PR 179).

On March 22, 2021, Commerce published its *Final Results*.  PR 192.  Commerce determined that Nucor provided insufficient evidence to support the existence of a benefit for the

alleged off-peak electricity for LTAR program.  PR 187 at 20-23.  Commerce also determined that POSCO Plantec is not POSCO's input supplier "because record evidence establishes that the types of materials and services that {POSCO} Plantec supplied to POSCO during the POR are not primarily dedicated to the production of the downstream product."  *Id.* at 36.

## IV.    **SUMMARY OF ARGUMENT**

Commerce's decision not to initiate upon Nucor's NSA regarding the provision of off-peak electricity for LTAR was supported by substantial evidence and is otherwise in accordance with law.  Contrary to Nucor's argument, Commerce did not subject its NSA to an overly burdensome standard.  Instead, as per 19 U.S.C. § 1671a(b)(1), Commerce reviewed Nucor's NSA to determine if it provided reasonably available evidence to support the elements of a countervailable subsidy, including benefit.  Commerce concluded that Nucor had not met its burden because the benchmarks that it provided to demonstrate the existence of a benefit were qualitatively flawed and did not support the allegation that KEPCO was providing off-peak electricity to industrial users like POSCO for LTAR.  The benchmarks were viewed within the established framework for evaluating electricity for LTAR allegations in Korea, and Commerce gave very detailed explanations for why Nucor's benchmarks did not suffice.  Contrary to Nucor's argument, the framework used by Commerce to evaluate this allegation was also fully consistent with Federal Circuit precedent and did not rely solely upon a preferentiality or standard pricing mechanism analysis, but instead analyzed cost recovery information and the prevailing market conditions in Korea in concluding that Nucor's benefit allegation fell short.

Commerce's decision that POSCO's cross-owned affiliate, POSCO Plantec, was not a cross-owned input supplier for reporting and subsidy attribution purposes is also supported by substantial evidence and is otherwise in accordance with law.  Commerce reviewed the evidence, including the fact that POSCO Plantec's business was not primarily dedicated to the production

of input products to POSCO, and reasonably concluded that POSCO Plantec's production of inputs was not primarily dedicated to the production of the downstream product produced by POSCO.  Given that the determination regarding whether an input product is primarily dedicated to the production of the downstream product is case specific, the various decisions relied upon by Nucor are not controlling and are in any case inapposite.  Commerce's decision was thus lawful and supported by record evidence and should be affirmed.

V.    **ARGUMENT**

    A.    **Commerce's Decision Not To Initiate Upon Nucor's Allegation With Respect To The Provision Of Off-Peak Electricity For LTAR Is Supported By Substantial Evidence And Is Otherwise In Accordance With Law.**

Commerce's decision not to initiate upon Nucor's NSA regarding the provision of off-peak electricity for LTAR was supported by substantial evidence and was in accordance with law.  The decision was based upon Nucor's failure to carry its burden to provide reasonably available evidence to adequately support its allegation that a benefit was conferred.  POSCO agrees with Defendant's arguments and has limited its discussion to arguments that supplement those made by Defendant.

    1.    **Commerce's Determination That No Benefit Was Conferred Under Nucor's Alleged "Off-Peak Electricity for LTAR" Program Was Supported By Substantial Evidence And Is In Accordance With Law.**

Under 19 U.S.C. § 1671a(b)(1), the party making an NSA must carry its burden to substantiate the allegation with "reasonably available" evidence.  In a CVD case, this includes evidence sufficient to support the existence of a financial contribution that is specific and that provides a benefit.  *See* 19 U.S.C. § 1677(5).  While the statute does not require the alleger to provide conclusive evidence in support of its allegation, it does put the burden on the alleger to provide "reasonably available evidence."  19 U.S.C. § 1671a(b)(1).  This does not mean that anything will do.  As this court has stated, it is the burden of the "interested party petitioning

8

Commerce… to allege all necessary elements for the imposition of a countervailing duty… and to support each element with reasonably available evidence." *Solarworld Ams., Inc. v. United States*, 125 F. Supp. 3d 1318, 1330 (Ct. Int'l Trade 2015).  This is not an insubstantial burden, as demonstrated by *Solarworld Ams., Inc.*, in which this court applied this statutory standard and affirmed Commerce's decision not to initiate on an NSA precisely because the petitioner in that case had failed to adequately support its allegation with reasonably available evidence.  *See id.*

