NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

NUCOR CORPORATION,

                Plaintiff,

       v.

UNITED STATES,

                Defendant,

       and

POSCO,

                Defendant-Intervenor.

Before: Hon. Mark A. Barnett,
       Chief Judge

Court No. 21-00182

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information
Removed from Pages 15 and 16

## <u>NUCOR CORPORATION'S REPLY BRIEF</u>

Alan H. Price, Esq.
Christopher B. Weld, Esq.
Derick G. Holt, Esq.
Adam M. Teslik, Esq.
Theodore P. Brackemyre, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Nucor Corporation*

Dated: April 18, 2022

Ct. No. 21-00182 NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................................................................ 1

II.    ARGUMENT ............................................................................................................... 1

     A.    Nucor's New Subsidy Allegation Met and Exceeded the Proper
          Initiation Standard .........................................................................................1

     B.    Commerce's Decision Not to Initiate Was Based on an Unlawful
          Adequate Remuneration Standard...............................................................8

     C.    Commerce Improperly Determined that POSCO Plantec Is Not
          POSCO's Cross-Owned Input Supplier .................................................12

III.    CONCLUSION ......................................................................................................... 20

Ct. No. 21-00182                                    NON-CONFIDENTIAL VERSION

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allegheny Ludlum Corp. v. United States,*
   287 F.3d 1365 (Fed. Cir. 2002)..................................................................................5

*Bethlehem Steel Corp. v. United States,*
   25 CIT 307, 140 F. Supp. 2d 1354 (2001) .............................................................2, 3

*British Steel PLC v. United States,*
   127 F.3d 1471 (Fed. Cir. 1997)................................................................................19

*Canadian Solar Inc. v. United States,*
   No. 18-00184, slip op. 20-23 (Ct. Int'l Trade Feb. 25, 2020)................................12

*DAK Ams. LLC v. United States,*
   456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ..........................................................19

*Essar Steel Ltd. v. United States,*
   34 CIT 1057, 721 F. Supp. 2d 1285 (2010) ...............................................................5

*Essar Steel Ltd. v. United States,*
   678 F.3d 1268 (Fed. Cir. 2012).............................................................................3, 4

*Fine Furniture (Shanghai) Ltd. v. United States,*
   748 F.3d 1365 (Fed. Cir. 2014)..................................................................................5

*Gose v. U.S. Postal Serv.,*
   451 F.3d 831 (Fed. Cir. 2006)..................................................................................14

*Guizhou Tyre Co. v. United States,*
   523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021) ............................................................5

*Murata Mfg. Co. v. United States,*
   17 CIT 259, 820 F. Supp. 603 (1993) .....................................................................3, 4

*Nucor Corp. v. United States,*
   927 F.3d 1243 (Fed. Cir. 2019)...............................................................................8, 9

*POSCO v. United States,*
   977 F.3d 1369 (Fed. Cir. 2020)...............................................................................8, 9

*QVD Food Co. v. United States,*
   658 F.3d 1318 (Fed. Cir. 2011)...............................................................................3, 4

Ct. No. 21-00182                                    NON-CONFIDENTIAL VERSION

*RZBC Grp. Shareholding Co. v. United States,*
   100 F. Supp. 3d 1288 (Ct. Int'l Trade 2015) ...............................................1, 2, 5, 8

*Sugiyama Chain Co. v. United States,*
   16 CIT 526, 797 F. Supp. 989 (1992) .........................................................................3, 4

*Torrington Co. v. United States,*
   15 CIT 456, 772 F. Supp. 1284 (1991) ...........................................................................1

**Statutes**

19 U.S.C. § 1671a(b)(1) ........................................................................................................1

19 U.S.C. § 1677(5)(E)(iv) ....................................................................................................8

19 U.S.C. § 1677m(d) ...........................................................................................................7

**Regulations**

19 C.F.R. § 351.203(b)(1) ......................................................................................................6

**Administrative Materials**

*Antidumping Duties; Countervailing Duties,*
   61 Fed. Reg. 7,308 (Dep't Commerce Feb. 27, 1996) ..........................................6, 7

*Antidumping Duties; Countervailing Duties,*
   62 Fed. Reg. 27,296 (Dep't Commerce May 19, 1997) ..............................................7

*Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea,*
   85 Fed. Reg. 45,185 (Dep't Commerce July 27, 2020) ............................................12

*Certain Chassis and Subassemblies Thereof from the People's Republic of China,*
   86 Fed. Reg. 15,186 (Dep't Commerce Mar. 22, 2021) ..........................................18

*Certain Cold-Rolled Steel Flat Products from Brazil,*
   81 Fed. Reg. 49,940 (Dep't Commerce July 29, 2016) ............................................16

*Certain Cold-Rolled Steel Flat Products from Brazil,*
   80 Fed. Reg. 79,569 (Dep't Commerce Dec. 22, 2015) ...........................................16

*Certain Corrosion-Resistant Steel Products from the Republic of Korea,*
   81 Fed. Reg. 35,310 (Dep't Commerce June 2, 2016) ...............................................9

*Certain Oil Country Tubular Goods from the Republic of Turkey,*
   79 Fed. Reg. 41,964 (Dep't Commerce July 18, 2014) ............................................13

