C-580-888
Remand
Slip Op 22-116, Court No. 21-00182
POR:  01/01/2018 – 12/31/2018
~~Business Proprietary Document~~
PUBLIC VERSION
E&C/OVIII:  TEAM

*Nucor Corporation v. United States*,
**Court No.  21-00182, Slip Op. 22-116 (CIT October 5, 2022)**
**Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order of the Court of International Trade (Court) in

*Nucor Corporation v. United States*, 600 F.Supp.3d 1225(CIT 2022) (*Remand Opinion and*

*Order*).  These final results of redetermination concern *Certain Carbon and Alloy Steel Cut-to-*

*Length Plate from the Republic of Korea:  Final Results and Partial Rescission of*

*Countervailing Duty Administrative Review; 2018*, 86 FR 15184 (March 22, 2021) (*2018 AR*

*Final Results*), and accompanying Issues and Decision Memorandum (IDM).  In the *Remand*

*Opinion and Order*, the Court ordered Commerce to:  (1) reconsider or further explain its

determination not to investigate the alleged off-peak sale of electricity for less than adequate

remuneration (LTAR); and (2) reconsider or further explain its decision not to treat POSCO

Plantec as a cross-owned input supplier of POSCO in connection with POSCO Plantec's supply

of scrap and provision of a [                    ] to POSCO.[1]

As discussed below, pursuant to the Court's *Remand Opinion and Order*, Commerce has

addressed the parties' comments regarding its decision not to initiate on the alleged provision of

---
[1] *See Remand Opinion and Order* at 30.

off-peak electricity for LTAR and its finding that POSCO Plantec was not POSCO's cross-owned input supplier during the period of review (POR).  After considering the parties' comments, we have provided further clarification to our analysis in the draft remand redetermination regarding the initiation standard we applied in our analysis of the off-peak electricity for LTAR new subsidy allegation and how the record and Commerce's previous determinations regarding the Korean electricity market informed our findings regarding benefit, as well as our rationale for considering the POSCO Plantec's production process and business functions when considering whether the inputs POSCO Plantec provided to POSCO were primarily dedicated to the production of downstream product.[2]  As explained below, in these final results of redetermination, we continue to find that the off-peak electricity for LTAR new subsidy allegation did not provide sufficient evidence of a benefit for Commerce to initiate on the allegation and that the inputs supplied by POSCO Plantec during the POR were not primarily dedicated to the production of downstream product.

## II.    BACKGROUND

On July 15, 2019, Commerce initiated an administrative review of certain carbon and alloy steel cut-to-length (CTL) plate from the Republic of Korea (Korea) for 37 producers and exporters of subject merchandise for the period January 1, 2018, through December 31, 2018.[3] On August 2, 2019, Commerce selected POSCO as the sole mandatory respondent in the administrative review.[4]  On November 4, 2019, Nucor timely filed two new subsidy allegations.[5]

---

[2] *See* Draft Results of Remand Redetermination, *Nucor Corporation v. United States*, Consol. Court No. 21-00182, Slip Op. 22-16 (CIT 2022), dated December 16, 2022 (Draft Remand).
[3] *See* Initiation of Antidumping and Countervailing Duty Administrative Reviews, 84 FR 33739 (July 15, 2019) (*Initiation Notice*).
[4] *See* Memorandum, "Respondent Selection," dated August 2, 2019.
[5] *See* Nucor's Letter, "New Subsidy Allegations," dated November 4, 2019 (New Subsidy Allegations).

2

In its new subsidy allegations, Nucor alleged:  (1) the Government of Korea (GOK) was providing countervailable subsidies to POSCO through the debt workout program of POSCO Plantec, which Nucor argued was POSCO's cross-owned input supplier during the POR; and (2) that the GOK was providing a countervailable subsidy to POSCO through the provision of off-peak electricity for LTAR.  Nucor maintained that POSCO Plantec was POSCO's cross-owned input supplier because POSCO owned 73.94 percent of POSCO Plantec's shares during the POR, and because POSCO Plantec provided steel scrap and steelmaking equipment and services to POSCO during the POR, purchasing a total of 3.2 billion Korean won (KRW) in materials, 215 billion KRW in fixed assets, 24.2 billion KRW in outsourced processing services, and 10.3 billion KRW in other sales from POSCO Plantec during the POR.[6]  Nucor also alleged that a benefit existed in the GOK's provision of off-peak electricity for LTAR under section 771(5)(E)(iv) of the Act, and provided alleged supporting evidence of POSCO paying prices below the Korea Electric Power Corporation's (KEPCO) cost of supply by comparing POSCO's weighted-average off-peak electricity price [                              ] during the POR to:  (A) the average off-peak system marginal price (SMP) for electricity, which Nucor defined as "the variable cost of electricity;" and (B) the annual average cost of sale for electricity at all hours.[7]

POSCO and the GOK submitted comments on the allegations on November 21 and 22, 2019, respectively.[8]  In its comments, POSCO argued that POSCO Plantec was not cross-owned with POSCO and that the inputs POSCO Plantec provided were not primarily dedicated to the production of downstream product.  The GOK explained the basis of its time-of-use (TOU)

---

[6] *Id.* at 6-7.
[7] *Id.* at 14-15 and Exhibits 4, 9, and 13.
[8] *See* POSCO's Letter, "POSCO's Response to Nucor's New Subsidy Allegations," dated November 21, 2019 (POSCO NSA Comments); *see also* the GOK's Letter, "Comments on Nucor's New Subsidy Allegations," dated November 22, 2019 (GOK NSA Comments).

3

system of electricity provision and argued that the provision of off-peak electricity for LTAR could not constitute a countervailable subsidy.

On December 20, 2019, Commerce issued a supplemental questionnaire to Nucor to request further information regarding Nucor's allegation on the provision of off-peak electricity for LTAR.[9]  In the supplemental questionnaire, Commerce requested additional supporting documentation and that Nucor explain how other factors beyond the SMP impact off-peak electricity pricing at off-peak hours.  On December 31, 2019, Nucor timely filed a response to Commerce's supplemental questionnaire, providing the requested documentation, and responding to Commerce's questions regarding the factors beyond the SMP that impacted off-peak electricity prices.[10]  In its response, Nucor maintained that the other elements of the electricity pricing formula, *i.e.*, the coefficient factor and capacity price, were "relevant only to transactions between the KPX {Korea Power Exchange} and electricity generators," and that the SMP was "a reasonably available and conservative proxy for what the price of electricity should be at any specific time of day."[11]

On April 1, 2020, Commerce issued a memorandum declining to initiate on the off-peak electricity for LTAR new subsidy allegation and noting that it would examine subsidies provided to POSCO Plantec in the ordinary course of the review, and that it was not necessary to separately initiate an investigation of POSCO Plantec's debt workout program.[12]  Specifically, Commerce declined to initiate on the off-peak electricity LTAR allegation, finding that Nucor

---

[9] *See* Letter, "New Subsidy Allegation Supplemental Questionnaire," dated December 20, 2019 (NSA Supplemental Questionnaire).
[10] *See* Nucor's Letter, "New Subsidy Allegations Supplemental Questionnaire Response," dated December 31, 2019 (Nucor NSA SQR).
[11] *Id.* at 4.
[12] *See* Memorandum, "Decision Memorandum on New Subsidy Allegations," dated April 1, 2020 (NSA Memorandum) at 4.

4

had not adequately supported its allegation regarding the existence of a benefit.[13]  In the NSA Memorandum, Commerce noted that neither of the benchmarks Nucor used to argue that KEPCO's cost of off-peak electricity was in excess of the off-peak tariff schedule industrial electricity prices paid by POSCO provided a suitable comparison.[14]

On April 9, 2020, Nucor submitted comments requesting that Commerce reconsider its decision in declining to initiate on the off-peak electricity for LTAR subsidy allegation.[15]  In the comments, Nucor argued that Commerce's rationale was inconsistent with the Federal Circuit's determination in *Nucor*, that Commerce did not take into account Nucor's evidence that the cost of supply of industrial electricity was consistent, and that Nucor had adequately supported its allegation.[16]  The GOK submitted comments in response on May 27, 2020, arguing that Nucor did not provide sufficient evidence that an examination of off-peak electricity in isolation would be appropriate and that there was no evidence of a benefit conferred to POSCO from the provision of off-peak electricity for LTAR.[17]

We issued the *Preliminary Results* of the administrative review on July 27, 2020, and preliminarily found that POSCO Plantec was not POSCO's cross-owned input supplier during the POR.[18]  On August 26, 2020, Nucor, POSCO, and the GOK submitted case briefs.[19]  In its case brief, Nucor argued that Commerce erred by declining to initiate an investigation of the

---

[13] *Id.* at 7-9.

[14] *Id.*

[15] *See* Nucor's Letter, "Request for Reconsideration of New Subsidy Allegation," dated April 9, 2020 (Nucor Pre-Prelim Comments).

[16] *Id.*

[17] *See* the GOK's Letter, "Response to Nucor's Request for Reconsideration," dated May 27, 2020.

[18] *See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review, and Intent to Rescind Review, in Part; 2018*, 85 FR 45185 (July 27, 2020) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum.

[19] *See* Nucor's Letter, "Case Brief," dated August 26, 2020 (Nucor Case Brief); *see also* POSCO's Letter, "POSCO's Case Brief," dated August 26, 2020; and the GOK's Letter, "The GOK's Case Brief," dated August 26, 2020.

5

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

GOK's provision of off-peak electricity for LTAR and that Commerce should attribute benefits received by POSCO Plantec to POSCO because POSCO Plantec was POSCO's cross-owned input supplier.[20]  On September 9, 2020, Nucor, POSCO, and the GOK filed rebuttal briefs, with the GOK arguing that Nucor did not adequately support its argument that off-peak electricity prices are below the cost of production or inconsistent with prevailing market conditions, and did not provide sufficient evidence for Commerce to re-examine KEPCO's cost recovery.[21]  POSCO also argued that Commerce was correct in declining to initiate on Nucor's off-peak electricity for LTAR allegation, and that POSCO Plantec was not POSCO's cross-owned input supplier because POSCO Plantec was neither cross-owned, nor supplying inputs to POSCO that were primarily dedicated to the production of downstream product.[22]

Commerce published its *2018 AR Final Results* on March 22, 2021.  In the *2018 AR Final Results*, Commerce calculated a *de minimis* rate of 0.49 percent for POSCO, which was also assigned to the non-selected companies.  In Comment 1 of the IDM, Commerce addressed the parties' arguments regarding the provision of off-peak electricity for LTAR subsidy allegation and continued to find that Nucor provided insufficient evidence to initiate an investigation with respect to the existence of a benefit.  Commerce continued to find that there was an insufficient allegation of benefit, noting that Nucor did not provide sufficient evidence in the allegation of either KEPCO's lack of cost recovery or an inconsistency with prevailing market conditions under a tier 3 market principles analysis.[23]

---

[20] *See* Nucor Case Brief.
[21] *See* Nucor's Letter, "Rebuttal Brief," dated September 9, 2020; *see also* POSCO's Letter, "POSCO's Rebuttal Brief," dated September 9, 2020 (POSCO Rebuttal Brief); and the GOK's Letter, "The GOK's Rebuttal Brief," dated September 9, 2020.
[22] *See* POSCO Rebuttal Brief.
[23] *See 2018 AR Final Results* IDM at Comment 1.

In Comment 2 of the IDM, Commerce continued to find that POSCO Plantec was not POSCO's cross-owned input supplier for the POR under 19 CFR 351.525(b)(6)(iv) because POSCO Plantec did not supply inputs primarily dedicated to the production of subject merchandise.  Commerce examined the materials, including steel scrap, equipment, and services, that POSCO Plantec provided POSCO, and found that there were distinguishing factors between the cases Nucor cited where Commerce found similar inputs primarily dedicated.[24]

## III.    REMAND OPINION AND ORDER

In the *Remand Opinion and Order*, the Court ordered Commerce to reconsider or further explain its decision not to initiate on Nucor's allegation that the GOK provided off-peak electricity for LTAR to POSCO during the POR, finding that "given the substantial amount of information that Nucor provided and the typically low bar for launching a CVD inquiry," Commerce's determination was lacking reasoned explanation and was unsupported by substantial evidence.[25]  In the *Remand Opinion and Order*, the Court noted that Nucor's allegation raised two questions:  (1) whether the pricing of off-peak electricity could constitute a subsidy program distinct from Nucor's previous allegation regarding the sale of electricity for LTAR; and (2) whether Nucor's allegation met the threshold for initiating an investigation into any such program.[26]  The Court explained that Commerce's determination focused on Nucor's asserted failure to provide a suitable benchmark to compare to the off-peak electricity prices POSCO paid and did not explicitly address whether the off-peak supply of electricity within Korea's time-of-use (TOU) system could constitute a distinct subsidy program.[27]  The Court,

---

[24] *Id.* at Comment 2.
[25] *See Remand Opinion and Order* at 16.
[26] *Id.* at 13-14.
[27] *Id.* at 14.

thus, limited its consideration to the grounds advanced by Commerce, that Nucor failed to meet the evidentiary threshold for initiating an investigation.

The Court also stated that Commerce faulted Nucor for failing to provide better cost information for its allegation of benefit without making a corresponding finding that such information was reasonably available to Nucor.[28]  The Court held that Commerce cursorily discussed the propriety of examining a segment of a TOU system and appeared to fault Nucor for failing to demonstrate that KEPCO's prices were inconstant with KEPCO's own tariff schedule. While Commerce noted there was "a substantial amount of information available to Nucor," Commerce did not tie that information to the deficiencies identified in the allegation, specifically failing to address whether time-period-specific data were reasonably available to Nucor.

Therefore, as ordered, Commerce is providing further explanation regarding its rationale for declining to initiate on Nucor's off-peak electricity for LTAR allegation, including further explanation of its consideration of off-peak electricity for LTAR as an independent subsidy program, the information available to Nucor when making the allegation, and how the information and prior determinations regarding the electricity market in Korea informed Commerce's finding that Nucor's allegation of benefit did not meet the standard for initiation.

Secondly, in the *Remand Opinion and Order*, the Court ordered Commerce to reconsider or further explain its decisions regarding POSCO Plantec's provision of scrap and a [

] to POSCO.  Regarding the provision of scrap, the Court found that Commerce's determination was undermined because it did not sufficiently explain why it relied upon POSCO Plantec's primary function of "the construction of industrial plants" in its determination, when it has stated elsewhere that the primary business activity of a company providing an input is not a

---

[28] *Id.*

8

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

relevant factor in most cases.[29]  Furthermore, the Court found that Commerce had argued *post hoc* at oral argument that it declined to attribute subsidies based on POSCO Plantec's sale of scrap because the volume of sales was small in relation to total sales by POSCO Plantec to POSCO.[30]  The Court found that this argument was unsupported by Commerce's citations to the record and is inconsistent with Commerce's attribution practices in other instances.[31]

The Court additionally found that Commerce did not adequately explain the difference between the instant record and its previous determinations regarding the distinction between producing scrap and generating scrap as a byproduct as well as the effect of the presence of an intermediary in the sale of the input.[32]  The Court noted that Commerce had found steel scrap primarily dedicated when there was no question that the input supplier generated steel scrap as a byproduct, and the decision regarding POSCO Plantec appeared arbitrary.[33]  Secondly, Commerce's record regarding the presence of an intermediary suggested that Commerce did not interpret the attribution regulation to apply in those circumstances; however, Commerce stated at oral argument that the regulation could be applied even with the presence of an intermediary, depending on the facts of the case, and, thus, the Court found it was unable to discern the relevance of the intermediary to Commerce's determination.[34]  Recognizing that decisions regarding attribution are fact specific, the Court nevertheless found that Commerce needed to provide a clear rationale supported by substantial evidence rather than appearing to identify one

---

[29] *Id.* at 20-21.
[30] *Id.* at 21.
[31] *Id.*
[32] *Id.* at 22-24.
[33] *Id.*
[34] *Id.*

9

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

set of prior decisions over another in support of its determination, and remanded Commerce to further explain or reconsider its rationale regarding POSCO Plantec's provision of scrap.[35]

Regarding POSCO Plantec's provision of equipment and services, the Court found that Nucor did not provide record evidence to undermine Commerce's finding that the services POSCO Plantec provided POSCO were not primarily dedicated to the production of downstream product and did not see a reason to disturb Commerce's finding with respect to services.[36] Likewise, the Court found Commerce's determination that POSCO Plantec's provision of raw materials or fixed assets could not be tied specifically to the production of any steel products and were instead of a type used in a typical manufacturing process was supported by substantial evidence regarding the nature of the equipment and its uses.[37]  However, the Court found one exception to that determination, a [                    ] provided by POSCO Plantec to POSCO, which was a fixed asset described as an object used [                          ].[38]  The Court notes that this explanation suggests use in steelmaking, and in the absence of specific explanation from Commerce, remanded the issue of this piece of equipment for reconsideration or further explanation.[39]

Therefore, as ordered, we have addressed each of the above inputs with respect to our primarily dedicated standard in our analysis below and provided further explanation regarding Commerce's input supplier analysis, the rationale for our determinations with regard to steel

---

[35] *Id.* at 24.
[36] *Id.* at 27-28.
[37] *Id.* at 28.
[38] *Id.* at 29-30 (n. 19, 20).
[39] *Id.* at 30.

