NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

NUCOR CORPORATION,

                        Plaintiff,

      v.

UNITED STATES,

                        Defendant,

        and

POSCO,

                    Defendant-Intervenor.

Before: Hon. Mark A. Barnett,
             Chief Judge

Court No. 21-00182

**NON-CONFIDENTIAL VERSION**

Business Proprietary Information
Removed from Pages: i, 12, 16-18, 24-26

## NUCOR CORPORATION'S COMMENTS ON FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

Alan H. Price, Esq.
Christopher B. Weld, Esq.
Maureen E. Thorson, Esq.
Adam M. Teslik, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Nucor Corporation*

Dated: March 2, 2023

Ct. No. 21-00182      **BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**      **NON-CONFIDENTIAL VERSION**

# <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ....................................................................................................1

II.    THE REMAND RESULTS SHOULD BE REMANDED FOR A SECOND TIME...................................................................................................................1

    A.    The Court Should Remand Commerce's Treatment of Nucor's NSA........................................................................................................2

        1.    The Remand Results Continue to Misapply the Initiation Standard for New Subsidy Allegations.........................................2

        2.    Nucor's NSA Did Not Conflate the Benefit and Specificity Elements.................................................................................6

        3.    The Remand Results Identify No Information that Undermines or Contradicts the Evidence of a Benefit in Nucor's NSA ..................................................................................8

    B.    The Court Should Remand Commerce's Treatment of Plantec.........................155

        1.    Commerce's Analysis of Plantec's Provision of Scrap to POSCO Should Be Remanded for Further Consideration ........................18

        2.    Commerce's Analysis of the [          ] Should Be Remanded for Further Consideration.........................................................24

III.   CONCLUSION...................................................................................................27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bethlehem Steel Corp. v. United States*,
  25 CIT 307, 140 F. Supp. 2d 1354 (2001) ..........................................................................3, 4

*Nucor Corp. v. United States*,
  927 F.3d 1243 (Fed. Cir. 2019)...........................................................................................2, 3

*Nucor Corp. v. United States*,
  No. 21-00182, slip op. 22-116 (Ct. Int'l Trade Oct. 5, 2022)..................................1, 16, 19, 20

*RZBC Grp. Shareholding Co. v. United States*,
  100 F. Supp. 3d 1288 (Ct. Int'l Trade 2015) ..........................................................................3

*Torrington Co. v. United States*,
  15 CIT 456, 772 F. Supp. 1284 (1991) ....................................................................................3

*Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*,
  498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) ...........................................................15, 20, 23

**Statutes**

19 U.S.C. § 1671a(b)(1) ....................................................................................................................3

19 U.S.C. § 1677(5)(A)-(B) ............................................................................................................2

19 U.S.C. § 1677(5)(C) ....................................................................................................................7

**Regulations**

19 C.F.R. § 351.303(c)......................................................................................................................7

19 C.F.R. § 351.511(a)(2)(iii) .........................................................................................................3

19 C.F.R. § 351.525(b)(6)(i) .........................................................................................................14

**Administrative Materials**

*Carbon and Alloy Steel Wire Rod From the Republic of Turkey*,
  82 Fed. Reg. 41,929 (Dep't Commerce Sept. 5, 2017)...........................................................18

*Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea*,
  86 Fed. Reg. 15,184 (Dep't Commerce Mar. 22, 2021) .........................................................16

*Certain Cold-Rolled Steel Flat Products From the Republic of Korea*,
   81 Fed. Reg. 49,943 (Dep't Commerce July 29, 2016) ....................................19

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea*,
   85 Fed. Reg. 38,361 (Dep't Commerce June 26, 2020) ..............................19, 23

*Certain Glass Containers From the People's Republic of China*,
   85 Fed. Reg. 31,141 (Dep't Commerce May 22, 2020) ...............................23

*Certain Oil Country Tubular Goods From the Republic of Turkey*,
   79 Fed. Reg. 41,964 (Dep't Commerce July 18, 2014) ............................19, 20

*Circular Welded Carbon Steel Pipes and Tubes From the Republic of Turkey*,
   84 Fed. Reg. 21,327 (Dep't Commerce May 14, 2019) .............................18

*Common Alloy Aluminum Sheet from India*,
   86 Fed. Reg. 13,285 (Dep't Commerce Mar. 8, 2021) .................................3

*Countervailing Duties*,
   63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998) ..........................7, 15

*Forged Steel Fluid End Blocks From the Federal Republic of Germany*,
   85 Fed. Reg. 80,011 (Dep't Commerce Dec. 11, 2020) ........................15, 19, 23

*Seamless Carbon and Alloy Steel Standard, Lined, and Pressure Pipe From the*
   *Russian Federation*, 85 Fed. Reg. 80,007 (Dep't Commerce Dec. 11, 2020) ....................18

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
   86 Fed. Reg. 53,279 (Dep't Commerce Sept. 27, 2021) ................................. *passim*

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
   87 Fed. Reg. 21,640 (Dep't Commerce Apr. 12, 2022) ................................. *passim*

## I.    INTRODUCTION

On behalf of Nucor Corporation ("Nucor"), we respectfully submit these comments on the January 31, 2023 remand results issued by the U.S. Department of Commerce ("Commerce") regarding the 2018 administrative review of the countervailing duty order on Korean cut-to-length steel plate ("CTL Plate"). *See Final Results of Redetermination Pursuant to Court Remand* (Jan. 31, 2023), ECF No. 60-1 ("Remand Results").

## II.    THE REMAND RESULTS SHOULD BE REMANDED FOR A SECOND TIME

In remanding Commerce's original final determination in the 2018 review, the Court held that Commerce failed to adequately explain or support its decision not to investigate Nucor's new subsidy allegation ("NSA") that the Government of Korea ("GOK") provided respondents with off-peak electricity for less-than-adequate-remuneration ("LTAR"). *Nucor Corp. v. United States*, No. 21-00182, slip op. 22-116 at 16 (Ct. Int'l Trade Oct. 5, 2022) ("Slip Op. 22-116"). The Court remanded for similar reasons Commerce's decision not to treat POSCO's affiliate POSCO Plantec ("Plantec") as a cross-owned input supplier. *Id.* at 24, 30.  Commerce issued its draft remand results on December 16, 2022. Draft Results of Redetermination Pursuant to Court Remand, *Nucor Corporation v. United States*, Court No. 21-00182, Slip. Op. 22-116 (CIT October 5, 2022) (Dec. 16, 2022), C.R.R. 1, P.R.R. 1 ("Draft Results").  On January 3, 2023, Nucor filed comments on the Draft Results, arguing that Commerce had not complied with the Court's holdings either with respect to Nucor's NSA or with respect to Plantec.  Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Comments on Draft Results of Redetermination* (Jan. 3, 2023), C.R.R. 3, P.R.R. 5 ("Nucor's Comments"). Because Commerce's final remand results do not cure the flaws in the original agency decision, the Court should remand the decision for a second time.

