**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | |
|---|---|
| NUCOR CORPORATION, | ) |
| Plaintiff, | ) |
| v. | ) |
| UNITED STATES, | ) Court No. 21-00182 |
| Defendant, | ) |
| and | ) |
| POSCO, | ) |
| Defendant-Intervenor. | ) |

**<u>ORDER</u>**

Upon consideration of plaintiff's comments regarding the Department of Commerce's (Commerce) Final Results of Remand Redetermination Pursuant to Court Remand, dated January 31, 2023, ECF Nos. 60-61 (Remand Redetermination), defendant's response thereto, and all other pertinent papers, it is hereby

ORDERED that Commerce's Remand Redetermination is sustained in all respects; and it is further

ORDERED that judgment will enter in favor of the United States.

_____
CHIEF JUDGE

Dated: _____, 2023
       New York, NY

*PUBLIC VERSION*

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| NUCOR CORPORATION, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>POSCO, )<br><br>Defendant-Intervenor. )<br> ) | Court No. 21-00182<br><br>**PUBLIC VERSION**<br>Business Proprietary<br>Information Removed From Pages<br>3, 25-29 |

---

**DEFENDANT'S RESPONSE TO PLAINTIFF'S COMMENTS REGARDING THE REMAND
REDETERMINATION**

---

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

*PUBLIC VERSION*

OF COUNSEL:
W. Mitch Purdy
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
  Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230
Tel: (202) 482-5214
Fax: (202) 482-4912
Email: William.Purdy@trade.gov


April 24, 2023

ELIZABETH A. SPECK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-0369
Email: elizabeth.speck@usdoj.gov


Attorneys for Defendant, United States

# <u>TABLE OF CONTENTS</u>

BACKGROUND ................................................................................................................2

    I.    The Administrative Determination Under Review ................................................2

    II.    The Court's Remand Order ...................................................................................3

    III.    Commerce's Remand Redetermination .................................................................3

SUMMARY OF ARGUMENT .........................................................................................3

ARGUMENT .....................................................................................................................4

    I.    Standard Of Review ..............................................................................................4

    II.    Commerce Reasonably Declined To Investigate The Alleged Off-Peak Sale Of Electricity For LTAR ...........................................................................................5

        A.  Commerce Applied The Correct Initiation Standard .........................................5

        B.  Nucor Did Not Submit Sufficient Evidence To Warrant Initiating An NSA Investigation.....................................................................................................6

        C.  Nucor's New Subsidy Allegation Is Contradicted By Record Evidence..........12

        D.  Nucor's Allegation Conflates Benefit And Specificity ....................................16

    III.    Commerce's Determination Not To Treat Plantec As A Cross-Owned Input Supplier In Connection With Certain Inputs Is Supported By Substantial Evidence And Is Otherwise In Accordance With Law .........................................17

        A.  Commerce's "Primarily Dedicated" Analysis Is In Accordance With Law.....17

        B.  Commerce Reasonably Concluded That Plantec Does Not Provide Scrap That Is Primarily Dedicated To The Production Of Downstream Products .....19

            1.  Commerce Drew Reasonable Distinctions Between Pohang SRCD's And Plantec's Provision of Scrap .................................................................20

            2.  Nucor's Arguments Ignore That Commerce's "Primarily Dedicated" Analysis Is Highly Case Specific And Cannot Be Reduced To A Single Factor ....................................................................................................22

*PUBLIC VERSION*

C. Commerce Reasonably Concluded That Another Input That Plantec Provides Is Not Primarily Dedicated To The Production Of Downstream Products.........................................................................................................24

1. Commerce's Determination Is Supported By Substantial Evidence ..........25

2. Nucor's Arguments Challenging Commerce's Conclusions Lack Merit ...26

CONCLUSION..................................................................................................................29

## **TABLE OF AUTHORITIES**

**Cases**                                                                                  **Page(s)**

*Bethlehem Steel Corp. v. United States*,
    140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001)............................................................... 7

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938) ........................................................................................................ 5

*Consolo v. Fed. Maritime Comm'n*,
    383 U.S. 607 (1966) .................................................................................................. 5, 26

*Corus Staal BV v. United States*,
    395 F.3d 1343 (Fed. Cir. 2005)..................................................................................... 4

*DynaEnergetics U.S., Inc. v. United States*,
    298 F. Supp. 3d 1363 (Ct. Int'l Trade 2018)................................................................ 5

*Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*,
    498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021).............................................................. 24

*Nucor Corporation v. United States*,
    Court No. 21-00182, Slip Op. 22-116 (Ct. Int'l Trade Oct. 5, 2022) ......................... 1

*Nucor Corp. v. United States*,
    No. 22-00137, Slip Op. No. 23-55 at 12-16 (Ct. Int'l Trade April 19, 2023) ........................... 9

*Nucor Corp v. United States*,
    No. 22-0050, Slip Op. No. 23-54 at 12-16 (Ct. Int'l Trade April 19, 2023) .............................. 9

*Nucor Corp. v. United States*,
    600 F. Supp. 3d 1225 (Ct. Int'l Trade 2022)........................................................ 3, 5

*Nucor Corp v. United States*,
    927 F.3d 1243 (Fed. Cir 2019).......................................................................... *passim*

*QVD Food Co. v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011)..................................................................................... 8

*RZBC Group Shareholding Co., Ltd., et. al. v. United States*,
    100 F. Supp. 3d 1288 (Ct. Intl. Trade 2015)...................................................... *passim*

*United Eurodif S.A. v. United States*,
    555 U.S. 305 (2009)..................................................................................................... 23

*Uttam Galva Steels Ltd. v. United States*,
   No. 21-2119, 2022 WL 1419596 (Fed. Cir. May 5, 2022) ................................. 19, 23

*Xinjiamei Furniture (Zhangzhou) Co. v. United States*,
   968 F. Supp. 2d 1255 (Ct. Int'l Trade 2014) .................................................................. 5

**Statutes**

19 U.S.C. § 1516a(b) ........................................................................................................ 5

19 U.S.C. § 1671(a) .......................................................................................................... 5

19 U.S.C. § 1677(5) ...................................................................................................... 4, 5

19 U.S.C. § 1671a(b) .................................................................................................... 4, 5

H.R. Rep. No. 96-317, at 51 (1979) ............................................................................. 4, 6

**Regulations**

19 C.F.R. § 351.202(b) .................................................................................................. 4, 6

19 C.F.R. § 351.511(a) .................................................................................................. 2, 17

19 C.F.R. § 351.525(b) ............................................................................................ 2, 18, 24

**Federal Register**

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*,
   81 Fed. Reg. 63,168 (Dep't of Commerce Sept. 14, 2016) ........................................ 8

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*,
   82 Fed. Reg. 16,341 (Dep't of Commerce April 4, 2017) .......................................... 8

*Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea*,
   86 Fed. Reg. 15,184 (Dep't of Commerce March 22, 2021) ...................................... 2

*Certain Cold-Rolled Steel Flat Products From Brazil, India, and the Republic of Korea*,
   81 Fed. Reg. 49,940 (Dep't of Commerce July 29, 2016) ........................................ 28

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea*,
   85 Fed. Reg. 38,361 (Dep't of Commerce June 26, 2020) ................................. 21, 25

*Certain Corrosion-Resistant Steel Products from the Republic of Korea:*,
   85 Fed. Reg. 35,310 ( Dep't of Commerce June 2, 2016)  .................................................. 8, 17

*Certain Glass Containers From the People's Republic of China*,
   85 Fed. Reg. 31,141 (Dep't of Commerce May 22, 2020)  ...................................................... 24