In reviewing Commerce's decision not to initiate, it is important to put Nucor's NSA into context.  This electricity for LTAR allegation was not novel, as Nucor had previously alleged and Commerce had investigated the provision of electricity for LTAR in Korea on numerous occasions.  *See* PR 144 at 8 (explaining that Commerce had previously examined KEPCO in other investigations and listing cases).  Commerce thus has significant experience with electricity for LTAR allegations in Korea and has developed a methodology for analyzing them that it has used repeatedly and found that no benefit exists.  *See id.*  Commerce was thus not viewing Nucor's allegation in a vacuum but was instead placing Nucor's "repackaged" allegation within this established framework to determine its sufficiency.  Nucor's NSA specifically sought to justify why Commerce should consider again the electricity for LTAR program that had repeatedly been rejected by explaining "that it was presenting a modified allegation that demonstrated the prices paid by the respondents did not reflect the fair value of the input under consideration."  Nucor Br. at 19 (citing CR 182-184 (PR 76-78) at 7-8).  Commerce thus viewed Nucor's modified allegation through the lens of its prior experience to see whether it was sufficient to support a new investigation into off-peak electricity for LTAR under its established market principles framework for Korea.

Part of that context was the fact that Commerce's established methodology focused on whether the electricity provider, KEPCO, applied its standard pricing mechanism and whether KEPCO had recovered its costs for the industrial category that included steel companies such as POSCO. *See, e.g., Nucor Corp. v. United States*, 927 F.3d 1243, 1247 (Fed. Cir. 2019) (summarizing Commerce's electricity for LTAR analysis in the corrosion-resistant steel CVD investigation). This was part of the unique framework applied to electricity for LTAR allegations in Korea, which, like most countries, provides electricity via a regulated monopoly. Normal market determined prices are not available as benchmarks. Commerce had previously and repeatedly found that KEPCO applied its standard pricing mechanism and recovered costs for the industrial category and thus no benefit existed under this tier three market principles framework. *See, e.g., Certain Carbon and Alloy Steel Cut-To-Length Plate From the Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 82 Fed. Reg. 16,341 (Dep't Commerce April 4, 2017), and accompanying Decision Memorandum at 19-20 & n. 107, 29 (finding the electricity for LTAR program not countervailable and citing cases). Having lost under that framework, Nucor gerrymandered a "new" allegation that sought to isolate the prices charged only during "off-peak" hours, *i.e.*, between 11pm and 9am and use them as a benchmark. CR 182-184 (PR 76-78) at 8. That is, instead of focusing on overall cost recovery and the standard pricing mechanism, Nucor sought to support its allegation with actual prices for a specific time period as a comparison to the prices POSCO paid during that off-peak time period.

In addition, this new allegation ignored the fact that the prevailing market condition in Korea was a TOU system that differentiates electricity charges by season or timeframe in order to promote the efficient use of limited electricity supply. PR 85-87 at 2. Under that system,

electricity charges during off-peak periods are set lower to encourage off-peak usage and limit disruptions or cessation of supply during peak periods when demand is highest. *See id.* This system also promotes efficiencies because restarting power generation facilities after switching them off is costly, and it is more efficient and profitable for power generation companies to continue production electricity 24-hours per day. *See id.* at 8-9. Nucor's NSA ignores the TOU system and seeks to cherry pick a single time period during the 24-hour period to support the alleged existence of a benefit without regard to overall cost recovery.

In this context, Nucor's argument that the evidentiary burden for an NSA is low and that it "met and exceeded" that standard by submitting evidence to support the existence of a benefit is unpersuasive. *See* Nucor Br. at 18-19. Specifically, Nucor recounts the information it provided in support of its allegation, including the proposed "benchmarks" it offered to measure whether off-peak electricity was being provided for LTAR. *See id.* at 19-24. This included the SMP data from the KPX and the "annual average cost of sale" KPX pricing data that is the average price that KPX charged KEPCO across all hours. *See id.* However, the key point that Nucor fails to grasp is that it is not the *quantity* of evidence provided that was the problem with its allegation but rather the *quality* and relevance of that evidence to the existence of a benefit from electricity for LTAR. This is where Commerce found the allegation wanting.