*Coated Free-Sheet Paper from the Republic of Korea*,
    72 Fed. Reg. 60,639 (Dep't Commerce Oct. 25, 2007) ........................................................12

*Common Alloy Aluminum Sheet from India*,
    86 Fed. Reg. 13,285 (Dep't Commerce Mar. 8, 2021) .........................................................1

*Countervailing Duties*,
    63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998) ......................................................14

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules,
    from the People's Republic of China*, 83 Fed. Reg. 34,828 (Dep't Commerce
    July 23, 2018) ...................................................................................................................11

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
    85 Fed. Reg. 3,030 (Dep't Commerce Jan. 17, 2020) .........................................................13

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
    86 Fed. Reg. 53,279 (Dep't Commerce Sept. 27, 2021) ......................................................18

*Supercalendered Paper from Canada*,
    82 Fed. Reg. 18,896 (Dep't Commerce Apr. 24, 2017) .......................................................11

## I.     INTRODUCTION

On behalf of Nucor Corporation ("Nucor"), we hereby submit the following brief in reply to the United States' ("Defendant") brief in opposition to Nucor's motion for judgment on the agency record.  Def.'s Resp. to Pl.'s Mot. for J. on the Agency R. (Mar. 7, 2022), ECF No. 31 ("Def. Resp. Br.").   Nucor respectfully requests that the Court find Defendant's response unpersuasive and hold that the Department of Commerce's ("Commerce") final results of the 2018 administrative review of *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea* were unsupported by substantial evidence and otherwise not in accordance with law.

## II.    ARGUMENT

### A.     Nucor's New Subsidy Allegation Met and Exceeded the Proper Initiation Standard

The statute provides that Commerce "shall" initiate an investigation into alleged subsidies when an allegation "alleges the elements necessary for the imposition of the duty" (*i.e.*, financial contribution, benefit, and specificity) and is "accompanied by information reasonably available to the petitioner supporting those allegations."  19 U.S.C. § 1671a(b)(1).  Investigations are to be initiated unless the allegation is "'clearly frivolous' or where the petitioner has not provided information reasonably available to it."  *Torrington Co. v. United States*, 15 CIT 456, 460, 772 F. Supp. 1284, 1288 (1991).  *See also RZBC Grp. Shareholding Co. v. United States*, 100 F. Supp. 3d 1288, 1295 (Ct. Int'l Trade 2015) ("{M}ost subsidy petitions are granted unless the allegations 'are clearly frivolous, not reasonably supported by the facts alleged or . . . omit important facts which are reasonably available to the petitioner.'"); Issues and Decision Memorandum accompanying *Common Alloy Aluminum Sheet from India*, 86 Fed. Reg. 13,285 (Dep't Commerce Mar. 8, 2021) (final affirm. countervailing duty deter. and final negative critical circumstances deter.) at 19.  Commerce may not "refuse to investigate based on conjecture that the subsidy does

not exist" or because "the precise contours of the subsidy {are} still unknown." *RZBC*, 100 F. Supp. 3d at 1295. Whether the evidence accompanying a subsidy allegation satisfies this standard is a legal question that is within the purview of the Court's authority to review Commerce's determinations. *See, e.g.*, *Bethlehem Steel Corp. v. United States*, 25 CIT 307, 312-13, 140 F. Supp. 2d 1354, 1360-61 (2001). This review is not a mere "reweigh{ing}" of the evidence, as Defendant suggests. Def. Resp. Br. at 9.

Nucor's new subsidy allegation regarding the provision of off-peak electricity for less than adequate remuneration included detailed qualitative and quantitative evidence that the alleged subsidy conferred a benefit. Nucor Corporation's Mem. in Supp. of Its Rule 56.2 Mot. for J. on the Agency R. (Sept. 30, 2021), ECF No. 22 ("Nucor's 56.2 Br.") at 19-26. This evidence was more than sufficient to support initiation under the "easygoing standards" articulated above. *RZBC*, 100 F. Supp. 3d at 1295. Defendant's response to the contrary mischaracterizes Nucor's arguments and is otherwise divorced from both the relevant legal standards and the evidence included in Nucor's allegation.

Defendant argues that Commerce reasonably determined "that no benefit was conferred under Nucor's alleged 'off-peak electricity for {less than adequate remuneration ('LTAR')}' program." Def. Resp. Br. at 9. According to Defendant, Nucor's argument "ignores . . . the burden" on interested parties "to build the administrative record." *Id.* at 12. Commerce, Defendant argues, has no "responsibility to request the requisite information from the parties to support a subsidy allegation, or to perform research on behalf of Nucor and fill in the blanks in its allegation." *Id.* at 13. Defendant accuses Nucor of attempting to "shift the responsibility to Commerce or ask that its burden be excused." *Id.* Defendant misrepresents Nucor's argument, the agency's statutory obligations, and the case law on which it relies. Ultimately, Defendant's

response proves Nucor's point.  Commerce improperly approached its decision regarding a new subsidy allegation in the same manner as it would a final determination of countervailability, without conducting the review that the statute requires.