10

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

scrap and the [                    ], and the distinction between this case and other cases where we made determinations on similar inputs.

## IV.    ANALYSIS

### A.    Commerce's Determination Not to Investigate the Alleged Sale of Off-Peak Electricity for LTAR

As requested by the Court, we further explain that our decision not to initiate an investigation on the alleged off-peak provision of electricity for LTAR was in accordance with sections 702(b)(2) and 771(5)(B) of the Act.

At the outset, we would like to clarify Commerce's decision to treat Nucor's allegation of the provision of off-peak electricity for LTAR as a separate subsidy program from the previously investigated provision of electricity for LTAR program, which did not confer a benefit because the electricity prices charged by the country's sole supplier, KEPCO, to end users was consistent with market principles under 19 CFR 351.511(a)(2)(iii).[40]  Although this new allegation also involves the provision of electricity for LTAR, we analyzed it outside the prior investigated electricity LTAR program because it is focused within a distinct subset of electricity pricing, namely off-peak hours.  Thus, in our assessment of the newly alleged subsidy, we were looking for sufficient evidence of a benefit, within the meaning of 19 CFR 351.511(a)(2)(iii), as proffered by the petitioner in its submission.  As section 771(5)(E) of the Act makes clear, this analysis is not limited to whether the government's price is consistent with market principles, which was the focus of Nucor's benefit allegation in this instance, but also includes factors related to prevailing market conditions such as quantity, availability, marketability, transportation, and other terms of sale.  Because there are many options to demonstrate that a

---

[40] *See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 82 FR 16341 (April 4, 2017), and accompanying IDM at Comment 2.

government price is not consistent with market principles to establish an alleged benefit under a tier-three analysis, a petitioner is not limited to making a comparison based on pricing.

The Court has described the standards for Commerce's subsidy initiation process as follows:

> To trigger an investigation, petitioners must allege a subsidy as defined by statute. They also have to pad their allegations with any "information reasonably available" to them at the time of filing … .  If a petition meets these requirements, Commerce must proceed.  The agency cannot refuse to investigate based on conjecture that the subsidy does not exist.  This means most subsidy petitions are granted unless the allegations "are clearly frivolous, not reasonably supported by the facts alleged or . . . omit important facts which are reasonably available to the petitioner.[41]

For the reasons described below, we found that Nucor's subsidy allegation did not provide a sufficient allegation of benefit because it omitted reasonably available facts that contradicted the basis of its pricing comparison.

Section 351.202(b)(7)(ii)(B) of Commerce's regulations describes "reasonably available" information necessary to initiate a subsidy allegation as the:  "factual information (particularly documentary evidence) relevant to the alleged countervailable subsidy, including any law, regulation, or decree under which it is provided, the manner in which it is paid, and the value of the subsidy to exporters or producers of the subject merchandise."  Moreover, *RZBC Group* further specifies that if the domestic industry alleges all elements necessary in a petition and supports each of the elements with evidence that is available to them, Commerce must investigate the subsidy allegation, "even if the precise contours of the subsidy were still unknown."[42]  As noted above, the new subsidy allegation in this case is distinct from the more general provision of electricity for LTAR program examined in the investigation.  However, this

---

[41] *See RZBC Group Shareholding Co., Ltd., et. al. v. United States*, 100 F. Supp. 3d 1288, 1295 (CIT August 5, 2015) (*RZBC Group*) (*citing* H.R. Rep. No. 96-317, at 51 (1979)).
[42] *See RZBC Group*, 100 F. Supp. 3d at 1295.

12

off-peak electricity allegation is a subset of this prior investigated program and the facts with

respect to the Korean electricity system, as a whole, were reasonably available to the petitioner.

Commerce had previously initiated investigations into the Korean electricity system based on

such information, collected additional information on the record, and conducted the relevant

analyses, not only in this proceeding, but also in numerous other Korean countervailing duty

(CVD) proceedings to which Nucor is an interested party.[43]  Moreover, the precise contours of

the Korean electricity market are very well known to all parties, including Nucor, due to

Commerce's previous investigations of the Korean electricity market through the electricity for

LTAR program and other related electricity and energy subsidy programs.  Nucor submitted

certain of this information to the record of this proceeding and was aware of such information as

a result of the numerous other Korean CVD proceedings involving electricity for LTAR wherein

it participated as a petitioner.  Accordingly, Commerce had a reasonable expectation that Nucor

would have the ability to make a benefit allegation which demonstrates inconsistency with

market principles based accurately on the well-known parameters of the Korean electricity

system.[44]  Nucor acknowledged this existing analysis in its allegation, stating that it believed its

off-peak electricity for LTAR allegation provided Commerce "with a sufficient basis to

reconsider its previous determinations regarding the Korean government's provision of

---

[43] *See, e.g., Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 85 FR 35310 (June 2, 2016) (*CORE from Korea INV*), and accompanying IDM at Comments 1-3.
[44] *See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  Preliminary Negative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 81 FR 63168 (September 14, 2016), and accompanying Preliminary Decision Memorandum at 28-29 ("Further, the GOK provided its calculation of electricity costs as well as data showing its cost and investment return pertaining to the POI for industrial users of electricity.  The GOK provided KEPCO's data that was submitted to MOTIE in 2013 for the tariff in effect during the POI, as well as explained its calculations and recovery costs.").  We note that the same tariff schedule was in effect during the 2018 POR.

13

electricity for LTAR in light of the Federal Circuit's recent opinion in *Nucor*."[45]  Thus, Commerce's decision not to initiate was in accordance with the Court's position in *RZBC Group*, as Nucor's allegation:  (1) was not reasonably supported by the facts alleged; and (2) omitted important facts which were reasonably available to the petitioner.[46]

Nucor based its off-peak electricity for LTAR allegation on a U.S. Court of Appeals for the Federal Circuit (Federal Circuit) ruling that affirmed Commerce's finding that the Korean electricity system was consistent with market principles, using the Federal Circuit's statement that in an LTAR analysis, the adequate remuneration standard must be tied to fair value, rather than merely finding that a government was not charging the producer a preferential rate.[47]  At the time of the allegation, the Courts had reviewed Commerce's previous examinations of the electricity market in Korea and affirmed Commerce's determination that Korea's electricity market was consistent with market principles, including a fair rate of return.  The analysis included substantial information on how the Korean electricity system is organized among generators, the KPX, which is the system operator, and the supplier, KEPCO, as well as how the KPX and KEPCO set their prices and tariffs, and KEPCO's pricing methodology and cost recovery data.  Even disregarding all publicly available information on the Korean electricity system available from other cases and court findings, Nucor was clearly aware of Commerce's determinations regarding electricity for LTAR in the investigation segment of this proceeding because Nucor not only requested that Commerce investigate an allegation of off-peak electricity for LTAR "notwithstanding {Commerce's findings} from the original investigation," but also

---

[45] *See* New Subsidy Allegations at 8 (citing *Nucor Corp. v. United States*, 827 F.3d 1243, 1254 (Fed. Cir. 2019) (*Nucor*)).
[46] *See RZBC Group*, 100 F. Supp. 3d at 1295.
[47] *Id.* at 8 (citing *Nucor*, 827 F.3d at 1255).

14

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

attached documents from the investigation record as exhibits in its allegation.[48]  Furthermore,

information regarding the Korean electricity system was available on the record of this specific

segment because Commerce was already conducting analysis on multiple other energy programs,

including electricity for more than adequate remuneration.[49]  Finally, KEPCO and the KPX are

public entities.  As such, KEPCO files annual Securities and Exchange Commission (SEC) 20-F

reports; there is substantial publicly available information from KEPCO pertaining to its

financial status and the KPX, some of which Nucor placed on the record in the context of its

allegation.  This information included, for example, KEPCO's power trading statistics, data from

Korea's Electric Power Statistics Information System, and a substantial description of KEPCO's

cost system, pricing factors, and relationship with the KPX.[50]

   Thus, evidence on the record demonstrates that interested parties that have participated in

other proceedings involving the Korean electricity system, including Nucor, should be aware of

the characteristics of the electricity market in Korea, including but not limited to its operations,

price setting method, cost system, availability to consumers, the relationship between KEPCO

and the KPX, and how the KPX sets pricing for generators within Korea.  Nucor's benefit

claims, as alleged, pertained to the prices KEPCO paid to the generators through the KPX's

pricing and KEPCO's electricity tariff schedule, both of which Commerce had previously

investigated and made determinations.

Allegation of Benefit

   Nucor argued that KEPCO's provision of off-peak electricity was inconsistent with

market principles based upon two overlaying themes:  (1) KEPCO's off-peak tariffs did not

---

[48] *See* New Subsidy Allegations at 7 and Exhibits 3, 5, and 6.
[49] *See*, *e.g.*, the GOK's Letter, "Response to the Initial Questionnaire," dated October 7, 2019, at Exhibits E-3 to E-5.
[50] *See*, *e.g.*, New Subsidy Allegations at Exhibit E-9; *see also* Nucor NSA SQR at Exhibit 1 (page 34-40).

recover costs through an examination of publicly available information and POSCO's reported business proprietary data in the investigation; and (2) KEPCO recovers costs to the extent that it charges tariff rates above costs during on-peak hours that cross-subsidizes large industrial companies (like respondent, POSCO) who move production to off-peak hours.  Regarding the latter allegation relating to potential cross-subsidization, Nucor conflates benefit and specificity. Section 771(5)(C) of the Act and 19 CFR 351.503(c) are clear that Commerce is not required to consider altered firm behavior as a result of alleged subsidies, *i.e.*, to "consider the effect of the subsidy in determining whether a subsidy exists."  The hours at which POSCO, or any entity utilizing industrial electricity, chose to purchase electricity based on the existing tariff schedule are therefore immaterial unless the tariff schedule itself is found to be inconsistent with market principles.  Moreover, Commerce would rightly expect such an underlying allegation about cross-subsidization to be supported by substantial evidence and be based on facts that demonstrate why the electricity system is inconsistent with market principles or discriminatory in its pricing.  Commerce had previously determined that its examination of the Korean electricity market (including the organization, price setting methodology and cost recovery of KEPCO) was consistent with market principles and this determination has not been modified since the previous determinations.[51]  Further, this determination was upheld by the Federal Circuit in *Nucor*.[52]  Thus, within the context of the Korean electricity market, Nucor had an obligation to address this "reasonably available information" in its allegation.  When Commerce made the statement that "Nucor has not provided sufficient information demonstrating that KEPCO's operations are outside of the prevailing market conditions of an electricity utility in Korea," Commerce was stating that Nucor failed to provide sufficient information about the price setting

---

[51] *See Nucor*, 827 F.3d at 1243.

[52] *Id.*

16

methodology, terms of sale, *etc.* for off-peak electricity being reviewed in a tier-three analysis that would either call into question Commerce's previous determination that the Korean electricity system was consistent with market principles or demonstrate that the provision of electricity at specific, off-peak hours was inconsistent with market principles, including Commerce's previous findings of KEPCO's cost recovery.[53]

Regarding the first theme of the benefit allegation that pertained to KEPCO's off-peak tariffs not recovering costs, Nucor made an allegation of benefit based on two comparisons to POSCO's weighted-average off-peak electricity price during the POR:  (1) the average SMP at off-peak hours; and (2) KPX data showing that the annual average cost of sale for industrial electricity was 106 Korean won per kilowatt hour in 2018.[54]  Nucor's primary allegation focused on the SMP as evidence that KEPCO had provided electricity at below cost during off-peak hours.

Information on how the KPX developed the SMP price and how an adjusted coefficient was applied to certain generators' prices prior to the purchase by KEPCO is on the record of numerous reviews[55] and was present on the record of the underlying proceeding at issue in this case within the SEC Form 20-F filing for the POR that Nucor itself placed on the record.  The SEC Form 20-F also contains financial disclosures and electricity power trading statistics from KEPCO and its subsidiary generators, and purchase information from unaffiliated suppliers.[56]  Nucor cannot claim that it was unaware of such information.  Commerce gave Nucor the opportunity to remedy the deficiencies in the allegation through its supplemental questionnaire,

---

[53] *See, e.g.*, *CORE from Korea INV* IDM at Comments 1-3; *aff'd* in *Nucor*, 927 F.3d at 1243, 1248 ("Commerce defends its decision in this case as consistent with the statute and regulation because Commerce found not only that KEPCO's pricing was non-discriminatory but also that the pricing ensured cost recovery.  We reject the first position, but we conclude that Nucor has not shown error in the second.")

[54] *See* New Subsidy Allegations at 14-15.

[55] *See Nucor*, 827 F.3d at 1243.

[56] *See* Nucor NSA SQR at Exhibit 1 p.38-40, 44-47.

17

specifically asking Nucor to discuss "factors that determine the price for electricity other than the {SMP};" however, Nucor continued to claim that the SMP was a "reasonably available and conservative proxy for what the price of electricity should be at any specific time of day."[57] Commerce found, based on evidence provided by Nucor, that Nucor's claim that the SMP was a "conservative estimate" was a direct contradiction to other evidence on the record and inconsistent with both Commerce's and KEPCO's published statements on Korean electricity pricing and costs.[58]  Even should we restrict our analysis to only this particular source of information available to Nucor, and ignore all of the other information readily available to Nucor on Korea's electricity system, KEPCO's Form 20-F filing clearly explains how other factors affect the prices KEPCO pays for electricity from generators through the KPX.[59]  We focused on the SMP in our analysis of Nucor's allegation because the use of the SMP, without regard to other factors in KEPCO's Form 20-F filing, was the point at which the benefit allegation was not sufficient as it did not address reasonably available information on the record concerning why the SMP prices were not a good proxy to demonstrate a benefit was conferred.

Likewise, we addressed the fact that Nucor's benefit allegation cited to the annual average cost of sale for industrial electricity in the same manner, by noting that the annual average cost, without factoring in some measure to account for the subsidy limitation to off-peak hours, was insufficient evidence of a benefit.  Commerce's statement that the annual average cost of sale for industrial electricity provided by Nucor as a suitable benchmark could be appropriate for the purposes of initiating an overall allegation of electricity for LTAR but was not appropriate for a specific period of time within a TOU system was a direct response to Nucor's

---

[57] *Id.* at 4-5.
[58] *Id.*
[59] *See* Nucor NSA SQR at Exhibit 1, p.34-37.

benefit allegation.[60]  This statement was not prescriptive, but merely meant to emphasize the fact

that in the off-peak electricity allegation, Nucor needed to provide an adjustment or justification

for the fact that its allegation compared certain hours (*i.e.*, off-peak hours) and certain electricity

types (*i.e.*, industrial electricity), to an average price across all hours.  Because the crux of

Nucor's argument centered around both the quantity and price of electricity provided at off-peak

hours, we found those factors to be crucial to the allegation of benefit.[61]  Such an allegation

could only be compared to the full value of the fixed and variable prices, as in Commerce's

electricity for LTAR calculations, rather than merely the variable electricity rates in the GOK's

tariff schedule.  Comparing the average full cost of sale to the variable price makes an apples-to-

oranges comparison.  When Commerce noted that the average price of electricity at all hours

could be an appropriate benchmark for all hours, but was not for certain hours, it was merely

noting that Nucor was missing a step in its analysis that would allow a comparison to be made on

an equivalent basis for a reasonable estimation of KEPCO's cost recovery at those hours.[62]

Namely, Commerce found that a successful benefit allegation of off-peak electricity for LTAR

required a reasonable proxy for determining what the prices KEPCO paid might be at the

specific point of off-peak hours, and not just an overall average price for electricity.  This did not

require that Nucor provide hour-by-hour electricity costs but instead required an additional step

---

[60] *See* New Subsidy Allegations at 15.

[61] *See* NSA Memorandum at 4 ("Specifically, Nucor alleges, through control of KEPCO's tariff schedule, the GOK provides off-peak consumers electricity at prices substantially below cost and recoups losses by charging prices above cost for consumers primarily using electricity in the daytime.  Nucor claims that recent data demonstrate that KEPCO's off-peak electricity prices are below the cost of production and supply, and do not accurately emulate supply and demand fluctuations."); *see also 2018 AR Final Results* IDM at Comment 1 ("We addressed the market principles Nucor included in its allegation, namely KEPCO's cost recovery, but also addressed industry preferentiality, *i.e.*, whether the GOK's provision of off-peak electricity for LTAR was consistent with market principles.  The CIT decision upheld by *Nucor* elucidates that there is a place within this analysis for an examination of the tariff schedule and whether a government treats certain entities in a preferential manner…").

[62] *See 2018 AR Final Results* IDM at Comment 1 ("{T}his benchmark cannot make an equivalent comparison to the tariff schedules' off-peak prices POSCO paid because it does not account for the demonstrated differences between TOU tariff rates during peak, mid-peak, and off-peak usage.").