**A.      The Court Should Remand Commerce's Treatment of Nucor's NSA**

Commerce continues to misunderstand or mischaracterize Nucor's NSA and to apply an unlawful initiation standard.  While Commerce insists that significant information reasonably available to Nucor undermines the assertions in the NSA, the agency points to no specific evidence on the record or elsewhere in the public domain.  The thrust of Commerce's Remand Results is that Nucor's NSA failed to meet the standard for initiation because it purportedly did not provide a benchmark value that the agency believes would be appropriate for measuring the precise amount of the benefit that the alleged subsidy conferred.  But even if Nucor's NSA did not contain such a benchmark, the agency cannot lawfully decide not to investigate a subsidy on this basis.  Commerce's Remand Results thus remain both unlawful and unsupported by the record and should be remanded for Commerce to conduct the investigation to which Nucor and the domestic industry are entitled under the law.

**1.      The Remand Results Continue to Misapply the Initiation Standard for New Subsidy Allegations**

The statute defines a countervailable subsidy as "the case in which an authority . . . provides a financial contribution . . . to a person and a benefit is conferred," where the subsidy is "specific." 19 U.S.C. § 1677(5)(A)-(B).  The statute defines "financial contribution" to include the provision of goods or services, in which case a benefit is conferred if they are provided "for less than adequate remuneration." *Id*. § 1677(5)(E)(iv). Courts have explained that "adequate remuneration" means "payment of an amount that reflects the value of what is being paid for," *i.e.*, a value that reflects "competitive-market prices" for the input under consideration. *Nucor Corp. v. United States*, 927 F.3d 1243, 1253 (Fed. Cir. 2019).  Where, as here, no domestic or world market prices are available to use as a benchmark, Commerce applies its "tier three" adequate remuneration rule, which directs the agency to consider whether "the government price is consistent with market

principles." 19 C.F.R. § 351.511(a)(2)(iii). The Federal Circuit has sustained Commerce's application of a standard that considers of whether "KEPCO's pricing met familiar standards of cost recovery" as reasonable under the adequate remuneration provision. *Nucor Corp.*, 927 F.3d at 1254.

The statute provides that Commerce "shall" initiate an investigation into alleged subsidies when a party (i) "alleges the elements necessary for the imposition of the duty" and (ii) provides "information reasonably available to the petitioner supporting those allegations." 19 U.S.C. § 1671a(b)(1). Investigations should be initiated unless the allegation is "clearly frivolous or where the petitioner has not provided information reasonably available to it." *Torrington Co. v. United States*, 15 CIT 456, 460, 772 F. Supp. 1284, 1288 (1991). *See also RZBC Grp. Shareholding Co. v. United States*, 100 F. Supp. 3d 1288, 1295 (Ct. Int'l Trade 2015) ("{M}ost subsidy petitions are granted unless the allegations are clearly frivolous, not reasonably supported by the facts alleged or . . . omit important facts which are reasonably available to the petitioner."); Issues and Decision Memorandum accompanying *Common Alloy Aluminum Sheet from India*, 86 Fed. Reg. 13,285 (Dep't Commerce Mar. 8, 2021) (final affirm. countervailing duty deter.). Commerce may not "refuse to investigate based on conjecture that the subsidy does not exist" or because "the precise contours of the subsidy {are} still unknown." *RZBC Grp.*, 100 F. Supp. 3d at 1295.

Commerce may apply a heightened initiation standard when it considers allegations of subsidies that the agency has previously determined are not countervailable. In such situations, "Commerce has discretion in deciding whether to reinvestigate a program previously found not countervailable in a final agency determination in the absence of sufficient new evidence." *Bethlehem Steel Corp. v. United States*, 25 CIT 307, 315, 140 F. Supp. 2d 1354, 1363 (2001).

Allegations related to such subsidies "must contain evidence of changed circumstances or provide a sufficient basis to believe that" reinvestigation is warranted.  *Id.*

Commerce's Remand Results are internally contradictory with respect to the initiation standard that they apply.  Commerce first confirms that it treated Nucor's NSA as a new allegation that is properly reviewed under the default standard as articulated in *RZBC Group*.  Remand Results at 11-12.  Nucor agrees that this is the standard that should apply in this case.

The agency, however, proceeds to explain that the decision not to initiate was based on the NSA's purported failure to provide information "that would . . . call into question Commerce's previous determination that the Korean electricity system was consistent with market principles." Remand Results at 17.  According to the Remand Results,

> Commerce had previously determined that its examination of the Korean electricity market (including the organization, price setting methodology and cost recovery of KEPCO) was consistent with market principles and this determination has not been modified since the previous determinations.  Further, this determination was upheld by the Federal Circuit in *Nucor*.  Thus, within the context of the Korean electricity market, Nucor had an obligation to address this "reasonably available information" in its allegation . . . .

*Id.* at 16.  This is the heightened standard as articulated in *Bethlehem Steel*, and not the *RZBC Group* standard that Commerce said should apply.

Commerce's reasoning elsewhere in the Remand Results suggests that the agency in fact applied a third standard, one that is even more exacting than the elevated standard defined in *Bethlehem Steel*.  In that case, the Court explained that even allegations of previously investigated subsidies only require "sufficient new evidence" or "evidence of changed circumstances." *Bethlehem Steel*, 25 CIT at 315, 140 F. Supp. 2d at 1363.  Nucor's allegation satisfied that elevated standard by demonstrating that KEPCO was selling electricity to large industrial users like POSCO at subsidized, below-cost prices, even if it "met familiar standards of cost recovery" in the

aggregate.  *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: New Subsidy Allegations* (Nov. 4, 2019), C.R. 182-184, P.R. 76-78 at 7-13 ("Nucor NSA").  In the Remand Results, however, Commerce treated Nucor's allegation as insufficient because it purportedly did not provide a precise, hourly benchmark value that the agency believed would be appropriate for determining the exact amount of any benefit conferred.  According to the Remand Results:

> When Commerce noted that the average price of electricity at all hours could be an appropriate benchmark for all hours, but was not for certain hours, it was merely noting that Nucor was missing a step in its analysis that would allow a comparison to be made on an equivalent basis for a reasonable estimation of KEPCO's cost recovery at those hours.  Namely, Commerce found that a successful benefit allegation of off-peak electricity for LTAR required a reasonable proxy for determining what the prices KEPCO paid might be at the specific point of off-peak hours, and not just an overall average price for electricity.