*Countervailing Duties*,
   63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998)................................................ *passim*

*Forged Steel Fluid End Blocks From the Federal Republic of Germany*,
   85 Fed. Reg. 80,011 (Dep't of Commerce Dec. 11, 2020)  ................................................. 23, 24

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
   86 Fed. Reg. 53,279 (Dep't of Commerce Sept. 27, 2021)................................................. 22, 23

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | |
|---|---|
| _____ ) | |
| NUCOR CORPORATION,                          ) | |
|                                             ) | |
|                      Plaintiff,             ) | |
|                                             ) | |
|         v.                                  ) | Court No. 21-00182 |
|                                             ) | |
| UNITED STATES,                              ) | **PUBLIC VERSION** |
|                                             ) | Business Proprietary |
|                      Defendant,             ) | Information Removed From Pages |
|                                             ) | 3, 25-29 |
|         and                                 ) | |
|                                             ) | |
| POSCO,                                      ) | |
|                                             ) | |
|                      Defendant-Intervenor.  ) | |
| _____ ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S COMMENTS REGARDING THE
<u>REMAND REDETERMINATION</u>**

Defendant, the United States, respectfully submits this response to the comments filed by

plaintiff, Nucor Corporation (Nucor), ECF No. 65-66 (Nucor's Comments), on the remand

redetermination issued by the Department of Commerce (Commerce) pursuant to *Nucor*

*Corporation v. United States*, Court No. 21-00182, Slip Op. 22-116 (Ct. Int'l Trade Oct. 5, 2022)

(Remand Order).  *See* Final Results of Remand Redetermination Pursuant to Court Remand,

dated Jan. 31, 2023, ECF Nos. 60-61 (Remand Redetermination).  For the reasons discussed

below, we respectfully request that the Court sustain Commerce's Remand Redetermination

because it is supported by substantial evidence and is otherwise in accordance with law.

BACKGROUND

I.    The Administrative Determination Under Review

On March 22, 2021, Commerce published the final results in *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea*, 86 Fed. Reg. 15,184 (Dep't of Commerce March 22, 2021) (final admin. review and partial recission) (Final Results), P.D. 192, and accompanying Issues and Decision Memorandum (IDM), P.D. 187.[1]  In the final results, Commerce calculated a *de minimis* rate of 0.49 percent for POSCO, which was also assigned to the non-selected companies.  *Id.* at 15,185.  Commerce addressed the parties' arguments regarding the provision of off-peak electricity for less than adequate remuneration (LTAR) subsidy allegation and continued to find that Nucor provided insufficient evidence to initiate an investigation.  IDM at 14-26.  Specifically, Commerce continued to find that there was an insufficient allegation of benefit, explaining that Nucor did not provide sufficient evidence in the allegation of either the Korea Electric Power Corporation's (KEPCO) lack of cost recovery or an inconsistency with prevailing market conditions under the "tier three" benchmark analysis set forth in 19 C.F.R. §351.511(a)(2)(iii), which evaluates whether the government price is set in accordance with market principles.  *Id.* at 20-26.  Commerce also continued to find that POSCO Plantec (Plantec) was not POSCO's cross-owned input supplier for the period of review pursuant to 19 C.F.R. § 351.525(b)(6)(iv) because the inputs Plantec supplied were not primarily dedicated to the production of downstream product.  *Id.* at 27-36.  In doing so, Commerce examined the inputs, including steel scrap, equipment, and services, that Plantec provided

---

[1]  Citations to the public documents (P.D.) and confidential documents (C.D.) refer to the record of the countervailing duty administrative review.

POSCO, and found that there were distinguishing factors between the cases Nucor cited in which Commerce found similar inputs were primarily dedicated.  *Id.* at 31-36.

II.    The Court's Remand Order

Nucor appealed the final results.  Nucor challenged Commerce's determinations regarding the provision of electricity for LTAR and Plantec's status as a potential cross-owned input supplier.  Complaint (ECF No. 5).  On October 12, 2022, the Court entered an order in which it sustained the Final Results in part, but remanded, in part, for Commerce to "reconsider or further explain its determination not to investigate the alleged off-peak sale of electricity for less than adequate remuneration" and "reconsider or further explain its determination not to treat Plantec as a cross-owned input supplier in connection with the supply of scrap and a ████████ ████"  Remand Order at 30.

III.    Commerce's Remand Redetermination

In its remand redetermination, Commerce reconsidered the record information and further explained its decision not to initiate on the alleged provision of off-peak electricity for LTAR and its finding that Plantec was not POSCO's cross-owned input supplier.  Remand Redetermination at 2.  Commerce continued to find that the off-peak electricity for LTAR new subsidy allegation did not provide sufficient evidence of a benefit for Commerce to initiate an investigation and that the inputs Plantec supplied were not primarily dedicated to the production of a downstream product.  *Id.*

SUMMARY OF ARGUMENT

Commerce's remand redetermination should be sustained in its entirety.  Commerce complied with the Court's Remand Order and explained its decision not to initiate on the alleged provision of off-peak electricity for LTAR and its finding that Plantec was not POSCO's cross-

owned input supplier.  First, Commerce explained that Nucor has not satisfied the requirements for initiation because the information that it provided did not sufficiently support the benefit component of the allegation.  19 U.S.C. §§ 1671a(b)(1) and 1677(5)(B); 19 C.F.R. § 351.202(b)(7)(ii)(B).  Further, Commerce concluded that the allegation was "not reasonably supported by the facts alleged" and "omit{ted} important facts which are reasonably available to the petitioner."  *RZBC Group Shareholding Co., Ltd., et. al. v. United States*, 100 F. Supp. 3d 1288, 1295 (Ct. Intl. Trade 2015) (citing H.R. Rep. No. 96-317, at 51 (1979)).

Second, Commerce explained its determination that Plantec is not a cross-owned input supplier because the inputs Plantec provided to POSCO were not "primarily dedicated to production of the downstream product."  Remand Redetermination at 21-32.  Neither the statute nor the regulations define "primarily dedicated."  Thus, Commerce explained how the facts of this record reasonably supported its conclusions based on its assessment of its regulations and the preamble to its regulations.  *Countervailing Duties*, 63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998) (*Preamble*), as well as decisions in prior countervailing duty (CVD) cases.  Accordingly, because Commerce has complied with the Remand Order and the remand redetermination is supported by substantial evidence, and is otherwise in accordance with law, we respectfully request that it be sustained.

<u>ARGUMENT</u>

I.    <u>Standard Of Review</u>

The Court sustains any determination, finding, or conclusion found by Commerce unless it is unsupported by substantial evidence on the record, or otherwise not in accordance with law.  *Corus Staal BV v. United States*, 395 F.3d 1343, 1346 (Fed. Cir. 2005) (quoting 19 U.S.C.

§ 1516a(b)(1)(B)(i)).  "Substantial evidence" means "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S.

197, 229 (1938) (citation omitted).  Even if it is possible to draw two inconsistent conclusions

from the record evidence, this does not mean that Commerce's findings are unsupported by

substantial evidence.  *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).  This

standard applies equally to remand redeterminations.  *DynaEnergetics U.S., Inc. v. United States*,

298 F. Supp. 3d 1363, 1367 (Ct. Int'l Trade 2018).  Remand redeterminations are also reviewed

for compliance with the Court's order.  *Xinjiamei Furniture (Zhangzhou) Co. v. United States*,

968 F. Supp. 2d 1255, 1259 (Ct. Int'l Trade 2014).

II.  **Commerce Reasonably Declined To Investigate The Alleged Off-Peak Sale Of Electricity For LTAR**

Commerce's determination that Nucor failed to meet the initiation standard and did not

initiate on the alleged provision of off-peak sale of electricity for LTAR is supported by

substantial evidence and is otherwise in accordance with law.  Remand Redetermination at 11-

21, 38-52.  Thus, it should be sustained.