More specifically, Commerce's decision not to initiate on Nucor's allegation was based on the fact that neither of Nucor's proffered benchmarks "provide a 'benefit calculation on a comparison of the price the respondent firm paid to the government for the good in question to a market determined benchmark price for the good that would have been available in the country of provision,' because neither of the offered benchmarks reflect the average price of off-peak electricity for LTAR." PR 187 at 21-22. With respect to Nucor's primary benchmark, the SMP,

11

Commerce found that it was not appropriate because it reflects "'the generation unit with the highest variable cost that receives a purchase order at any given hour, which is, in effect, the highest price at which electricity is supplied at any given time.'" PR 187 at 22 (citing PR 144 at 7). Furthermore, Commerce found that "the SMP is only one variable in the formula used by KEPCO to determine market payment to generators…." PR 144 at 7. Therefore, "the SMP is not an appropriate proxy for a market price because the SMP in and of itself neither reflects a real-world average unit cost of providing electricity nor the rates that KEPCO would pay electricity generators." PR 187 at 22. Commerce further explained that "{t}he SMP, which represents only a maximum marginal cost at any given hour, does not reflect the average value of those generation costs over the course of the day, or even during off-peak electricity consumption, and whether the generation costs would be higher than the tariff rates charged to POSCO, thus providing a benefit." *Id.* Commerce thus rejected the SMP because it was not a relevant benchmark for supporting Nucor's allegation that off-peak electricity was being provided for LTAR.

As for Nucor's alternative benchmark, *i.e.*, the "annual average cost of sale," Commerce explained that it was not relevant because while it "could be a suitable benchmark for comparing the tariff rates POSCO paid for electricity across all hours, the allegation at hand is the provision of off-peak electricity." *Id.* More specifically, Commerce explained that this annual average cost-of-sale data could not be isolated to off-peak hours, and thus "this benchmark cannot make an equivalent comparison to the tariff schedules' off-peak prices POSCO paid because it does not account for the demonstrated differences between TOU tariff rates during peak, mid-peak, and off-peak usage." *Id.* In other words, there was nothing wrong *per se* with the average KPX

NON-CONFIDENTIAL

pricing data, but rather it was simply not relevant to measuring whether off-peak electricity was provided for LTAR.

Nucor does not directly address these reasons why Commerce found its proposed benchmark insufficient to support its allegation, but instead simply restates its same claims that either the SMP or the "annual average cost of sale" would be a suitable benchmark to demonstrate the existence of a benefit and that Commerce applied "an unlawfully high standard to a determination of whether to initiate an investigation." Nucor Br. at 27-31.  For example, Nucor reiterates that "the allegation demonstrated that mandatory respondent's off-peak prices were [

] and that they were [

]. Nucor Br. at 28 (citing CR 182-184 (PR 76-78) at 14-15).  But this is just restating the facts made in support of its NSA and does not respond to the reason *why* Commerce found the evidence used by Nucor was not sufficient.

In obsessively restating the evidence it relied upon to support its allegation, Nucor fails to address a factual error in its allegation, which Commerce pointed out in its *Final Results*. Commerce had rejected the SMP as a proxy for a market price because "the SMP in and of itself neither reflects a real-world average unit cost of providing electricity nor the rates at which KEPCO would pay electricity generators." PR 187 at 22.  Nucor attempted to address this deficiency by arguing that there were no significant fluctuations in electricity consumption based on time of day and a similar maximum price would result in similar total costs paid to electricity generators at all hours." *Id.* (citing CR 300 (PR 174) at 5).  In response, Commerce explained that "while Nucor claims that the total quantities of electricity used in Korea during the day and at night are similar, the hourly SMP rates found in the Electric Power Statistics Information

13

System's database for the dates of the POR indicate that the SMPs for off-peak hours were lower than the daily averages of the SMPs." PR 187 at 22. Nucor is silent as to this problem with its SMP benchmark. Instead, Nucor just ignores it and continues to complain that Commerce applied too high of an evidentiary burden. *See, e.g.,* Nucor Br. at 27.