Nucor did not argue that Commerce is obligated to "fill in the blanks in its allegation." Nucor argued that Commerce, as the investigating authority, is statutorily obligated to <u>investigate</u> subsidies when they are timely alleged in an allegation that meets the standard for initiation. Commerce's statutory obligation is, in fact, broader than this.  Courts have held that "even in cases where an allegation is untimely" under the regulations, Commerce is by statute "bound to <u>investigate</u> allegations that reasonably appear to be countervailable and are discovered within a reasonable time prior to the completion of its investigation."  *See, e.g.*, *Bethlehem Steel*, 25 CIT at 313, 140 F. Supp. 2d at 1361 (emphasis added).

Defendant relies on inapplicable case law to support its position.  Def. Resp. Br. at 12-14 (citing *Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012); *QVD Food Co. v. United States*, 658 F.3d 1318 (Fed. Cir. 2011); *Murata Mfg. Co. v. United States*, 17 CIT 259, 820 F. Supp. 603 (1993); and *Sugiyama Chain Co. v. United States*, 16 CIT 526, 797 F. Supp. 989 (1992)). Each of these cases involves attempts by respondents to correct or supplement inaccurate or incomplete questionnaire responses after Commerce completed an investigation or review and the administrative record was closed.

In *Essar*, the court considered an application of adverse facts available where a respondent repeatedly denied the existence of a production facility, withheld documentation in its possession, and attempted disclosure only after an application for subsidy benefits had been denied by the home government and after the administrative record was closed.  *Essar*, 678 F.3d 1275, 1278. *QVD Food* addressed a respondent's challenge to Commerce's decision not to rely on information

that the agency itself placed on the record for comment after the hearing in an administrative review. *QVD Food*, 658 F.3d at 1322-25. The court rejected the respondent's arguments on appeal, in part because the report was publicly available information that "QVD itself failed to introduce into the record" in a timely manner. *Id.* at 1324. *Murata* and *Sugiyama* both sustained Commerce decisions to reject revisions to antidumping sales databases and supporting information when those revisions were presented for the first time in case briefs or ministerial error allegations, after the record was closed. *Murata*, 17 CIT at 260-61, 820 F. Supp. at 604; *Sugiyama*, 16 CIT at 529-30, 797 F. Supp. at 993.

Unlike in these cases, Nucor was neither uncooperative nor untimely. It did not deliberately mislead the agency or withhold information that was in its possession or, to best of counsel's knowledge, available at all in the public domain. It timely responded to Commerce's supplemental questions and provided all of the additional information that was requested. It did not attempt to present any information after the record was closed or to argue that Commerce was obligated to accept database revisions based on untimely filed factual information. This case, therefore, gives rise to none of the concerns underlying the holdings in the cases cited by Defendant. None of Nucor's arguments implicate "the risk of gamesmanship and lack of finality." *Essar*, 678 F.3d at 1276. Nucor's arguments certainly do not suggest any "endeavor to disrupt administrative proceedings by improperly seeking to manipulate data to secure Machiavellian style ends." *Murata*, 17 CIT at 265, 820 F. Supp. at 607-08. *See also Sugiyama*, 16 CIT at 533, 797 F. Supp. at 995 ("If this Court were to approve of Plaintiff's method of submissions, it might actually encourage others to manipulate figures and other data to get what it considered desired results from Commerce."). Defendant cites to no cases that actually involve decisions on subsidy or dumping allegations, suggesting that there are none that support the agency's actions here.

These cases do, however, highlight the fact that the administrative record of an antidumping or countervailing duty proceeding is created by both the interested parties and Commerce over the course of an investigation. Courts have recognized that "{d}uring a countervailing duty proceeding, Commerce requires information from the foreign government alleged to have provided a subsidy and the respondent company{ies} alleged to have received the subsidy." *Guizhou Tyre Co. v. United States*, 523 F. Supp. 3d 1312, 1332 (Ct. Int'l Trade 2021). This is because the respondent parties "normally . . . are in the best position to provide information" regarding distinct aspects of an alleged subsidy program. *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1369-70 (Fed. Cir. 2014); *Essar Steel Ltd. v. United States*, 34 CIT 1057, 1070, 721 F. Supp. 2d 1285, 1297 (2010). "At the outset, when a petition is drafted, domestic industry may lack the data it needs to make firm factual allegations," and "a degree of imprecision is acceptable . . . ." *RZBC*, 100 F. Supp. 3d at 1296. Commerce, as the investigating authority, is ultimately responsible for seeking "all obtainable or accessible information . . . on the economic factors necessary for its analysis." *Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365, 1373 (Fed. Cir. 2002).

A subsidy <u>allegation</u>, in other words, is not a complete "administrative record." Commerce's decision not to initiate precluded the development of an administrative record on which a final determination could be based. The burden of providing the information necessary to support a final determination of countervailability, moreover, does not fall on petitioners alone. Contrary to Defendant's suggestion, it was improper for Commerce to determine, without investigation and based solely on Nucor's allegation, that "no benefit was conferred" by the subsidy alleged. Def. Resp. Br. at 9.