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

or reasonable explanation to demonstrate how the average price of electricity reflected the price of electricity at off-peak hours, considering potential differences in the generators in terms of operation, usage, *etc*. at different hours.

Commerce did not fault Nucor for not providing KEPCO's hourly off-peak electricity costs, nor did we have an expectation for Nucor to provide that information.  Rather, we faulted Nucor for not making reasonable adjustments to its submitted estimate of KEPCO's costs based on available information on the record that called into question the accuracy of the alleged benefit values in Nucor's allegation.  In essence, Nucor requested that Commerce ignore its previous understanding and findings regarding the Korean electricity market, data on the record that contradicted Nucor's claims regarding the alleged benefit, and information previously known and placed on the record regarding the Korean electricity system's pricing and cost recovery, and instead initiate an LTAR investigation on the basis of newspaper articles that claimed similar amounts of electricity usage at off-peak and other hours of the day and speculation that the cost of provision of electricity would be similar at off-peak and on-peak hours for KEPCO given the claims of usage.  Given that the allegation was made in the context of a proceeding in which Commerce could reasonably expect the petitioner to have a clear understanding of how the Korean electricity market and cost system functioned, we determined that the information referenced in support of the allegation of benefit did not sufficiently account for known information on the record and thus provided no viable comparison to KEPCO's tariff schedule pricing of off-peak electricity.  Accordingly, it was not sufficient to meet the standard for initiation.  Thus, we continue to find in the *2018 AR Final Results* that Nucor did not provide a sufficient allegation of benefit for Commerce to initiate on the provision of off-peak electricity for LTAR new subsidy allegation.

Filed By: Faris Montgomery, Filed Date: 1/31/23 9:13 AM, Submission Status: Approved

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

Moreover, we also note that, as has been stated in numerous investigations of KEPCO, to develop the electricity tariff schedule, KEPCO first calculates its overall cost, including an amount for investment return.  These costs include the operational cost for generating and supplying electricity as well as taxes.  The cost for each electricity classification is calculated by: (1) distributing the overall cost according to the stages of providing electricity (generation, transmission, distribution, and sales); (2) dividing each cost into fixed cost, variable cost, and the consumer management fee; and (3) then calculating the cost by applying the electricity load level, peak level, and the patterns of consuming electricity.  Each cost is then distributed into the fixed charge and the variable charge.  KEPCO then divides each cost taking into consideration the electricity load level, the usage pattern of electricity, and the volume of the electricity consumed.  Costs are then distributed according to the number of consumers for each classification of electricity.[63]  Thus, it is clear from our analysis in numerous other public investigation memoranda and remand determinations that KEPCO calculates its cost and establishes tariff rates in order to cover its costs on an aggregated basis.  Therefore, even in the event that an interested party could support the type of pricing allegation that was made by Nucor, the interested party would still need to provide information demonstrating that determining electricity tariffs using aggregated costs (as done by KEPCO) is "inconsistent with prevailing market conditions" within the meaning of the statute and not in accord "with market principles" under 19 CFR 351.511(a)(2)(iii) for the utility industry.

**B.      Commerce's Determinations Regarding POSCO Plantec**

As requested by the Court, and as explained below, we continue to determine that POSCO Plantec did not provide inputs primarily dedicated to the production of downstream

---

[63] *See, e.g.*, *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Final Affirmative Determination*, 81 FR 49946 (July 29, 2016), and accompanying IDM at Comment 2.

Filed By: Faris Montgomery, Filed Date: 1/31/23 9:13 AM, Submission Status: Approved

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

products, and therefore, POSCO Plantec is not a cross-owned input supplier pursuant to 19 CFR 351.525(b)(6)(iv).

With regard to the court's finding that Commerce did not sufficiently explain why it considered information regarding POSCO Plantec's primary business activity, we first note that neither the statute nor the CVD regulations provide a definition of "primarily dedicated."  Thus, recognizing that decisions regarding primarily dedicated inputs are case-specific, following 19 CFR 351.525(b)(6)(iv) and using the *Preamble* and our past CVD decisions as a guide*,* we find that Commerce has relied on a number of factors under which we would analyze the facts of the case at issue in this remand.[64]

Section 351.525(b)(6)(iv) of Commerce's regulations states that, "if there is cross-ownership between an input supplier and a downstream producer, and *production* of the input product is *primarily dedicated to production* of the downstream product, the Secretary will attribute subsidies received by *the input producer* to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations)" (emphasis added).  Therefore, one of the factors we considered for this analysis is whether an input supplier produced the input.

Our determinations regarding this attribution provision have always been guided by the *Preamble,* which states that Commerce developed regulations to countervail subsidies provided to cross-owned input suppliers for a specific purpose:  "the main concern we have tried to address is the situation where a subsidy is provided to an input supplier whose production is dedicated almost exclusively to the production of a higher-value added product – the type of input product that is merely a link in the overall production chain."[65]

---

[64] *See Countervailing Duties:  Final Rule*, 63 FR 65348 (November 25, 1998) (*Preamble*).
[65] *Id.* at 65401.

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

Rather than explicitly defining what qualifies as an input supplier relationship with a downstream producer, the *Preamble* provides two examples:  stumpage subsidies on timber that is used in lumber production and subsidies to semolina primarily dedicated to pasta production.[66] "We believe that in situations such as these, the purpose of a subsidy provided to the input producer is to benefit the production of both the input and downstream products."[67]  At the same time, we cautioned against including all the cross-owned input producers in a CVD case. Specifically, we stated that:

> Where we are dealing with input products that are not primarily dedicated to the downstream products, however, it is not reasonable to assume that the purpose of a subsidy to the input product is to benefit the downstream product.  For example, it would not be appropriate to attribute subsidies to a plastics company to the production of cross-owned corporations producing appliances and automobiles. Where we are investigating products such as appliances and automobiles, we will rely on the upstream subsidy provision of the statute to capture any plastics benefits which are passed to the downstream producer.[68]

As we previously stated, neither the *Preamble* nor the statute and regulations offer an explicit definition of "primarily dedicated;" the determination must therefore be made reasonably based on the facts of each proceeding.  Therefore, two factors we considered in our analysis include whether the input is merely a link in the overall production chain, as stumpage is to lumber production or semolina is to pasta production as described in the *Preamble*, and whether the input is a common input among a wide variety of products and industries, as plastics are to automobiles, and thus not the type of input that is merely a link in the overall production.

Since the *Preamble* was published, we have gained more experience with respect to investigating input producers.  Accordingly, based on the *Preamble* and our attribution regulation, we have further clarified how we analyze whether inputs are primarily dedicated on a

---

[66] *Id.*
[67] *Id.*
[68] *Id.*

Filed By: Faris Montgomery, Filed Date: 1/31/23 9:13 AM, Submission Status: Approved

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

case-by-case basis.  In *Coated Free Sheet Paper from China,* in deciding HJP Pulp is a cross-

owned input supplier, we explained that:

> Section 351.525(b)(6)(iv) of our regulations addresses situations where cross-owned suppliers receive subsidies and directs that those subsidies be attributed to the combined sales of the input and downstream products, as long as the input product is primarily dedicated to the production of the downstream product. There does not appear to be any dispute in this case that pulp is primarily dedicated to the production of paper … .[69]

> In general, {Commerce} does not trace subsidies … .[70]  Whether a producer uses a particular input is usually driven by business considerations.  For example, a producer may choose different inputs based on the demands of different customers.  Also, government regulations may make it more or less costly to use certain inputs depending on where the product is to be sold.  In such situations, it is perfectly rational for the producer to create a business model that takes these factors into account.  However, these business choices should not dictate how {Commerce} attributes subsidies bestowed on the inputs.[71]

Therefore, one of the factors we have considered is whether the input could be used in the

production of downstream products, regardless of whether the input was actually used in the

production of subject merchandise.

We have also considered in prior cases whether the downstream producers in the overall

production chain are the primary users of the inputs produced by the input producers and

whether the production of the inputs by the input producers is exclusively for the overall

production chain.[72]  For example, in the case of electricity, while electricity could be used in

---

[69] *See Coated Free Sheet Paper from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 72 FR 60645 (October 25, 2007) (*Coated Free Sheet Paper from China*)*, and accompanying* IDM at Comment 18.

[70] *Id.* (citing *Preamble*, 63 FR at 65403; *Final Results and Partial Recission of Countervailing Duty Expedited Reviews:  Certain Softwood Lumber Products from Canada*, 67 FR 67388 (November 5, 2002), and accompanying IDM at Section III, Comment 8).

[71] *See Coated Free Sheet Paper from China* IDM at Comment 18.

[72] *See Steel Concrete Reinforcing Bar from the Republic of Turkey:  Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2019*, 87 FR 21640 (April 12, 2022) (*Rebar from Turkey 2019 AR*), and accompanying IDM at Comment 1 (Finding scrap to be a primarily dedicated input, we stated that "more importantly, in this instance, the record information shows that Nur sold the steel scrap exclusively to Kaptan, thus providing to Kaptan a supply of scrap devoted to Kaptan's downstream steel production."); *see also Steel Concrete Reinforcing Bar from the Republic of Turkey:  Preliminary Results of Countervailing Duty Administrative Review*

Filed By: Faris Montgomery, Filed Date: 1/31/23 9:13 AM, Submission Status: Approved

many industries, it is reasonable to assume that a cross-owned electricity producer's production is primarily dedicated almost exclusively to the production of downstream product if the subject merchandise producer is the sole user of the electricity produced, because the production of electricity by the cross-owned input producer is exclusively for the overall production chain. This is the case in *Rebar from Turkey*, where we found that the cross-owned input supplier's provision of scrap was provided exclusively to the downstream producer.[73]

Lastly, we have examined a company's business activities in previous cases to assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the *Preamble* or if the purpose of any subsidy provided to the input producer would be "to benefit the production of both the input and downstream products."[74]  In *Glass Containers from China,* we found that the glass machinery provided by a company was not a primarily dedicated input because the company's business license detailed a variety of production activities other than glass equipment manufacturing. Given the company's involvement in producing a variety of machinery and products unrelated to glassmaking machinery, we found the input producer's production was not dedicated almost exclusively to the production of a higher value-added product in the manner suggested by the *Preamble.*[75]

---

[73] *Id.*; *see also Steel Concrete Reinforcing Bar from the Republic of Turkey:  Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2018*, 86 FR 53279 (September 27, 2021) (*Rebar from Turkey 2018 AR*), and accompanying IDM at Comment 5.

[74] *See Preamble*, 63 FR 65401.

[75] *See Certain Glass Containers from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 85 FR 31141 (May 22, 2020) (*Glass Containers from China*)*, and accompanying* IDM at Comment 12; *see also Forged Steel Fluid End Blocks from the Federal Republic of Germany:  Final Affirmative Countervailing Duty Determination*, 85 FR 80011 (December 11, 2020) (*FEBs from Germany*)*, and accompanying* IDM at Comment 14.

*and Intent to Rescind in Part; 2020*, 87 FR 73750 (December 1, 2022), and accompanying Preliminary Decision Memorandum at 6-8.

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

In sum, for the purposes of this remand, we examined the facts on the record with consideration toward the following factors:

- Whether an input supplier produced the input;

- Whether the input could be used in the production of downstream products including subject merchandise, regardless of whether the input is actually used for the production of the subject merchandise;

- Whether the input is merely a link in the overall production chain, as stumpage is to lumber production or semolina is to pasta production as described in the *Preamble*, or whether the input is a common input among a wide variety of products and industries and it is not the type of input that is merely a link in the overall production chain, as plastic is to automobiles;

- Whether the downstream producers in the overall production chain are the primary users of the inputs produced by the input producer and whether the production of the inputs by the input producers is exclusively for the overall production chain; and

- Examining a company's business activities to assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the *Preamble* such that the purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products."

These factors are not in hierarchical order, but instead provide a general outline of our considerations in our examination of the record to determine whether POSCO Plantec's inputs or production processes are primarily dedicated to the production of downstream product. We also note that these criteria are not exhaustive nor exclusive and that any analysis of whether an input is primarily dedicated is established by all the facts on the record, which in many instances, are proprietary. When assessing these factors and examining the record, we are still guided by our regulation and the *Preamble*. Furthermore, to clarify for the Court, we do not consider the amount of the input provided to be one of the factors in determining whether an input is primarily dedicated. Neither our statute nor our regulations include a threshold for the amount of the input supplied by a cross-owned company. For example, if an input is critical for the

26

production of downstream products, such as stumpage is to lumber production, even if the input supplier supplies a miniscule amount to the subject merchandise producer, we would still consider the input to be primarily dedicated to the production of downstream product.

The Court ordered Commerce to reconsider or further explain its decisions regarding POSCO Plantec's provision of scrap and a [                    ] to POSCO.  Below, we analyze the facts on the record according to the factors described above:

POSCO Plantec's Provision of Scrap

We continue to find that the scrap produced by POSCO Plantec was not primarily dedicated to the production of POSCO's downstream product.  As an initial matter, there is no debate among the parties that POSCO Plantec generated the scrap and that the scrap in question can be, and was in fact, used in the production of downstream product.[76]  However, scrap in this case is not merely a link in the overall production chain, as stumpage is to lumber production. Rather, similar to plastic, unprocessed scrap is a common input among a variety of products and industries and generated as a byproduct during a variety of production processes.  To further explain this finding, we can compare the scrap provided by POSCO Plantec with the scrap processing services provided by POSCO's cross-owned input supplier, Pohang Scrap Recycling Distribution Center Co., Ltd. (Pohang SRDC).  POSCO Plantec generated the scrap as a byproduct in its production processes, and it did not alter or otherwise process the scrap it generated for use as a steel input or specifically in the production of POSCO's downstream product.[77]  Furthermore, no parties argued, and the record did not demonstrate, that the steel scrap in question was not a generic scrap input that could be used in the production of many

---

[76] *See* POSCO's Letter, "Response to the Affiliated Companies Section of the Initial Questionnaire," dated August 29, 2019 (POSCO AQR) at 12.
[77] *See* POSCO NSA Comments at 9.

27

products.  This is in contrast with Pohang SRDC, which Commerce examined as a cross-owned input supplier in this case, as the record demonstrates that Pohang SRDC *processed* scrap by means such as loading and unloading, storage, guillotining (cutting), pressing to adjust size, *etc.*, on behalf of POSCO Daewoo Corporation (PDC), which then provided the processed scrap to POSCO.[78]  The scrap provided by Pohang SRDC was processed in a way that was specifically repurposed for POSCO's steel production.

The Court requested that Commerce further explain the significance we placed on the presence of an intermediary, PDC, to which POSCO Plantec sold the scrap it generated, which PDC then resold to POSCO.[79]  The fact that PDC, a trading company, was the intermediary in the scrap input supply chain is relevant because it is an indication that POSCO Plantec's sales of scrap only incidentally end up as part of POSCO's production of subject merchandise, circumstances which are not in themselves indicative of the scrap production being merely a link in an overall production chain to provide scrap to affiliated producers.  This situation is distinguishable from scenarios where multiple companies are involved in the provision of scrap to the downstream producer, which may imply that the production of scrap by those companies is a part of an overall production chain to provide scrap to the affiliated downstream producer.  This, along with the fact that POSCO Plantec did not process the scrap, much less in a way that specifically repurposes the scrap for use in POSCO's steel production, indicates that the scrap to steel production relationship in this case is more akin to the plastic to automobile production example in the *Preamble*.  In addition, there is no record evidence indicating that POSCO's steel production is the primary use for the scrap produced and that the production of the scrap is

---

[78] *See* Pohang SRDC's Letter, "Pohang SRDC's Initial Questionnaire Response," dated September 26, 2019 (Pohang SRDC IQR) at 5.
[79] *See Remand Opinion and Order* at 23.

exclusively for POSCO's steel production.  In other words, POSCO Plantec's provision of the scrap through an intermediary is only one part of our overall analysis regarding whether POSCO Plantec's scrap is merely a link in the overall production chain, is produced exclusively for the overall production chain, or could be considered "dedicated almost exclusively to the production of higher-value product."  Upon considering all of the facts present in this case, we do not conclude that the scrap is primarily dedicated to POSCO's downstream steel production.

As an example of a situation where Commerce may reach a different determination, this case is distinguishable from *Rebar from Turkey 2018 AR*.  While we cannot publicly compare details of business proprietary inputs and production processes on the record of that case with the record in this review, there are nevertheless distinguishing factors that can be found in the public Issues and Decision Memorandum:  foremost, the presence of a clear, vertically integrated scrap supply process, and scrap inputs used exclusively for the overall production chain.  Based on the publicly available information in that determination, scrap generation in the *Rebar from Turkey 2018 AR* is a consistent part of the production process.  Although the input supplier's primary function is identified as shipbuilding, Commerce noted:

> {i}n this review, there is no question that in producing ships, one of Nur's byproducts is steel scrap … .  Accordingly, whether or not Nur manufacturers scrap as its primary business or any other steel product matters little for purposes of our analysis of Nur's status as an input supplier to Kaptan … .  {I}n this instance, there is no information on the record to show that Nur sells its scrap to anyone else besides Kaptan, indicating that this scrap supply is devoted to Kaptan's downstream steel production.[80]

Further, in *Rebar from Turkey 2019 AR,* Commerce once again emphasized the facts on the record that the scrap was devoted to Kaptan's downstream steel production, as the scrap was provided exclusively and directly to Kaptan and thus supports a finding that the scrap was

---

[80] *See Rebar from Turkey 2018 AR* IDM at Comment 5.