Remand Results at 19 (citation omitted). The initiation standard, however, requires only reasonably available evidence of a benefit.  It does not require a petitioner to establish the precise contours of the subsidy, or to provide "an appropriate benchmark" to measure the actual amount of the benefit conferred.

   To the extent that the Remand Results suggest that the agency's prior proceedings provide "reasonably available information" that might have created "a reasonable proxy for determining what the prices KEPCO paid might be at the specific point of off-peak hours," they do not specify what that information is.  Instead, the agency refers only to "<u>potential</u> differences in the generators" and to questions about "what the prices KEPCO paid <u>might be</u> at the specific point of off-peak hours . . . ."  *Id.* (emphasis added); *see also id.* at 44 (suggesting that the data in the NSA "does not account for the quantity of electricity each type of generator is supplying {at each hour} that will inherently affect KEPCO's overall cost of supply," without citing to any actual evidence of

meaningful variations in the mix of generators supplying electricity over the course of a day). To the best of counsel for Nucor's knowledge, the agency has never requested any information related to KEPCO's hourly cost of acquisition or to the mix of generators supplying electricity at any given hour.

As discussed in greater detail below, however, Nucor provided the information reasonably available to it with respect to these issues. *See infra* at 9-14. In doing so, it addressed precisely the questions that Commerce attempts to fault Nucor for sidestepping.

## 2. Nucor's NSA Did Not Conflate the Benefit and Specificity Elements

The Remand Results suggest that the discussion of cross-subsidization in Nucor's NSA somehow "conflates benefit and specificity." Remand Results at 16. According to the Remand Results, this is because the statute and regulations do not require Commerce "to consider altered firm behavior as a result of alleged subsidies." *Id.* The agency thus suggests that "{t}he hours at which POSCO, or any entity utilizing industrial electricity, chose to purchase electricity based on the existing tariff schedule are . . . immaterial unless the tariff schedule itself is found to be inconsistent with market principles." *Id.*; *see also id.* at 50-51. This reasoning is legally and factually flawed.

As a preliminary matter, the benefit allegation in Nucor's NSA was based on "{p}ublicly available information {that} confirms that KEPCO's off-peak industrial electricity prices are significantly lower than the cost of supply," in accordance with the standard that Commerce itself has articulated. Nucor NSA at 14-15; *see also id.* at 10-12 (establishing that KEPCO's cost of supply does not change sufficiently over the course of a day, and thus does not account for the discrepancy between off-peak and other prices); Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Request for*

*Reconsideration of New Subsidy Allegation* (Apr. 9, 2020), C.R. 254, P.R. 148 at 7-8 ("Nucor Request for Reconsideration") (establishing that off-peak prices were below KEPCO's cost of acquiring electricity from even the lowest-cost generator). Nucor's NSA discussed "what entities and industries are using electricity at specific hours" <u>only</u> in support of its *de facto* specificity allegation. Remand Results at 50; Nucor NSA at 15-16. The NSA therefore conflated nothing, and the Remand Results are wrong to suggest otherwise.

Moreover, while a benefit determination does not turn on the effect of a subsidy on a firm's operations, this principle does not apply to a respondent's choice to avail itself of a subsidized price when other prices are also available to it. The statute provides that "the administering authority is not required to consider the effect of the subsidy in determining whether a subsidy exists . . . ." 19 U.S.C. § 1677(5)(C). The regulations, in turn, clarify that Commerce "is not required to consider the effect of the government action on the firm's performance, including its prices or output, or how the firm's behavior otherwise is altered." 19 C.F.R. § 351.303(c). The CVD Preamble explains that this refers to the effect that <u>receipt</u> of a subsidy has on a firm's performance, not to the practical effect that the availability of a subsidy has a firm's actions (*i.e.*, to the fact that the firm chooses to avail itself of a subsidized price). *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,361 (Dep't Commerce Nov. 25, 1998) (final rule). ("{I}f there is a financial contribution and a firm pays less for an input than it otherwise would pay in the absence of that financial contribution . . . that is the end of the inquiry insofar as the benefit element is concerned. {Commerce} need not consider how a firm's behavior is altered when it <u>receives</u> a financial contribution that lowers its input costs or increases its revenues.") (emphasis added). Commerce's suggestion that a subsidized price paid by a respondent confers no benefit simply because the respondent could have chosen to pay a non-subsidized price has no basis in law or agency practice.

It is thus unclear what Commerce means when it says that "{t}he hours at which POSCO, or any entity utilizing industrial electricity, chose to purchase electricity based on the existing tariff schedule are . . . immaterial unless the tariff schedule itself is found to be inconsistent with market principles." Remand Results at 16. The agency articulates no substantive distinction between the prices that POSCO actually paid and "the tariff schedule itself," nor does it explain why any such distinction would be legally relevant. Indeed, the Remand Results simultaneously suggest that the agency's analysis was limited to off-peak prices, and that "there {were} no additional prices available to the respondent during off-peak hours . . . ." *Id.* at 50-51.

The relevance of the "tariff schedule itself" beyond the prices that POSCO paid is thus insufficiently explained. Nucor's NSA alleged and provided reasonably available evidence that the prices POSCO paid pursuant to KEPCO's tariff schedule were significantly lower than KEPCO's cost of supply and an amount for profit. That was sufficient for the purpose of a benefit allegation, and Remand Results fail to demonstrate otherwise.

### 3. The Remand Results Identify No Information that Undermines or Contradicts the Evidence of a Benefit in Nucor's NSA

The Remand Results continue to find that Nucor's NSA "was not reasonably supported by the facts alleged" and "omitted important facts which were reasonably available to the petitioner." *Id.* at 14. First, the Remand Results suggest that the system marginal price ("SMP") data in the allegation did not provide evidence of a benefit because it did not reflect the actual prices paid to individual generators on an hourly basis pursuant to the Korea Power Exchange ("KPX") pricing formula described in KEPCO's Form 20-F. *Id.* at 17-18, 40-47. Second, the Remand Results suggest that the average annual cost data in the NSA did not provide evidence of a benefit because it did not reflect KEPCO's cost of supply specifically at the off-peak hours that were the focus of

the allegation. *Id.* at 19-20. Neither explanation grapples with the evidence in Nucor's NSA or remedies the flaws in the original determination.