A.  Commerce Applied The Correct Initiation Standard

In its remand redetermination, Commerce continued to find that its determination not to

initiate an investigation on the alleged off-peak provision of electricity for LTAR was in

accordance with 19 U.S.C. §§ 1671a(b)(1), 1677(5)(B).  *Nucor Corp.*, 600 F. Supp. 3d at 1241;

Remand Redetermination at 11.  Pursuant to 19 U.S.C. § 1671a(b)(1), the petitioner must allege

the elements necessary for the imposition of a countervailing duty as set forth in section 19

U.S.C. § 1671(a) (*i.e.*, specificity, benefit, and financial contribution).  This Court has described

the standards for Commerce's subsidy initiation process as follows:

> To trigger an investigation, petitioners must allege a subsidy as defined by statute.  They also have to pad their allegations with any "information reasonably available" to them at the time of filing …. If a petition meets these requirements, Commerce must proceed. The agency cannot refuse to investigate based on conjecture that the subsidy does not exist.  This means most subsidy petitions are granted unless the allegations "are clearly frivolous, not reasonably supported by the facts alleged or . . . omit important facts which are reasonably available to the petitioner."

*RZBC Group*, 100 F. Supp. 3d at 1295 (citing H.R. Rep. No. 96-317, at 51 (1979)).

Commerce's regulations describe "reasonably available" information as the:  "factual information (particularly documentary evidence) relevant to the alleged countervailable subsidy, including any law, regulation, or decree under which it is provided, the manner in which it is paid, and the value of the subsidy to exporters or producers of the subject merchandise." Remand Redetermination at 2-3 (citing 19 C.F.R. § 351.202(b)(7)(ii)(B)).  If the domestic industry alleges all elements necessary in a petition and supports each of the elements with evidence that is available to it, Commerce must investigate the subsidy allegation, "even if the precise contours of the subsidy were still unknown."  *RZBC Group*, 100 F. Supp. 3d at 1295. Most importantly, however, Commerce will not initiate an investigation if the allegation is "not reasonably supported by the facts alleged" or "omit{s} important facts which are reasonably available to the petitioner."  *Id.*; Remand Redetermination at 11.

B.  Nucor Did Not Submit Sufficient Evidence To Warrant Initiating An NSA Investigation

In requiring Nucor to include all "important facts which are reasonably available to the petitioner." Commerce applied the appropriate standard for initiating an investigation.  *RZBC Group*, 100 F. Supp. 3d at 1295.  Contrary to Nucor's assertions, Commerce did not apply a heightened standard; instead, Nucor failed to provide sufficient information to satisfy its burden.

6

Nucor wrongly asserts that Commerce's determination is "internally inconsistent," because Commerce purportedly applied either the standard set forth in *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354, 1363 (Ct. Int'l Trade 2001), or some other heightened standard.  Nucor Comments at 3-4.  As Commerce explained in the remand redetermination, Commerce considered the off-peak electricity allegation to be a new subsidy allegation.  Remand Redetermination at 11-13, 51.  But the information that Nucor provided with its allegation, which included publicly available information such as KEPCO's Form 20-F, as well as information Nucor obtained through the various investigations that Commerce has conducted on the electricity system in Korea, did not support Nucor's benefit allegation.  Remand Redetermination at 11-21, 38-53.[2]  Instead of considering the variety of factors that are incorporated in the Korea Power Exchange's (KPX) pricing of electricity and the electricity tariff schedule that would be necessary to establish a reasonable allegation of benefit, Nucor focused on the system marginal price (SMP) and argued that the SMP served as proof that the government of Korea was providing electricity for LTAR during off-peak hours.

---

[2]  These sections cite the following record documents; Letter re:  Certain Carbon and Alloy Steel Cut-To-Length Plate from the Republic of Korea:  New Subsidy Allegations (Nov. 4, 2019) (New Subsidy Allegations), P.D. 76-78, C.D. 182-184 at 7, 8, 14-15, Exhs. 3-10, 12-13, 16-17, E-9; GOK's Letter, "Response to the Initial Questionnaire," (Oct. 7, 2019) (GOK QR), P.D. 60-70, C.D. 170-180 at Exhs. E-1 to E- 6; Nucor's Letter, "New Subsidy Allegations Supplemental Questionnaire Response," (Dec. 31, 2019) (Nucor NSA SQR), P.D. 94 at 4-5, Exh. 1, pp. 5-7, 34-40, 44-47; Memorandum re:  Second Administrative Review of Countervailing Duty Order on Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea (Apr. 1, 2020) (NSA Memorandum), P.D. 144 at 4; POSCO's Letter, "POSCO's Initial Questionnaire Response," (Sept. 26, 2019) (POSCO IQR), P.D. 39-44, C.D. 120-140 at Exh. C-4; Letter, "New Subsidy Allegation Supplemental Questionnaire," (Dec. 20, 2019) (NSA Supplemental Questionnaire), P.D. 90 at 1; Nucor's Letter, "Comments on Draft Results of Redetermination," (Jan. 3, 2023) (Nucor Draft Remand Comments), R.P.D. 5, R.C.D. 3 at 11-13, 15-28.

As this Court has repeatedly recognized:  "{T}he burden of creating an adequate record lies with {interested parties} and not with Commerce."  *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (cleaned up).  The evidence that Nucor submitted did not satisfy the standard set forth in *RZBC Group* and, thus, did not satisfy the burden of developing an adequate record.  Nucor Comments at 4-6.  Because Nucor's new subsidy allegation concerned a subset of the overarching electricity system, Nucor could not ignore Commerce's prior findings on the Korean electricity market.  Remand Redetermination at 12-13.[3]  Because these facts were "reasonably available" to Nucor, Nucor was required to submit evidence demonstrating that the industrial rates at off-peak hours were not based on market principles.  *RZBC Group*, 100 F. Supp. 3d at 1295.

Further underscoring the reasonableness of Commerce's expectation is the fact that factual information on the record—such as the power trading statistics and electricity pricing formula found in KEPCO's Form 20-F that Nucor submitted as a part of its allegation— contradicts Nucor's allegation of benefit with respect to the off-peak provision of electricity for LTAR.  Remand Redetermination at 17-18, 20, 40, 42, 51; *see also* Nucor NSA SQR, P.D. 94 at Exh. 1 pp.38-40, 44-47.  We discuss the problems with the SMP data at pages 13-15, below. Nucor, however, did not account for several factors in KPX's pricing of electricity and the

---

[3]  Citing, *e.g.*, *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 82 Fed. Reg. 16,341 (Dep't of Commerce April 4, 2017) (final affirmative CVD determ, and final negative critical circumstances determ.), and accompanying IDM at cmt. 2;  *Certain Corrosion-Resistant Steel Products from the Republic of Korea:*, 85 Fed. Reg. 35,310 ( Dep't of Commerce June 2, 2016) (final affirmative CVD determ. and final affirmative critical circumstances determ, in part (*CORE from Korea INV*), and accompanying IDM at cmts. 1-3, *affirmed in Nucor Corp v. United States*, 927 F.3d 1243, 1254-59 (Fed. Cir 2019); *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 81 Fed. Reg. 63,168 (Dep't of Commerce Sept. 14, 2016) (prelim. negative CVD determ. and alignment of final determ. with final antidumping duty determ.), and accompanying Preliminary Decision Memorandum (PDM) at 28-29.

electricity tariff schedule that would create a reasonable allegation of benefit.  Remand Redetermination at 11, 51.  As a result, Commerce determined that the allegation was not "reasonabl{y} supported by the facts alleged" because KEPCO's Form 20-F and various other record documents refuted Nucor's benefit allegation by highlighting that SMP is only one factor considered in the pricing formula.  Remand Redetermination at 42-43.  And Nucor omitted other facts that were reasonably available to it by refusing to examine the off-peak electricity prices within the overarching electricity system or acknowledging any of the factors involved in KPX's price setting methodology outside of the SMP.  Remand Redetermination at 51; *RZBC Group*, 100 F. Supp. 3d at 1295.