Commerce also examined the only aspect of Nucor's allegation that even focused on cost recovery, which is the established basis for Commerce to determine if electricity is being provided for LTAR in Korea. Specifically, Nucor attempted to tie KEPCO's losses during the POR to the alleged below-cost, off-peak prices to industrial users. *See* CR 182-184 (PR 76-78) at 12-13. Commerce considered this aspect of the allegation, but did "not find that one year without cost recovery sufficient to demonstrate that a government-owned entity is not recovering its costs." PR 187 at 23. Commerce supported this practice with cases where it had established that it looks at cost recovery over a period of time, and that one year of losses after several previous years of profits was insufficient to support initiation into this program. *Id.* (citing PR 144 at 8). Nucor characterizes this decision as "arbitrary in light of Nucor's allegation." Nucor Br. at 34. This argument is unavailing.

Commerce reasonably found that within the prevailing market conditions in Korea, losses by KEPCO in one year are not indicative of the provision of electricity for LTAR within the context of the TOU electricity distribution system in Korea. Specifically, Commerce found that "{e}vidence on the record of this review indicates that normal market operations for TOU electricity distribution systems such as the system used by KEPCO include electricity tariff schedules which change depending on the electricity demand, supply environment, sales conditions, and seasons. In other words, it appears that the prevailing market condition in Korea is a TOU system, which ensures that electricity is supplied consistently throughout a 24-hour

14

period and that costs are recovered to the extent necessary to ensure future operations." PR 144 at 9. Plainly stated, under the prevailing market conditions in Korea of a TOU system, evidence of losses in one year are not indicative of KEPCO selling below cost and cannot be linked to any particular time period (*e.g.,* off-peak). Commerce thus correctly considered and found the proffered evidence of KEPCO's loss in one year insufficient to support Nucor's allegation.

This court's decision in *TMK IPSCO v. United States*, 179 F. Supp.3d 1328 (Ct. Int'l Trade 2016) supports Commerce's decision not to initiate. In that case, Commerce declined to initiate several NSAs and this court found those decisions to be supported by substantial evidence and in accordance with law. For example, the court affirmed Commerce's decision not to initiate on an allegation regarding export restraints because the allegation did not sufficiently support the existence of a causal nexus between the alleged export restraints and the benefit as required by Commerce's practice. *TMK IPSCO,* 179 F.3d at 1340. As Nucor argues here, the plaintiff in that case argued that "Commerce's refusal to investigate… {was} based on a heightened initiation standard" and was thus "contrary to law and, alternatively, unsupported by substantial evidence." *Id.* at 1338. The court, however, found it lawful that Commerce subjected the allegation to scrutiny to determine if the necessary elements under Commerce's practice had been met. *Id.* at 1341.

Here, as in *TMK IPSCO*, Commerce scrutinized Nucor's NSA allegation under its existing practice and in light of the history on this program and found the allegation failed to provide sufficient evidence of a benefit. This was not done applying an unlawful "heightened standard" but instead was Commerce doing its job to make sure that it only initiated upon allegations that had sufficient evidentiary support. The fact that Nucor disagrees and can point to a large quantity of evidence that it submitted does not support its argument that Commerce

should have initiated.  Instead, the quality of the evidence came up short under Commerce's established market principles framework for analyzing electricity for LTAR allegations in Korea.

In sum, whether Nucor's information was "substantial and detailed," Nucor Br. at 24, as it claims, is not the issue here because the benchmarks it submitted to support its allegation needed to be qualitatively sufficient to support the existence of a benefit.  They were not. Likewise, it is irrelevant if Nucor's benefit estimates were "conservative."  Nucor Br. at 23.  The issue remains that Nucor failed to provide a benchmark that "reflect{ed} the average price of off-peak electricity for LTAR," and thus Commerce did not err in declining to initiate on Nucor's alleged off-peak electricity for LTAR program.