Defendant does not, in any event, grapple with the detailed evidence of a benefit that Nucor included in its allegation. Instead, Defendant simply summarizes the agency's determination and suggests that Nucor's new subsidy allegation provided no evidence whatsoever that a benefit was conferred. Defendant concedes that there is "a low standard for initiation" but argues that this "is not the same as having no standard at all." *Id.* at 12. Nucor's Opening Brief details the evidence included in Nucor's allegation, from the pricing structure apparent on the face of the Korea Electric Power Corporation's ("KEPCO") electricity tariff schedule, to explicit statements from Korean sources that this pricing structure was designed to cross-subsidize large industrial users, to Korean government data establishing that there was no market-based justification for the discrepancy between on-peak and off-peak prices, to an estimate of the actual benefit received by the mandatory respondent based on multiple Korean government proxies for KEPCO's cost of supply. Nucor's 56.2 Br. at 19-24. Defendant's suggestion that Nucor's allegation included no evidence that a benefit was conferred, and thus satisfied "no standard at all," is untethered from reality.

Defendant also mischaracterizes Commerce's practice with respect to considering subsidy allegations. According to Defendant, the statute "does not state that it is Commerce's responsibility to request the requisite information from the parties to support a subsidy allegation, or to perform research on behalf of {petitioners} and fill in the blanks . . . ." Def. Resp. Br. at 13. The agency's rules, however, provide that it "will examine the accuracy and adequacy of the evidence provided" in an allegation "and determine whether to initiate an investigation" based on "sources readily available to the Secretary . . . ." 19 C.F.R. § 351.203(b)(1). Under this provision, Commerce will "ask the petitioner to provide additional information" where "information . . . lack{s} sufficient support or . . . appear{s} aberrational." *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,313 (Dep't Commerce Feb. 27, 1996) (notice of proposed

rulemaking and request for public comments).  It will also "seek information from sources other than the petitioner" if "better information is unavailable to the petitioner," or if the information provided "appears aberrational and is central to the adequacy" of the allegation, while "giv{ing} the petitioner an opportunity to comment on any such information acquired by the {agency}."  *Id.*; *see also Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,307 (Dep't Commerce May 19, 1997) (final rule) (explaining Commerce's practice "to seek additional information where support for a particular allegation is weak or information appears aberrational").

Much like the agency will identify the deficiencies in questionnaire responses and give respondents an opportunity to remedy them before applying an adverse inference, *see* 19 U.S.C. § 1677m(d), Commerce can and does identify potential deficiencies in subsidy allegations and seek additional information from multiple sources before denying the allegation outright.  It is telling, therefore, that the agency did not identify or request, from any source, any of the information that was purportedly lacking from Nucor's allegation.  *See* Nucor's 56.2 Br. at 24-26, 29.

On this point, Defendant creates a strawman.  According to Defendant, "Nucor acknowledges that the information is missing but was 'reasonably available'" because it "impl{ied} that the necessary evidence to support its allegation could have been provided had Commerce requested it . . . ."  Def. Resp. Br. at 13.  Nucor implied no such thing.  *See* Nucor's 56.2 Br. at 29 ("Commerce requested none of this information in its supplemental NSA questionnaire . . . nor did it explain how information at this level of detail and granularity could possibly be 'reasonably available' to a petitioner in a countervailing duty proceeding.").  To the contrary, given Commerce's practice "to seek additional information where support for a particular allegation is weak or information appears aberrational," the failure to do so here reflected the agency's view that the information purportedly missing from Nucor's allegation was either not

essential to satisfy the initiation standard or not reasonably available to any party to the proceeding. With no attempt to identify or collect the additional information, Commerce's decision not to initiate was solely "based on conjecture that the subsidy does not exist." *RZBC*, 100 F. Supp. 3d at 1295.

Commerce thus applied an unlawful initiation standard in declining to initiate based on Nucor's new subsidy allegation. Defendant's response fails to persuade otherwise.

### B. Commerce's Decision Not to Initiate Was Based on an Unlawful Adequate Remuneration Standard

Commerce's determination that Nucor did not adequately support its allegation with respect to the existence of a benefit not only applied an unlawfully high initiation standard. It also applied an unlawful methodology for analyzing the adequacy of remuneration. Nucor's Rule 56.2 Br. at 31-34. The statute provides that a government's provision of goods or services confers a benefit if it provides them for "less than adequate remuneration." 19 U.S.C. § 1677(5)(E)(iv). The Court of Appeals for the Federal Circuit ("Federal Circuit") has held that, regardless of the regulatory "tier" under which Commerce conducts its analysis, the agency must determine whether the government price to the respondent reflects "payment of full value" for the input under consideration. *Nucor Corp. v. United States*, 927 F.3d 1243, 1253 (Fed. Cir. 2019). Commerce has explained that, under this standard, "if the {electricity} tariff charged to the respondent does not cover 'cost of production' plus 'a profitable return on the investment,' . . . then the respondent has received a countervailable benefit . . . ." Final Results of Redetermination Pursuant to Ct. Remand, *POSCO v. United States*, Consol. Ct. No. 16-00225 (CIT Dec. 7, 2020) (Apr. 19, 2021), ECF No. 128 at 31.