29

primarily dedicated.[81]  Unlike in *Rebar from Turkey*, there is no indication that the scrap sold by POSCO Plantec was exclusively for POSCO's downstream steel production.[82]

Examining a company's business activities helps us assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the *Preamble* such that the purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products."[83] Here, examining POSCO Plantec's business activities indicates that its production is not dedicated almost exclusively to POSCO's higher value-added steel production.  We found POSCO Plantec's primary business purpose, "the construction of industrial plants," significant because it reflects a variety of industrial construction business activities of a scope beyond those related to steelmaking or constructing steel-making plants.  POSCO reported that POSCO Plantec's business functions included, for example, a variety of services for construction and repairs of buildings, equipment, and machinery, including such diverse functions as

[

].[84]  The record indicated that POSCO Plantec was or had the capacity to [

] different industrial facilities, and as such, these business functions could not be attributed specifically to POSCO's steelmaking, regardless of the fact that POSCO Plantec's [                              ] was within the scope of its business activities.[85]

We made a similar determination in *Glass Containers from China*, wherein we found that an input supplier's broad business scope demonstrates that the input supplier's production is not

---

[81] *See Rebar from Turkey 2019 AR* IDM at Comment 1.
[82] *See Rebar from Turkey 2018 AR* IDM at Comment 5.
[83] *See Preamble*, 63 FR at 65401.
[84] *See* POSCO NSA Comments at 10-11.
[85] *Id.*

"dedicated almost *exclusively* to the production of a higher value-added product."  Specifically, we stated:

> Commerce disagrees with {the respondent} that suppliers of machinery could never meet the intent of the attribution regulations with regard to input suppliers. As the petitioner correctly notes, we have determined in past cases that equipment and machinery can be considered a primarily dedicated input depending on the facts and circumstances of the case.  However, in the instant case, the record evidence does not support a finding that the glass machinery provided by Company A should be considered a primarily dedicated input such that it would meet the attribution criteria set forth in 19 CFR 351.525(b)(6)(iv) … .  Specifically, *Company A's business license indicates that the range of its business are broad … . Company A is engaged in "{p}roduction and sales: glass machinery; import and export of goods and technology permitted by the state; assembly and sales: glass machinery, rubber machinery, winery equipment, reducers, other mechanical equipment and parts and related technical consulting services; software development."*[86]

Therefore, we conclude that POSCO Plantec's production is not dedicated almost exclusively to the production of higher value-added steel production by POSCO.

Having reviewed the record again and analyzed the totality of the facts on the record, we continue to find the scrap produced by POSCO Plantec was not primarily dedicated to the production of POSCO's downstream product for the reasons specified above.  We did not rely on previous cases or comparable records to make the determination; rather, we examined the facts on this record and found that there was insufficient evidence to find scrap to be primarily dedicated to the downstream product in this case.  While in the *2018 AR Final Results* we cited to our determination in *Cold Rolled Steel from Korea*, our analysis was based on the facts on the record of this proceeding.  Our citation to *Cold Rolled Steel from Korea* indicated that we would expect that in circumstances where we made a cross-owned input supplier determination across multiple proceedings for the same companies, with nearly the same inputs provided, Commerce would come to the same determination unless there was a significant change in the cross-owned

---

[86] *See Glass Containers from China* IDM at Comment 12 (Emphasis added).

Barcode:4335731-01 C-580-888 REM - Remand - Slip Op. 22-116

input supplier's ownership or business activities during the different PORs.[87]

<u>POSCO Plantec's Provision of a [          -          ]</u>

      As directed by the Court, we are providing further explanation supporting our decision with respect to POSCO Plantec's provision of a [                    ] to POSCO and continue to find that, as part of the equipment and services POSCO Plantec provided to POSCO, the provision of the [                    ] among other inputs does not meet the primarily dedicated standard.  First, there is no record information showing that POSCO Plantec produced the [                    ].  The record demonstrates that at least certain of the equipment provided by POSCO Plantec was not produced by POSCO Plantec.[88]  Therefore, we do not have sufficient record evidence to conclude that POSCO Plantec was the producer of the product.  Second, POSCO states that "none of the fixed assets are actual machinery or equipment used to produce the downstream product;" however, POSCO described the [                    ] as a [                    ].[89]  Therefore, the record shows that the [                    ] could be used in the production of the downstream steel product.

      However, we do not conclude that a [                    ] is merely a link in the overall production chain, as stumpage is to lumber production.  Unlike stumpage to the production of lumber or pulp to the production of paper, we have never found [                    ] to be a primarily dedicated input into the production of steel.  POSCO stated that its [                    ] is not actual machinery or equipment used to produce the downstream product.  In addition, a review of the vast majority of the equipment inputs, which POSCO identified as

---

[87] *See 2018 AR Final Results* IDM at Comment 2 (citing *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2017*, 85 FR 38361 (June 26, 2020) (*Cold-Rolled Steel from Korea*), *and accompanying* IDM at Comment 2).
[88] *Id.*
[89] *See* POSCO NSA Comments at 10.

Filed By: Faris Montgomery, Filed Date: 1/31/23 9:13 AM, Submission Status: Approved

[

], indicates that they can be used in the production of many different products in different industries; most of the listed equipment inputs are used generically for [                    ].[90] The provision of the [                    ] was made under a similar set of factual circumstances as the other equipment inputs Commerce found were not primarily dedicated.  The Court has already sustained Commerce's determination that the generic nature of the remainder of the equipment provided by POSCO Plantec to POSCO during the POR cannot be found primarily dedicated to the production of downstream product.[91]  Thus, we find that the [

], consistent with other equipment inputs, is not merely a link in the overall production chain.  The record also does not contain evidence demonstrating that POSCO's steel production is or could be the primary use of POSCO Plantec's [                    ], or that POSCO Plantec was [                    ] at all, much less exclusively for POSCO.  Lastly, we reexamined POSCO Plantec's business activities.  As described in the section above in which we found scrap not to be primarily dedicated, we do not find POSCO Plantec's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the *Preamble* such that the purpose of any subsidy provided to the company would be to benefit the production of both the inputs and downstream steel products.

After reassessing the record and analyzing the totality of the factors for POSCO Plantec's provision of machinery and equipment for repairs, we continue to find the [                    ] is not a primarily dedicated input in this case.

---

[90] *Id.* at 9-10.
[91] *See Remand Opinion and Order* at 29.

33

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

## V.      INTERESTED PARTY COMMENTS

On December 16, 2022, we released our draft remand redetermination to interested

parties.[92]  On December 21, 2022, we extended the deadline for interested parties to submit

comments on the Draft Remand until January 3, 2023.[93]  On January 3, 2023, we received

comments from Nucor and POSCO.[94]

**Comment 1:  Commerce's Determination Not to Investigate the Alleged Sale of Off-Peak Electricity for LTAR**

*Nucor's Comments*[95]

- Commerce's draft remand redetermination provides additional explanation for the decision not to initiate on the off-peak electricity for LTAR subsidy allegation, but does not remedy the flaws in the underlying determination, failing to explain Commerce's rationale for treating a TOU pricing system as consistent with market principles, and faulting Nucor for failing to provide information without making the corresponding finding that such information was reasonably available.
- In the final remand results, Commerce should either determine that Nucor's allegation provided sufficient evidence of a benefit to support initiation or clearly explain the reasonably available facts it believes were omitted and how said facts contradicted the basis of the pricing comparison in the allegation.
- The draft remand redetermination faults Nucor for failing to provide information but does not explain what the information was or how it was reasonably available in the public domain.  Commerce's draft remand redetermination omits a clear explanation of what exactly Commerce was looking for beyond sweeping, generalized references regarding all information available to Nucor.
- Commerce conceded that Nucor's allegation included KEPCO's power trading statistics, data from Korea's Electricity Power Statistics Information System, and a substantial description of KEPCO's cost system, pricing factors and the KPX.  The deficiencies Commerce described in its draft remand redetermination in broad categories were placed on the record by Nucor.
- The draft remand redetermination refers to data on the record that contradicted Nucor's claims without specifying the data in question.  Commerce faulted Nucor for not making reasonable adjustments to its submitted estimate of KEPCO's costs and needs to explain what those reasonable adjustments should have been, and what available information on

---

[92] *See* Draft Remand.
[93] *See* Memorandum, "Extension of Deadline to Submit Comments on Draft Remand Redetermination," dated December 21, 2022.
[94] *See* Nucor's Letter, "Comments on Draft Results of Redetermination," dated January 3, 2023 (Nucor Draft Remand Comments); *see also* POSCO's Letter, "POSCO's Comments on Draft Remand Redetermination," dated January 3, 2023 (POSCO Draft Remand Comments).
[95] *See* Nucor Draft Remand Comments at 2-15.

the record Nucor should have provided.

- Nucor's allegation is based on readily available information that the cost of supplying off-peak industrial electricity is no lower than the cost of supplying on-peak electricity.

- The GOK's response to Nucor's allegation provided no actual cost, price, or demand data, and nothing in the GOK's response contradicted the qualitative and quantitative information underlying Nucor's allegation, which included both explicit statements from KEPCO and GOK officials, and actual GOK data that corroborated the statements. Commerce failed to address the significance of the information the allegation did include and did not specify where contradicting information on the record or the public domain might exist.[96]

- Nucor's allegation observed that on-peak industrial prices were nearly three times higher than off-peak industrial prices and established that there was no market-based justification for a price discrepancy of such magnitude.  Nucor conducted extensive research and found qualitative and quantitative evidence contradicting the GOK's prior explanations that off-peak prices were lower because of demand patterns and the ability of lower-cost generators to supply off-peak electricity.[97]

- Nucor did not merely provide "newspaper articles," but documentation including direct quotes from high-ranking officers of the GOK and KEPCO that explicitly confirmed the basis for Nucor's allegation.  According to the President of KEPCO, off-peak prices were subsidized as part of the GOK's efforts to "foster the manufacturing industry" and were divorced from the actual cost of supply such that increases to off-peak prices were necessary, and the majority of electricity consumption occurred at off-peak hours primarily due to large industrial users shifting consumption.[98]

- Nucor's allegation examined the Korean electricity pricing mechanism and official GOK market data that corroborated the aforementioned statements and quoted KEPCO's definitions of the SMP and the merit order system.[99]

- Based on KEPCO's own explanations of the merit order system and SMP, Nucor's allegation examined hourly SMP data for the entire POR as an indication of electricity demand trends over the course of the day and KEPCO's cost of supply.  If demand falls significantly during off-peak hours, fluctuations in the SMP should reflect that dynamic. However, the data showed the SMP remained stable over the course of the day, demonstrating that neither demand nor cost of supply changed significantly.[100]

- The average SMP during on-peak hours was 4.00 KRW per kWh lower than the average SMP during off-peak hours, while KEPCO's off-peak industrial electricity prices were more than 140 KRW per kWh lower than on-peak hours.  Nucor provided GOK data showing that the base-load generators did not establish the SMP at all during the POR and the higher-cost generators supplied electricity at all hours to demonstrate that off-peak prices would not have covered KEPCO's cost of supply.  The GOK and POSCO did not provide any contradictory data.[101]

---

[96] *Id.* at 5-6 (citing, generally, GOK NSA Comments).
[97] *Id.* at 6-7 (citing New Subsidy Allegations at 8-9 and Exhibit 6).
[98] *Id.* at 7 (citing New Subsidy Allegations at Exhibits 7, 10, 12, 16, and 17).
[99] *Id.* at 8 (citing New Subsidy Allegations at 10 and Exhibit 8).
[100] *Id.* (citing New Subsidy Allegations at 10-11 and Exhibit 9).
[101] *Id.*at 9 (citing New Subsidy Allegations at Exhibits 4, 9, and 11; generally, GOK NSA Comments; GOK NSA Comments at 7; Nucor Pre-Prelim Comments at 7-8).

35

- The draft remand redetermination suggests that the problem with Nucor's allegation was that Nucor did not provide information confirming Commerce's pre-existing understanding of the Korean electricity market. This appears to be the principle that there are differences in generators in terms of operation and usage at different hours that require unspecified adjustments.

- Commerce's understanding is incorrect and, therefore, Nucor is unable to provide information to substantiate the incorrect assertion. Nucor is not deliberately withholding or concealing facts and no party, including Commerce, has demonstrated the ability to identify or obtain this information.

- Commerce's draft remand redetermination purports to analyze Nucor's allegation by the standard articulated in *RZBC Group*, which Nucor agrees is the correct standard. However, Commerce asserts Nucor's allegation is insufficient in light of prior proceedings involving the provision of electricity for LTAR and is, in fact, applying the heightened standard articulated in *Bethlehem Steel*. Commerce should review Nucor's allegation under the proper standard and find it reasonably provided available evidence of a benefit.[102]

- The draft remand redetermination considers adequate remuneration under a cost-to-government standard that precludes affirmative benefit determinations any time a government supplier recovers aggregate costs by engaging in cross-subsidization. Contrary to Commerce's assertion in the draft remand redetermination, Nucor established a rationale that KEPCO's practice of establishing electricity tariffs to cover aggregate costs through a system of cross-subsidization is inconsistent with market principles.[103]

- KEPCO's implantation of a TOU system does not undermine the evidence establishing that certain prices within the system are subsidized prices. Rather, the fact that KEPCO covers its costs on an aggregate basis only establishes that there is no cost to the GOK in conferring the subsidy. Finding no benefit on this basis contravenes the fundamental basis for identifying and measuring subsidies in U.S. CVD practice.[104]

- Under section 771(5)(E) of the Act and Commerce practice, a benefit is conferred based on what the recipient would have had to pay for the good in the marketplace, absent any government involvement. Determining whether a benefit is conferred based on cost recovery in the aggregate, *i.e.*, cost to the government, is inappropriate from the

---

[102] *Id.* at 10-11 (citing *RZBC Group*, 100 F. Supp. 3d at 1295).

[103] *Id.* at 11-12 (citing New Subsidy Allegations at 8-13; Nucor Pre-Prelim Comments at 4-5, 10).

[104] *Id.* at 12 (citing *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review, 2015*, 83 FR 34828 (July 23, 2018) (*Solar Cells from China*), *and accompanying* IDM at Comment 10 ("In a subsidy analysis, a benefit is either conferred or not conferred, and a positive benefit from certain transactions cannot be masked by 'negative benefits' from other transactions."); *Supercalendered Paper from Canada: Final Results of Countervailing Duty Expedited Review*, 82 FR 18896 (April 24, 2017) (*Supercalendered Paper from Canada*), *and accompanying* IDM at Comment 26 (noting that "offsetting a benefit calculated on some transactions, *i.e.*, those that represent the government provision of a good for LTAR, with the 'negative' benefits that arise from transactions in which the government provision of the good is not at LTAR, is not one of the permissible offsets {in section 771(6) of the Act}"); *Coated Free-Sheet Paper from the Republic of Korea: Notice of Final Affirmative Countervailing Duty Determination*, 72 FR 60639 (October 25, 2007) (*Coated Free-Sheet Paper from Korea*), *and accompanying* IDM at Comment 15; *Canadian Solar Inc. v. United States*, Slip Op. 20-23 (CIT Feb. 25, 2020) (*Canadian Solar*) at 14-16; Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA) at 927).

36

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

perspective of the private recipient.[105]

- Commerce and the courts have both found that the government supplier's aggregate performance is irrelevant to an adequate remuneration analysis.[106]

- Commerce fails to explain why the allegation of cross-subsidization "conflates benefit and specificity," making no reference to any provision in the specificity statute or Commerce practice. Instead, Commerce cites to 19 CFR 351.503(c), which discusses the effect of subsidies on a firm's performance or behavior.

- Commerce's rationale creates a loophole in CVD laws, suggesting that because Commerce does not consider the effect of a subsidy on firm behavior, Commerce cannot find that a benefit has been conferred if a respondent has a choice between subsidized and non-subsidized prices. Commerce has not previously found that a subsidized price does not confer a benefit simply because non-subsidized prices are also available to the respondent but has instead made multiple determinations finding the opposite.[107]

- Commerce failed to explain the meaningful difference between KEPCO's tariff schedule itself being inconsistent with market principles and certain prices in the tariff schedule being inconsistent with market principles. The tariff schedule prices were the starting point for Nucor's allegation, and Nucor established in its allegation that certain prices were inconsistent with market principles. Commerce should explain this determination and its legal significance.[108]

*POSCO's Comments*[109]

- Commerce properly declined to initiate an investigation of off-peak electricity for LTAR and should not change its draft remand redetermination for the final redetermination.