With respect to the SMP, the agency ultimately declined to initiate because Nucor purportedly "did not acknowledge that certain generators and types of electricity are paid a variable price of electricity well below the SMP due to their adjusted coefficient." *Id.* at 47. According to Commerce, "{t}he inclusion of the coefficient factor, which . . . directly adjusts the value of the SMP in the KPX's pricing formula, is crucial to understanding the actual prices KEPCO pays to the generators that comprise KEPCO's costs." *Id.* In Commerce's view, Nucor's allegation failed because "{t}hese real-world prices were readily available to Nucor for use in its allegation." *Id.* The agency's conclusion is flawed.

The agency does not explain its conclusion that the only reasonable way to adequately allege a benefit is by reference to the prices that KEPCO actually paid individual generators to acquire electricity through the KPX based on the Korean government's own pricing formula. Regardless, Nucor not only "acknowledged" the "real-world prices" and the KPX pricing formula that the Remand Results emphasize, it established that those real-world prices also provided evidence of a benefit.

The NSA began by noting the GOK's explanation that off-peak prices are lower because "if one consumes electricity when the load factor is low, e.g., at night, the electricity tariff decreases since electricity could be generated by those using cheap fuels, e.g., nuclear power generators." Nucor NSA at 9. To demonstrate that this explanation was unsupported and unsupportable, Nucor relied on both the KPX's pricing system and formula and on the so-called "real-world prices" that they produced during the period of review ("POR").

The allegation included an extended quotation from KEPCO's Form 20-F regarding the operation of the KPX's "merit order system." *Id.* at 10. This explanation defined the SMP as "the variable cost of the generation unit that is the last to receive the purchase order for such hour" and "the highest price at which electricity can be supplied at a given hour based on the demand and supply for such hour." *Id.* Based on this explanation of the merit order system, the allegation explained that if the SMP does not vary significantly over the course of the day, then neither does KEPCO's cost of supply. *Id.* at 10-11. This is because a stable SMP reflects <u>both</u> a similar mix of generators supplying electricity over the course of the day, <u>and</u> similar prices paid by KEPCO to each individual generator. The other variables in the KPX formula are static and do not change over the course a day. *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: New Subsidy Allegations Supplemental Questionnaire Response* (Dec. 31, 2019), P.R. 90 at Exhibit 1, pp. 35-36 ("Nucor NSA Supp. QR") (explaining that the generators' "variable costs" are assigned on a monthly basis, that the "adjusted coefficient factors" are assigned on an annual or, in exceptional circumstances, a quarterly basis, and that the "capacity price" is determined on an annual basis). The only variable that changes KEPCO's hourly cost of supply is the SMP. Estimating KEPCO's hourly cost of supply based on fluctuations in the SMP, in other words, accounts for fluctuations based on the KPX pricing formula.

Commerce suggests that Nucor somehow failed to use an "opportunity to remedy the deficiencies in the allegation through its supplemental questionnaire," which, according to the agency "specifically ask{ed} Nucor to discuss 'factors that determine the price for electricity other than the {SMP} . . . .'" Remand Results at 17-18. The supplemental questionnaire "specifically asked" no such thing. It asked Nucor to "explain how the SMP only impacts pricing at off-peak

times." Nucor NSA Supp. QR at 4.  But Nucor never asserted that the SMP only affects off-peak prices and has never believed that to be accurate.  As Nucor explained in response, neither the SMP nor the other variables in the KPX pricing formula affect KEPCO's electricity prices at all, whether at off-peak hours or otherwise.  *Id.* at 4-5.  Rather, the SMP is an indicator of (1) total electricity demand, (2) the mix of generators supplying electricity at any given hour, and (3) as a result, KEPCO's hourly cost of supply.  *Id.*

The Remand Results nevertheless continue to suggest that miniscule variations in the SMP over the course of a day could result in significant variations in KEPCO's cost of supply because the SMP "does not account for the quantity of electricity each type of generator is supplying." Remand Results at 44.  They speculate that whether "the SMP accounts for, for example, 5 percent or 15 percent of the electricity generated at any given hour, affects KEPCO's overall cost of supply." *Id.* The agency cites no evidence of any actual variation in the mix of generators supplying electricity over the course of a day during the POR, let alone evidence of variation significant enough to explain the discrepancy between off-peak prices and prices at other times of day.  Nor does it explain where information regarding the hourly mix of operational generators was reasonably available to Nucor.

Nucor's NSA addressed this concern in any event.  In its request for reconsideration before the agency, Nucor established that KEPCO's off-peak prices were below-cost even assuming that all off-peak electricity was supplied by the lowest-cost generator. Nucor Request for Reconsideration at 7-8. During the POR, KEPCO acquired electricity from its lowest-cost individual generator – at prices established by the KPX pricing formula – at a unit price of KRW 67.38 per kilowatt-hour.  Nucor NSA Supp. QR at Exhibit 1, p. 38.  KEPCO acquired electricity from the lowest-cost generator type, nuclear generators, at a unit price of KRW 62.18 per kilowatt-

**BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED**

hour.  *Id.*  Based on its purchases during the original period of investigation, which reflected prices paid under the same tariff schedule that was in effect during the POR, POSCO paid a weighted-average off-peak electricity price of [

].  *See* Nucor NSA at 14, Exhibit 5.

In other words, based on the reasonably available information, there is no possible mix of generators that would have resulted in KEPCO covering its costs on POSCO's purchases of off-peak electricity.  Whatever unspecified "reasonable adjustments" the agency believes that Nucor should have made, Remand Results at 20, the comparison still would have shown evidence of a benefit. This is based on the "real-world prices" that Commerce insists were unaccounted for in Nucor's NSA.  Remand Results at 47.

KEPCO itself described the SMP as "in effect, the marginal price of electricity at a given hour at which the projected demand for electricity and the projected supply of electricity for such hour intersect . . . ."  Nucor NSA Supp. QR at Exhibit 1, p. 35.  The annual average SMP for the POR was KRW 94.28 per kilowatt-hour, Nucor NSA at Exhibit 8.  This is nearly identical to the annual average price of KRW 94.51 per kilowatt-hour at which KEPCO acquired electricity through the KPX.  Nucor NSA Supp. QR at Exhibit 1, p. 38.  The reasonably available record evidence thus establishes a close correlation between the SMP and the actual price at which KEPCO acquired electricity through the KPX.