Given its participation as the petitioner in numerous proceedings concerning the Korean electricity system, its filing of numerous subsidy allegations regarding the provision of electricity for LTAR, and its status as an unsuccessful litigant in *Nucor Corporation v. United States*, 927 F.3d at 1254-59, Nucor was on notice that Commerce would reasonably expect any benefit allegation to demonstrate inconsistency with market principles based upon the parameters of the Korean electricity system.  Remand Redetermination at 13.  Nor can Nucor feign ignorance regarding the information contained within KEPCO's Form 20-F or the factors considered as a part of the KPX's pricing mechanism, which has played a major role in many of Commerce's analyses in these public determinations regarding the overall electricity system in Korea.  *E.g.*, *Nucor Corp. v. United States*, No. 22-00137, Slip Op. No. 23-55 at 12-16 (Ct. Int'l Trade April 19, 2023); *Nucor Corp v. United States*, No. 22-0050, Slip Op. No. 23-54 at 12-16, (Ct. Int'l Trade April 19, 2023).

Also incorrect is Nucor's assertion that Commerce applied a heightened standard because it required Nucor to provide hour-by-hour electricity costs.  Nucor Comments at 5.

Instead, Commerce required an "additional step or reasonable explanation" to demonstrate how the average price of electricity at any given hour was reflected by the SMP, considering potential differences in operation, usage, etc. at different hours" across different types of electricity generation.  Remand Redetermination at 19-20.  Here, Nucor's argument rests on a preferentiality or discrimination standard—one that Commerce has repeatedly rejected—rather than one that focuses on whether the prices charged by the government are based on market principles.  Remand Redetermination at 50-51.  As Commerce explained, regardless of whether the SMP, or even the overall cost of electricity to KEPCO, varies throughout the different parts of the time of use schedule, that variance is immaterial if the allegation does not adequately demonstrate that the average price of electricity is lower than the cost, in other words whether it demonstrates that electricity pricing is not based on market principles.  *Id.*  Commerce has explained numerous times that the SMP, without adjustment or accounting for the other factors that affect the actual price of electricity KEPCO pays, does not reflect the average price of electricity at any given hour.  *E.g.*, Remand Redetermination at 18; IDM at 20; NSA Memorandum, P.D. 144 at 7-8; NSA Supplemental Questionnaire, P.D. 90 at 1; *see* decisions cited *supra* at note 3.  Commerce also explained that there were both previous administrative determinations and sufficient information on the record at the time of the allegation to respond to Commerce's request for additional explanation regarding how the other factors of the electricity pricing formula determined the average price of electricity for KEPCO.  *See* decisions cited *supra* at note 3; *see also* Remand Redetermination at 14-17 (citing New Subsidy Allegations, C.D. 182-184 at 7, 14-15, Exhs. 3, 5-6 and E-9, GOK QR, C.D. 170-180 at Exhs. E-3 to E-5, and Nucor NSA SQR, P.D. 94 at 4-5, Exh 1, pp. 34-40, 44-47). These decisions repeatedly explained that, although KEPCO may have incurred similar costs at all hours, but charged different prices

to industrial consumers during on and off-peak hours under the time of use tariff schedule, this does not establish that the electricity at off-peak hours was provided for LTAR.  Nucor, however, did not address any of these issues.

Nor is there merit to Nucor's claim that Commerce "has never requested any information related to KEPCO's hourly cost of acquisition or to the mix of generators supplying electricity at any given hour."  Nucor Comments 5-6.  As Commerce explained, the SEC 20-F contains power trading statistics during the period of review, which contain actual prices KEPCO paid its generators that can reasonably reflect KEPCO's costs.  Commerce specifically requested Nucor amend its allegation to "*explain*" how the "other factors that determine the price for electricity" beyond the SMP impacted electricity pricing at off-peak hours.  Remand Redetermination. at 4 (emphasis added) (citing NSA Supplemental Questionnaire, P.D. 90).  But nowhere did Commerce require Nucor to provide KEPCO's proprietary cost data.  Instead, Commerce faulted Nucor for not making reasonable adjustments to its submitted estimate of KEPCO's costs based on available information on the record that called into question the accuracy of the benefit values in Nucor's allegation.  Remand Redetermination at 20.  Commerce determined that the information referenced in support of the allegation of benefit did not sufficiently account for known information on the record and, thus, provided no viable comparison to KEPCO's tariff schedule pricing of off-peak electricity.  *Id.*  Accordingly, Nucor did not provide a sufficient allegation of benefit for Commerce to initiate an investigation in response to its NSA for the provision of off-peak electricity for LTAR.

C.      Nucor's New Subsidy Allegation Is Contradicted By Record Evidence

As explained below, there is no merit to Nucor's criticism of Commerce's conclusions regarding the insufficiency of the SMP data and average annual cost data to reflect the actual prices paid to generators at off-peak hours.  Nucor Comments at 8-9.  In making these arguments, Nucor ignores the record evidence that contradicts its allegation.

Nucor erroneously claims that Commerce "does not explain its conclusion that the only reasonable way to adequately allege a benefit is by reference to the prices that KEPCO actually paid individual generators to acquire electricity through the KPX based on the Korean government's own pricing formula." *Id.* at 9.  But Commerce addressed this argument.  Remand Redetermination at 15-20, 38-47.  In doing so, Commerce explained that it cannot conduct its benefit analysis without evaluating the actual price KEPCO pays to the generators in order to determine whether that price was set in accordance with market principles.  Here, Nucor is asking Commerce to investigate only part of price that was actually paid—the SMP.  But SMP is relevant to the cost of generating electricity making for a comparison to the prices in the GOK's tariff schedule, only to the extent it is used in the KPX's pricing formula by which the KPX sets the prices at which KEPCO compensates electricity generators.  Remand Redetermination at 42 (citing GOK QR, C.D. 170-180 at Exhs. E-1 to E-6 and New Subsidy Allegations, C.D. 182-184 at Exh. 8, pp. 35-36).  As Commerce explained, companies are compensated based on the marginal price, or the variable cost of generating electricity, and the capacity price, or the predetermined fixed cost of generating electricity.  *Id.*  Because the SMP pertains to the marginal price, it is only one of the factors KPX uses to calculate the per-unit variable cost of electricity KEPCO pays to each generator and is not representative of the variable cost of electricity.  *Id.*

Nucor further criticizes Commerce's emphasis on the need to evaluate variable and fixed costs for KPX saying that they remain "static and do not change over the course {of} a day." Nucor Comments at 10. SMP data, however, "do{} not account for the quantity of electricity each type of generator is supplying that will inherently affect KEPCO's overall cost of supply." Remand Redetermination at 44. The SMP information shows that the highest bid prices for electricity at on- and off-peak hours have a 4 KRW/kWh price difference, but that demonstrates only that certain generators are in use. *Id.* (citing New Subsidy Allegations, C.D. 182-184 at 14-15 and Exhs. 9 and 13). Thus, it is not an accurate estimate of KEPCO's costs during a given period because it does not account for the quantity of electricity that each generator is supplying, which will then affect the cost of supply. *Id.* In other words, the amount of electricity reflected in the SMP at a given time is not reflected in Nucor's comparison of on- and off-peak SMPs.