> **2.      Commerce's Determination That No Benefit Was Conferred Under Nucor's Alleged "Off-Peak Electricity for LTAR" Program Was In Accordance With Law.**

Nucor also argues that Commerce's decision is unlawful because it allegedly applied an analysis that the Federal Circuit held to be unlawful in *Nucor* and *POSCO*.  Nucor Br. at 32 (citing *Nucor Corp,* 927 F.3d at 1253; *POSCO v. United States*, 977 F.3d 1369 (Fed. Cir. 2021)). More specifically, Nucor argues that in those cases the Federal Circuit "held that an analysis limited to considering whether a price is consistent with a government supplier's pricing methodology is insufficient under the adequate remuneration standard" and that Commerce ran afoul of these holdings in rejecting its NSA because "Commerce determined that the only appropriate benchmark price would be the one that results from applying the government supplier's standard pricing mechanism."  Nucor Br. at 32.  This argument should be rejected as it mischaracterizes the basis for Commerce rejecting Nucor's NSA and also misstates the holdings of these cases.

The holdings of *Nucor* and *POSCO* are narrow in scope and stand for the limited proposition that in measuring the adequacy of remuneration under a tier-three market principles

16

analysis, Commerce cannot limit its examination to whether the government gave preferential treatment to certain users, *Nucor*, 927 F.3d at 1254; *POSCO*, 977 F.3d at 1376-78, and that in looking at cost recovery, Commerce must at least consider generation costs as part of its analysis. *See POSCO*, 977 F.3d at 1376-78. These cases did not reject Commerce's consideration of whether the price was set consistent with the government's standard pricing mechanism or, for that matter, even the use of the preferentiality standard so long as it was combined with other factors such as cost recovery that includes consideration of generation costs. *E.g., Nucor*, 927 F.3d at 1254-55. To the contrary, the Federal Circuit confirmed that Commerce has broad discretion in choosing a methodology to assess whether a price is consistent with market principles:

> In our analysis rejecting the government's broad position, we have decided that nonpreferentiality of the sort the government stresses is insufficient to meet the statutory standard of adequate remuneration, which, along with its implementing regulation, requires ensuring that the government authority's price is not too low considering what the authority is selling. That ruling is significant but limited in constraining Commerce. We readily recognize that such a standard, while excluding the government's broad preferentiality position, leaves a large range of potential implementation choices. One need only look outside the present statutory context to the familiar rate-regulation context to see the great variety of methodologies used over time to ensure that rates of a monopoly provider are not too low, some directly focused on value (such as "fair value"), some on various measures of "cost" (which may reflect value). *Verizon*, 535 U.S. at 484-86; *see generally id.* at 477-89. Commerce has considerable prima facie leeway to make a reasonable choice within the permissible range, and properly justify its choice, based on the language and policies of the countervailing duty statute as well as practicality and other relevant considerations.

*Nucor*, 927 F.3d at 1254-55 (emphasis added).

In declining to initiate upon Nucor's NSA, Commerce did not run afoul of the narrow holdings in *Nucor* and *POSCO* but rather applied a robust analysis that focused upon deficiencies in Nucor's proposed benchmarks. For example, Commerce found that Nucor's reliance on KEPCO losses in the POR was not sufficient, citing the fact that KEPCO had reported a profit in

the previous four years, and that KEPCO's TOU system "ensures that… costs are recovered to the extent necessary to ensure future operations." PR 144 at 9. This focus on cost recovery is entirely consistent with the Federal Circuit's findings in *Nucor*, which explicitly indicated that Commerce can determine the adequacy of remuneration by examining cost recovery and affirms that Commerce has "a large range of potential implementation choices" in assessing the adequacy of remuneration. *Nucor*, 927 F.3d at 1254-55. Nor does Commerce's consideration of the prevailing market conditions in Korea conflict with these Federal Circuit decisions. To the contrary, the statute requires it. *See* 19 U.S.C. § 1677(5)(E)(iv) (the adequacy or remuneration "shall be determined in relation to prevailing market conditions for the good or service being provided" in the country under investigation or review).