As Nucor explained in its Opening Brief, Commerce's rejection of Nucor's new subsidy allegation unlawfully applied a circular analysis requiring an impossible showing that KEPCO's

prices were inconsistent with themselves.  Nucor's Rule 56.2 Br. at 32-34.  First, Commerce rejected Nucor's allegation because it did not provide a proposed benchmark price using the Korean government's own formula for establishing the price at which KEPCO purchases electricity from generators.  *Id.* at 33.  Second, Commerce rejected the allegation of cross-subsidization because it arose from a "time-of-use" system that, according to the agency, Nucor failed to establish was "outside of the prevailing market conditions of an electricity utility in Korea." *Id.* at 33-34.  Defendant does not respond to these arguments.

Defendant first focuses on KEPCO's purported cost recovery.  Citing *Nucor v. United States*, Defendant argues that "the determination that KEPCO recovers its costs has already been reviewed and affirmed by the Federal Circuit, and the facts considered by Commerce . . . remain the same here."  Def. Resp. Br. at 14.  This assertion mischaracterizes both *Nucor*'s holdings and the "facts considered by Commerce."  In *Nucor*, the Federal Circuit did not "affirm" that "KEPCO recovers its costs," as though this were a universally applicable legal determination.  The court's holding was limited to an agency determination that addressed a different allegation based on proprietary, period-specific data that was provided by the Korean government and was not on the record under review here.  Issues and Decision Memorandum accompanying *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 81 Fed. Reg. 35,310 (Dep't Commerce June 2, 2016) (final affirm. deter., and final affirm. critical circumstances deter., in part) at 23.  Defendant also fails to note that the Federal Circuit remanded an identical analysis in *POSCO v. United States*, confirming that the Federal Circuit has not "affirmed" that "KEPCO recovers its costs" as a matter of law.  *POSCO v. United States*, 977 F.3d 1369, 1376-78 (Fed. Cir. 2020).

Defendant also notes Commerce's conclusion regarding KEPCO's "poor financial performance" during the review period, asserting that "Nucor ignores Commerce's thorough

explanation as set forth in the NSA Memorandum and reiterated in the Final Results." Def. Resp. Br. at 14-15. Far from ignoring Commerce's explanation on this point, Nucor has directly challenged it as arbitrary and inconsistent with agency practice. Nucor's 56.2 Br. at 34-36. As Nucor pointed out in its Opening Brief, KEPCO's losses during the review period simply provided additional context and support for Nucor's allegation, which included evidence that below-cost, off-peak electricity prices were an important contributing factor. *Id.* at 34-35. Both Commerce and the courts have consistently determined that a government supplier's overall financial performance does not establish whether an input is provided for adequate remuneration. *Id.* at 35.

Finally, Defendant quotes Commerce's rationale for determining that Nucor's allegation failed to establish "that KEPCO's operations are outside of the prevailing market conditions of an electricity utility in Korea." Memorandum from Robert Palmer & Faris Montgomery, Int'l Trace Compliance Analysts, Off. VIII, AD/CVD Operations, through Katie Marksberry, Program Manager, Off. VIII, AD/CVD Operations, to Irene Darzenta Tzafolias, Director, Off. VIII, AD/CVD Operations, re: *Second Administrative Review of Countervailing Duty Order on Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Decision Memorandum on New Subsidy Allegations* (Apr. 1, 2020), P.R. 144 at 9; Def. Resp. Br. at 15. Without explanation, Defendant asserts, as though it were a matter of fact, that "Commerce's determination was in accordance with law." Def. Resp. Br. at 15. But it is unclear why the mere fact that KEPCO operates a time-of-use system negates the evidence that certain prices within that time-of-use system are subsidized prices that confer a benefit accruing overwhelmingly to certain energy-intensive industrial consumers like steel companies. Nucor's 56.2 Br. at 33-34. Because KEPCO is the only electric utility in Korea, its operations are by definition "inside of" the "prevailing market conditions of an electric utility in Korea." *Id.* at 34.

As Nucor explained in its Opening Brief, KEPCO's time-of-use system consists of three different industrial electricity prices – an off-peak price, a mid-peak price, and an on-peak price. *Id.* at 20.   The off-peak prices range from KRW 53.7 per kilowatt-hour ("kWh") to KRW 68.6/kWh.   *Id.*   These prices are lower than the price at which KEPCO acquired electricity from the lowest cost generator, based on the Korea Power Exchange pricing formula, during the review period.   *Id.* at 28; Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Request for Reconsideration of New Subsidy Allegation* (Apr. 9, 2020), C.R. 254, P.R. 148 at 7-8.   Korean sources confirm that these off-peak prices are set below cost specifically to support the operations of energy-intensive industrial consumers.   Nucor's 56.2 Br. at 20-21.