- Commerce was correct in its findings that publicly available factors affect the price that KEPCO pays for electricity and contradicts Nucor's claim that the SMP is a suitable benchmark for the purposes of the benefit allegation, and that Nucor's provision of the annual average cost of sale was an apples-to-oranges comparison.[110]

- Commerce was correct that the petitioner provided no information to demonstrate that

---

[105] *Id.* at 12-13 (citing *Certain Softwood Lumber Products from Canada: Notice of Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination*, 66 FR 43186, 43193 (August 17, 2001) (*Softwood Lumber from Canada INV Prelim*)).

[106] *Id.* at 13 (citing *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 73 FR 31966 (June 5, 2008) (*CWP from China*), *and accompanying* IDM at Comment 7; *Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Final Affirmative Countervailing Duty Investigation Determination*, 73 FR 35642 (June 24, 2008) (*LWR Pipe and Tube from China*), *and accompanying* IDM at Comment 7 ("{T}he profitability of SOE HRS producers . . . is not relevant to the determination of whether HRS was sold for LTAR."); *U.S. Steel Corp. v. United States*, 33 CIT 1935, (CIT December 30, 2009) ("The overall profitability of the NMDC does not demonstrate that its prices to Essar are market-based.") (*U.S. Steel*).

[107] *Id.* at 13-14 (citing *Solar Cells from China* IDM at Comment 10; *Supercalendered Paper from Canada* IDM at Comment 26; *Coated Free-Sheet Paper from Korea* IDM at Comment 15; *Canadian Solar*, Slip Op. 20-23 at 14-16).

[108] *Id.* at 14 -15 (citing New Subsidy Allegations at 8-15).

[109] *See* POSCO Draft Remand Comments at 2-3.

[110] *Id.* at 3 (citing New Subsidy Allegations at 14-15; Nucor NSA QR at Exhibit 1 at 34-37).

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

KEPCO's tariff schedule was inconsistent with prevailing market conditions in Korea that Commerce has previously determined are consistent with market principles.

**Commerce's Position:**

We continue to find that Nucor did not provide a sufficient allegation of benefit to initiate on the alleged off-peak electricity for LTAR program.  We address below the points argued by Nucor in its comments regarding its allegation and our analysis.

Nucor cites the industrial rate tariff schedule and articles it submitted as support for its allegation.  For the tariff schedule, Nucor notes the "nearly three times" difference between on-peak and off-peak rates under the industrial tariff classification.[111]  Nucor further asserts the allegation "is apparent on the face of KEPCO's tariff schedule."[112]  When examining the submitted tariff schedule, it is important to note that the general and educational classification tariff rates also have a similar pattern between the on- and off-peak rates.[113]  There is also seasonality included in the tariff schedule that adjusts the stated tariff rates and varying tariff options for customers that offer variable demand and energy charges.[114]  Thus, the tariff rate schedule, on its own, does not demonstrate or support Nucor's allegation, as the industrial tariff rate patterns cited by Nucor also exist in other tariff classifications and were determined to be based on market principles as part of the investigation.[115]  However, the tariff schedule's rates, overall, do support the GOK's assertion of setting rates that correspond to varying cost considerations such as fuel, load factor, and pattern usage of consumers.[116]

---

[111] *See* Nucor Draft Remand Comments at 7 (citing New Subsidy Allegations at 8-9).
[112] *See* New Subsidy Allegations at 8.
[113] *Id.* at Exhibit 7.
[114] *Id.*
[115] *See* New Subsidy Allegations at Exhibit 4.
[116] *Id.* at 9.

Nucor also provided articles citing KEPCO and GOK officials to demonstrate the shift of large industrial users to off-peak electricity usage and its impact on KEPCO's costs.[117]  In one article, Nucor cites a quote from the President of KEPCO in 2018, Kim Jong-gap, stating that off-peak electricity prices were subsidized as part of the GOK's efforts to "foster the manufacturing industry."[118]  However, this is not a full direct quote from KEPCO's president; the full quote of the article states, "*In the past*, {emphasis added} the government encouraged the industry's use of late-night electricity at low rates to foster the manufacturing industry."[119]  Later, in the article, KEPCO's president "stressed that KEPCO is neutral in its electricity sales revenues," and stated that "the cost recovery rate {for industrial electricity} is low," but, nevertheless, existent.[120]

The other articles cited by Nucor establish a shift of industrial users toward the off-peak timeframe.  However, the articles do not describe the situation as "so divorced from the actual cost of supply that increases to off-peak prices became necessary."[121]  For example, one article noted, "since last year, the nuclear power plant utilization rate (58% as of May) has declined and the proportion of LNG power generation has increased" and "{r}aising the light load rate and lowering the other time period (heavy load, maximum load) is a good idea {according to the Ministry of Industry, etc.}"[122]  Moreover, another article noted, "{p}eak consumption at midnight, which was 67.73 gigawatts (GW) in 2009, increased to 72.84 GW in 2012 and reached 78.47 GW last year," "the demand for late-night electricity is enough to meet the demand of nuclear power plants (22.5 GW) and coal-fired plants (36.8 GW)" and "the peak of the winter

---

[117] *See* Nucor Draft Remand Comments at 7.
[118] *Id.* at 7 (citing New Subsidy Allegations at Exhibit 7).
[119] *See* New Subsidy Allegations at Exhibit 7.
[120] *Id.*
[121] Nucor Draft Remand Comments at 7.
[122] *See* New Subsidy Allegations at Exhibit 10.

39

midnight power is not caused by industrial use…{t}he problem is the demand for heating power, which has been on the rise since the 1990s…."[123]   The final two articles include statements from the Minister of Trade/Commerce, Industry and Energy, in April 2018, postponing the adjustments of the light load rate from 2018 onward.[124]   Thus, although there has been an increase in industrial off-peak electricity users, the articles do not draw a clear line to any potential below-cost pricing by KEPCO established in the November 2013 tariff schedule and include a myriad of possibilities that may explain why light load pricing may not be recovering costs during the POR.[125]   Finally, we note that none of the submitted articles state that off-peak prices did not recover costs during the POR.

For the purposes of Nucor's new subsidy allegation in the underlying proceeding, we required reasonable evidence that the industrial rates at off-peak hours were not based on market principles.   As part of this analysis, Nucor needed to address prior findings on the Korean electricity market that lay out the basic framework of the system and how prices are determined. Nucor argues it provided this exact standard in making its allegation.   However, as we have previously stated, Nucor did not account for several factors in the KPX's pricing of electricity and the electricity tariff schedule that would create a reasonable allegation of benefit.   The information required to provide sufficient explanation was clearly available within Commerce's extensive record with regard to its analysis of the Korean electricity market.

At the outset, we would like to clarify certain facts on the record of this proceeding regarding the Korean electricity market.   Nucor has misconstrued certain facts as they pertain to

---

[123] *Id.* at Exhibit 12.
[124] *Id.* at Exhibits 16 and 17.
[125] *Id.* at Exhibit 4.

its allegation.  The KPX is the GOK authority that acts as the electricity market operator.[126]  In this role, it receives bids for electricity from generation companies.  KEPCO has two roles within the Korean electricity system.  First, through its subsidiaries, it generates electricity and sells it through the KPX.[127]  KEPCO is also responsible for the transmission, distribution, and sales of electricity to consumers in Korea.[128]  KEPCO purchases the electricity from the KPX.  Under the Rules on Operation of Electric Utility Market,[129] the KPX electricity market sets prices via merit order depending on estimated hourly power demand; as shown in the Appendix, which contains the KPX's own publicly available description of this system.[130]  As the Korean electricity system is designed, generators for which the cost of providing electricity is low (nuclear and coal power) are the first to have their bids accepted and comprise the base load, *i.e.*, electricity intended to operate on a 24-hour basis.  Generators that have higher costs (oil and liquefied natural gas (LNG) power) comprise the non-base load and may or may not have their bids accepted depending on their bid price and the KPX's estimated level of electricity demand.[131]  The KPX accepts the bid of the generation unit with the lowest variable cost of producing electricity among all the generation units that have submitted a bid for a given hour.  The lowest-priced bid is first awarded a purchase order for electricity up to the available capacity of such unit as indicated in its bid.  The generation unit with the next lowest variable cost is then awarded a purchase order up to its available capacity as indicated in its bid, and so forth, until the projected demand for electricity for such hour is met.  This maximum bid value is the SMP, which is

---

[126] *See* the GOK's Letter, "Response to the Initial Questionnaire," dated October 7, 2019 (GOK IQR) at Exhibits E-3 to E-5.
[127] *Id.* at Exhibits E-3 to E-5.
[128] *Id.* at Exhibits E-3 to E-5.
[129] *Id.* at Exhibit E-6.
[130] *Id.* at Exhibits E-3 to E-5; *see also* POSCO's Letter, "POSCO's Initial Questionnaire Response," dated September 26, 2019 (POSCO IQR) at Exhibit C-4.
[131] *Id.*

41

reflected in the GOK's chart demonstrating how the generator bids are built up by the GOK's price scheduling system in the Appendix.[132]  As shown in the chart, the SMP at any given hour is reflected by the top line, while all other lower-priced electricity bids that comprise the bulk of the electricity provided are reflected in the shaded areas below the top line.[133]  The chart and descriptions of the KPX's electricity market trading process were placed on the record by POSCO and the GOK in their initial questionnaire responses.[134]

The SMP is relevant to the cost of generating electricity and, thus, relevant for a comparison to the prices in the GOK's tariff schedule, only insofar as it is utilized in the KPX's pricing formula by which the KPX sets the prices at which KEPCO compensates electricity generators.  This was explained in KEPCO's Form 20-F that Nucor placed on the record.[135] Generation companies are compensated based on the marginal price (the variable cost of generating electricity as calculated by the formula below) and the capacity price (the predetermined fixed cost of generating electricity).[136]  The capacity price and variable cost, which includes the adjustment coefficient, are determined by the Cost Evaluation Committee, which is comprised of stakeholders including the Ministry of Trade, Industry and Energy officials, KEPCO, the KPX, generation companies, and scholars and researchers.[137]  The SMP pertains to the marginal price.  The KPX calculates the per-unit variable cost of electricity KEPCO pays to each generator as follows:

$$Per\ Unit\ Cost = Variable\ Cost + (SMP - Variable\ Cost) * (Adjusted\ Coefficient)$$

---

[132] Id.
[133] Id.
[134] See, e.g., GOK IQR at Exhibits E-1 to E-6.
[135] See New Subsidy Allegations at Exhibit 8, p.35-36.
[136] Id.
[137] Id.

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

Each generation company is paid its variable cost (at its bid price) plus an additional amount based on the difference between its bid price and the maximum bid price, multiplied by the adjusted coefficient, which is assigned to each generator operated by KEPCO's generation subsidiaries.[138]  The purpose of the adjusted coefficient is two-fold:  (1) to prevent over-payment to generators with low fuel costs (*e.g.*, nuclear and coal); and (2) to maintain a differential between the expected rate of return between the generation companies and KEPCO.  The result is that less expensive fuel types are paid a variable cost of electricity below the full value of the SMP.[139]  Based on the formula, the only generator that receives the variable price of electricity at the value of the SMP is the one with the highest variable cost (*i.e.*, bid price), because that is the only variable cost at which the adjusted coefficient for the generator does not factor into the variable price.  KEPCO's actual aggregate costs of providing electricity at any given hour are not reflective of this value, because it does not account for the fact that:  (A) lower cost generators are paid a variable cost of electricity below the SMP; and (B) as a maximum price, the SMP does not account for the quantity of electricity provided by each generation type.  The total cost of providing electricity at any given hour is reflected in the chart in the Appendix by the full area under the maximum price at the top line, *i.e.*, the SMP.  Based on these factors, which were available and clearly explained on the record either prior to or within Nucor's allegation, we found that an allegation that substituted SMP for the variable price of electricity was insufficient without amendment.  Specifically, we found the off-peak electricity for LTAR subsidy allegation was not reasonably supported by the facts alleged because Nucor continuously asserted that the

---

[138] *Id.*
[139] *Id.*

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

SMP was representative of the variable cost of electricity and there was clear information on the record disproving this assertion.[140]

While the hourly SMP information provided by Nucor demonstrates that off-peak electricity was operating above base load, *i.e.*, requiring use of higher-priced generators beyond the coal and nuclear generators that provide the base load, it does not account for the quantity of electricity each type of generator is supplying that will inherently affect KEPCO's overall cost of supply. As can be seen from the chart in the Appendix, the increase in the SMP is a series of discrete steps by electricity type, rather than a continuous, rising line. Even a small apparent difference in the SMP could indicate a significantly different quantity of electricity provided, because the same type(s) of electricity will have similar generation costs. The bidding process by the generators in the Korean electricity market is established such that KEPCO purchases the lowest cost electricity available until the generated supply meets the consumer demand.[141] The SMP information Nucor provided shows that the highest bid prices for electricity at on- and off-peak hours have a 4 KRW/kWh price difference, but that only demonstrates that certain generators are in use and is not an accurate estimate of KEPCO's costs.[142] Instead, whether that bid price reflected in the SMP accounts for, for example, 5 percent or 15 percent of the electricity generated at any given hour, affects KEPCO's overall cost of supply.

We provided Nucor an opportunity to amend its allegation or provide further explanation to account for the other factors in the KPX's pricing formula that would comprise a reasonable allegation of benefit. In our supplemental questionnaire to Nucor, we requested that Nucor provide an explanation of the "other factors that determine the price for electricity other the

---

[140] *See* New Subsidy Allegations at 14.
[141] *See* Nucor NSA QR at Exhibit 1, p.34-38.
[142] *See* New Subsidy Allegations at 14-15 and Exhibits 9 and 13.

44

{SMP}," citing specifically to the pages in KEPCO's Form 20-F placed on the record by Nucor that explained how the KPX sets the marginal pricing formula to compensate generation companies for variable costs and how the other factors are used in conjunction with the SMP to derive the amount paid to the generators, as we described above.[143]  We did not receive any indication or notification that Nucor was having difficulty providing the information or any requests for clarification regarding the information Commerce was seeking to substantiate the allegation until after we declined to initiate on the subsidy allegation.

As we stated in the draft results, requesting additional information in regard to Nucor's allegation of benefit did not require that Nucor provide business proprietary off-peak electricity costs during the POR.  Rather, we asked Nucor to "explain" any additional factors that determine the price of electricity in order to provide a viable comparison to the electricity tariff schedule. Nucor defined the adjusted coefficient factor, noting that it "may be relevant to the manner in which {Commerce} analyzes the benefit conferred… but has no direct impact on KEPCO's end-user prices."[144]  Nucor discussed the coefficient factor in context with the tariff schedule, rather than in the context of the KPX pricing formula.  Further, Nucor provided the following in its response:

> Nucor discussed the SMP for two reasons.  First, since it reflects the variable cost of electricity generation, it serves as a reasonably available and conservative proxy for what the price of electricity should be at any specific time of day.  According to KEPCO's Form 20-F, the SMP "represents, in effect, the marginal price of electricity at a given hour at which the projected demand for electricity and the projected supply electricity for such hour intersect … ."  It is, therefore, the Korean government's own estimate of a supply/demand electricity price, such that it is reasonable to believe that any price that is substantially lower than the SMP during a particular hour reflects a subsidized price.[145]

---

[143] *See* NSA Supplemental Questionnaire at 1.
[144] *See* Nucor NSA SQR at 4.
[145] *Id.* at 4-5.

Barcode:4335731-01 C-580-888 REM - Remand - Slip Op. 22-116

This statement provided none of the further context or explanation requested by Commerce and was readily contradicted by information on the record.  First, the SMP does not reflect the variable cost of electricity generation; as discussed above, it reflects the *maximum* variable cost of electricity generation and is the GOK's own estimate of a *maximum* supply/demand electricity price.  We describe above the reasons that this is not reflective of the actual costs of the provision of electricity.  Secondly, it is easily contradicted by other numbers on the record. Nucor's benefit allegation contends that the average off-peak SMP was 93.17 KRW/kWh during the POR, and that this conservatively "does not include fixed costs or profit."[146]  However, the unit prices of electricity provided by KEPCO during the POR in the power trading statistics in KEPCO's Form 20-F, which are the actual prices paid to the generation subsidies as effected through the KPX and include both the marginal price and capacity price of electricity (*i.e.*, variable and fixed costs) show certain prices below the 93.17 KRW/kWh SMP.[147]

For example, the two largest generation subsidiaries by volume during the POR were Korea Hydro & Nuclear Power Co., Ltd. (KHNP), which provides both base load (nuclear power) and non-base load (renewable) electricity, and Korea South Eastern Power Company (KOSEP), which is a non-nuclear generation subsidiary operating base load (bituminous and anthracite coal) and non-base load (combined cycle, and renewable) electricity.[148]  KEPCO's Form 20-F reports an average unit price paid to KHNP and KOSEP across all hours, based on the payments made by KEPCO through the KPX, of 67.38 and 90.33 KRW/kWh, respectively, during the POR.[149]  Rather than the SMP conservatively accounting only for KEPCO's variable

---

[146] *See* New Subsidy Allegations at 14-15.
[147] *See* Nucor NSA SQR at Exhibit 1, p.38.
[148] *Id.* at Exhibit 1, p.1, 38, and 44.
[149] *Id.* at Exhibit 1, p.38.  We note that these numbers include fixed costs and account for all hours and are not an appropriate comparison to the off-peak prices in the tariff schedule without accounting for time of use and the base rate(s) also paid by electricity consumers.

costs, as Nucor contends, a brief examination of these numbers shows that the average prices

KEPCO paid to purchase electricity through the KPX, including fixed costs, were actually below

Nucor's alleged variable benefit price at off-peak hours, because Nucor did not acknowledge that

certain generators and types of electricity are paid a variable price of electricity well below the

SMP due to their adjusted coefficient.  The inclusion of the coefficient factor, which as stated

above, directly adjusts the value of the SMP in the KPX's pricing formula, is crucial to

understanding the actual prices KEPCO pays to the generators that comprise KEPCO's costs.