Commerce's attempts to discount the evidence in the NSA only confirm that KEPCO's off-peak cost of supply was significantly higher than the unit prices that it paid to its lowest-cost generation subsidiary.  Commerce, for example, points to an illustration in the KPX annual report

in the Korean government's initial questionnaire response. Remand Results at 74. As a preliminary matter, this appears to be a hypothetical illustration of how the SMP is established with no real-world correspondence to the actual SMP or mix of generators in operation at any given hour during the POR.  Regardless, it establishes that higher-cost generators, like coal and oil generators, supply electricity throughout the day, including at off-peak hours. *Id.*; *see also id.* at 39-40 (quoting information from Nucor's NSA confirming that higher-cost generators are needed to satisfy demand during off-peak hours), and 44 (confirming that "the hourly SMP information provided by Nucor demonstrates that off-peak electricity was operating above base load, *i.e.*, requiring use of higher-priced generators beyond the coal and nuclear generators that provide the base load . . . ."). During the POR, KEPCO acquired electricity from coal generators at a weighted-average unit price of KRW 83.19 per kilowatt-hour, and it acquired electricity from oil generators at a unit price of KRW 173.37 per kilowatt-hour. Nucor NSA Supp. QR at Exhibit 1, p. 38.  Incorporating these generators into the supply mix would significantly increase KEPCO's off-peak cost of supply.

This was the entire point of Nucor's allegation.  Because large industrial users have shifted consumption to off-peak hours to take advantage of subsidized prices, there is no significant decline in demand between on-peak and off-peak hours, so higher- cost generators must supply electricity in similar amounts throughout the day. Nucor NSA at Exhibit 7, Exhibit 10, Exhibit 12, Exhibit 16, and Exhibit 17. As a result, KEPCO's cost of supply does not vary significantly from on-peak to off-peak hours, and large industrial consumers benefit from unjustifiably low prices. This is not "speculation."  Remand Results at 20.  It is reflected in the stable hourly SMP data and confirmed in explicit statements by officials of both KEPCO and the GOK.  Nucor NSA at 11, Exhibit 7, Exhibit 16, and Exhibit 17. To the extent that Commerce's "previous understanding . .

. regarding the Korean electricity market" is something different, then to the best of counsel for Nucor's knowledge, that previous understanding is wrong. Remand Results at 20.

The Remand Results identify no specific information – either on the record or otherwise publicly available – that undermines or contradicts the significant qualitative and quantitative evidence supporting the benefit allegation in Nucor's NSA. Instead, they make sweeping, vague references to the existence of such information. *See, e.g.*, *id.* at 13 (claiming that "the facts with respect to the Korean electricity system, as a whole, were reasonably available to the petitioner"), 14 (referencing "all publicly available information on the Korean electricity system available from other cases and court findings"), 15 (claiming that interested parties "should be aware of the characteristics of the electricity market in Korea, including but not limited to its operations, price setting method, cost system, availability to consumers, the relationship between KEPCO and the KPX, and how the KPX sets pricing for generators within Korea"), 18 (citing "all of the other information readily available to Nucor on Korea's electricity system"), and 20 (faulting Nucor for not making "reasonable adjustments" based on "available information on the record that called into question the accuracy of the alleged benefit values"). Even if specific information that should have been accounted for in the NSA exists, Commerce does not identify it with any particularity or point to where it can be found. Counsel for Nucor does not know where it is or how to obtain it. Nor has any other party to the proceeding produced it.

The Remand Results' treatment of Nucor's NSA thus remains unlawful and unsupported by the record. They should be remanded again for reconsideration under the proper initiation standard and with reference to actual information that is either on the record or that was reasonably available to Nucor.

### B.     The Court Should Remand Commerce's Treatment of Plantec

Where the recipient of a countervailable subsidy is cross-owned with other corporations, Commerce normally attributes the subsidy to the products produced by the recipient company. 19 C.F.R. § 351.525(b)(6)(i). However:

> If there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to production of the downstream product, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations).

*Id.* § 351.525(b)(6)(iv). This regulation closes "a loophole whereby vertically integrated businesses could avoid countervailing duty exposure for input subsidies simply by separately incorporating the division that makes the input." *Countervailing Duties*, 63 Fed. Reg. at 65,401.

In determining whether production of an "input product is primarily dedicated to production of the downstream product," Commerce considers whether the input is of a kind usable primarily for manufacturing a limited number of goods. *See, e.g.*, *id.* (indicating that a hypothetical plastics producer would not likely be found to supply an input "primarily dedicated" to the downstream production of automobiles or appliances). Where the input is used to produce the subject merchandise, the volume of the input supplied is irrelevant, and the supplier's business focus "matters little." *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1364 (Ct. Int'l Trade 2021) (approving cross-attribution of subsidies where a power company provided small quantities of steel scrap to a downstream steel producer); Issues and Decision Memorandum accompanying *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 86 Fed. Reg. 53,279 (Dep't Commerce Sept. 27, 2021) (final results of countervailing duty admin. rev. and rescission, in part; 2018) at 25-27 ("*Turkey Rebar 2018* IDM"); Issues and Decision Memorandum accompanying *Forged Steel Fluid End Blocks From the Federal Republic*

*of Germany*, 85 Fed. Reg. 80,011 (Dep't Commerce Dec. 11, 2020) (final affirm. countervailing duty deter.) at 57-58 ("*FEBs from Germany* IDM") (confirming that there is no "'de minimis' standard or a requirement" for the amount of an input supplied between cross-owned companies).

During the review period, Plantec generated [          ] that it sold to another POSCO affiliate, POSCO Daewoo Corporation ("PDC"), which in turn sold the [          ] to POSCO. Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: Response to the Affiliated Companies Section of the Initial Questionnaire* (Aug. 19, 2019), C.R. 4, P.R. 20 at 12-13 ("POSCO Affiliated Companies Response"). Plantec also sold POSCO "[

                                                    ]" Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: POSCO's Response to Nucor's New Subsidy Allegations* (Nov. 21, 2019), C.R. 185, P.R. 88 at 10 ("POSCO NSA Response").

Commerce nonetheless declined to cross-attribute subsidies received by Plantec. Issues and Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea*, 86 Fed. Reg. 15,184 (Dep't Commerce Mar. 22, 2021) (final results and partial rescission of countervailing duty admin. rev., 2018), P.R. 186 at 34. The Court remanded, questioning the agency's reliance on (1) an alleged distinction between generating and producing scrap, (2) the fact that Plantec's scrap was provided through an intermediate affiliate, (3) the volume of scrap provided, and (4) Plantec's "primary function." Slip Op. 22-116 at 2, 19-24. The Court also found that Commerce had not adequately addressed whether the [          ] constituted steelmaking equipment. *Id.* at 29-30.