Also incorrect is Nucor's assertion that Commerce cannot identify evidence "of any actual variation in the mix of generators supplying electricity over the course of a day during the POR," or a "variation significant enough to explain the discrepancy between off-peak prices and prices at other times of day," and cannot explain "where information regarding the hourly mix of operational generators was reasonably available to Nucor." Nucor Comments at 11. Commerce's supplemental questionnaire cited KEPCO's publicly available Form 20-F, placed on the record by Nucor, that explained how the KPX sets the marginal pricing formula to compensate generation companies for variable costs and how the other factors are used in conjunction with the SMP to derive the amount paid to the generators. Remand Redetermination at 45 (citing NSA Supplemental Questionnaire, P.D. 90 at 1). The Form 20-F also contains financial disclosures and electricity power trading statistics from KEPCO and its subsidiary generators, and purchase information from unaffiliated suppliers. Remand Redetermination at

17 (citing Nucor NSA SQR, P.D. 94 at Exh. 1, pp. 38-40, 44-47).  All of this information, which

Commerce explicitly referenced as evidence refuting Nucor's reliance on the SMP, shows that

the SMP is not an appropriate comparison for the prices actually paid by POSCO.  *Id.*

Further, as explained above, and as Commerce recognized, publicly available information

contradicts Nucor's claim that KEPCO's off-peak prices were below costs.  Remand

Redetermination at 15 (citing New Subsidy Allegations, C.D. 182-184 at Exh. E-9 at Nucor NSA

SQR, P.D. 94 at Exh. 1, pp. 34-30); *see generally* Nucor Comments 11-12.  KEPCO's Form 20-

F reports an average unit price paid to some generators across all hours, based on the payments

made by KEPCO through the KPX, of 67.38 and 90.33 KRW/kWh, respectively, during the

POR.  Remand Redetermination at 46 (citing Nucor NSA SQR, P.D. 94 at Exh. 1, p.38).  These

numbers demonstrate that the SMP alone is not reflective of the total cost of electricity and that

certain average prices KEPCO paid to purchase electricity through the KPX, including fixed

costs, were below Nucor's alleged variable price at off-peak hours.  Nucor did not acknowledge

that certain generators and types of electricity are paid a variable price of electricity well below

the SMP due to their adjusted coefficient.  *Id.*  The inclusion of the coefficient factor directly

adjusts the value of the SMP in the KPX's pricing formula and is critical to understanding the

actual prices KEPCO pays to the generators that comprise KEPCO's costs.  Thus, Nucor's

argument that "{t}he only variable that changes KEPCO's hourly cost of supply is the SMP" is

inaccurate.  Nucor Comments at 10.

Nucor asks Commerce to ignore the body of authority, including *Nucor Corporation v.

United States*, 927 F.3d 1243, regarding the Korean electricity market.  Remand Redetermination

at 20.  This information previously known and placed on this record, regarding the Korean

electricity system's pricing and cost recovery, contradicts Nucor's claims regarding the alleged

benefit.  *Id.*  Instead, Nucor would have Commerce initiate an LTAR investigation based on articles that claimed similar amounts of electricity usage at off-peak and other hours of the day and on speculation that the cost to KEPCO for providing electricity would be similar at off-peak and on-peak hours given the claims of usage.  Nucor Comments at 13.  These real-world prices were readily available to Nucor for use in its allegation and highlight that SMP is only one factor that illustrates the pricing formula.

Nor is there merit to Nucor's claim that "there is no significant decline in demand between on-peak and off-peak hours, so higher-cost generators must supply electricity in similar amounts throughout the day" and that "KEPCO's cost of supply does not vary significantly from on-peak to off-peak hours, and large industrial consumers benefit from unjustifiably low prices." Nucor Comments at 12-13.  As Commerce explained throughout its analysis, KEPCO's Form 20-F filing for the period of review contained financial disclosures and electricity power trading statistics from KEPCO and its subsidiary generators, data from Korea's Electric Power Statistics Information System, a substantial description of KEPCO's cost system, pricing factors, and relationship with the KPX, as well as purchase information from unaffiliated suppliers.  Remand Redetermination at 17; Nucor NSA SQR, P.D. 94 at Exh.1 pp. 38-40, 44-47.  Reported in the form is an average unit price paid to generators across all hours, based on the payments made by KEPCO during the period of review.  Remand Redetermination at 46; Nucor NSA SQR, P.D. 94 at Exh. 1 pp. 38-40, 44-47.  To meet these varying levels of demand, the bidding process by the generators in the Korean electricity market is established such that KEPCO purchases the lowest cost electricity available until the generated supply meets the consumer demand.  Accordingly, Commerce reasonably found that the SMP data was not a basis for initiation.

D.   Nucor's Allegation Conflates Benefit And Specificity

One theme underlying Nucor's new subsidy allegation is that KEPCO recovers costs to the extent that it charges tariff rates above costs during on-peak hours that cross-subsidizes large industrial companies (like respondent, POSCO) who move production to off-peak hours.  Nucor Comments at 13; Remand Redetermination at 15-16.  Nucor claims that it did not conflate its allegation of the benefit and specificity elements by providing "{p}ublicly available information {that} confirms that KEPCO's off-peak industrial electricity prices are significantly lower than the cost of supply" for benefit and information regarding "what entities and industries are using electricity at specific hours" for *de facto* specificity.  Nucor Comments at 6-7.  As discussed in the remand redetermination, however, the allegation of "cross-subsidization" pertains to a price discrimination or preferentiality analysis, which the Federal Circuit has found to be  insufficient to determine whether electricity was provided for LTAR.  *Nucor Corp.*, 927 F.3d at 1254-59

Instead, Commerce is concerned with whether Nucor provided sufficient evidence of a benefit by reasonably demonstrating that the price KEPCO paid for off-peak electricity is higher than the prices it charges consumers.  Consequently, the only prices available for the purchase of electricity at off-peak hours are the off-peak electricity prices on the tariff schedule.  Thus, the price POSCO pays for electricity at other hours is irrelevant except for the purposes of conducting a *de facto* specificity analysis.

Nucor's allegation cannot require Commerce to investigate the hours in which POSCO, or any other entity, chose to purchase electricity based on the existing tariff schedule.  As a result, Nucor's allegation of cross-subsidization is immaterial, unless it can show that the tariff schedule itself, which Commerce has previously found to be consistent with market principles, is inconsistent with market principles.  Remand Redetermination at 16.  And, as explained in the

preceding section, Nucor did not provide new information to indicate that its newly alleged subsidy program—off-peak electricity for LTAR—is inconsistent with market principles under 19 C.F.R. § 351.511(a)(2)(iii).  *Id.* at 21;  *Nucor,* 927 F.3d at 1243; *CORE from Korea INV*, 85 Fed. Reg. at 35,310, and accompanying IDM at Comments 1-3.

Nor is Nucor correct that the "relevance of the 'tariff schedule itself' beyond the prices that POSCO paid is thus insufficiently explained."  Nucor Comments at 8.  In its remand redetermination, Commerce explained that because of its prior finding that the tariff schedule is consistent with market principles, the fact that KEPCO charged consumers higher prices at certain hours was relevant only if Nucor alleged new information requiring Commerce to reconsider the existing tariff schedule.  Remand Redetermination at 13.  Otherwise, Commerce was concerned only with whether the allegation presented sufficient evidence that electricity provided at off-peak hours was below cost.  Accordingly, because Nucor failed to provide evidence that "the industrial rates at off-peak hours were not based on market principles," Commerce reasonably declined to initiate on Nucor's new subsidy allegation.  *Id.* at 40.