Nucor further claims that "Commerce determined that the only appropriate benchmark price would be the one that results from applying the government supplier's standard pricing mechanism," thereby "effectively recreat{ing} the 'standard pricing mechanism analysis that the CAFC in *POSCO* determined was unlawful." Nucor Br. at 32, 34. However, nowhere did Commerce determine that the only appropriate benchmark would be the one that results from applying KEPCO's standard pricing mechanism. Commerce simply reviewed the benchmark information provided by Nucor and found that it did not reasonably support the allegation that KEPCO was providing off-peak electricity for LTAR. Moreover, consideration of the government's price setting philosophy or price setting mechanism is perfectly lawful and in accord with the *CVD Preamble*. *See Countervailing Duties*, 63 Fed. Reg. 65,348, 65,378 (Dep't Commerce Nov. 25, 1998) ("*CVD Preamble*") (explaining that in tier-three market principles analyses, Commerce can consider government's price setting philosophy, costs (including rates of return sufficient to ensure future operations, or possible price discrimination)). The flaw

identified by the Federal Circuit was that Commerce could not lawfully only rely on preferentiality as the basis for its market principles analysis. That is not the case here.

**B.**      **Commerce's Finding That Subsidies Received By POSCO Plantec Are Not Attributable to POSCO Was Supported By Substantial Evidence And Was In Accordance With Law.**

Defendant comprehensively rebuts Nucor's arguments that Commerce erred in finding that POSCO Plantec was not a cross-owned reporting entity because it did not supply POSCO with input products that were primarily dedicated to the production of the downstream product. *See* Def't Br. at 19-25. POSCO agrees with Defendant's arguments and has thus limited its argument to discussing several cases that Nucor relies upon in an attempt to support its interpretation of the input supplier practice that have not already been distinguished by Defendant. As discussed, these additional cases do not undermine Commerce's conclusion that POSCO Plantec was not a cross-owned input supplier and are factually inapposite.

Although Nucor acknowledges that Commerce's "rules do not define 'input supplier' or the circumstances under which 'production of the input product is primarily dedicated to production of the downstream product,'" Nucor Br. at 37 (citing *CVD Preamble*, 63 Fed. Reg. at 65,401), it nonetheless argues that Commerce's determination that POSCO Plantec is not a cross-owned input supplier is arbitrary and unlawful. As support, Nucor discusses Commerce decisions that it claims support its position that POSCO Plantec should be considered to be a cross-owned input supplier. However, as Commerce explained in the *Final Results*: "The issue of whether production of the input product is primarily dedicated to the production of the downstream product depends on the specific factual situations presented to Commerce because the nature of the input and downstream products and production processes vary among cases." PR 187 at 33. Nevertheless, the cases relied upon by Nucor are plainly not on point.

19

Nucor first cites to *Lined Paper from Indonesia* for the proposition that Commerce's input supplier regulation "'leaves open the possibility that the 'products' benefitting from the subsidy may include subject and non-subject merchandise.'" Nucor Br. at 37 (citing *Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination: Certain Lined Paper Products from Indonesia*, 71 Fed. Reg. 47,174 (Dep't Commerce Aug. 16, 2006) and accompanying Decision Memorandum at 30). This statement was made to explain that 19 C.F.R. § 351.525(b)(6)(iv)'s reference to "downstream product" and not "subject merchandise" meant that the input product at issue could be used in the production of subject and non-subject merchandise. It is not clear how this proposition supports Nucor's argument. The issue in the instant appeal is not whether the inputs POSCO Plantec provided to POSCO relate to subject and non-subject merchandise. Rather, the issue is whether POSCO Plantec is an input supplier to POSCO, whether POSCO Plantec's production was primarily dedicated to the production of the downstream product, and whether the inputs provided by POSCO Plantec were inputs primarily dedicated to the production of the downstream product. *See* PR 187 at 33.

In the case of scrap, for example, Commerce found that POSCO Plantec did not produce the scrap nor did POSCO Plantec provide the scrap to POSCO. *Id.* at 34. Instead, the scrap was a by-product generated by POSCO Plantec that was supplied to POSCO by PDC. *Id.* POSCO Plantec was thus not an input supplier to POSCO. Commerce also concluded that POSCO Plantec's primary function is the "'construction of industrial plant{s}'" and thus it is not reasonable to assume that POSCO Plantec's production was primarily dedicated to the production of the downstream product produced by POSCO. *Id.* at 33. Furthermore, Commerce correctly determined that "it would be unreasonable to conclude that the inputs at issue are

20

dedicated almost exclusively to the production of the downstream products and that they are merely a link in the overall production chain." *Id.* at 34. None of Commerce's analysis in the *Final Results* hinges on whether the input products benefitting from subsidies to POSCO Plantec may be used to produce subject and non-subject merchandise. *Certain Lined Paper Products from Indonesia* is thus inapposite.