That KEPCO may also sell electricity at prices that are not subsidized does not negate evidence that a benefit is conferred by the prices that are subsidized.   *See, e.g.*, Issues and Decision Memorandum accompanying *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 83 Fed. Reg. 34,828 (Dep't Commerce July 23, 2018) (final results of countervailing duty admin. rev.; 2015) at 45-46 ("In a subsidy analysis, a benefit is either conferred or not conferred, and a positive benefit from certain transactions cannot be masked by 'negative benefits' from other transactions.").   *See also* Issues and Decision Memorandum accompanying *Supercalendered Paper from Canada*, 82 Fed. Reg. 18,896 (Dep't Commerce Apr. 24, 2017) (final results of countervailing duty expedited rev.) at 92 (noting that "offsetting a benefit calculated on some transactions, *i.e.*, those that represent the government provision of a good for LTAR, with the 'negative' benefits that arise from transactions in which the government provision of the good is not at LTAR, is not one of the permissible offsets {in section 771(6) of the Tariff Act of 1930}"); Issues and Decision Memorandum accompanying

*Coated Free-Sheet Paper from the Republic of Korea*, 72 Fed. Reg. 60,639 (Dep't Commerce

Oct. 25, 2007) (final affirm. countervailing duty deter.) at 55-56; *Canadian Solar Inc. v. United*

*States*, No. 18-00184, slip op. 20-23 (Ct. Int'l Trade Feb. 25, 2020) at 14-16 (holding that the

respondent "benefitted from receiving reduced-cost inputs and Commerce properly countervailed

those benefits, regardless of whether {it} also purchased some inputs at or above LTAR").

Commerce's decision not to initiate was thus based on an improper adequate remuneration

standard, in addition to an unlawful initiation standard.

### C.   Commerce Improperly Determined that POSCO Plantec Is Not POSCO's Cross-Owned Input Supplier

Commerce improperly determined that POSCO Plantec ("Plantec") is not POSCO's cross-

owned input supplier.  As Nucor explained in its Opening Brief, Commerce applied case-specific

legal standards that, to the best of counsel's knowledge,[1] had never been applied before, to reach

conclusions that were both internally inconsistent and irreconcilable with prior determinations

regarding virtually identical inputs.  Nucor's 56.2 Br. at 36-45.  Defendant's arguments do not

persuade otherwise.[2]

With respect to steel scrap, Defendant suggests that Commerce's determination was lawful

because "Plantec neither produced nor supplied the scrap . . . ."  Def. Resp. Br. at 19.  On this

---

[1]   Defendant cites to no cases in which the agency applied the same or even similar standards to entities other than Plantec.

[2]   Defendant's response suggests that Commerce "did not consider the two entities to be cross-owned . . . ."  Def. Resp. Br. at 21.  To clarify, the agency did not reach the issue of cross-ownership.  The issue before the Court is whether Plantec supplied inputs that are primarily dedicated to the production of the downstream product, and not whether POSCO and Plantec are cross-owned.  *See* Preliminary Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea*, 85 Fed. Reg. 45,185 (Dep't Commerce July 27, 2020) (prelim. results of countervailing duty admin. rev., and intent to rescind rev., in part; 2018), P.R. 161 at 13 ("{R}egardless of whether POSCO and POSCO Plantec are cross-owned, POSCO Plantec does not meet the criteria for a cross-owned input supplier . . . .").

basis, Defendant attempts to distinguish Commerce's prior treatment of steel scrap in *Rebar from Turkey* and *OCTG from Turkey*. *Id.* at 20-21. In those cases, according to Defendant, the scrap was "produced" rather than "generated," and it was supplied directly to the mandatory respondent, rather than indirectly through a second cross-owned affiliate. *Id.* Contrary to Defendant's suggestion, the nature of steel scrap does not vary from country to country, and the very purpose of the rule was to prevent respondents from using separately incorporated affiliates to avoid countervailing duty liability.

In *Rebar from Turkey*, cross-owned affiliates generated scrap from the production of rebar, and the respondent used the scrap to produce billet for its own rebar production. Preliminary Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 85 Fed. Reg. 3,030 (Dep't Commerce Jan. 17, 2020) (prelim. results of countervailing duty admin. rev. and intent to rescind the rev. in part; 2017) at 10 ("*Rebar Turkey* PDM"). In *OCTG from Turkey*, the cross-owned affiliate generated scrap from the production of steel angles and profiles, and the mandatory respondent used the scrap to produce billet and hot-rolled steel for its own production of oil country tubular goods. Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods from the Republic of Turkey*, 79 Fed. Reg. 41,964 (Dep't Commerce July 18, 2014) (final affirm. countervailing duty deter. and final affirm. critical circumstances deter.) ("*OCTG Turkey* IDM") at 6-8. Here, Plantec generated scrap in the process of "manufactur{ing} steel making equipment and machinery," and POSCO used that scrap for its own steelmaking operations. Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: Response to the Affiliated Companies Section of the Initial Questionnaire* (Aug. 19, 2019), C.R. 4-15, P.R. 20-23 ("POSCO Aff. Cos. QR") at Exhibit 8, p. 3.

Scrap is thus a by-product.  It is, by definition, generated in the process of producing a different product.  That is as true in Korea as it is in Turkey.  Neither the agency, nor Defendant in its response brief, have articulated any justification for treating scrap as "generated," and thus beyond the reach of the input supplier rule in cases involving Korea, but as "produced," and thus within the scope of the input supplier rule in cases involving other countries.  In *OCTG from Turkey*, the agency explicitly rejected the very proposition underlying Defendant's argument here, namely that scrap was not "produced" and thus fell outside the scope of the cross-owned input supplier rule.  *OCTG Turkey* IDM at 8.

Nor does Defendant address Nucor's argument that the agency's requirement of a <u>direct</u> input supplier relationship was unreasonable because it undermines the very purpose of the rule. Nucor explained that the cross-owned input supplier rule represents a modification to Commerce's practice to close "a loophole whereby vertically integrated businesses could avoid countervailing duty exposure for input subsidies simply by separately incorporating the division that makes the input."  *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,401 (Dep't Commerce Nov. 25, 1998) (final rule).  By interpreting the cross-owned input supplier rule here to require a direct input supplier relationship, Commerce improperly re-opened the very loophole the rule was designed to close.  *Gose v. U.S. Postal Serv.*, 451 F.3d 831, 838 (Fed. Cir. 2006) ("Just as an agency's inconsistent interpretation of its regulation detracts from the deference we owe to that interpretation, so does evidence that the proffered interpretation runs contrary to the intent of the agency at the time of enactment of the regulation.").  Commerce's interpretation of the rule allows vertically integrated companies to avoid countervailing duty exposure simply by separately incorporating the division that directly sells the input to the mandatory respondent.

**BUSINESS PROPRIETARY INFORMATION**
                                         **HAS BEEN DELETED**

Defendant's attempt to distinguish Commerce's previous determinations regarding steel mill equipment and services likewise fails.  As Nucor explained in its Opening Brief, POSCO purchased "fixed assets" from Plantec, "consist{ing} mostly of [



]." Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: POSCO's Response to Nucor's New Subsidy Allegations* (Nov. 21, 2019), C.R. 185, P.R. 88 ("POSCO's NSA Response") at 10.  POSCO also sourced [                                                              ] and [                                                              ].  *Id.* at 9-11.  With the exception of the [                    ], which Defendant does not mention at all, Defendant concedes that Plantec supplied these "various materials and services to POSCO."  Def. Resp. Br. at 22. POSCO's purchases of these "fixed assets" from Plantec accounted for nearly [          ] of Plantec's total sales during the period of review.  *See* POSCO Aff. Cos. QR at Exhibit 5 (note 36 to POSCO's separate financial statements, showing purchases of fixed assets from Plantec in the amount of KRW 215 billion; "List of All Materials Purchased from Affiliated Korean Supplier," showing Plantec period of review sales of [                    ]).

In POSCO's financial statements, Plantec's "category of business" is listed as "construction of industrial plant."  *Id.* at Exhibit 2, p. 25.  In its list of affiliated companies located in Korea, POSCO described Plantec's "main function" as "steel producing facilities, infrastructure construction."  *Id.* at Exhibit 3.  POSCO explained in a questionnaire response during the original

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

investigation that Plantec "manufactures steel making equipment and machinery . . . ." *Id.* at

Exhibit 8, p. 3.  As part of Plantec's debt restructuring agreement with its creditor banks, Plantec

was to "[

].  "  POSCO's NSA Response at

Attachment 1.  These are "steelmaking equipment and services," which Commerce has determined

"are indeed inputs into the downstream production of steel."  Issues and Decision Memorandum

accompanying *Certain Cold-Rolled Steel Flat Products from Brazil*, 81 Fed. Reg. 49,940 (Dep't

Commerce July 29, 2016) (final affirm. deter.) ("*Cold-Rolled Brazil* IDM") at 55.

Defendant nevertheless asserts that the agency's determination in *Cold-Rolled from Brazil*

is inapplicable because, in that case, "Commerce found the <u>actual steel mill equipment</u> used to

make steel products to be an input primarily dedicated to the production of the downstream

product," and that "Commerce did not find services to maintain and refurbish steel production

equipment to be primarily dedicated to the production of subject merchandise."  Def. Resp. Br. at

23-24.   "Plantec," according to Defendant, "did not provide steelmaking machinery or

equipment . . . ."  *Id.* at 23.  Defendant is wrong both with respect to *Cold-Rolled from Brazil* and

with respect to the inputs that Plantec supplied to POSCO.  As noted above, the equipment that

Plantec supplied included a [                          ], which, under even the narrowest definition of

steelmaking equipment, is "<u>actual steel mill equipment</u> used to make steel products."  *Id.*

Regardless, in *Cold-Rolled from Brazil*, the cross-owned input supplier "provided parts for {the

respondent's} steel mills and equipment as well as services to maintain and refurbish steel

production equipment at {the respondent's} plants."  Preliminary Decision Memorandum

accompanying *Certain Cold-Rolled Steel Flat Products from Brazil*, 80 Fed. Reg. 79,569 (Dep't

Commerce Dec. 22, 2015) (prelim. affirm. deter. and alignment of final deter. with final

antidumping duty deter.) ("*Cold-Rolled Brazil* PDM") at 18.  The respondent argued that "there is nothing on the record . . . to support the Department's conclusion that the equipment and services provided by UMSA are primarily dedicated to the production of subject merchandise."  *Cold-Rolled Brazil* IDM at 54.  In the final determination, Commerce found that <u>both</u> "steelmaking equipment <u>and services</u> are indeed inputs into the downstream production of steel."  *Id.* at 55 (emphasis added).  As with its country-specific treatment of steel scrap, the agency thus determined without adequate justification that steel mill equipment and services are inputs primarily dedicated to steel production in Brazil, but not in Korea.

The agency's country-specific analysis went beyond its treatment of the actual inputs under consideration.  As Nucor argued in its Opening Brief, the standard that the agency applied to consider whether inputs were "primarily dedicated" in this case was, to the best of counsel's knowledge, unique to its consideration of Plantec and had not been used in any other context.  Nucor's 56.2 Br. at 43.  This analysis focused not on the nature of the input, but on whether Plantec's operations were "dedicated almost exclusively" to supporting POSCO's steel production operations.  *Id.*  In its response brief, Defendant confirms that the agency applied a standard requiring "Plantec's primary function" to be "{in}distinct from POSCO's steel production . . . ."  Def. Resp. Br. at 20.  Other than the agency's companion analysis of Plantec in *Cold-Rolled Steel from Korea*, Defendant cites to no examples in which the agency has applied a similar standard.

Each of the cases discussed above underscores the arbitrariness of Commerce's Korea-specific determination here.  In *Rebar from Turkey*, scrap was primarily dedicated to rebar production, notwithstanding the fact that the cross-owned affiliates' primary function was their own production of steel products.  *Rebar Turkey* PDM at 10.  In *OCTG from Turkey*, the input was primarily dedicated notwithstanding the fact that the cross-owned affiliate's "primary function"

was its own production of steel angles and profiles. *OCTG Turkey* IDM at 6. In *Cold-Rolled from Brazil*, the inputs were primarily dedicated notwithstanding the fact that the input supplier "operate{d} in the capital goods and services areas with customers in the steel, mining, automotive, energy, petrochemical, shipbuilding and infrastructure industries . . . ." *Cold-Rolled Brazil* PDM at 18. In *Certain Chassis and Subassemblies Thereof from the People's Republic of China*, Commerce explained that, in a "primarily dedicated" determination, Commerce "need not consider whether all other products manufactured by that producer are inputs in the production of subject merchandise." Issues and Decision Memorandum accompanying *Certain Chassis and Subassemblies Thereof from the People's Republic of China*, 86 Fed. Reg. 15,186 (Dep't Commerce Mar. 22, 2021) (final affirm. countervailing duty deter.) at 49.

In the most recently completed administrative review of *Rebar from Turkey*, Commerce effectively disavowed the very "primary function" standard that it defends before this Court. Citing to Commerce's analysis of Plantec in *Cold-Rolled Steel from Korea*, the respondent in that review argued that Commerce was required to "consider the primary business activity of the affiliated company that is providing the input and whether that primary business activity relates to the production of the downstream product at issue in {the proceeding}." Issues and Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 86 Fed. Reg. 53,279 (Dep't Commerce Sept. 27, 2021) (final results of countervailing duty admin. rev. and rescission, in part; 2018) at 23. Commerce "disagree{d} that primary business activity of the affiliated company that is providing the input is a relevant factor in this case, or even most cases." *Id.* at 26. It thus found that small amounts of steel scrap, generated by a cross-owned affiliate whose "primary function" was shipbuilding, was primarily dedicated to the respondents' production of rebar. If the agency's "primarily dedicated" standard does not turn on whether the

cross-owned affiliate's operations or "primary function" is "distinct from" the respondent's production operations in countervailing duty proceedings involving Brazil, China, Turkey, or other countries, then it may not turn on that standard in countervailing duty proceedings involving Korea.

Defendant's resort to the "fact-specific" nature of Commerce's determinations is unavailing. Def. Resp. Br. at 24. Nucor acknowledges that the application of the same rules and standards to case-specific facts may yield different outcomes on a case-by-case basis. But the agency may not conjure the "*sui generis*" nature of its proceedings alone to justify applying case-specific legal rules and standards to achieve different outcomes based on similar, if not identical, facts. That is arbitrary, and it is unlawful under the standard of review. *See, e.g.*, *DAK Ams. LLC v. United States*, 456 F. Supp. 3d 1340, 1355-56 (Ct. Int'l Trade 2020); *British Steel PLC v. United States*, 127 F.3d 1471, 1475 (Fed. Cir. 1997).

Commerce's determination that Plantec is not POSCO's cross-owned input supplier was thus unsupported by the record and otherwise not in accordance with law, and it should be remanded for reconsideration.

**NON-CONFIDENTIAL VERSION**

## III.   <u>CONCLUSION</u>

For the reasons discussed above and in Nucor's Rule 56.2 brief, Nucor respectfully requests that the Court hold that Commerce's final results were unsupported by substantial evidence and not otherwise in accordance with law, and remand to Commerce for redetermination in accordance with the Court's opinion.

Respectfully submitted,

*/s/ Alan H. Price*
Alan H. Price, Esq.
Christopher B. Weld, Esq.
Derick G. Holt, Esq.
Adam M. Teslik, Esq.
Theodore P. Brackemyre, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Nucor Corporation*

Dated: April 18, 2022

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Nucor Corporation's Reply Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2021), is 5,956 words.

<u>      /s/ Alan H. Price      </u>
(Signature of Attorney)

<u>      Alan H. Price      </u>
(Name of Attorney)

<u>Nucor Corporation</u>
(Representative Of)

<u>April 18, 2022</u>
(Date)