These real-world prices were readily available to Nucor for use in its allegation.

Nucor further argues that determining whether a benefit is conferred based on whether a

government supplier covers its costs in the aggregate is inappropriate from the perspective of the

private recipient based on Commerce's previous determinations and precludes affirmative

benefit determinations any time a government supplier recovers aggregate costs, citing

Commerce's statement in *Softwood Lumber from Canada INV Prelim* that only considering

aggregate costs to the government is inappropriate.[150]  However, this mischaracterizes

Commerce's tier-three analysis, which is not merely concerned with whether a government

supplier recovers aggregate costs.  Under 19 CFR 351.511(a)(2)(iii), we assess the extent the

price charged by the government is consistent with market principles.  We note that an

evaluation of a government supplier's income and costs and whether the income covers costs and

profit, which Nucor equates to an evaluation of an entity's financial position, has consistently

been part of our tier-three analysis when assessing whether KEPCO's pricing is consistent with

market principles and has been found to be within the bounds of what 19 CFR 351.511(a)(2)(iii)

---

[150] *See* Nucor Draft Remand Comments at 11-13 (citing *Softwood Lumber from Canada INV Prelim*, 66 FR at 43193).

proposes.[151]  Our analysis is not based on KEPCOs total revenue but, instead, KEPCO's methodology for determining the adequacy of its pricing through cost and revenue data.

*Softwood Lumber from Canada INV Prelim* states that:

> from the government's perspective, remuneration could be considered 'adequate' as long as it covers the costs to the government of providing the good or service, the cost-to-government standard is wholly inappropriate from the perspective of the private recipient.  This is because the cost to the government does not necessarily measure the price at which the private recipient could have obtained the good or service in the marketplace free of government interference.[152]

This rationale is precisely why Commerce does not merely examine KEPCO's cost recovery, but also KEPCO's system of provision of electricity, which, as discussed above, Commerce has found to be consistent with market principles.  As such, our analysis of electricity for LTAR relates to financial performance only to the extent income from prices charged for each electricity consumption category covers KEPCO's costs plus profit.  Because POSCO paid electricity prices that are charged to all companies in the corresponding electricity consumption classifications, our analysis does account for whether the prices POSCO paid were covering KEPCO's costs.  While Nucor appears to argue that we should disregard a market analysis of KEPCO's pricing and simply focus on the price charged to the respondent, 19 CFR 351.511(a)(2)(iii) necessarily requires that we evaluate whether KEPCO's pricing is consistent with market principles.

Nucor cites a number of cases in making this argument, but these cases do not pertain to tier-three analyses.  The statements in *Solar Cells from China*, *Supercalendered Paper from Canada*, and *Coated Free-Sheet Paper from Korea* pertain to offsets based on tier-one or tier-two comparisons of prices paid by the respondent for inputs to other available market prices, and

---

[151] *See, e.g.*, *Nucor*, 927 F.3d at 1243, 1248.
[152] *See Softwood Lumber from Canada INV Prelim*, 66 FR at 43193.

discuss Commerce's established policy that where market prices are available, transactions made at LTAR conferring a benefit are not reduced by the value of transactions that do not confer a benefit.[153]  *Canadian Solar* likewise affirms this policy.[154]  Calculating a benefit on a transactional basis is not possible in a tier-three market analysis, where there is no available market price, and this policy has no relevance to the examination of the cost recovery of a government authority providing inputs.

The statements Nucor cited in *CWP from China* and *LWR Pipe and Tube from China* pertain to the appropriateness of considering the cost recovery of a government-owned input provider in a tier-two market analysis, where a world market price is readily available.[155]  Likewise, the Court discusses the appropriateness of considering the overall profitability of a government authority providing an input instead of an unaffiliated world market price in *U.S. Steel.*[156]  As we explained in *Softwood Lumber from Canada Inv Final*, there is a hierarchy to 19 CFR 351.511(a), and an observed market price from actual transactions within the country under investigation is the preferred benchmark in the hierarchy.[157]  Thus, resorting to a tier-three market principles analysis considering government cost recovery is inappropriate where a tier-two world market price exists; however, this statement does not apply when there is no market price available.  We reiterate that in this instance, Nucor's benefit allegation was based on a tier-three analysis.  Therefore, an appropriate examination of market principles of industrial electricity provided at off-peak hours pertains to whether KEPCO recovered its industrial

---

[153] *See Solar Cells from China* IDM at Comment 10; *see also Supercalendered Paper from Canada* IDM at Comment 26; *Coated Free-Sheet Paper from Korea* at Comment 15.
[154] *See Canadian Solar*, Slip. Op. 20-23 at 6.
[155] *See CWP from China* IDM at Comment 7; *see also LWR Pipe and Tube from China* IDM at Comment 7.
[156] *See U.S. Steel*, 33 CIT 1935.
[157] *See Notice of Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination:  Certain Softwood Lumber Products from Canada*, 67 FR 15545 (April 2, 2002) (*Softwood Lumber from Canada Inv Final*), and accompanying IDM at 36.

electricity tariff costs at off-peak hours, in aggregate, precisely because there is no market price to determine whether KEPCO is recovering its costs on a transactional basis.

Our tier-three analysis is not a preferentiality or discrimination analysis but, rather, is used to determine whether the prices charged by the government are based on market principles. In prior proceedings, we have examined the Korean electricity market and determined that there is no benefit as the electricity pricing is based on market principles. Nucor did not provide in its allegation any new information regarding the Korean electricity market beyond KEPCO's lack of cost recovery for industrial rates at off-peak hours. Thus, the focus of Commerce's analysis of this allegation is whether the industrial off-peak rates paid by the respondent are based on market principles. When we referred to the limitations imposed by 19 CFR 351.503(c) in the draft results, we were noting that we do not use the price POSCO would pay at on-peak hours in the tariff schedule as a benchmark comparison because we do not consider how POSCO's behavior has altered to use electricity at different hours due to the prices the GOK has set in its tariff schedule. We, therefore, do not conduct an examination of the tariff schedule's consistency with market principles based on the prices POSCO would have paid if they did not purchase electricity at off-peak hours, *i.e.*, the prices for electricity at on-peak or mid-peak hours. A discussion of what entities and industries are using electricity at specific hours is only applicable in these circumstances when making a determination of *de facto* specificity under section 771(5A)(D)(iii)(I) of the Act. Nucor argues that we are suggesting that the off-peak price does not confer a benefit because on-peak and mid-peak prices are also available to the respondent. This is an inaccurate characterization of Commerce's methodology; as we are examining electricity pricing at off-peak hours, the only prices available to industrial users are those off-peak prices in the tariff schedule. There are no additional prices available to the respondent

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

during off-peak hours, which is why we are examining Nucor's allegation in the context of whether off-peak electricity prices are consistent with market principles, *i.e.*, recovering costs. This does not create a loophole in the CVD law, as Nucor suggests; rather, it is precisely the analysis intended under 19 CFR 351.511(a)(2)(iii) and section 771(5)(E)(iv) of the Act.

Finally, accounting for the factors discussed above, which were present throughout the existing record at the time of the allegation or were both publicly available and explained in Commerce's previous determinations, did not constitute holding the petitioners to a higher standard of allegation than that expected by *RZBC Group*.  In *RZBC Group*, the CIT upheld that Commerce reasonably initiated on a tier-two input for LTAR allegation despite the petitioner misidentifying the specific, business proprietary input that the responding company was purchasing for use in its subject merchandise.[158]  As we previously stated in our draft remand redetermination, the standard outlined by *RZBC Group* states that petitioners must allege a subsidy in accordance with the statute and with the support of information reasonably available at the time of filing.[159]  Nothing in this standard requires Commerce to consider new allegations without considering readily available information pertaining to the alleged subsidy program or to the context of the allegation resulting from Commerce's previous determinations.  In fact, *RZBC Group* states that valid reasons for not initiating on subsidy allegations include circumstances when the allegations "are … not reasonably supported by the facts alleged or…omit important facts which are reasonably available to the petitioner."[160]  The record is clear in this case that Commerce did not initiate on the off-peak electricity for LTAR subsidy allegation due to problems with the applicability and accuracy of the benefit data Nucor provided given the full

---

[158] *See RZBC Group*, 100 F. Supp. 3d at 1288.
[159] *Id.*
[160] *Id.*

Filed By: Faris Montgomery, Filed Date: 1/31/23 9:13 AM, Submission Status: Approved

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

context of the known information regarding the subsidy, rather than on the basis of Nucor's

failure to provide information it was reasonably unable to provide (*i.e.*, business proprietary

data), as was the case in *RZBC Group*.

## Comment 2:  Commerce's Determinations Regarding POSCO Plantec

*Nucor's Comments*[161]

- Commerce's regulations under 19 CFR 351.525(b)(6)(i) were promulgated to close a loophole wherein vertically integrated businesses could avoid countervailing duty exposures for input subsidies by separately incorporating the division that makes the input.  Commerce does not consider whether the production of the input is the primary function of the input supplier, or the quantity supplied, but instead whether the input is of a kind primarily usable for manufacturing a limited number of goods.[162]
- Commerce's draft remand redetermination does not appropriately address the Court's concerns regarding its analysis of POSCO Plantec's provision of scrap.
- Commerce's argument that scrap is a generic input is unsupported given the nature of the end product, CTL plate.  Commerce has repeatedly found that steel scrap is primarily dedicated to downstream steel production, because it is used in the downstream producer's steel production process.[163]

---

[161] *See* Nucor Draft Remand Comments at 15-28.

[162] *Id.* at 15 (citing *Preamble*, 63 FR at 65401; *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1364 (CIT 2021) (*Icdas*) (approving Commerce's cross attribution of subsidies where an input supplier that primarily focused on electricity generation nonetheless provided small quantities of steel scrap to a downstream steel producer); *Large Residential Washers from the Republic of Korea:  Final Affirmative Countervailing Duty Determination*, 77 FR 75975 (December 26, 2012), and accompanying IDM at 3 (discussing the *Preamble*'s example of the hypothetical plastics producer); *FEBS from Germany* IDM at Comment 14 (confirming that there is no '*de minimis*' standard or a requirement with regard to the quantity or value of the input supplied between cross-owned companies); *Cold-Rolled Steel from Korea* IDM at Comment 2 (emphasizing that the focus of the analysis is on whether the input being supplied is one that is usable across many non-specific manufacturing processes or one that it usable primarily for manufacturing a limited number of specific goods)).

[163] *Id.* at 20 (citing *Rebar from Turkey 2019 AR* IDM at Comment 1; *Rebar from Turkey 2018 AR* IDM at Comment 5; *Seamless Carbon and Alloy Steel Standard, Lined, and Pressure Pipe from the Russian Federation:  Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 85 FR 80007 (December 11, 2020), and accompanying PDM at 10, unchanged in *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Russian Federation:  Final Affirmative Countervailing Duty Determination*, 86 FR 35263 (July 2, 2021), and accompanying IDM; *Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey:  Preliminary Results of Countervailing Duty Administrative Review and Intent to Rescind the Review, in Part; Calendar Year 2017*, 84 FR 21327 (May 14, 2019), and accompanying PDM at 8, unchanged in *Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey:  Final Results of Countervailing Duty Administrative Review and Rescission of Countervailing Duty Administrative Review, in Part; Calendar Year 2017*, 84 FR 56173 (October 21, 2019), and accompanying IDM; *Carbon and Alloy Steel Wire Rod from the Republic of Turkey:  Preliminary Affirmative Countervailing Duty Determination and Preliminary Affirmative Critical Circumstances Determination, in Part*, 82 FR 41929 (September 5, 2017), and accompanying PDM at 9, 20, unchanged in *Carbon and Alloy Steel Wire Rod from the Republic of Turkey:  Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, in Part*, 83 FR 13239 (March 28, 2018), and accompanying IDM; *Certain Cold-Rolled Steel Flat Products from the Republic of*

- Commerce did not explain how steel scrap could be used to produce anything other than steel by remelting for introduction into steel production processes. Uses of steel scrap are limited to downstream production of a discrete group of products, akin to semolina or stumpage.[164]

- Commerce does not successfully distinguish between its decisions regarding POSCO Plantec and Pohang SRDC. Unlike the scrap provided by POSCO Plantec, Commerce found that the scrap provided by Pohang SRDC was primarily dedicated to downstream production, reflecting the long-term understanding that steel scrap is primarily used for steel products.

- The draft remand redetermination is the only instance in which Commerce has ever attempted to distinguish between "processed" steel scrap and other scrap supplied by a cross-owned affiliate. The fact that no party argued scrap was not "generic" is irrelevant because no party would anticipate the need for such an argument, given its novelty. The fact that the scrap POSCO Plantec generated did not require processing prior to use does not support Commerce's conclusion and instead indicates that POSCO Plantec's scrap was appropriate by nature for use in POSCO's production of subject merchandise.

- PDC's status as an intermediary does not support Commerce's determination that the scrap POSCO Plantec provided was not primarily dedicated. PDC also acted as an intermediary in Pohang SRDC's supply of scrap to POSCO. The disparate treatment between these entities is arbitrary.[165]

- There are multiple POSCO affiliates involved in the provision of scrap to POSCO, including at least PDC, Plantec, and Pohang SRDC. The significance of Commerce's finding that POSCO Plantec's sales to POSCO are incidental because of the presence of PDC rather than multiple companies involved in the provision of scrap to the downstream producer is unclear, as is why Commerce considers the sales between POSCO Plantec and POSCO to be incidental in the first place.[166]

- PDC's status as an intermediary does not make the provision of scrap incidental given Pohang SRDC's similar record. Likewise, regardless of the lack of relevance of the quantity of the input as upheld by the courts, POSCO characterized the amount of scrap provided by both POSCO Plantec and Pohang SRDC as "small." Commerce should make the same determination for POSCO Plantec given the similar facts on the record.[167]

- Commerce has repeatedly held, and the courts have upheld, that the "primary focus" of an input supplier's business operations is irrelevant where the input supplied is primarily dedicated to the downstream product. Commerce has treated steel scrap provided by electricity generators and shipbuilders as primarily dedicated and stated that the primary

*Korea: Final Affirmative Determination of the Countervailing Duty Investigation*, 81 FR 49946 (July 29, 2016), and accompanying IDM at Comment 5 (treating scrap provided to POSCO by its affiliate POSCO P&S as presumptively "primarily dedicated to the production" of downstream flat-rolled steel); *Certain Oil Country Tubular Goods from the Republic of Turkey: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 79 FR 41964 (July 18, 2014) (*OCTG from Turkey*), *and accompanying* IDM at 8).

[164] *Id.* (citing *OCTG from Turkey* IDM at 8).
[165] *Id.* at 21-22 (citing Pohang SRDC IQR at 1,6, and 9).
[166] *Id.* at 22 (citing POSCO AQR at 12-13 and Exhibit 5; POSCO NSA Comments at 9; Pohang SRDC IQR at 1, 6, and 9).
[167] *Id.* at 22-23 (citing POSCO SRDC IQR at 1; *Icdas*, 498 F. Supp. 3d at 1364).

business operation of the supplying affiliate "matters little."[168]

- Neither *Glass Containers from China* nor *FEBs from Germany* reasonably supports Commerce's analysis. Commerce considered the supplier's overall business activity in *Glass Containers from China* solely in the context of determining whether to apply adverse inferences with respect to failure to supply a questionnaire response. *FEBs from Germany* made its cross-ownership determination on the "quantities and types of materials" provided between the affiliates.[169]

- Commerce's conclusion that there is no evidence POSCO Plantec generated scrap exclusively for POSCO's production operations, in contrast with the record in the 2018 and 2019 administrative reviews of *Rebar from Turkey*, holds no meaning because there is no indication on the record that POSCO Plantec sells scrap to companies other than POSCO.[170]

- Commerce concedes that the [                              ] is a piece of equipment that could be used in POSCO's downstream steel production. Based on POSCO's description of the item, as well as POSCO's production process diagram, it is clearly used for [                              ], a fundamental part of the production process and distinguishable from the other kinds of non-scrap goods POSCO Plantec provided to POSCO.[171]

- Given the information POSCO provided regarding the [                              ], the record demonstrates that it is a fundamental piece of equipment used in POSCO's production of subject goods in direct contradiction with the draft remand's assertion that the record does not contain evidence demonstrating that POSCO's steel production is or could be the primary use of POSCO Plantec's [                              ].[172]

- Commerce has previously found that steelmaking equipment, as a general matter, is an "input into the downstream production of steel," notwithstanding the supplier's sales of industrial equipment to a broad array of industries.[173]

- POSCO's assertion that its [                              ] is not actual machinery or equipment used to produce the downstream product is at odds with POSCO's production process diagram. Likewise, contrary to Commerce's assertion, there is no evidence to directly state whether or not POSCO Plantec actually produced the converter vessel, but the only reasonable conclusion based on POSCO's description of operations is that POSCO Plantec did produce the item.[174]

- Commerce failed to explain why the producer of the [                              ] matters in the first place; POSCO Plantec supplied the item, which Commerce concedes could be used in POSCO's steel production, which the record shows to be an item fundamental to the production of subject goods.

---

[168] *Id.* at 23 (citing, *e.g.*, *Icdas*, 498 F. Supp. 3d at 1364; *Rebar from Turkey 2018 AR* IDM at Comment 5).

[169] *Id.* at 23-24 (citing *Glass Containers from China* IDM at Comment 12; *FEBs from Germany* IDM at Comment 14).

[170] *Id.* at 24 (citing *Rebar from Turkey 2018 AR* IDM at Comment 5; *Rebar from Turkey 2019 AR* IDM at Comment 1).

[171] *Id.* at 25-26 (citing POSCO IQR at Exhibit 12, p.128).

[172] *Id.* at 26 (citing POSCO IQR at Exhibit 12, p.128).

[173] *Id.* (citing *Certain Cold-Rolled Steel Flat Products from Brazil: Final Affirmative Countervailing Duty Determination*, 81 FR 49940 (July 29, 2016) (*Cold-Rolled Steel from Brazil), and accompanying* IDM at Comment 16).

[174] *Id.* at 27 (citing POSCO IQR at Exhibit 12 p.128; POSCO AQR at Exhibits 5, 6, and 8).

54

- Likewise, the primary function of the input supplier is not relevant to the input attribution analysis, where the input itself is by nature primarily dedicated to downstream production under 19 CFR 351.525(b)(6)(iv). Subsidies provided to POSCO Plantec would therefore have the purpose of benefiting POSCO Plantec's supply of [                    ] and POSCO's downstream steelmaking operations.[175]
- The draft remand redetermination does not adequately explain or support either Commerce's treatment of POSCO Plantec's provision of scrap and a [                    ] or its conclusion that Plantec was not a cross-owned input supplier to POSCO. Commerce should accordingly find POSCO Plantec was a cross-owned input supplier to POSCO.

*POSCO's Comments*[176]

- Commerce's draft remand redetermination that POSCO Plantec is not a cross-owned input supplier because the production of scrap and the provision of the [                    ] are not primarily dedicated to the production of CTL plate is correct and Commerce should continue to find that POSCO Plantec is not a cross-owned input supplier.
- Commerce is correct that the unprocessed scrap produced by POSCO Plantec is a common input not primarily dedicated to downstream product as described in the *CVD Preamble*, and that POSCO Plantec's business activities cover a variety of services for construction and repairs, which may not be attributed specifically to POSCO's steelmaking. Furthermore, the fact that PDC is an intermediary for the scrap sales indicated that POSCO Plantec's sales of scrap were incidentally part of the production of POSCO's subject merchandise.[177]
- Commerce's determination regarding the [                    ] is reasonable because POSCO Plantec's business purpose is the construction of industrial plants and includes a variety of services including equipment repair and [                    ]. The record does not support that POSCO Plantec produced the [                    ] and Commerce found that the [                    ] was provided under a similar set of factual circumstances as the other equipment Commerce found not primarily dedicated. Thus, the record cannot support that the [                    ] is dedicated almost exclusively to POSCO's production of CTL plate.[178]

**Commerce's Position:**

At the outset, we disagree with Nucor's opinion that that the draft remand

redetermination did not appropriately address the Court's concerns regarding Commerce's

---

[175] *Id.* (citing *Icdas*, 498 F. Supp. 3d at 1364; *Rebar from Turkey 2018 AR* IDM at Comment 5).
[176] *See* POSCO Draft Remand Comments at 3-5.
[177] *Id.* at 4 (citing *Preamble*, 63 FR at 65401; *see also* Memorandum, "Business Proprietary Information Accompanying the Issues and Decision Memorandum for the Final Results," dated March 16, 2021, at 2-3).
[178] *Id.* at 4-5 (citing *2018 AR Final Results* IDM at Comment 2; *Remand Opinion and Order* at 28-29 (sustaining Commerce's determination regarding generic equipment)).

analysis of POSCO Plantec's provision of scrap and the [                    ].  When remanding this issue, the Court ordered Commerce to reconsider or further explain its rationale for considering the inputs at issue to be not primarily dedicated to the production of downstream product, citing to specific previous determinations where, on the surface of the determination, Commerce made contradictory findings under similar factual circumstances.  Specifically, the Court noted that Commerce needed to distinguish POSCO Plantec's provision of scrap from our determinations regarding scrap in *Rebar from Turkey 2018 AR*, *OCTG from Turkey*, and *Cold-Rolled Steel from Brazil*, as well as POSCO Plantec's provision of a [                    ] from our determination regarding equipment in *Cold-Rolled Steel from Brazil*.[179]  In light of the Court's concerns, we reviewed these and other past CVD cases.  In the draft remand redetermination, we explained how the facts of this record reasonably supported our conclusions based on our assessment of Commerce's regulations, the *Preamble*, as well as past CVD cases involving our primarily dedicated analysis.  As a part of this analysis and by means of explaining how the facts on the record of this proceeding differ from other proceedings, we also explained how our conclusion is distinguishable from the CVD cases involving Turkey.  Nucor disagrees with the relevance of certain of those explanations based on its interpretation of Commerce's input supplier regulations.  However, Commerce complied with the Court's instructions.

Neither the statute nor the regulations define "primarily dedicated."  The Courts have provided Commerce a great deal of deference "when a statute fails to make clear 'any Congressionally mandated procedure or methodology for assessment of the statutory tests.'"[180]  In that circumstance, "Commerce 'may perform its duties in the way it believes most

---

[179] *See*, generally*, Remand Opinion and Order*.
[180] *See JBF RAK LLC v. United States*, 790 F.3d. 1358, 1353 (Fed. Cir. 2015) (quoting *U.S. Steel Grp. V. United States*, 96 F.3d. 1352, 1362 (Fed. Cir. 1996)).

56

suitable.'"[181]  Consequently, Commerce receives "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and apply methodologies to implement the dictates of the trade statute.[182]  If "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."[183]  In such cases, "{a}ny reasonable construction of the statute is a permissible construction,"[184] and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous."[185] Commerce's interpretation of the statute need not be "the only one it permissibly could have adopted" in order for Commerce's determination to be reasonable.[186]  Therefore, Commerce has discretion when determining an appropriate methodology for analyzing whether production of an input product is primarily dedicated to the production of the downstream product.  As we stated in the draft remand redetermination, neither the statute nor the CVD regulations provide a definition of "primarily dedicated."  Commerce's interpretation of what is considered "primarily dedicated" is necessarily complex because of the vast variety of companies, inputs, types of subject merchandise, production processes, and circumstances surrounding all of the aforementioned that Commerce must examine on a record-specific basis.  We have repeatedly emphasized such determinations are record-specific and involve an analysis of all relevant facts on each individual record in order to determine whether an input producer's production processes or involvement in the production of subject merchandise indicates that a subsidy a

---

[181] *Id.*
[182] *See Fujitsu General Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996).
[183] *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. at 837, 843 (S. Ct. 1984).
[184] *See Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004).
[185] *See United States v. Eurodif S.A.*, 55 U.S. 305, 316 (S. Ct. 2009).
[186] *See Chevron*, 467 U.S. at 843.

government provided to that input producer was intended to support the production of downstream product.

*POSCO Plantec's Provision of Scrap to POSCO*

A major assertion in Nucor's comments is that Commerce has repeatedly found that steel scrap is primarily dedicated to downstream steel production, rather than constituting a generic input used across industries.[187]  As support for this assertion, Nucor argues that scrap cannot be used to produce anything other than steel products, and that the uses of steel scrap are limited to downstream production of a discrete group of products, akin to semolina or stumpage.[188]  We disagree with Nucor's arguments and continue to find that the scrap generated by POSCO Plantec is not akin to the semolina to pasta or stumpage to lumber examples found in the *Preamble*.

It is quite apparent, given the amount of steel proceedings that Commerce administers, that Commerce does not have a rule that scrap is always primarily dedicated to the production of steel in the manner of semolina to pasta or stumpage to lumber.  Neither Commerce's regulations nor the *Preamble* state that scrap is always primarily dedicated to the production of downstream product.  Thus, Commerce makes a determination regarding scrap as an input on a case-by-case, fact-specific basis.  Commerce has never made a finding that scrap is always primarily dedicated to the production of steel.  This is evident by not only this case, but *Cold-Rolled Steel from Korea* and *FEBs from Germany*, in which Commerce did not treat scrap as a primarily dedicated input.[189]  The difference in outcome between these cases and *Rebar from Turkey*, in which we found scrap to be a primarily dedicated input, shows that Commerce's analysis is not rigid, but

---

[187] *See* Nucor Draft Remand Comments at 20.
[188] *Id.*
[189] *See Cold-Rolled Steel from Korea* IDM at Comment 2; *see also FEBs from Germany* IDM at Comment 14.

58

instead is based on a consideration of all relevant facts on the record of each proceeding.  With

respect to scrap, as we stated in the draft remand redetermination, it is a case-by-case

determination based on the facts on each record, following 19 CFR 351.525(b)(6)(iv) and the

*Preamble*.[190]

As explained in our draft remand redetermination,  we followed 19 CFR

351.525(b)(6)(iv) and used the *Preamble* and our past CVD decisions as a guide, and in doing so

we found that Commerce has previously considered a number of non-exhaustive factors in

analyzing whether an input is primarily dedicated:

- Whether an input supplier produced the input;

- Whether the input could be used in the production of downstream products including
  subject merchandise, regardless of whether the input is actually used for the production of
  the subject merchandise;

- Whether the input is merely a link in the overall production chain, as stumpage is to
  lumber production or semolina is to pasta production as described in the *Preamble*, or
  whether the input is a common input among a wide variety of products and industries and
  it is not the type of input that is merely a link in the overall production chain, as plastic is
  to automobiles;

- Whether the downstream producers in the overall production chain are the primary users
  of the inputs produced by the input producer and whether the production of the inputs by
  the input producers is exclusively for the overall production chain; and

- Examining a company's business activities to assess whether an input supplier's
  production is "dedicated almost exclusively to the production of a higher value-added
  product" in the manner suggested by the *Preamble* such that the purpose of any subsidy
  provided to the company would be "to benefit the production of both the input and
  downstream products."

As clearly explained in our draft remand redetermination, scrap produced by POSCO

Plantec is not a primarily dedicated input in this case.  Commerce has previously found scrap to

be an input that is not primarily dedicated to downstream steel production and, thus, this case is

---

[190] *See* Draft Remand at 22-23.

not an outlier when reviewed in the light of Commerce's past determinations.[191]  We further disagree with Nucor's arguments with respect to the distinction between processed scrap and generic scrap.

> As explained in our draft remand redetermination:
>
> rather than explicitly defining what qualifies as an input supplier relationship with a downstream producer, the *Preamble* provides two examples:  stumpage subsidies on timber that is used in lumber production and subsidies to semolina primarily dedicated to pasta production.  "We believe that in situations such as these, the purpose of a subsidy provided to the input producer is to benefit the production of both the input and downstream products."[192]

At the same time, we cautioned against including all the cross-owned input producers in a CVD case.  Specifically, Commerce stated in the *Preamble* that:

> Where we are dealing with input products that are not primarily dedicated to the downstream products, however, it is not reasonable to assume that the purpose of a subsidy to the input product is to benefit the downstream product.  For example, it would not be appropriate to attribute subsidies to a plastics company to the production of cross-owned corporations producing appliances and automobiles.  Where we are investigating products such as appliances and automobiles, we will rely on the upstream subsidy provision of the statute to capture any plastics benefits which are passed to the downstream producer.[193]

> Therefore, as we discussed in our draft remand redetermination, we considered in our

analysis whether the input is merely a link in the overall production chain, as stumpage is to lumber production or semolina is to pasta production as described in the *Preamble*.  We found that scrap produced by POSCO Plantec is not merely a link in the overall production chain, as stumpage is to lumber production.  Rather, similar to plastic, unprocessed scrap is a common input among a variety of products and industries and generated as a byproduct during a variety of production processes.

---

[191] *See, e.g.*, *Cold-Rolled Steel from Korea* IDM at Comment 2; *see also FEBs from Germany* IDM at Comment 14.
[192] *See* Draft Remand at 23 (quoting *Preamble*, 63 FR at 65401).
[193] *See Preamble*, 63 FR at 65401.

60

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

The record does not show that POSCO Plantec processed scrap in a way that it was specifically repurposed for POSCO's steel production.  In contrast, the record does demonstrate that Pohang SRDC, which Commerce examined as a cross-owned input supplier in this case, *processed* scrap by means such as loading and unloading, storage, guillotining (cutting), pressing to adjust size, *etc.*, on behalf of PDC, which then provided the processed scrap to POSCO.[194] The scrap provided by Pohang SRDC was processed in a way that was specifically repurposed for POSCO's steel production, which supports a determination that Pohang SRDC's scrap is primarily dedicated to POSCO's downstream steel production.

With respect to Nucor's argument concerning PDC, it is important to note that we did not rely solely on the fact that PDC is an intermediary.  It is only one of the relevant factors we considered.  The fact that PDC, a trading company, was the intermediary in the scrap input supply chain is relevant because it is an indication that POSCO Plantec's sales of scrap only incidentally end up as part of POSCO's production of downstream product.  Although we consider this fact relevant, these circumstances are not in themselves dispositive as to whether the scrap production is merely a link in the overall production chain for POSCO's steelmaking.[195]  We did not find sufficient evidence of scrap production designed for POSCO's downstream products, where POSCO is the primary user and POSCO Plantec's production is exclusively for the overall production chain.  Nucor argues that this distinction holds no meaning because there is nothing on the record demonstrating that POSCO Plantec sells scrap to companies other than POSCO.  However, this is not supported by the record; POSCO Plantec sold scrap only to PDC during the POR, not POSCO, and there is no evidence that the scrap was intended for POSCO upon its generation by POSCO Plantec.  This, along with the fact that

---

[194] *See* Pohang SRDC IQR at 6.
[195] *See* Draft Remand at 27.

Filed By: Faris Montgomery, Filed Date: 1/31/23 9:13 AM, Submission Status: Approved

Barcode:4335731-01 C-580-888 REM - Remand - Slip Op. 22-116

POSCO Plantec did not process the scrap, much less in a way that specifically repurposed the scrap for use in POSCO's steel production, suggests that the scrap to steel production relationship in this case is more akin to the plastic to automobile production example in the *Preamble*. Although we considered this factor in our analysis, POSCO Plantec's provision of the scrap through an intermediary is only one part of our overall analysis regarding whether POSCO Plantec's scrap is merely a link in the overall production chain, is produced exclusively for the overall production chain, or could be considered "dedicated almost exclusively to the production of higher-value product."

We also disagree with Nucor's arguments about *Rebar from Turkey*. As explained in our draft remand redetermination, whether the downstream producers in the overall production chain are the primary users of the inputs produced by the input producer and whether the production of the inputs by the input producers is exclusively for the overall production chain is one of the factors we examined based on our reading of our regulation and *Preamble*. While we cannot publicly compare details of business proprietary inputs and production processes on the record of that case with the record in this review, there are nevertheless distinguishing factors that can be found in the public Issues and Decision Memorandum: foremost, the presence of a clear, vertically integrated scrap supply process, and scrap inputs used exclusively for the overall production chain. Based on the publicly available information in that determination, scrap generation in the *Rebar from Turkey 2018 AR* is a consistent part of the production process. Although the input supplier's primary function in that case is identified as shipbuilding, Commerce noted:

> {i}n this review, there is no question that in producing ships, one of Nur's byproducts is steel scrap ... . Accordingly, whether or not Nur manufactures scrap as its primary business or any other steel product matters little for purposes of our analysis of Nur's status as an input supplier to Kaptan ... . {I}n this instance, there

Filed By: Faris Montgomery, Filed Date: 1/31/23 9:13 AM, Submission Status: Approved

is no information on the record to show that Nur sells its scrap to anyone else besides Kaptan, indicating that this scrap supply is devoted to Kaptan's downstream steel production.[196]

Further, in *Rebar from Turkey 2019 AR*, Commerce once again emphasized the facts on the record that the scrap was devoted to Kaptan's downstream steel production, as the scrap was provided exclusively and directly to Kaptan, and thus supported a finding that the scrap was primarily dedicated.[197]  Unlike in *Rebar from Turkey*, there is no indication that the scrap sold by POSCO Plantec was exclusively for POSCO's downstream steel production.[198]

Furthermore, in comparing the production processes of POSCO Plantec and Pohang SRDC in the draft remand redetermination, Commerce was examining whether the activities of POSCO Plantec and the production chain support a determination that the scrap is primarily dedicated.  Again, POSCO Plantec's provision of the scrap through an intermediary is only one part of our overall analysis wherein we are determining whether a subsidy provided by the GOK to POSCO Plantec was also intended to support POSCO's steelmaking.  We disagree with Nucor's assertion that an input supplier's business operations are irrelevant in determining whether an input is a primarily dedicated input.  Nucor claimed in its comments that Commerce considers the "primary focus" of an input supplier's business operations to be irrelevant where the input supplied is primarily dedicated to the downstream product.[199]  Commerce's case history clearly demonstrates that we have previously examined the business operations of input suppliers; in the draft remand redetermination, we discussed *Glass Containers from China* and *FEBS from Germany* as examples.

---

[196] *See Rebar from Turkey 2018 AR* IDM at Comment 5.
[197] *See Rebar from Turkey 2019 AR* IDM at Comment 1.
[198] *See* Draft Remand at 28-29.
[199] *Id.* at 23 (citing, *e.g.*, *Icdas*, 498 F. Supp. 3d at 1364; *Rebar from Turkey 2018 AR* IDM at Comment 5).

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

In *Glass Containers from China*, we stated that, "the record evidence does not support a finding that the glass machinery provided by Company A could be considered a primarily dedicated input," and elaborated that the input supplier's broad business scope "does not indicate that Company A's production is 'dedicated almost exclusively to the production of a higher value added product' in the manner suggested by the *Preamble* or that the purpose of any subsidy provided to Company A would be 'to benefit the production of both the input and downstream products.'"[200] While *Glass Containers from China* found that an adverse facts available determination for the input supplier was not warranted, our analysis regarding the input supplier in question described precisely the same primary dedication analysis we are describing here.[201] Nucor's argument that this case is distinguishable because Commerce's analysis was within the context of whether to apply adverse facts available is inapposite. Furthermore, in *FEBs from Germany*, Commerce "examined {the respondents'} business activities on the record … and concluded that these companies' production are not 'dedicated almost exclusively to the production {of} subject merchandise," clarifying that there is no *de minimis* standard for primary dedication of an input, and finding that "{a}nalogous to the plastic as an input to an automobile example in the *Preamble*, one cannot reasonably conclude that these inputs are dedicated exclusively to the production of downstream products..."[202] While Nucor is correct in that Commerce made its determination on other merits as well, we considered the primary business purpose of the company in our analysis. Thus, *FEBs from Germany* further illustrates that Commerce's analysis is based on a review of all relevant facts on the record, and that Commerce determines whether inputs are primarily dedicated on a case-by-case basis.

---

[200] *See Glass Containers from China* IDM at Comment 12.
[201] *Id.*
[202] *See FEBS from Germany* IDM at Comment 14 (citing *Preamble*, 63 FR at 65348, 65401).

Nucor cites to Commerce's decision in *Cold-Rolled Steel from Korea* as evidence that Commerce's focus in its primarily dedicated analysis is on whether the input being supplied is usable across many non-specific manufacturing processes or one that it usable primarily for manufacturing a limited number of specific goods.[203]  However, in *Cold-Rolled Steel from Korea,* we found similar inputs, provided by POSCO Plantec to POSCO, not to be primarily dedicated to the production of downstream product based on precisely the same rationale as that in our *2018 AR Final Results*.[204]  While Nucor argues the analysis in that case emphasizes "that the focus of the analysis is on whether the input being supplied is one that is usable across many non-specific manufacturing processes or one that it usable primarily for manufacturing a limited number of specific goods,"[205] our analysis in *Cold-Rolled Steel from Korea* instead:  (1) repeatedly emphasizes the case-by-case nature of Commerce's input supplier analysis; (2) states clearly that we examined POSCO Plantec's production and found it was not dedicated almost exclusively to the production of a higher value product; and (3) states that our input supplier analysis "did not *solely* rely on whether an input producer supplies an input exclusively to a particular company and/or industry;" rather, it concludes that, "similar to the plastic to automobile example set out in the {*Preamble*}, inputs … are used in a typical manufacturing process and not in a way they are primarily and/or exclusively dedicated…."[206]  To characterize the extent of that analysis, which is consistent with our analysis in this review, as focusing on whether the inputs provided are primarily usable for manufacturing a limited number of goods is inaccurate and reductive.  Rather, as we clearly outlined in the draft remand redetermination, Commerce considers a variety of factors, including those which we specifically identified for the

---

[203] *See* Nucor Draft Remand Comments at 15 (n. 63).
[204] *See Cold-Rolled Steel from Korea* IDM at Comment 2; *see also 2018 AR Final Results* IDM at Comment 2.
[205] *See* Nucor Draft Remand Comments at 16 (footnote 33).
[206] *See Cold-Rolled Steel from Korea* IDM at Comment 2.

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

Court, that we find significant in determining whether an input is primarily dedicated to the production of downstream product such that it is reasonable to assume a subsidy a government provides to a cross-owned input supplier was intended to support the production of downstream product.

Finally, underlying the entirety of Nucor's comments on the draft remand redetermination is an attempt to reduce or otherwise constrict Commerce's primarily dedicated analysis by drawing discrete, individual discrepancies between Commerce's past cases and this proceeding. For each prior case where Commerce has carried out its primarily dedicated analysis, Nucor points to a single fact among the totality of the facts present in each case in an effort to refute Commerce's finding in this proceeding. In doing so, Nucor fails to consider the entirety of the facts present in each of these past cases, refuses to recognize notable differences between the facts of those cases and the facts present in this administrative review, and ignores Commerce's repeated statements that our primarily dedicated analysis is highly fact-specific and is carried out on a case-by-case basis. As we have explained at length above, Commerce's decisions in this case do not depend on the outcome of a single controlling factor or fact, but involve a holistic analysis of the facts on the record of this proceeding. Thus, Nucor's attempts to minimize Commerce's analysis to single, isolated facts taken entirely out of context does not accurately reflect how Commerce undertakes its primarily dedicated analysis in this case.

*POSCO Plantec's Provision of a [                    ] to POSCO*

With respect to Nucor's argument that a [                    ] could be used in steelmaking, we continue to find that the [                    ] provided by POSCO Plantec is not primarily dedicated to the production of downstream product. Nucor argues that because POSCO's description of the [                    ] and steelmaking production process

66

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

demonstrate that the converter vessel is used for [                    ], it is a fundamental part of

the production process and distinguishable from the other types of equipment POSCO Plantec

provided to POSCO.[207]  As we stated in the draft remand redetermination, we do not contest the

fact that the [                    ] could be used in the production of downstream product.

However, as we discussed in the draft remand redetermination, we looked at a number of factors

in determining whether each input is primarily dedicated to the production of downstream

product.  As described in our draft remand redetermination,[208]  we examined the following:

- Whether an input supplier produced the input;

- Whether the input could be used in the production of downstream products
  including subject merchandise, regardless of whether the input is actually used for
  the production of the subject merchandise;

- Whether the input is merely a link in the overall production chain, as stumpage is
  to lumber production or semolina is to pasta production as described in the
  *Preamble*, or whether the input is a common input among a wide variety of
  products and industries and is not the type of input that is merely a link in the
  overall production chain, as plastic is to automobiles;

- Whether the downstream producers in the overall production chain are the
  primary users of the inputs produced by the input producer and whether the
  production of the inputs by the input producers is exclusively for the overall
  production chain; and

- Examining a company's business activities to assess whether an input supplier's
  production is "dedicated almost exclusively to the production of a higher value-
  added product" in the manner suggested by the *Preamble* such that the purpose of
  any subsidy provided to the company would be "to benefit the production of both
  the input and downstream products.

As explained in the draft remand redetermination,[209] 19 CFR 351.525(b)(6)(iv) states

that, "if there is cross-ownership between an input supplier and a downstream producer, and

*production* of the input product is *primarily dedicated to production* of the downstream product,

---

[207] *See* Nucor Draft Remand Comments at 25-26.
[208] *See* Draft Remand at 21-26.
[209] *See* Draft Remand at 22.

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

the Secretary will attribute subsidies received by *the input producer* to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations)" (emphasis added).  Therefore, one of the factors we considered for this analysis is whether an input supplier produced the input.  Nucor argues that because POSCO has previously described POSCO Plantec as a company that produces "'steel producing facilities' and otherwise 'manufactures steel making equipment and machinery,'" that "the only reasonable conclusion is that {POSCO} Plantec did produce this item."[210]  We disagree that we can make that conclusion based on the record evidence present here.  Nucor's argument rests on a description of POSCO Plantec's business as described in the investigation of this case.[211]  However, that statement does not apply to the POR, and there are other, very different characterizations of POSCO Plantec in other more recent records.[212]  Instead, we based our analysis on the information on the record for the current POR; specifically, POSCO's audited financial statements as submitted to the GOK indicate that POSCO Plantec's business purpose is "the construction of industrial plants."[213]  Likewise, elsewhere in its list of affiliates, POSCO describes the business purpose of POSCO Plantec as constructing "steel producing facilities, infrastructure construction."[214]  There is no record information showing that POSCO Plantec produced the [          ] or even that POSCO Plantec was engaged in making steelmaking equipment along with [          ] or constructing industrial facilities.[215]  To this extent, there is only evidence that POSCO Plantec was engaged in [          ] of POSCO's facilities, including providing [          ] to POSCO, the purpose of which  POSCO quite clearly states

---

[210] *See* Nucor Draft Remand Comments at 27 (citing POSCO AQR at Exhibits 5, 6, and 8).
[211] *See* POSCO AQR at Exhibit 8.
[212] *See*, *e.g.*, *Cold-Rolled Steel from Korea* IDM at Comment 2.
[213] *See* POSCO AQR at Exhibit 2, p. 26.
[214] *Id*. at Exhibit 6.
[215] *See* POSCO NSA Comments at 10-11.

[                                                  ].[216]  Therefore, we do not have

sufficient record evidence to conclude that POSCO Plantec was the producer of the [          ].

As our draft remand redetermination further explains, we do not conclude that the

[                    ] is merely a link in the overall production chain, as stumpage is to lumber

production.  Unlike stumpage to the production of lumber or pulp to the production of paper, we

have never found [                    ] to be a primarily dedicated input into the production of

steel.  POSCO stated that its [                    ] is not actual machinery or equipment used to

produce the downstream product.  In addition, a review of the vast majority of the equipment

inputs, which POSCO identified as [


], indicates that they can be used in the production of many different products in

different industries; most of the listed equipment inputs are used generically for [

].[217] The provision of the [                    ] was made under a similar set of factual

circumstances as the other equipment inputs Commerce found were not primarily dedicated.  The

Court has already sustained Commerce's determination that the generic nature of the remainder

of the equipment provided by POSCO Plantec to POSCO during the POR cannot be found

primarily dedicated to the production of downstream subject merchandise.[218] Thus, we find that

the [                    ], consistent with other equipment inputs, is not merely a link in the

overall production chain.  The record also does not contain evidence demonstrating that

POSCO's steel production is or could be the primary use of POSCO Plantec's [

---

[216] *Id.*
[217] *Id.*
[218] *See Remand Opinion and Order* at 29.

69

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

], or that POSCO Plantec was [                    ] at all, much less exclusively for

POSCO.[219]

       Finally, as previously discussed, POSCO Plantec's primary business activities, while they

include the construction of steelmaking facilities, are not limited to the construction or

production of such steelmaking facilities.  Rather, as previously discussed, POSCO describes

POSCO Plantec's business functions during the POR (*i.e.*, [

                     ] as diverse and pertaining to 'industrial

plants' rather than specifically to steelmaking facilities.[220]  Thus, we did not find sufficient

rationale to find the [                    ] primarily dedicated to the production of downstream

product on the basis of POSCO Plantec's business activities.

       Nucor attempts to minimize or reduce Commerce's analysis to only certain specific facts

that support its overall conclusion concerning the [                    ] and ignores or otherwise

dismisses the other factors that Commerce has stated it considered in making a determination

regarding the [                    ].  As an example of this, Nucor attempts to divorce the

[                    ] from the other various equipment and services POSCO Plantec provided to

POSCO that Commerce already determined were not primarily dedicated to POSCO's

production of downstream higher value product, and which the Court already sustained as

supported by substantial evidence and in accordance with law.  The [                    ] was

not provided as a separate and distinct input from these other equipment and services, but was

provided as a part of POSCO Plantec's business functions related to [

].[221]  To examine the [                    ] separate

---

[219] *See* Draft Remand at 33.
[220] *See* POSCO NSA Comments at 10-11.
[221] *Id.*

70

from the other equipment and services POSCO Plantec provided would not take into account all of the relevant facts present on the record regarding Commerce's primarily dedicated analysis.

Although we are unable to discuss and specifically identify the business proprietary steel-making equipment inputs at issue in *Cold-Rolled Steel from Brazil* as a comparison to the record here, we note that the respondent in *Cold-Rolled Steel from Brazil* provided "only steel mill equipment and services" to the producer in that case, whereas here, POSCO Plantec provided a variety of types of equipment, the rest of which we found not primarily dedicated on the basis that it was generic and not related to the production of downstream product, an analysis the Court upheld in the *Remand Opinion and Order*.[222]  As explained above, we do not find it reasonable to make a determination that a subsidy provided to POSCO Plantec would be for the purpose of benefitting POSCO's steelmaking solely on the basis of the provision of a

[                    ].

Each of Commerce's proceedings is conducted on a case-specific basis and stands on its own.[223]  Although two cases may share commonalities in some of the issues presented, each administrative review, and each proceeding, "is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record."[224]  Commerce, in making a determination in a given proceeding, must base its determination on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" in light of the entire record, including whatever "fairly detracts from the substantiality of the evidence."[225]  This standard requires Commerce to thoroughly examine the record and "articulate a satisfactory explanation

---

[222] *See Cold-Rolled Steel from Brazil* IDM at Comment 16; *see also Remand Opinion and Order* at 27-29.

[223] *See, e.g., Certain Steel Concrete Reinforcing Bars from Turkey:  Final Results and Recission of Antidumping Duty Administrative Review in Part*, 71 FR 65082 (November 7, 2006), and accompanying IDM at Comment 22.

[224] *See Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1299 (Fed. Cir. 2016) (quoting *Qingdao Sea-Line Trading Co., Ltd. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014)).

[225] *See Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1335 (Fed.Cir.2002) (quotation marks & citations omitted).

71

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

for its action including a 'rational connection between the facts found and the choice made.'"[226]

That two parties may draw two inconsistent conclusions "does not prevent an administrative

agency's finding from being supported by substantial evidence."[227]  Here, Commerce has

reviewed all of the facts on the record, including an analysis of a variety of factors that

Commerce found relevant to its primarily dedicated analysis, in reaching its conclusion that the

scrap and [                    ] are not inputs primarily dedicated to the production of

downstream higher value-added product.  Nucor's arguments fail to show that Commerce has not

made its determination based on a reasonable interpretation of the limited facts available on the

record of this proceeding, or that Commerce's determination is not based on substantial

evidence.

## VI.    FINAL RESULTS OF REDETERMINATION

In accordance with the CIT's remand mandate, Commerce has reexamined its analysis

and determinations with respect to declining to initiate upon the provision of off-peak electricity

for LTAR new subsidy allegation and finding that POSCO Plantec was not POSCO's cross-

owned input supplier during the POR and provided additional explanation for its determinations

on both issues.  For the purposes of these final results of remand redetermination, Commerce

continues to rely upon the *2018 AR Final Results*, finding that Nucor did not adequately support

its subsidy allegation of the provision of off-peak electricity for LTAR with respect to the

existence of a benefit, and that the inputs provided by POSCO Plantec to POSCO during the

POR were not primarily dedicated to the production of downstream product.  Therefore, the

CVD rates for POSCO and the non-selected companies under review from the *2018 AR Final*

---

[226] *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).
[227] *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted).

Filed By: Faris Montgomery, Filed Date: 1/31/23 9:13 AM, Submission Status: Approved

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

*Results* (*i.e.*, 0.49 percent, *de minimis*), for the period January 1, 2018, through December 31,

2018, will remain unchanged.

1/30/2023

X 
_____

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

Barcode:4335731-01 C-580-888 REM - Remand  -  Slip Op. 22-116

# APPENDIX

*Source:* GOK IQR at Exhibit E-4.

### Method of Determining the System Marginal Price

The system marginal price (SMP) refers to the cost of the most expensive generating unit included in the Price Setting Schedule (PSS). PSS is set up by a computer program that can minimize the total production cost of generating units including the startup cost and incremental fuel cost. During some hours, certain generating units are not entitled to set the market price owing to their technical characteristics such as ramping rates, minimum output level, etc.