In its draft remand results, Commerce continued its original treatment of Plantec, contrasting the "unprocessed scrap" that Plantec provided with the "processed scrap" that POSCO received from a different affiliate. *Id.* at 26-27. Commerce explained that (1) Plantec's provision of scrap through an affiliate indicated that Plantec supplied POSCO "incidentally," (2) the provision of scrap did not reflect Plantec's "primary business purpose," and (3) the record did not indicate that Plantec provided scrap only to POSCO. *Id.* at 27-29. While Commerce conceded that the [          ] was steelmaking equipment, it nonetheless found cross-attribution inappropriate given Plantec's primary business purpose, and the alleged lack of any indication that Plantec produced the [          ] or that POSCO used it to make steel. *Id.* at 31-33.

In its comments on the draft results, Nucor argued that Commerce had not adequately explained or supported its distinction between "generic," "unprocessed" scrap and "processed" scrap. Nucor's Comments at 20-21. Nucor argued that Commerce's treatment of Plantec appeared at odds with its treatment of other scrap-providing POSCO affiliates, *id.* at 21-23, and that its reliance on the volume of scrap supplied and Plantec's business focus was unsupported by its past practice and judicial precedent. *Id.* at 23-24. Nucor questioned Commerce's assumption that Plantec had supplied scrap to parties other than POSCO. *Id.* at 24. Finally, Nucor challenged Commerce's finding that the [          ] was not an input "primarily dedicated" to downstream steel production as inconsistent with the record, the agency's regulations, and its precedent. *Id.* at 25-27.

In the Remand Results, Commerce continues to rely on the rationales underpinning its draft results. Remand Results at 55-72; *see also id.* at 21-33 (reproducing the draft results in their

entirety.[1] As explained below, the Remand Results regarding both Plantec's provision of scrap and the [                    ] are inconsistent with this Court's remand order and the standard of review.

> **1.    Commerce's Analysis of Plantec's Provision of Scrap to POSCO Should Be Remanded for Further Consideration**

Commerce argues that its practice is to conduct a holistic, fact-intensive, case-by-case analysis of whether any particular item supplied by a cross-owned affiliate is primarily dedicated to downstream production. *Id.* at 56-57, 59. It notes that while it has sometimes found scrap to be primarily dedicated to downstream steel production, it does not universally do so. *Id.* at 58-59, 63-65. Commerce argues that the "unprocessed" nature of the scrap that Plantec provided, as well as Plantec's overall business focus, support its determination that Plantec should not be treated as an input supplier for the purposes of cross-attributing subsidies. *Id.* at 61-64. It also relies, albeit to a lesser extent, on the fact that Plantec provided the scrap to POSCO through an intermediate affiliate and the alleged lack of any indication that the Plantec's scrap was provided solely to POSCO. *Id.* Commerce's remand results remain inadequately explained and supported.

Commerce first argues that its practice is to conduct a holistic, segment-specific examination of whether inputs are "primarily dedicated to production of the downstream product." *Id.* at 56-59. But this generalized characterization fails to recognize that not only has Commerce repeatedly found steel scrap primarily dedicated to downstream steel production, it has done so in cases involving POSCO's flat-rolled steel products. Issues and Decision Memorandum accompanying S*teel Concrete Reinforcing Bar From the Republic of Turkey*, 87 Fed. Reg. 21,640 (Dep't Commerce Apr. 12, 2022) (final results of countervailing duty admin. rev. and rescission,

---

[1]      In light of the commonality between the Draft Results and the portion of the Remand Results responding to Nucor's comments on the Draft Results, these comments focus on the agency's response to Nucor's comments on the Draft Results.

in part; 2019) at 10-11 ("*Turkey Rebar 2019* IDM"); *Turkey Rebar 2018* IDM at 25-27;

Preliminary Decision Memorandum accompanying *Seamless Carbon and Alloy Steel Standard,*

*Lined, and Pressure Pipe From the Russian Federation*, 85 Fed. Reg. 80,007 (Dep't Commerce

Dec. 11, 2020) (prelim. affirm. countervailing duty deter. and alignment of final deter. with final

antidumping duty deter.) at 10 (unchanged in final); Preliminary Decision Memorandum

accompanying *Circular Welded Carbon Steel Pipes and Tubes From the Republic of Turkey*,

84 Fed. Reg. 21,327 (Dep't Commerce May 14, 2019) (prelim. results of countervailing duty

admin. rev. and intent to rescind the rev., in part; calendar year 2017) at 8 (unchanged in final);

Preliminary Decision Memorandum accompanying *Carbon and Alloy Steel Wire Rod From the*

*Republic of Turkey*, 82 Fed. Reg. 41,929 (Dep't Commerce Sept. 5, 2017) (prelim. affirm.

countervailing duty deter. and prelim. affirm. critical circumstances deter., in part) at 9, 20

(unchanged in final); Issues and Decision Memorandum accompanying *Certain Cold-Rolled Steel*

*Flat Products From the Republic of Korea*, 81 Fed. Reg. 49,943 (Dep't Commerce July 29, 2016)

(final affirm. deter. of the countervailing duty inv.) at cmt. 5 (treating scrap provided by POSCO

P&S as presumptively "primarily dedicated to the production" of POSCO's downstream flat-rolled

steel); Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods*

*From the Republic of Turkey*, 79 Fed. Reg. 41,964 (Dep't Commerce July 18, 2014) (final affirm.

countervailing duty deter. and final affirm. critical circumstances deter.) at 8 ("*OCTG from Turkey*

IDM").

    Commerce points to its decisions in the 2017 administrative review of the countervailing

duty order on Korean cold-rolled steel products and *FEBS from Germany* as demonstrating that it

does not universally treat steel scrap as primarily dedicated to downstream steel production.

Remand Results at 59, 65. But the 2017 Korean cold-rolled case involved the same reasoning that

the Court found insufficient here. Issues and Decision Memorandum accompanying *Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 85 Fed. Reg. 38,361 (Dep't Commerce June 26, 2020) (final results of countervailing duty admin. rev.; 2017) at 30-32 ("*Cold-Rolled Korea 2017* IDM"); Slip Op. 22-116 at 21-24. And Commerce made its determination in *FEBs from Germany* based on the "miniscule" volume of scrap supplied – a factor that it has disavowed here and in other recent cases. Remand Results at 26-27;[2] *FEBs from Germany* IDM at 57-58; *see also Icdas*, 498 F. Supp. 3d at 1364; *Turkey Rebar 2019* IDM at 10-11; *Turkey Rebar 2018* IDM at 25-27.

Commerce next explains that Plantec provided POSCO with a "common input {used} among a variety of products and industries" – namely, "unprocessed" steel scrap. Remand Results at 60-61. Commerce compares Plantec's "unprocessed" scrap unfavorably with the "processed" scrap provided to POSCO by Pohang SRDC. *Id.* Commerce asserts that Pohang SRDC's processing of steel scrap resulted in an input "primarily dedicated" to downstream steel production, but that there is no indication that Plantec's "unprocessed" scrap was "designed" for POSCO's downstream products or "intended for POSCO upon its generation." *Id.* at 61-62.

These remand proceedings appear to be the first instance in which Commerce has drawn a distinction between "processed" steel scrap and other steel scrap supplied by cross-owned affiliates and used to produce subject goods. Tellingly, while stating that "unprocessed" steel scrap is an

---

[2]      Indeed, Commerce here treated "small" quantities of steel scrap supplied by another POSCO affiliate as "primarily dedicated" to POSCO's downstream steel production. *See* Remand Results at 26-27 (noting Commerce's treatment of Pohang Scrap Recycling Distribution Center Co., Ltd ("Pohang SRDC") as a cross-owned input supplier); *see also* Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: Pohang SRDC's Initial Questionnaire Response* (Sept. 26, 2019), C.R. 140, P.R. 45 at 1, 6, 9 ("Pohang SRDC IQR") (reporting that Pohang SRDC supplied "small" quantities of scrap to POSCO).

input used across multiple industries and products, Commerce identifies no industries or products for which such scrap could be used except downstream steel production. *Id.* at 58, 60-62. Nor is it obvious how steel scrap, regardless of its processing level, could be used to produce anything other than more steel through remelting. As noted above, Commerce has repeatedly found that steel scrap – without any consideration of its processing level – is primarily dedicated to downstream steel production. *See* discussion *supra* at 18-19, collecting cases. In explaining why, Commerce has pointed to the fact that the steel scrap supplied by the affiliate is used in the downstream producer's steel production process. *See, e.g.*, *OCTG from Turkey* IDM at 8. Commerce concedes here that POSCO used Plantec's scrap to produce CTL plate.  Remand Results at 26.

Commerce contends that the lack of pre-use processing indicates that Plantec's scrap was not "designed" for POSCO or "intended for POSCO upon its generation." *Id.* at 61-62. Given that scrap is a byproduct, it is unclear how scrap could ever be "designed" or "intended" for a particular recipient's use upon generation. But more concretely, the fact that Plantec's scrap required no pre-use processing indicates that it was appropriate by nature for use in POSCO's subject production operations – where it was in fact used. As such, the lack of processing does not support Commerce's conclusion that the scrap was not primarily dedicated to downstream steel production. For that matter, it is not clear that Pohang SRDC's scrap was "intended for POSCO upon its generation," given that the company does not appear to have generated the scrap it provided, but simply to have processed it. Pohang SRDC IQR at 6, 9.

Commerce next attempts to distinguish the 2018 and 2019 Turkish rebar reviews, by way of justifying its reliance on Plantec's business focus. Remand Results at 62-63. In those cases, Commerce cross-attributed subsidies based on a shipbuilder's provision of steel scrap to a downstream rebar producer. *Turkey Rebar 2019* IDM at 10-11; *Turkey Rebar 2018* IDM at 25-27.

In so doing, Commerce held that, where an input is used in the respondent's manufacturing process, the primary business operation of the supplying affiliate "matters little." *Turkey Rebar 2018* IDM at 26. Commerce argues that a different result is merited here because the rebar cases involved a "clear, vertically integrated scrap supply process, and scrap inputs used exclusively for the overall production chain." Remand Results at 62. Commerce further argues that in those cases, the affiliate's "scrap generation" was "a consistent part of the production process," and that the affiliate's scrap was sold exclusively to the downstream producer. *Id.* at 62-63.

Commerce's explanation is once again insufficient. Here, there appears to be a vertically integrated scrap supply process, in that POSCO purchased and used scrap generated by its affiliate, Plantec. To the extent that Commerce finds that process not "clear" because of PDC's status as an intermediary, *id.* at 62-63, this is not a meaningful observation given Commerce's treatment of Pohang SRDC, which also supplied steel scrap to POSCO through PDC. Pohang SRDC IQR at 1, 6, 9. It is likewise not immediately apparent what Commerce means by a "consistent part of the production process." Remand Results at 62. As in the Turkish cases, Plantec generated steel scrap in the course of its production operations; that scrap was then used to produce steel by its downstream steelmaking affiliate. *Compare id.* (quoting *Turkey Rebar 2018* IDM at cmt. 5), *with* POSCO Affiliated Companies Response at 12-13.

Finally, in the 2018 Turkish rebar case, Commerce noted that there was no record evidence that the affiliate's scrap was sold to anyone but the downstream producer. Remand Results at 62 (quoting *Turkey Rebar 2018* IDM at cmt. 5). Here, too, there appears to be no evidence that Plantec's scrap was sold on to anyone but POSCO; certainly, Commerce cites no record evidence of such sales, and its reliance on PDC's intermediary status rings hollow, given PDC's intermediary status with respect to Pohang SRDC. *Id.* at 61-63. Rather, as in the 2018 Turkish

rebar review, the record indicates that Plantec's scrap was used by POSCO, but not by anybody else.[3]   Further, Pohang SRDC was treated as a cross-owned input supplier, although the record suggests that it processed scrap ultimately used by companies other than POSCO. *See* Pohang SRDC IQR at 1, 9-10 and Exhibit 7 (characterizing amount of scrap supplied to POSCO as small; describing overall company sales).

Commerce argues that its precedent supports reliance on Plantec's business focus, citing its investigation into Chinese glass containers and *FEBs from Germany*. Remand Results at 63-64. But Commerce considered the supplier's overall business activity in the *Glass Containers* case solely in determining whether to employ adverse inferences. Issues and Decision Memorandum accompanying *Certain Glass Containers From the People's Republic of China*, 85 Fed. Reg. 31,141 (Dep't Commerce May 22, 2020) (final affirm. countervailing duty deter.) at 68-70. In *FEBs from Germany*, Commerce ultimately relied on "the quantities and types of materials" provided between the affiliates, rather than the affiliates' primary business activities. *FEBs from Germany* IDM at 56-59. Moreover, Commerce has elsewhere found – and the courts have affirmed – that business focus is largely irrelevant where, as here, the supplier provides an input actually used in subject production. *See Icdas*, 498 F. Supp. 3d at 1364; *Turkey Rebar 2019* IDM at 10-11; *Turkey Rebar 2018* IDM at 25-27.[4]

---

[3]     While the record of the 2019 Turkish rebar review appears to have included affirmative evidence that the shipbuilding affiliate sold its scrap only to the downstream steel producer, Commerce's treatment of that same affiliate in the 2018 review indicates that such affirmative evidence is not necessary to cross-attribution.  *Turkey Rebar 2019* IDM at 11; 2018 *Turkey Rebar 2018* IDM at 26.

[4]     Again, to the extent that Commerce relies on the *Cold-Rolled Korea 2017* IDM, Remand Results at 65, that case involved the same reasoning that the Court found insufficient here. *See* discussion *supra* at 19.

In sum, Commerce's treatment of Plantec's provision of scrap to POSCO should again be remanded. The factors that Commerce cites to support its decision do not withstand scrutiny either individually or in concert. These include the alleged difference between "processed" and "unprocessed" steel scrap, provision of scrap through an intermediate affiliate, and Plantec's primary business focus. The decision also remains out of step with the agency's treatment of steel scrap in other proceedings. Accordingly, the Court should remand Commerce's treatment of Plantec's scrap for further consideration.

### 2. Commerce's Analysis of the [                    ] Should Be Remanded for Further Consideration

On remand, Commerce continues to find that Plantec's provision of a [                ] to POSCO does not justify cross-attribution. Remand Results at 66-72. Commerce concedes that the [                ] could be used in POSCO's downstream steel production. *Id.* at 67. It finds, however, that there is insufficient evidence to show that Plantec produced the item. *Id.* at 67-69. It also finds that the record does not show that POSCO used the item to produce steel. *Id.* at 69-72. Finally, Commerce finds that Plantec's business focus does not support cross-attribution based on the [                ]. *Id.* at 70.

Commerce's treatment of the [                ] remains unexplained and unsupported. First, Commerce argues that the record does not indicate that Plantec produced the item. *Id.* at 68-69. Simultaneously, the agency acknowledges that Plantec's reported business activities include constructing "steel producing facilities" and that the [                ] is equipment of a kind used to produce steel. *Id.* at 67-68. POSCO also described Plantec in the original investigation as "manufactur{ing} steel making equipment." POSCO Affiliated Companies Response at Exhibit 8, p. 3. Commerce downplays the original investigation description as outdated, but the description is in no way inconsistent with information specific to the 2018 review period. Remand Results at

**BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**

68. Indeed, POSCO itself placed the document containing the investigation description on the 2018 review's record, indicating that the facts therein have continued relevance. POSCO Affiliated Companies Response at 13 and Exhibit 8. Given that POSCO has described Plantec as producing "steel making equipment" and "steel producing facilities" and that Plantec sold POSCO steelmaking equipment, Commerce's conclusion that Plantec did not produce the [

] is bizarre. This is particularly so given that the record is clear that the [

], and that Plantec manufactures goods from steel (otherwise, it could not generate steel scrap), rather than merely reselling such goods. *See, e.g.*, POSCO NSA Response at 10.

Commerce's conclusion that POSCO did not use the [                ] to produce steel is also inadequately explained. While POSCO reported that none of the items it purchased from Plantec "are actual machinery or equipment used to produce the downstream product," POSCO nonetheless described the [                ] as [

] POSCO NSA Response at 10. Further, POSCO's production process for subject goods [                        ], an item that [                        ]. Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, re: *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea, Case No. C-580-888: POSCO's Initial Questionnaire Response* (Sept. 26, 2019), C.R. 120-140, P.R. 38-44 at Exhibit 12, PDF p. 128 (Manufacturing Process). This indicates that the [                ] is not only steelmaking equipment, but equipment of a kind fundamental to POSCO's steel production.

Commerce reasons that because Plantec provided POSCO with, in addition to the [                ] (and scrap), goods that were not steelmaking equipment, it can reasonably treat the [                ] as not primarily dedicated to downstream steel production. Remand Results at 69-70. In support, Commerce cites the Court's approval of its decision not to treat these other

**BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**

(non-scrap) goods as primarily dedicated to downstream production. *Id.* But while Commerce argues that the [                    ] was not provided separately from the other non-steelmaking goods, the Court explicitly remanded treatment of the [                    ], indicating that it must be considered in its own right, not simply "grandfathered" in with other items. Slip Op. 22-116 at 29-30.

Finally, Commerce argues that while Plantec's business focus includes producing steelmaking facilities, it also has other important focuses, as reflected by its provision of non-steelmaking equipment and services to POSCO. Remand Results at 70-71. On this basis, it seeks to distinguish the facts here from those underlying its investigation into Brazilian cold-rolled steel, where it cross-attributed subsidies based on an affiliate's provision of steelmaking equipment to a downstream steel producer. *Id.* (citing Issues and Decision Memorandum accompanying *Certain Cold-Rolled Steel Flat Products From Brazil*, 81 Fed. Reg. 49,940 (Dep't Commerce July 29, 2016) (final affirm. countervailing duty deter.) at cmt. 16). But Plantec provided POSCO not only with an item that Commerce concedes is steelmaking equipment, but with a direct input into its subject production – steel scrap. The agency has yet to adequately grapple with these facts, or to adequately explain how its decision is consistent with the record and reconcilable with its precedent.

## III.   <u>CONCLUSION</u>

As explained above, the Court should again remand Commerce's decision not to investigate Nucor's allegation regarding the GOK's cross-subsidization of electricity, as well as Commerce's decision that Plantec is not POSCO's cross-owned input supplier.

Respectfully submitted,

*/s/ Alan H. Price*
Alan H. Price, Esq.
Christopher B. Weld, Esq.
Maureen E. Thorson, Esq.
Adam M. Teslik, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Nucor Corporation*

Dated: March 2, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedure 2(B)(1), the undersigned certifies that these comments comply with the word limitation requirement. The word count for Nucor Corporation's Comments on Final Results of Redetermination Pursuant to Court Remand, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 8,496 words.

_/s/ Alan H. Price_
(Signature of Attorney)

Alan H. Price
(Name of Attorney)

Nucor Corporation
(Representative Of)

March 2, 2023
(Date)