III.  Commerce's Determination Not To Treat Plantec As A Cross-Owned Input Supplier In Connection With Certain Inputs Is Supported By Substantial Evidence And Is Otherwise In Accordance With Law

Commerce also reasonably concluded that Plantec does not provide inputs that are primarily dedicated to the production of downstream products.  In reaching this conclusion, Commerce did not reduce its analysis to a single factor; instead, it conducted a holistic, multi-factor analysis taking into account the record evidence.  As Commerce has previously explained, Commerce's interpretation of what is considered "primarily dedicated" is necessarily complex because of the vast variety of companies, inputs, types of subject merchandise, production processes, and circumstances that Commerce must examine on a record-specific basis.  Because

the factual circumstances involved in each case can vary from one proceeding to another, applying a blanket rule across proceedings regarding particular inputs would not reflect the records nor the analysis that is required under the statute and Commerce's regulations.  Remand Redetermination at 57.

A.    Commerce's "Primarily Dedicated" Analysis Is In Accordance With Law

Commerce's analysis of whether an input is primarily dedicated to the production of a downstream product is highly fact-specific and is conducted on a case-by-case basis.  *Id.*

The term "primarily dedicated" is undefined in Commerce's statute, regulations, and *Preamble*.  Despite this, the *Preamble* provided guidance to assist Commerce's determinations.  Commerce promulgated regulations to countervail subsidies provided to cross-owned input suppliers for a specific purpose:  "the main concern we have tried to address is the situation where a subsidy is provided to an input supplier whose production" of the input product "is dedicated almost exclusively to the production of a higher-value added product – the type of input product that is merely a link in the overall production chain."  Remand Redetermination at 22 (quoting *Preamble*, 63 Fed. Reg. at 65,401).  The *Preamble* provides examples to illustrate when an input will or will not be considered to be "primarily dedicated to a downstream product."  63 Fed. Reg. at 65,401.  For example, Commerce cited stumpage subsidies on timber as an input that would be primarily dedicated to lumber production and subsidies to semolina primarily as an input that would be primarily dedicated to pasta production and, thus, would be considered "mere link{s}" in the overall supply chain for those products.  *Id.*  Conversely, Commerce explained that "it would not be appropriate to attribute subsidies to a plastics company to the production of cross-owned corporations producing appliances and automobiles."  *Id.*

Consistent with the *Preamble*, Commerce identified and explained its analysis of a non-exhaustive list of factors gathered from 19 C.F.R. § 351.525(b)(6)(iv), the *Preamble*, and past CVD decisions. Remand Redetermination at 59-66. In carrying out its primarily dedicated analysis, Commerce considered the following non-hierarchical factors:

- Whether an input supplier produced the input;

- Whether the input could be used in the production of downstream products including subject merchandise, regardless of whether the input is actually used for the production of the subject merchandise;

- Whether the input is merely a link in the overall production chain, as stumpage is to lumber production or semolina is to pasta production as described in the *Preamble*, or whether the input is a common input among a wide variety of products and industries and it is not the type of input that is merely a link in the overall production chain, as plastic is to automobiles;

- Whether the downstream producers in the overall production chain are the primary users of the inputs produced by the input producer and whether the production of the inputs by the input producers is exclusively for the overall production chain; and

- Examining a company's business activities to assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the *Preamble* such that the purpose of any subsidy provided to the company would be "to benefit the production of both the input and downstream products.

Remand Redetermination at 59. Nucor's reduction of Commerce's analysis to single, isolated factual comparisons taken out of context do not accurately reflect Commerce's multi-factor analysis. Commerce's decisions do not depend on the outcome of a single controlling factor or fact but involve a holistic analysis of the record evidence. *Id.* at 66.

19

B.     Commerce Reasonably Concluded That Plantec Does Not Provide Scrap That Is Primarily Dedicated To The Production Of Downstream Products

Contrary to Nucor's assertions, Commerce does not have an absolute rule that scrap is always primarily dedicated to the production of steel.  Remand Comments at 18-19; Remand Redetermination at 58 (citing *Preamble*, 63 Fed. Reg. at 65,348).  Nor has Commerce ever found that scrap is always primarily dedicated to the production of steel.  Here, record evidence supports Commerce's conclusion that Plantec is not a cross-owned input supplier of scrap.  Thus, Nucor's arguments, which merely reflect disagreement with Commerce's analysis, lack merit and do not warrant setting aside Commerce's determination.  *Uttam Galva Steels Ltd. v. United States*, No. 21-2119, 2022 WL 1419596, at *4 (Fed. Cir. May 5, 2022) (agreeing with the trial court that appellant failed to demonstrate that Commerce's determination was unsupported by substantial evidence because it could not demonstrate that the cited evidence "could lead Commerce to reach one and only one reasonable outcome on the administrative record").

1.     Commerce Drew Reasonable Distinctions Between Pohang SRCD's And Plantec's Provision of Scrap

Commerce's comparison of Pohang SRDC and Plantec demonstrates that Plantec's provision of scrap is unlike Pohang SRDC's provision of scrap, which incorporates further processing.  Remand Redetermination at 60-61; *id.* at 27-28.[4]  Thus, it is not primarily dedicated to the production of downstream products.  *Id.*  Specifically, Commerce found that in providing the scrap to POSCO, Pohang SRDC "*processed* scrap by means such as loading and unloading,

---

[4]  The Remand Redetermination cites:  POSCO's Letter, "Response to the Affiliated Companies Section of the Initial Questionnaire," Aug. 29, 2019 (POSCO AQR), P.D. 20. C.D. 5 at 12; POSCO's Letter, "POSCO's Response to Nucor's New Subsidy Allegations," Nov. 21, 2019 (POSCO NSA Comments), P.D. 88, C.D. 185; Pohang SRDC's Letter, "Pohang SRDC's Initial Questionnaire Response," Sept. 26, 2019 (Pohang SRDC IQR), P.D. 45, C.D. 41  at 5.

storage, guillotining (cutting), pressing to adjust size, *etc.*, on behalf of {POSCO Daewoo Corporation} (PDC), which then provided the processed scrap to POSCO." *Id.* (citing Pohang SRDC IQR, C.D. 141 at 6). Pohang SRDC, therefore, actively changed and modified the scrap to repurpose the scrap for POSCO's downstream production. *Id.* This is one of the many factors that supported Commerce's determination that Pohang SRDC's scrap was primarily dedicated to POSCO's downstream production, thereby supporting that Pohang SRDC a cross-owned input supplier. Significantly, there is *no* record evidence indicating that Plantec processed the scrap in any way before it provided the scrap to POSCO prior to selling it to the intermediary company.

Relying upon determinations from proceedings regarding Korean steel, Nucor challenges Commerce's distinction between Plantec and Pohang SRCD's provision of scrap. Nucor Comments at 20-21 (citing, *e.g. Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 85 Fed. Reg. 38,361 (Dep't of Commerce June 26, 2020) (final admin. review) (*Cold-Rolled Steel Flat from Korea*), and accompanying IDM); Remand Redetermination at 27-28. But Nucor cites no authority that prohibits Commerce from distinguishing between "processed" and "unprocessed" scrap. As explained above, the *Preamble* supports Commerce's analysis of the nature of a particular input when determining whether that input is primarily dedicated to the production of downstream product. Remand Redetermination at 60 (citing *Preamble*, 63 Fed. Reg. at 65,401). Here, based on an analysis of the record facts, Commerce reasonably concluded that, "similar to plastic, unprocessed scrap is a common input among a variety of products and industries and generated as a byproduct during a variety of production processes." Remand Redetermination at 60.

Nucor incorrectly contends that Commerce should have known that the scrap was primarily dedicated to the production of subject merchandise. Nucor Comments at 21. But

Nucor cites minimal record evidence to support this finding, arguing that "it is not clear that {POSCO's cross-owned input supplier, Pohang Scrap Recycling Distribution Center Co., Ltd. (Pohang SRDC)}'s scrap was 'intended for POSCO upon its generation,' given that the company does not appear to have generated the scrap it provided, but simply to have processed it." *Id.* (citing Pohang SRDC IQR, C.D. 141 at 6, 9).  This demonstrates only that Nucor does not understand the distinction Commerce was making between Plantec and Pohang SRDC, which is that Pohang SRDC processed the scrap to retool it to better suit  POSCO's downstream production.  Remand Redetermination at 61.

>    2.   Nucor's Arguments Ignore That Commerce's "Primarily Dedicated" Analysis
>          Is Highly Case Specific And Cannot Be Reduced To A Single Factor

Also flawed are Nucor's attempts to draw comparisons between this proceeding and others based upon its selective interpretation of the facts of those proceedings.  These comparisons ignore that Commerce's analysis is made on a case-by-case basis and is based upon the respective record as a whole.  Nucor Comments at 19-21.

First, Nucor cites Commerce's determinations in the 2018 and 2019 administrative reviews of the order covering rebar from Turkey, in which Commerce cross-attributed subsidies based on a shipbuilder's provision of steel scrap to a downstream rebar producer, stating the primary business operation of the supplying affiliate "matters little."  Nucor Comments at 21-22 (citing *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 86 Fed. Reg. 53,279 (Dep't of Commerce Sept. 27, 2021) (final admin. review and recission) (*Rebar from Turkey*), and accompanying IDM at 26).  In *Rebar from Turkey*, Commerce found that the vertically integrated manner in which the input supplier provided the input to the downstream producer supported a finding that the input was primarily dedicated to the production of downstream products.  *Id.*  In

that case, the input supplier provided scrap directly and exclusively to the downstream producer. *Rebar from Turkey*, 86 Fed. Reg. 53,279, and accompanying IDM at cmt. 5.

Unlike in *Rebar from Turkey*, here, there is no record evidence that Plantec provided scrap exclusively to POSCO; the record shows that Plantec provided the scrap to POSCO through an intermediary, PDC, a trading company.  Remand Redetermination at 28, 62-63 (citing Pohang SRDC IQR, C.D. 47-50) at 5).  PDC's status as an intermediary is relevant because it indicates that Plantec's sales of scrap only incidentally end up as part of POSCO's production of downstream product.  *Id.*  Also, Plantec sold scrap only to PDC during the POR, not POSCO, during the period of review, and there is no evidence that the scrap was specifically intended for POSCO upon its generation by Plantec.  Remand Redetermination at 61.  This, along with the fact that Plantec did not process the scrap, much less in a way that specifically repurposed the scrap for use in POSCO's steel production, suggests that the scrap to steel production relationship in this case is similar to the plastic to automobile production example in the *Preamble*.  *Id.*

Further, although Nucor argues that Commerce cannot prove that Plantec provided scrap to any other companies, this is not a basis for setting aside Commerce's determination.  Nucor Comments at 22-23.  Commerce need only come to a reasonable determination based on substantial evidence on the record, which it has done here.  *United States v. Eurodif S.A.,* 555 U.S. 305, 316 n.6 (2009); *Uttam Galva*, 2022 WL 1419596, at *4 (the substantial evidence standard requires that the appellant demonstrate that the cited evidence "could lead Commerce to reach one and only one reasonable outcome on the administrative record").

Nucor's other attempts to draw analogies between this proceeding and other proceedings based upon its cherry-picking of the facts similarly fail because Commerce's analysis considers

the record as a whole and does not hinge upon a single factor.  Remand Redetermination at 64.

For example, Nucor contends that in *Forged Steel Fluid End Blocks From the Federal Republic*

*of Germany*, 85 Fed. Reg. 80,011 (Dep't of Commerce Dec. 11, 2020) (final affirm.

determination) (*FEBs from Germany*), and accompanying IDM, Commerce relied on "the

quantities and types of materials" to determine whether an entity was a cross-owned input

supplier in, and should continue to do so here.  Nucor Comments at 23.  But this is not the reason

that Commerce referenced *FEBs from Germany.*  Remand Redetermination at 63.  Commerce

cited that proceeding as one instance in which Commerce considered the business operations of

the input supplier with respect to its primarily dedicated analysis, but Commerce also considered

other factors.  Remand Redetermination at 64.  Thus, as Commerce explained, "*FEBs from*

*Germany* further illustrates that Commerce's analysis is based on a review of all relevant facts on

the record, and that Commerce determines whether inputs are primarily dedicated on a case-by-

case basis."  Remand Redetermination at 64.

  Further, the cases that Nucor cites support Commerce's finding that "there is no *de*

*minimis* standard for primary dedication of an input," and finding that "{a}nalogous to the plastic

as an input to an automobile example in the *Preamble*, one cannot reasonably conclude that these

inputs are dedicated exclusively to the production of downstream products. . . ."  *FEBs from*

*Germany* IDM at Comment 14 (citing *Preamble*, 63 Fed. Reg. at 65,401); *see also Içdaş Celik*

*Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1364 ("It is well-

settled that Commerce is not required to examine the ultimate use of the subsidy. . . . Rather,

viewed in light of the CVD Preamble, 19 C.F.R. § 351.525(b)(6)(iv) looks only at the purpose of

the subsidy at the time of bestowal.").  Therefore, the record supports Commerce's determination

that the scrap was not primarily dedicated to the production of subject merchandise.  Commerce

explained that Plantec generated the scrap as a byproduct in its production processes, it did not alter or otherwise process the scrap it generated for use as a steel input or specifically in the production of POSCO's downstream product, its primary business activity consisted of building industrial plants, and it was not merely a link in the overall production chain.  Remand Redetermination at 30, 68 (citing POSCO AQR, C.D. 5 at Exh. 2, p. 26).

Finally, there is no merit to Nucor's attempts to discount Commerce's reliance on *Certain Glass Containers From the People's Republic of China*, 85 Fed. Reg. 31,141 (Dep't of Commerce May 22, 2020) (final affirm. determination) (*Certain Glass Containers from China),* accompanying IDM at 68-70, on the basis that Commerce considered the supplier's overall business activity when deciding whether to apply an adverse inference.  Nucor Comments at 27. Although in *Glass Containers from China* Commerce found that an adverse facts available determination for the input supplier was not warranted, the input supplier analysis described the same primary dedication analysis that Commerce relied upon here.  Remand Redetermination at 64*.* (citing *Glass Containers from China* IDM at cmt. 12).

C.    Commerce Reasonably Concluded That Another Input That Plantec Provides Is Not Primarily Dedicated To The Production Of Downstream Products

Commerce also reasonably continued to find that the [███████████] provided by Plantec does not satisfy the primarily dedicated standard.  Remand Redetermination at 32-33, 66-72.  Nucor contends that Commerce's treatment remains unexplained and unsupported, stating that "the agency acknowledges that Plantec's reported business activities include constructing 'steel producing facilities' and that the ███████████ is equipment of a kind used to produce steel."  Nucor Comments at 24 (citing Remand Redetermination at 67-68).  As with Nucor's arguments related to Plantec's provision of scrap, Nucor, however, ignores the context and totality of the facts involved in Plantec's provision of the ███████████] to POSCO.

1.   Commerce's Determination Is Supported By Substantial Evidence

Commerce relied on the same factors that it relied on for its analysis of Plantec's

provision of scrap, to determine whether it is primarily dedicated to the production of

downstream product.  Remand Redetermination at 67.  One of the factors Commerce considered

is whether an input supplier produced the input.  In doing so, Commerce disagreed with Nucor's

outdated interpretation of the facts at issue.  Nucor relies upon a description of Plantec's business

as described in the investigation and merely points to POSCO's description from the

investigation for its "continued relevance."  Remand Redetermination at 68 (citing POSCO

AQR, C.D. 5 at Exh. 8): *see also* Nucor Comments at 24.

By contrast, Commerce supported its finding with recent, updated information from the

record that reflects whether Plantec is an input suppler.  Specifically, Commerce cited POSCO's

audited financial statements on the record of this administrative review as submitted to the

government of Korea to establish that Plantec's primary business activity is "the construction of

industrial plants" and "steel producing facilities, infrastructure construction."  Remand

Redetermination at 68 (citing *Cold-Rolled Steel Flat from Korea*, 85 Fed. Reg. at 38,361, and

accompanying IDM at cmt. 2); POSCO AQR, C.D. 5 at Exh. 2, p. 26 and Exh. 6.  No record

evidence indicates that Plantec was engaged in the production of steelmaking equipment during

the period of review, much less that Plantec was the producer of the [███████████].  Remand

Redetermination at 68.  Instead, the record shows that Plantec was engaged in [███████████

████] of POSCO's facilities, including providing [███████████] to POSCO, the

purpose of which POSCO quite clearly states [███████████████████████

███████████████████████████].  Remand Redetermination at 68-69

(citing POSCO NSA Comments, C.D. 185, at 10-11).  Based on this reasonable interpretation of

the facts, Commerce's determination—that there is no evidence that Plantec was the producer of

the [████████]— is supported by the record and other administrative determinations.  As

explained below, although Nucor may disagree, this does not establish that Commerce's

determination is unreasonable or otherwise unsupported by substantial evidence.  *Consolo*, 383

U.S. at 620 (explaining that the fact that two parties may draw two inconsistent conclusions

"does not prevent an administrative agency's finding from being supported by substantial

evidence").

2.   <u>Nucor's Arguments Challenging Commerce's Conclusions Lack Merit</u>

As explained below, none of Nucor's arguments warrant setting aside Commerce's

rational determination in the remand redetermination.

First, Nucor attempts to distinguish the [████████] from other general, non-steel

making equipment stating that it "is not only steelmaking equipment, but equipment of a kind

fundamental to POSCO's steel production."  Nucor Comments at 25.  Commerce, however,

made a contrary finding that is consistent with the guidance in the *Preamble*.  Remand

Redetermination at 69.  Plantec provided the [████████] to POSCO in addition to a wide

variety of other inputs and services associated with its construction of industrial plants, steel

producing facilities, and infrastructure construction.  Remand Redetermination at 69.  As

Commerce explained, a review of the vast majority of the equipment inputs, which POSCO

identified as [████████████████████████████████

████████████████████████████████████

████████████████████████], indicates that they can be used in the

production of many different products in different industries; most of the listed equipment inputs

are used generically for [████████].  Remand Redetermination at 69 (citing POSCO NSA

27

Comments, C.D. 185 at 10-11).  The provision of the ███████████ ] was made under a

similar set of factual circumstances as the other equipment inputs Commerce found were not

primarily dedicated.  Remand Redetermination at 69.  Further, the Court has already sustained

Commerce's determination that the generic nature of the remainder of the equipment provided

by Plantec to POSCO during the period of review cannot be found primarily dedicated to the

production of downstream subject merchandise.  Remand Order at 29.

Indeed, Commerce has never found [███████████ ] to be a primarily dedicated input

into the production of steel.  Remand Redetermination at 33.  Because the Court has already

sustained Commerce's determination that the generic nature of the remainder of the equipment

provided by Plantec to POSCO during the POR cannot be found primarily dedicated to the

production of downstream subject merchandise, there is no reason why Commerce would accept

Nucor's invitation to apply a different analysis for similar non-primarily dedicated equipment.

Remand Redetermination at 69 (citing *Preamble*, 63 Fed. Reg. at 65401).  The ███████████ ]

was provided under the same set of factual circumstances as the other generic inputs Commerce

found to be not primarily dedicated.  *Id.*

Nucor focuses solely on the fact that the [███████████ ] is a piece of equipment that

[███████████ ].  But Commerce does not rely on a single factor when

determining whether a particular input is primarily dedicated to downstream production.  Nucor

Comments at 25-26; Remand Redetermination at 68-70.  Nor is there merit to Nucor's attempts

to divorce the [███████████ ] from the other various equipment and services Plantec provided

to POSCO that Commerce already determined were not primarily dedicated to POSCO's

production of downstream higher value product, and which the Court already sustained as

supported by substantial evidence and in accordance with law.  The [███████████ ] was not

provided as a separate and distinct input from the other equipment and services, but was

provided as a part of Plantec's business functions related to [███████████████

████████████████████████████████████████████████████████████

██████]. Remand Redetermination at 70. Thus, to examine it separately from the other

equipment and services Plantec provided would not take into account all of the relevant facts.

Remand Redetermination at 70-71(citing POSCO NSA Comments, C.D. 185 at 10-11 ).

    Also flawed, is Nucor's criticism of Commerce's reliance on *Certain Cold-Rolled Steel*

*Flat Products From Brazil, India, and the Republic of Korea*, 81 Fed. Reg. 49,940 (Dep't of

Commerce July 29, 2016) (final affirm. determination) (*Cold-Rolled Steel from Brazil*) and

accompanying IDM at cmt. 16, stating Plantec provided both the [███████████] and scrap to

POSCO for the production of subject merchandise. Nucor Comments at 30. In *Cold-Rolled*

*Steel from Brazil*, however, "only steel mill equipment and services" were provided to the

producer in that case. 81 Fed. Reg. at 49,940 and accompanying IDM at cmt. 16. Conversely,

here Plantec provided various types of equipment, the rest of which Commerce found not

primarily dedicated on the basis that it was generic and not related to the production of

downstream product, an analysis the Court has already sustained. Remand Redetermination at

71 (citing *Cold-Rolled Steel from Brazil* IDM at cmt. 16; *see also* Remand Order at 27-29).

Thus, Nucor fails to identify any basis to set aside Commerce's rational determination.

CONCLUSION

    For these reasons, we respectfully request that the Court sustain Commerce's Remand

Redetermination and enter judgment for the United States.

29

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL:                             /s/ Elizabeth A. Speck
W. Mitch Purdy                          ELIZABETH A. SPECK
Attorney                                Senior Trial Counsel
U.S. Department of Commerce             Commercial Litigation Branch
Office of the Chief Counsel for Trade   Civil Division
  Enforcement and Compliance            United States Department of Justice
1401 Constitution Avenue, NW            P.O. Box 480
Washington, D.C. 20230                  Ben Franklin Station
Tel: (202) 482-5214                     Washington, D.C. 20044
Fax: (202) 482-4912                     Tel: (202) 307-0369
Email: William.Purdy@trade.gov          Email:  elizabeth.speck@usdoj.gov


April 24, 2023                          Attorneys for Defendant, United States

*PUBLIC VERSION*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that this motion complies with the Court's type-volume limitation rules.  According to the word count calculated by the word processing system with which the brief was prepared, the public version of the brief contains a total of 8,710 words.


<u>/s/ Elizabeth Speck</u>


April 24, 2023