Nucor's reliance on *Seamless Pipe from China* is similarly misplaced. In that case, Commerce found that coke and coking coal were "primarily dedicated" to steel production, despite being used in numerous steel products. Nucor Br. at 38 (citing *Certain Seamless Carbon Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination, Final Affirmative Critical Circumstances Determination*, 75 Fed. Reg. 57,444 (Dep't Commerce Sept. 21, 2010) and accompanying Decision Memorandum at 98-99). Commerce reached this conclusion because the coke and coking coal were used to make steel rounds, and the production of those steel rounds was primarily dedicated to the production of subject merchandise, thereby linking all inputs to the production of the downstream product. PR 187 at 35. In contrast, here, POSCO Plantec did not even supply by-product scrap to POSCO. Rather, POSCO Plantec generated scrap that was provided to PDC, who later provided small amounts of scrap to POSCO. *Id.* at 34. The other products and services that POSCO Plantec provided to POSCO were tangentially "related" to steelmaking equipment or machinery but were not merely one step that led to another step of production of the downstream product, as was the case in *Seamless Pipe from China*. *See id.* at 34-36. Commerce thus correctly concluded that it "cannot reasonably conclude that the materials provided by Plantec, including by-product scrap, are inputs dedicated almost

exclusively to the production of the downstream steel products and that these are the type of input products that are merely a link in the overall steel production chain." *Id.* at 35.

*Warmwater Shrimp from Thailand* is also not on point. According to Nucor, this case supports that "an input… be primarily dedicated to the production of the downstream product generally" and "does not require that the cross-owned producer actually used the input in the production of the downstream product." Nucor Br. at 38 (citing *Certain Frozen Warmwater Shrimp from Thailand: Final Negative Countervailing Duty Determination*, 78 Fed. Reg. 50,379 (Dep't Commerce Aug. 19, 2013) and accompanying Decision Memorandum at 28). Here, the question is not whether POSCO used the input in the production of the downstream product but rather whether the inputs were "dedicated almost exclusively to the production of a higher value added product – the type of input product that is merely a link in the overall production chain." *CVD Preamble*, 63 Fed. Reg. at 65,401. Commerce correctly found that the POSCO Plantec inputs were not because the scrap was not produced by POSCO Plantec and was merely a by-product sold to POSCO by another affiliate, PDC.

Similarly, Commerce correctly determined that the other products and services provided by POSCO Plantec "are not an actual part of POSCO's steel production process," as these items consisted of "[          ] parts that it [

] as well as [                                  ] at the [                          ]." CR 302 (PR 188) at 3. As Commerce stated, POSCO Plantec reported "providing [                          ] and not [                          ]." *Id.*

Finally, Nucor argues that Commerce has "{i}nterpret{ed} the regulation to foreclose treatment of cross-owned affiliates as input suppliers simply because they supply inputs indirectly through a second cross-owned affiliate." Nucor Br. at 40. This misrepresents

Commerce's determination.  Commerce stated that it "examined Plantec's business activities as reflected in information on the record of this review… and concluded that Plantec's production is not 'dedicated almost exclusively to the production of a higher value product' (*i.e.*, POSCO's steel production) and that it is not reasonable to assume the purpose of a subsidy to Plantec is to benefit POSCO's products."  PR 187 at 33.  Thus, Commerce determined that "the record shows that Plantec's primary function is the 'construction of industrial plant{s}.'"  *Id.*  Commerce did not rely solely on the fact that POSCO Plantec generated scrap and sold it to PDC, which then provided it to POSCO, as the basis for finding POSCO Plantec was not a cross-owned input supplier.

## VI.    **CONCLUSION**

Based on the foregoing, POSCO respectfully requests that this Court reject Nucor's arguments and affirm the *Final Results*.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 408-5153

*Counsel to Defendant-Intervenor POSCO*

</div>

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 6,875 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills