Slip Op. 23-119

## UNITED STATES COURT OF INTERNATIONAL TRADE

NUCOR CORPORATION,

        Plaintiff,

        v.

UNITED STATES,

        Defendant,

        and

POSCO,

        Defendant-Intervenor.

Before: Mark A. Barnett, Chief Judge
Court No. 21-00182

**PUBLIC VERSION**

## <u>OPINION AND ORDER</u>

[Remanding the U.S. Department of Commerce's Remand Results filed in connection with the 2018 administrative review of the countervailing duty order on certain carbon and alloy steel cut-to-length plate from the Republic of Korea.]

Dated: August 21, 2023

<u>Alan H. Price</u>, <u>Christopher B. Weld</u>, <u>Maureen E. Thorson</u>, <u>Adam M. Teslik</u>, Wiley Rein LLP, of Washington, DC, for Plaintiff.

<u>Elizabeth A. Speck</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant.  With her on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Tara K. Hogan</u>, Assistant Director.  Of counsel on the brief was <u>W. Mitch Purdy</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Brady W. Mills</u>, <u>Donald B. Cameron</u>, <u>Julie C. Mendoza</u>, <u>R. Will Planert</u>, <u>Mary S. Hodgins</u>, <u>Eugene Degnan</u>, <u>Edward J. Thomas III</u>, <u>Jordan L. Fleischer</u>, and <u>Nicholas C. Duffy</u>, Morris, Manning & Martin, LLP, of Washington, DC, for Defendant-Intervenor.

Barnett, Chief Judge: This matter is before the court following the U.S.

Department of Commerce's ("Commerce" or "the agency") redetermination upon

remand.  *See* Confid. Final Results of Redetermination Pursuant to Court Remand

("Remand Results"), ECF No. 60-1.  Plaintiff Nucor Corporation ("Nucor") challenged

Commerce's final results in the 2018 administrative review of the countervailing duty

("CVD") order on certain carbon and alloy steel cut-to-length plate ("CTL plate") from the

Republic of Korea ("Korea").  Compl., ECF No. 5; *Certain Carbon and Alloy Steel Cut-

to-Length Plate From the Republic of Korea*, 86 Fed. Reg. 15,184 (Dep't Commerce

Mar. 22, 2021) (final results and partial rescission of [CVD] admin. review, 2018) ("*Final

Results*"), ECF No. 18-4, and accompanying Issues and Decision Mem., C-580-888

(Mar. 16, 2021) ("I&D Mem."), ECF No. 18-5.[1]  In *Nucor Corp. v. United States* ("*Nucor

I*"), 46 CIT __, 600 F. Supp. 3d 1225 (2022),[2] the court remanded Commerce's

determination not to initiate an investigation into the alleged provision of off-peak

electricity for less than adequate remuneration (sometimes referred to as "LTAR") and

Commerce's determination that mandatory respondent POSCO and its affiliate POSCO

---

[1] The administrative record for the Remand Results is contained in a Public Remand Record ("PRR"), ECF No. 62-1, and a Confidential Remand Record ("CRR"), ECF No. 62-2.  The administrative record for the *Final Results* is likewise contained in a Public Administrative Record ("PR"), ECF No. 18-1, and a Confidential Administrative Record ("CR"), ECF No. 18-2.  The parties submitted joint appendices containing record documents cited in their comments.  [Conf. Remand] J.A. ("CRJA"), ECF No. 76; [Public Remand] J.A., ECF No. 77.  The court references the confidential record documents, unless otherwise specified, including, when necessary, those provided in the confidential joint appendix that accompanied parties' Rule 56.2 briefs.  *See* Confid. J.A. ("CJA"), ECF No. 43.
[2] *Nucor I* presents background information, familiarity with which is presumed.

Plantec ("Plantec") do not meet the requirements necessary to find a cross-owned input supplier relationship with respect to the supply of scrap and a converter vessel.

On January 31, 2023, Commerce filed the Remand Results. Therein, Commerce provided further explanation for its determinations, which otherwise remain unchanged. Remand Results at 11–33, 38–52, 55–72.

Nucor filed comments opposing Commerce's Remand Results. Confid. Nucor Corp.'s Am. Cmts. on Final Results of Redetermination Pursuant to Ct. Remand ("Pl.'s Opp'n Cmts."), ECF No. 74. Defendant United States ("the Government") filed comments in support of the Remand Results. Confid. Def.'s Resp. to Pl.'s Cmts. Regarding the Remand Redetermination ("Def.'s Supp. Cmts."), ECF No. 70.[3]

For the following reasons, the court remands again the matters addressed in Commerce's redetermination.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018),[4] and 28 U.S.C. § 1581(c). The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

---

[3] POSCO filed comments incorporating by reference the Government's arguments and made no additional arguments. Def.-Int POSCO's Cmts. in Supp. of the Agency's Remand Determination, ECF No. 72.

[4] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition unless otherwise stated.

DISCUSSION

**I.      Nucor's Allegation Concerning Electricity for Less Than Adequate Remuneration**

      **A.  Background**

During the investigation underlying the order on CTL plate from Korea, the Korean government explained that "if one consumes electricity when the load factor is low, e.g., at night, the electricity tariff decreases since electricity could be generated by those using cheap fuels, e.g., nuclear generators."  New Subsidy Allegations (Nov. 4, 2019) ("Allegation") at 9 & n.34, CR 182–84, PR 76–78, CRJA Tab 5 (citing the Government of Korea's July 15, 2016, response filed in the original investigation, attached to the Allegation as Exhibit 6).  Nucor's allegation in this review pointed to news reports and KPX data demonstrating that electricity demand was more "evenly divided between on-peak and off-peak hours."  *Id.*  Nucor relied, in part, on the absence of fluctuation in the system marginal price ("SMP")[5] and information indicating that lower cost generators, such as coal or nuclear power, established the SMP "less than 4 [percent] of the time even during off-peak hours."  *Id.* at 11 & n.41 (citing Allegation, Ex.

---

[5] The Korea Electric Power Corporation ("KEPCO") purchases "electricity from the [Korea Power Exchange ("KPX")], which "sets prices via merit order depending on estimated hourly power demand."  Remand Results at 41.  Generators with lower variable costs (such as nuclear and coal power) "are the first to have their bids accepted and comprise the base load, i.e., electricity intended to operate on a 24-hour basis."  *Id.*  Thereafter, generators with higher variable costs (such as oil and liquified natural gas) "comprise the non-base load and may or may not have their bids accepted depending on their bid price and the KPX's estimated level of electricity demand."  *Id.*  Commerce explained that the KPX accepts bids in ascending order of price "until the projected demand for electricity for such hour is met."  *Id.*  The "maximum bid value" for a given hour is the SMP.  *Id.*

10).  To demonstrate benefit, Nucor initially compared POSCO's weighted average off-peak electricity price for one plant[6] to the average off-peak SMP in the amount of 93.17 KRW/kWh and the KPX's annual average cost of sale in the amount of 106 KRW/kWh. *Id.* at 14–15.

Commerce issued a supplemental questionnaire, in which it stated: "According to . . . KEPCO's Form 20-F . . . there are other factors that determine the price for electricity other than the SMP.  Based on these factors, please explain how the SMP only impacts pricing at off-peak hours."  New Subsidy Allegations Suppl. Questionnaire (Dec. 20, 2019) ("Suppl. Questionnaire") at 3, PR 90, CRJA Tab 7.  Nucor responded that the KPX pricing formula accounts for an adjusted coefficient and the fixed capacity price, but that Nucor did not understand those values to "affect the actual prices that end-users pay KEPCO for electricity."  New Subsidy Allegations Suppl. Questionnaire Resp. (Dec. 31, 2019) ("Suppl. Allegation") at 4, PR 94, CRJA Tab 8.  Nucor went on to describe the adjusted coefficient as an "ad hoc means of adjusting the distribution of profits or losses among KEPCO and its generating subsidiaries" and that it may ultimately be relevant to a benefit calculation.  *Id.*  Nucor explained, however, that it "discussed the SMP for two reasons.  First, since it reflects the variable cost of electricity generation, it serves as a reasonably available and conservative proxy for what the price of electricity should be at any specific time of day."  *Id.*  Nucor further stated that "because [the SMP] is theoretically tied to demand, it should fall significantly

---

[6] The weighted average off-peak electricity price for POSCO's [[                    ]] was [[      ]] Korean Won ("KRW") per kilowatt hour ("kWh").

if, as the Korean government has asserted, substantially lower off-peak electricity prices for certain end users simply reflect lower off-peak end-use demand for electricity," but that "this is not the case." *Id.* at 5.

The statute provides that Commerce "shall" initiate a CVD investigation "whenever an interested party" files a petition[7] "on behalf of an industry" that "alleges the elements necessary for the imposition of the duty imposed by section 1671(a) of this title" and provides "information reasonably available to the petitioner supporting those allegations." 19 U.S.C. § 1671a(b)(1). In this case, however, Commerce declined to initiate an investigation. *See* Decision Mem. on New Subsidy Allegations (Apr. 1, 2020), PR 144, CRJA Tab 9. Commerce found that Nucor had not adequately accounted for the adjusted coefficient and capacity price, stating that "any cost-based, market benchmark . . . should include these factors, because . . . KEPCO's cost of electricity is based on that formula." *Id.*

Nucor requested Commerce to reconsider its decision. Request for Recons. of New Subsidy Allegation (Apr. 9, 2020) ("Req. for Recons."), CR 254, PR 148, CRJA Tab 10. In the request for reconsideration, Nucor argued, *inter alia*, that even assuming that the Korean government's pricing formula results in a suitable benchmark, "the record still presents evidence of a benefit to POSCO." *Id.* at 7 (underline omitted). To support this assertion, Nucor pointed to "unit prices for each KEPCO generator and for each fuel type" for the period of review ("POR"). *Id.* Nucor explained that the "[t]he

---

[7] The statute also permits Commerce to self-initiate an investigation. 19 U.S.C. § 1671a(a).

lowest unit price was KRW 67.38" per kWh, which was "[[


]]."  *Id.* at 7–8.  Thus, Nucor argued, Commerce's decision not to initiate an investigation lacked record support "even assuming that the lowest-cost generator supplied 100 [percent] of off-peak electricity, with fair value measured as whatever price results from the KPX's pricing formula for that specific generator."  *Id.* at 8.

For the *Final Results*, Commerce rejected both the average off-peak SMP and KPX's cost-of-sale data as benchmarks, reasoning that "neither . . . reflect the average price of off-peak electricity for [less than adequate remuneration]."  I&D Mem. at 22. With respect to cost recovery, Commerce did not find "one year without cost recovery sufficient to demonstrate that a government-owned entity is not recovering its costs."  *Id.* at 23.  Commerce did not address Nucor's comparison between the POR average unit price paid to the lowest cost generator and KEPCO's off-peak tariff rates.  *See id.* at 20–26.

The court remanded Commerce's determination, explaining that although "Commerce appeared to question the propriety of examining a segment of a time-of-use system, its discussion in this regard is cursory."  *Nucor I*, 600 F. Supp. 3d at 1233 (further noting the Government's concession that "Commerce did not explicitly address whether the off-peak supply of electricity within such a system may constitute a distinct subsidy program").  The court also found that Commerce had faulted Nucor for failing to provide information that Commerce did not identify as being reasonably available to Nucor.  *Id.* at 1234.

### B.  Commerce's Remand Results

In the Remand Results, Commerce framed the issues identified by the court as "(1) whether the pricing of off-peak electricity could constitute a subsidy program distinct from Nucor's previous allegation regarding the sale of electricity for LTAR; and (2) whether Nucor's allegation met the threshold for initiating an investigation into any such program."  Remand Results at 7.  With respect to the first issue, Commerce clarified that it treated Nucor's allegation regarding the off-peak supply of electricity "as a separate subsidy program" distinct "from the previously investigated provision of electricity for LTAR program."  *Id.* at 11.  Commerce stated that it applied the standard for initiating an investigation set forth in *RZBC Group Shareholding Co. v. United States*. *See id.* at 12 & n.41 (citing *RZBC Grp. Shareholding Co. v. United States*, 39 CIT __, __, 100 F. Supp. 3d 1288, 1295 (2015)).

In *RZBC Group*, the court explained that a petition or subsequent subsidy allegation functions "like a civil complaint" and is intended "to alert the agency to the possibility of a subsidy."  100 F. Supp. 3d at 1292.  Thus, "most subsidy petitions are granted unless the allegations are clearly frivolous, not reasonably supported by the facts alleged or omit important facts which are reasonably available to the petitioner."  *Id.* at 1295 (citation and ellipsis omitted).  On remand, Commerce again found that "Nucor's subsidy allegation did not provide a sufficient allegation of benefit because it omitted reasonably available facts that contradicted the basis of its pricing comparison."  Remand Results at 12.

In reaching this conclusion, Commerce explained that Nucor's allegation rested on two separate bases: first, that "KEPCO's off-peak tariffs did not recover costs"; and second, that KEPCO's on-peak tariffs "cross-subsidize[] large industrial companies . . . who move production to off-peak hours." *Id*. at 15–16. Commerce addressed cross-subsidization before addressing cost recovery. *See id*. at 16.

With respect to cross-subsidization, Commerce maintained that "Nucor conflates benefit and specificity" because "[t]he hours at which POSCO . . . chose to purchase electricity based on the existing tariff schedule are . . . immaterial unless the tariff schedule itself is found to be inconsistent with market principles." *Id*. Commerce next addressed its earlier findings regarding the Korean electricity market. *Id.* at 16–17. To that end, Commerce explained that Nucor had failed to provide information "that would either call into question Commerce's previous determination that the Korean electricity system was consistent with market principles or demonstrate that the provision of electricity at specific, off-peak hours was inconsistent with market principles, including Commerce's previous findings of KEPCO's cost recovery." *Id*. at 17.

Regarding KEPCO's alleged failure to recover the costs of supplying off-peak electricity, Commerce explained that Nucor's "primary allegation focused on the SMP." *Id.* Commerce stated that Nucor failed to address available "[i]nformation on how the KPX developed the SMP price and how an adjusted coefficient was applied to certain generators' prices prior to the purchase by KEPCO" even after Commerce gave Nucor the opportunity to remedy deficiencies in the allegation. *Id.* at 17–18. According to Commerce, "[t]he SMP is relevant to the cost of generating electricity and, thus, relevant

for a comparison to the prices in the GOK's tariff schedule, only insofar as it is utilized in the KPX's pricing formula by which the KPX sets the prices at which KEPCO compensates electricity generators." *Id.* at 42.[8]  Commerce stated that the SMP does not reflect KEPCO's cost of electricity because lower cost generators receive less than the SMP and, "as a maximum price, the SMP does not account for the quantity of electricity provided by each generation type." *Id.* at 43.

Commerce acknowledged that "the hourly SMP information provided by Nucor demonstrates that off-peak electricity was operating above base load" and "that the highest bid prices for electricity at on- and off-peak hours" reflect a four KRW/kWh difference. *Id.* at 44.  However, Commerce found that such information only showed "that certain generators are in use and is not an accurate estimate of KEPCO's costs" because differences in the amount of electricity generated at the SMP bid price "affects KEPCO's overall cost of supply." *Id.*  Commerce pointed to evidence regarding "the actual prices paid to the generation subsidiaries" that were "below the 93.17 KRW/kWh SMP" but which "include[d] both the marginal price and capacity price of electricity (i.e., variable and fixed costs)." *Id.* at 46 & nn.147, 149 (citing Suppl. Allegation, Ex. 1 at 38 (reflecting the annual average unit prices paid to each GENCO)).  Commerce addressed Nucor's reliance on news articles tending to show "a shift of industrial users

---

[8] The per-unit variable cost of generating electricity that KEPCO pays is calculated as follows: "Per Unit Cost = Variable Cost + (SMP – Variable Cost) * (Adjusted Coefficient)."  Remand Results at 42.

toward the off-peak timeframe," *id.* at 39, but found "a myriad of possibilities that may

explain why light load pricing may not be recovering costs during the POR," *id.* at 40.

### C. Parties' Contentions

Nucor contends that Commerce applied a heightened standard that required

Nucor to address Commerce's previous determinations concerning the Korean

electricity market and provide a more precise benchmark value.  Pl.'s Opp'n Cmts. at 4–

5.  Nucor asserts that it relied on the SMP to rebut the Korean government's reliance on

purportedly lower consumption rates to explain cheaper off-peak electricity, *id.* at 9,

explaining that the lack of variation in the SMP means that KEPCO's cost of supply

likewise does not vary because "other variables in the KPX formula are static and do not

change over the course of a day," *id.* at 10 (citing Allegation at 10–11; Suppl. Allegation,

Ex. 1 at 35–36).  Nucor further asserts that it addressed Commerce's concern about

variations in KEPCO's cost of supply through its demonstration that KEPCO acquired

electricity from its lowest-cost generator type at prices that were [[

]].  *Id.* at 11–12.  Nucor also contends that Commerce's references to additional

publicly available information that it asserts Nucor should have addressed are

nonspecific and do not undermine the evidence Nucor relied on.  *Id.* at 14.

The Government contends that Nucor's allegation "did not satisfy the standard

set forth in *RZBC Group*" because the allegation failed to account for "Commerce's prior

findings on the Korean electricity market" and factors affecting KPX's pricing besides

the SMP.  Def.'s Supp. Cmts. at 8–9; *see also id.* at 10–11 (arguing that Nucor failed to

address Commerce's prior decisions finding no benefit in the Korean electricity system).

The Government further contends that, insofar as Nucor claims that KEPCO recovers its costs by inflating its on-peak prices, Nucor conflates benefit and specificity because "the price POSCO pays for electricity at other hours is irrelevant except for the purposes of conducting a *de facto* specificity analysis." *Id.* at 16.  According to the Government, Commerce is solely "concerned with whether Nucor provided sufficient evidence of a benefit by reasonably demonstrating that the price KEPCO paid for off-peak electricity is higher than the prices it charges consumers." *Id.*

### D.  Analysis

With respect to the standard used to evaluate Nucor's benefit allegation, Commerce claims to have applied the framework set forth in *RZBC Group*.  *See* Remand Results at 11–12.  In reviewing Commerce's remand determination, however, the court considers what Commerce said and what it did.  To that end, as discussed below, there is inconsistency between the two.

This court has previously recognized that, in some circumstances, a heightened standard may apply.  "When allegations concern a program previously held noncountervailable," Commerce may "require[ ] a petition to contain evidence of changed circumstances . . . before an investigation is initiated."  *Delverde, SrL v. United States*, 21 CIT 1294, 1296–97, 989 F. Supp. 218, 222 (1997), *vacated on other grounds by Delverde SrL v. United States*, 202 F.3d 1360 (Fed. Cir. 2000); *see also Bethlehem Steel Corp. v. United States*, 25 CIT 307, 315, 140 F. Supp. 2d 1354, 1363 (2001) (applying this standard).

Commerce asserted that this heightened standard did not apply because it accepted Nucor's allegation to raise the existence of a subsidy program distinct from Commerce's prior examination of the provision of electricity for less than adequate remuneration.  *See* Remand Results at 11.  Nevertheless, the agency clearly recognized that Nucor's allegation implicated a substantial amount of information previously examined by Commerce in connection with its investigations into the Korean electricity market.  *See id.* at 12–15.

There need not be a strictly binary choice between the *RZBC Group* standard and the heightened standard of *Delverde*; however, the agency must be consistent with respect to the standard it articulates and that which it applies.  Here, when Nucor has previously alleged a countervailable subsidy through the provision of electricity to POSCO, without success,[9] Commerce may reasonably require Nucor to take account of

---

[9] While, in one case, the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") remanded Commerce's determination that electricity was not sold for less than adequate remuneration in the investigation concerning cold-rolled steel, the appellate court based its decision to remand on Commerce's failure to adequately investigate the role of the KPX in the Korean electricity market.  *See POSCO v. United States*, 977 F.3d 1369 (Fed. Cir. 2020).  Commerce's remand redetermination, in which the agency continued to find no countervailable subsidy from the price of electricity, was sustained by the CIT and is pending review before the Federal Circuit.  *See POSCO v. United States*, 46 CIT __, 557 F. Supp. 3d 1290 (2022), *appeal filed* (Fed. Cir. Mar. 25, 2022). Similar agency determinations in other proceedings involving subject merchandise from Korea have likewise been sustained by the CIT.  *See, e.g.*, *Nucor Corp. v. United States*, 47 CIT __, 633 F. Supp. 3d 1302 (2023); *Nucor Corp. v. United States*, 47 CIT __, 633 F. Supp. 3d 1225 (2023).  Nucor has also dismissed recent appeals challenging Commerce's determinations regarding the Korean electricity market.  *See* Stip. of Dismissal, *Nucor Corp. v. United States*, Court No. 23-cv-00003 (CIT June 14, 2023); Stip. of Dismissal, *Nucor Corp. v. United States*, Court No. 22-cv-00170 (CIT June 13, 2023).

the agency's prior findings when Nucor seeks to have the agency again examine the

provision of electricity for less than adequate remuneration, albeit limited to a particular

time of day.  Whether Commerce applies the *RZBC Group* standard, the *Delverde*

standard, or some hybrid standard, that decision is for Commerce to articulate in the

first instance; however, the agency must be consistent in its statement of the applicable

standard and its application of that standard.  Because the Remand Results instead

reflect inconsistency in this regard, as discussed below, the court must remand the

determination for Commerce to further evaluate and explain its decision.

At the outset, Commerce appeared to accept the premise of Nucor's allegation,

i.e., that a particular time period within a time-of-use system could be examined as a

separate subsidy program.  Nevertheless, certain statements within Commerce's

discussion of Nucor's benefit allegation suggest otherwise.  Commerce stated, for

example, that the time period during which POSCO purchased electricity is relevant to a

specificity analysis rather than a benefit analysis.  Remand Results at 16.[10]  Commerce

further stated that Nucor did not provide information regarding off-peak prices that

negated Commerce's prior determination that the Korean electricity system as a whole

was consistent with market principles, or that would "demonstrate that the provision of

electricity at specific, off-peak hours was inconsistent with market principles, including

Commerce's previous findings of KEPCO's cost recovery."  *Id.* at 17.  These statements

---

[10] A countervailable subsidy "exists when . . . a foreign government provides a financial
contribution . . . to a specific industry" that confers "a benefit" on "a recipient within the
industry."  *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1369 (Fed.
Cir. 2014) (citing 19 U.S.C. § 1677(5)(B)).

suggest some reluctance by the agency to examine time-period specific pricing. However, instead of providing further explanation in this regard, Commerce, seeking to apply the *RZBC Group* standard, faulted Nucor for failing to address certain reasonably available information, such as the capacity price and the per-unit variable cost, as modified by the adjustment coefficient, that are relevant to KEPCO's costs in addition to the SMP.  *Id.* at 42–43, 47.

To that end, in its allegation, Nucor acknowledged that the adjusted coefficient may bear upon Commerce's benefit calculation.  *See* Suppl. Allegation at 4.  Nucor argued, nevertheless, that the adjusted coefficient has no bearing on the similarity of SMPs apparent across the 24-hour time period, the constancy of which suggested a certain constancy in KEPCO's costs as compared to the three-fold difference between on-peak and off-peak pricing.  *See id.* at 4–5; Allegation at 8–11.

Commerce addressed this when it discussed how the adjusted coefficient impacts the price paid to the generators and, moreover, the fact that the SMP represents the cap, or the maximum price paid to a generator for the variable cost of electricity for any given time.  *See* Remand Results at 41–42.  Based on the information available to Commerce, the agency reasonably found that Nucor overlooked relevant information about the Korean electricity pricing system, such as the fact that the KPX accepts specific variable bid prices below the SMP and the fact that lower cost producers would provide a higher percentage of the electricity during off-peak hours despite similarities in SMP as compared to on-peak hours.  *See id.* at 40–44.  In finding Nucor's allegation insufficient, Commerce compared the POR average off-peak SMP to

the POR average unit prices paid to the two largest generation subsidiaries to assert that KEPCO paid certain generators for electricity at prices that were lower than the SMP. *Id.* at 46–47. This is consistent with Commerce's explanation that certain generators "are paid a variable price of electricity well below the SMP." *Id.* at 47.

Nucor did, however, provide additional information regarding KPX's pricing formula that appears to indicate that KEPCO's weighted-average off-peak prices paid by POSCO [[                                ]] KEPCO's cost of acquiring electricity from its lowest cost generator. *See* Req. for Recons. at 7–8; *see also* Pl.'s Opp'n Cmts. at 11–12 (noting the same result with respect to KEPCO's cost of "acquir[ing] electricity from the lowest-cost generator type, nuclear generators"). This information appears responsive to Commerce's request that Nucor go beyond its arguments based on the off-peak SMP and directly address electricity pricing during off-peak hours, regardless of whether Nucor addressed the consistency of the pricing system with market principles as a whole. Commerce did not respond to this particular aspect of the allegation or explain why it constituted insufficient evidence of a benefit for Commerce to investigate the off-peak pricing in particular pursuant to the low standard of *RZBC Group*. In the absence of a clearly articulated standard and an application of that standard to the entirety of the allegation made by Nucor, the court remands this issue for reconsideration or further explanation.

II.      **Issues Regarding Plantec**

A.  **Background**

The provision of countervailable subsidies by a foreign government may be direct

or indirect "with respect to the manufacture, production, or export" of subject

merchandise to the United States.  *See* 19 U.S.C. § 1671(a)(1).  Commerce has

promulgated rules addressing the attribution of subsidy benefits to a respondent based

on corporate cross-ownership.  19 C.F.R. § 351.525(b)(6).  With respect to inputs, when

"there is cross-ownership between an input supplier and a downstream producer, and

production of the input product is primarily dedicated to production of the downstream

product, [Commerce] will attribute subsidies received by the input producer to the

combined sales of the input and downstream products produced by both corporations

(excluding the sales between the two corporations)."  *Id.* § 351.525(b)(6)(iv).

Commerce has explained that the regulation is intended to capture situations in

which "a subsidy is provided to an input producer whose production is dedicated almost

exclusively to the production of a higher value added product—the type of input product

that is merely a link in the overall production chain."  *Countervailing Duties*, 63 Fed.

Reg. 65,348, 65,401 (Dep't Commerce Nov. 25, 1998) (final rule) ("*CVD Preamble*" or

"*Preamble*") (providing as examples "stumpage subsidies on timber that was primarily

dedicated to lumber production and subsidies to semolina primarily dedicated to pasta

production").  Conversely, when inputs "are not primarily dedicated to the downstream

products," Commerce will not "assume that the purpose of a subsidy to the input

product is to benefit the downstream product."  *Id.* (noting, by way of example, that "it

would not be appropriate to attribute subsidies to a plastics company to the production of cross-owned corporations producing appliances and automobiles").

In the underlying proceeding, Commerce initially declined to attribute to POSCO subsidies received by Plantec based on Plantec's supply of scrap because Plantec generated scrap as a by-product and sold it through an intermediary, POSCO Daewoo Corporation ("PDC"). *See* I&D Mem. at 34. Commerce also declined to attribute subsidies based on Plantec's supply of various raw materials, fixed assets, and services based on Commerce's findings that the inputs were not produced by Plantec or used in POSCO's steelmaking. *See id.* at 33.[11]

The court remanded Commerce's determination regarding Plantec's supply of scrap, explaining that "various prior Commerce determinations appear to support the arguments of both Plaintiff and Defendant-Intervenor" and, thus, "it is incumbent upon Commerce to go beyond simply identifying one set of prior decisions in support of its determination." *Nucor I*, 600 F. Supp. 3d at 1238.[12] The court sustained Commerce's determination regarding the raw materials, fixed assets, and services except with

---

[11] Commerce did not address the parties' arguments regarding whether Plantec was cross owned by POSCO based on its resolution of the arguments concerning Plantec's provision of scrap and other materials. *See* Decision Mem. for the Prelim. Results (July 20, 2020) at 13, PR 161, CJA Tab 15; *see also* I&D Mem. at 31–36 (not addressing the issue).

[12] The court declined to sustain Commerce's determination on the basis of the Government's argument that the volume of Plantec's sales of scrap was small in relation to total sales by Plantec to POSCO, finding the argument impermissibly *post hoc*. *Nucor I*, 600 F. Supp. 3d at 1237. In the Remand Results, Commerce clarified that it "does not consider the amount of the input provided to be one of the factors" it uses to determine "whether an input is primarily dedicated." Remand Results at 26.

respect to the converter vessel.  *Id.* at 1239–41.  The court explained that Commerce had failed to adequately explain its decision in light of record evidence indicating that POSCO used the converter vessel in steelmaking.  *Id.* at 1241.

### B.  Commerce's Remand Results

In its redetermination, Commerce explained that agency decisions as to whether inputs are primarily dedicated such that a subsidy provided to the input producer is intended to benefit production of the input and the downstream product "are case-specific" and guided by the *Preamble* accompanying the CVD regulations.  Remand Results at 22 & n.64 (citing *CVD Preamble*, 63 Fed. Reg. at 65,378).  Commerce listed several factors the agency considers relevant to the analysis.  *See id.* at 26.  Those factors are:

- Whether an input supplier produced the input;

- Whether the input could be used in the production of downstream products including subject merchandise, regardless of whether the input is actually used for the production of the subject merchandise;

- Whether the input is merely a link in the overall production chain, as stumpage is to lumber production or semolina is to pasta production as described in the *Preamble*, or whether the input is a common input among a wide variety of products and industries and it is not the type of input that is merely a link in the overall production chain, as plastic is to automobiles;

- Whether the downstream producers in the overall production chain are the primary users of the inputs produced by the input producer and whether the production of the inputs by the input producers is exclusively for the overall production chain; and

- Examining a company's business activities to assess whether an input supplier's production is "dedicated almost exclusively to the production of a higher value-added product" in the manner suggested by the *Preamble* such that the purpose of any subsidy

> provided to the company would be "to benefit the production of both
> the input and downstream products."

*Id.* at 26, 59.  The court addresses Commerce's findings in relation to these factors for

both scrap and the converter vessel, and the parties' arguments relevant thereto, in

turn.

### C.  Scrap

Commerce again determined that the scrap provided by Plantec "was not

primarily dedicated to the production of POSCO's downstream product."  *Id.* at 27.

Commerce noted that Plantec "generated" the scrap and that the scrap was "used in the

production of downstream product."  *Id.*  However, Commerce "compare[d] the scrap

provided by . . . Plantec with the scrap processing services provided by POSCO's

cross-owned input supplier, Pohang Scrap Recycling Distribution Center Co., Ltd.

(Pohang SRDC)."  *Id.*  Commerce explained that, whereas Plantec "did not alter or

otherwise process the scrap it generated for use as a steel input or specifically in the

production of POSCO's downstream product," *id.*, "Pohang SRDC *processed* scrap by

means such as loading and unloading, storage, guillotining (cutting), pressing to adjust

size, *etc.*, on behalf of [PDC], which then provided the processed scrap to POSCO," *id.*

at 28 (further stating that "[t]he scrap provided by Pohang SRDC was processed in a

way that was specifically repurposed for POSCO's steel production").

Commerce explained that the sale of scrap through an intermediary "is relevant

because it is an indication that . . . Plantec's sales of scrap only incidentally end up as

part of POSCO's production of subject merchandise."  *Id.*  Additionally, Commerce

found "no record evidence indicating that POSCO's steel production is the primary use for the scrap produced [or] that the production of the scrap is exclusively for POSCO's steel production."  *Id.* at 28–29; *see also id.* at 61 (noting that "Plantec sold scrap only to PDC during the POR, not POSCO, and there is no evidence that the scrap was intended for POSCO upon its generation by POSCO Plantec").

With respect to business activities, Commerce identified "Plantec's primary business purpose" as "the construction of industrial plants," which went beyond the scope of "steelmaking or constructing steel-making plants."  *Id.* at 30.  Commerce analogized this case to *Glass Containers From China*, a case in which Commerce "found that an input supplier's broad business scope demonstrates that the input supplier's production is not 'dedicated almost *exclusively* to the production of a higher value-added product.'"  *Id.* at 30–31 & n.86 (citing Decision Mem. for Certain Glass Containers from the People's Republic of China, C-570-115 (May 11, 2020) at Cmt. 12 ("Glass Containers Mem."), https://access.trade.gov/Resources/frn/summary/prc/2020-11070-1.pdf (last visited Aug. 21, 2023)).

### 1.  Parties' Contentions

Nucor contends that Commerce's "holistic" examination is at odds with Commerce's prior determinations involving POSCO in which Commerce found scrap to be primarily dedicated to POSCO's steel production.  Pl.'s Opp'n Cmts. at 18–19 (collecting cases).  Nucor further contends that Commerce has, for the first time in the Remand Results, distinguished processed scrap from unprocessed scrap.  *Id.* at 20. Nucor asserts that Commerce's consideration of the presence of an intermediary "is not

meaningful" because Pohang SRDC also sold scrap to POSCO through PDC.  *Id.* at 22
(citing Pohang SRDC's Initial Questionnaire Resp. (Sept. 26, 2019) ("Pohang's
Questionnaire Resp.") at 1, 6, 9, CR 141, PR 45, CRJA Tab 3).  Nucor argues there is
no evidence that Plantec's scrap was sold to anyone other than POSCO, and that
affirmative evidence of exclusivity is not necessary for attribution.  *Id.* at 22–23.  Lastly,
Nucor contends that primary business activity was relevant in *Glass Containers From
China* only insofar as Commerce used that information to apply adverse inferences.  *Id.*
at 23 (citing Glass Containers Mem. at 68–70).

The Government contends that Commerce's analysis accords with the law.
Def.'s Supp. Cmts. at 18.  The Government argues that Nucor merely disagrees with
Commerce's determination and such disagreement is not a basis for another remand.
*Id.* at 20.  With respect to scrap, the Government contends that Plantec's sale of scrap
through the intermediary PDC and lack of processing together "suggest[] that the scrap
to steel production relationship in this case is similar to the plastic to automobile
production example in the *Preamble*."  *Id.* at 23.

## 2.  Analysis

Commerce is correct that neither the statute nor the agency's regulations define
"primarily dedicated."  Remand Results at 22.  The court "recognizes that decisions
regarding attribution are fact specific and Commerce may reach different conclusions in
different cases in relation to the same input."  *Nucor I*, 600 F. Supp. 3d at 1238.  Nucor
offers no substantive arguments against Commerce's consideration of various factors
beyond noting that Commerce has reached different decisions in certain other

proceedings involving scrap supplied to POSCO.  *See* Pl.'s Opp'n Cmts. at 18–19.  That

alone is not a basis for remand.  Commerce explained its methodological approach by

way of reference to the *CVD Preamble* and prior agency determinations.  Remand

Results at 24–25.  Except to the extent discussed further in, the chosen factors appear

at least facially relevant to determining whether "the purpose of a subsidy provided to

the input producer is to benefit the production of both the input and downstream

products."  *CVD Preamble*, 63 Fed. Reg. at 65,401.  Commerce must, of course,

"explain the basis for its decisions."  *NMB Singapore Ltd. v. United States*, 557 F.3d

1316, 1319 (Fed. Cir. 2009).  With respect to the attribution matters considered on

remand, Commerce was required to identify the facts on which it seeks to rely and

explain their relevance to the inquiry.[13]

---

[13] In the Remand Results, Commerce distinguished the agency's decision in *Rebar From Turkey 2018* in which it found scrap primarily dedicated to production of the downstream product.  *See, e.g.*, Remand Results at 25 & n.73 (citing Decision Mem. for Steel Concrete Reinforcing Bar from the Republic of Turkey, C-489-819 (Sept. 21, 2021) at Cmt. 5, https://access.trade.gov/Resources/frn/summary/turkey/2021-20906-1.pdf (last visited Aug. 21, 2023)).  That decision has since been remanded by the court.  *See Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 47 CIT __, 633 F. Supp. 3d 1276 (2023).  On remand, Commerce reversed its decision and found that scrap was not primarily dedicated.  Final Results of Redetermination Pursuant to Ct. Remand, *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, Ct. No. 21-cv-00565 (CIT July 24, 2023) ("2018 Rebar Remand").  Commerce's remand redetermination pursuant to *Kaptan Demir* is pending before the court.  Thus, unless they are otherwise relevant, the court disregards Commerce's and the parties' statements made in reliance on Commerce's original determination in *Rebar From Turkey 2018*.

Regarding scrap, Commerce acknowledged that Plantec generated the scrap[14]
and that POSCO used the scrap in production of the downstream product.  Remand
Results at 27.  Commerce therefore based its decision not to attribute subsidies
received by Plantec on other considerations.  *See id.* at 27–31, 60–66.

Among those considerations Commerce concluded that Plantec's primary
business activity, "the construction of industrial plants," along with its "diverse" business
functions, is insufficiently tied to "steelmaking or constructing steel-making plants."  *Id.*
at 30.  Nucor does not dispute these underlying facts or that Commerce has considered
business activities in other proceedings even if Commerce ultimately resolved the
question on a different basis.  *See* Pl.'s Opp'n Cmts. at 23.[15]  Nucor's principal
argument instead rests on Commerce's treatment of primary business activities in the
2018 and 2019 administrative reviews of the CVD order on rebar from Turkey.  *See id.*
at 21–23.  As noted, however, Commerce has issued a revised determination in *Rebar*

---

[14] While, for the *Final Results*, Commerce distinguished the by-product nature of scrap
from intentional production, I&D Mem. at 34, Commerce did not repeat that distinction in
the Remand Results, *see* Remand Results at 27.

[15] In *FEBs From Germany*, Commerce referenced its consideration of business
activities in its preliminary determination.  Decision Mem. for Forged Steel Fluid End
Blocks from Germany, C-428-848 (Dec. 7, 2020) at 58, https://access.trade.gov/
Resources/frn/summary/germany/2020-27335-1.pdf (last visited Aug. 21, 2023).
However, Commerce based its final determination on "the quantities and types of
materials that" were supplied to the respondent.  *Id.* at 59.  In *Glass Containers From
China*, Commerce declined to apply adverse inferences to a respondent for the
nonresponse of a cross-owned company after finding that Commerce did not request
such a response.  Glass Containers Mem. at 69.  Commerce explained that the cross-
owned company did not meet the criteria for attribution regarding the supply of certain
machinery and materials based on the range of business activities that went beyond the
scope of glass equipment manufacturing.  *Id.* at 69–70.

*From Turkey 2018*, *see* 2018 Rebar Remand, and Commerce's determination in the

2019 review is nonfinal pending judicial review, *see Kaptan Demir Celik Endustrisi ve*

*Ticaret A.S. v. United States*, 46 CIT __, 592 F. Supp. 3d 1332, 1335 (2022) (declining

to enter a stay in litigation concerning the 2019 review pending review of the 2018

Rebar Remand).  Commerce has offered reasoned analysis supporting its consideration

of primary business activities, noting that such consideration helps the agency to

determine "whether an input supplier's production is 'dedicated almost exclusively to the

production of a higher value-added product' in the manner suggested by the *Preamble*

such that the purpose of any subsidy provided to the company would be 'to benefit the

production of both the input and downstream products.'"  Remand Results at 30 & n.83

(quoting *CVD Preamble*, 63 Fed. Reg. at 65,401).  In other circumstances, Commerce

may examine subsidies in the context of the upstream subsidy statutory provision.  *See*

*CVD Preamble*, 63 Fed. Reg. at 65,401 ("Where we are investigating products such as

appliances and automobiles, we will rely on the upstream subsidy provision of the

statute to capture any plastics benefits which are passed to the downstream

producer.").

      Other aspects of Commerce's analysis of scrap, however, require further

consideration.

      In examining the role of scrap in the production chain, Commerce distinguished

processed scrap from unprocessed scrap and, on that basis, distinguished its decisions

vis-à-vis Plantec and Pohang SRDC.  Remand Results at 27–28, 60.[16]  Commerce,

however, failed to support its finding that the unprocessed scrap at issue here is more

"generic" than processed scrap.  *See id.* at 27 (asserting that "unprocessed scrap is a

common input among a variety of products and industries" without citing evidence that

processed scrap is less common).  Commerce points to no evidence that Plantec's

scrap required processing to be used in POSCO's production process such that it was

less suited for use than processed scrap.[17]  *See id.* at 27–28.  Further, Commerce

offered no evidence to support the assertion that Pohang SRDC's scrap "was

specifically repurposed for POSCO's steel production."  *Id.* at 28.  Pohang SRDC's

---

[16] Alluding to the language in the *Preamble*, Commerce found that the "scrap in this
case is not merely a link in the overall production chain."  Remand Results at 27.
Because Commerce did not, however, dispute that POSCO used Plantec's scrap it its
production chain, *see id.*, the scrap does appear to be some sort of link in the
production chain.  Commerce's finding with respect to scrap (and likewise with the
converter vessel discussed further in) is an example of how a potential typographic error
or poor wording choice in the *CVD Preamble* impacts the meaning of the sentence.  The
*Preamble* states: "The main concern we have tried to address is the situation where a
subsidy is provided to an input producer whose production is dedicated almost
exclusively to the production of a higher value added product—the type of input product
that is *merely* a link in the overall production chain."  *CVD Preamble*, 63 Fed. Reg. at
65,401 (emphasis added).  The term "merely" is a minimizing term, such that the
sentence would make more sense if "merely" was preceded by "not."  Indeed, the
examples that follow indicate that attribution may be appropriate when inputs are *not*
mere links in a production chain (as plastic arguably is to an automobile), but instead
serve a more crucial role in downstream production (such as timber used in lumber
production).  The notion that Commerce attributes subsidies when inputs are not mere
links in the production chain is also consistent with Commerce's efforts in the Remand
Results to explain the relevance of factors beyond an input's use in production.  Thus,
on remand, Commerce may want to reevaluate the meaning that should be afforded to
the language in the *Preamble*.
[17] The significance of the processing may be overstated to the extent that it is
characterized as including "loading and unloading" and "storage."  *See* Remand Results
at 28.

questionnaire response noted that the company "processed inputs that *could have been used* by POSCO," Pohang's Questionnaire Resp. at 5 (emphasis added), and stated that such processing was performed "on behalf of PDC," *id.* at 6.  There is no indication that POSCO provided any specifications or criteria to either PDC or Pohang SRDC.

Commerce's determination further suggests that the agency considers knowledge of the downstream destination relevant.  Commerce stated that Plantec's sale of scrap through PDC implies that the scrap "only incidentally end[s] up as part of POSCO's production of subject merchandise."  Remand Results at 28; *see also id.* at 61 (stating that "there is no evidence that the scrap was intended for POSCO").  Insofar as Commerce finds the presence of an intermediary relevant but not dispositive, Commerce's position appears to be that attribution may be appropriate when the record reflects intentional distribution through the intermediary to the downstream producer. *See id.* at 28, 61.

Commerce's position suffers from two flaws.  First, Commerce distinguished this scenario from those in which "multiple companies are involved in the provision of scrap to the downstream producer, which may imply that the production of scrap by those companies is part of an overall production chain to provide scrap to the affiliated downstream producer."  *Id.* at 28.  Here, however, at least two companies—Plantec and Pohang SRDC—are involved in supplying scrap to POSCO through PDC in some fashion.  Commerce does not explain why this is insufficient to find an "overall production chain" supplying scrap to POSCO.  Second, because, as discussed above, Commerce failed to demonstrate that Pohang SRDC processed scrap specifically *for*

POSCO, Commerce's differential treatment of Pohang SRDC and Plantec appears arbitrary.  *See SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (stating that it is "well-established that an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently").

Commerce's statement that there is insufficient evidence that "POSCO is the primary user" of Plantec's scrap does not save its determination.  Remand Results at 61.  Commerce acknowledged that Plantec sold scrap only to PDC, *see id.*, and the record indicates that Plantec's scrap was then resold by PDC to POSCO, *see* Resp. to the Affiliated Cos. Sec. of the Initial Questionnaire (Aug. 19, 2019) at 12 ("Aff. Cos. Resp."), CR 4–15, PR 20–23, CRJA Tab 1 (stating that Plantec's scrap "was just sold to PDC, which then resold it to POSCO").  In response to Nucor's argument that there is no indication "that the steel scrap that Plantec generated was sold to companies other than POSCO," Cmts. on Draft Results of Redetermination (Jan. 3, 2023) at 24, CRR 3, PRR 5, CRJA Tab 14, Commerce misconstrued the issue as whether Plantec sold to companies other than POSCO and asserted that Nucor's argument "is not supported by the record" because Plantec sold scrap to PDC, not POSCO, Remand Results at 61.

To the extent that Commerce finds relevant information missing from the record, it is incumbent on Commerce to solicit that information from the party in possession of the information, i.e., POSCO.  *See Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1336 (Fed. Cir. 2002) ("The burden of production [belongs] to the party in possession of the necessary information.") (quoting *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993) (alteration in original)).  And "[w]hile the

burden of creating an adequate record lies with [interested parties], Commerce must, nonetheless, support its decision with substantial evidence."  *SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 847 (Fed. Cir. 2020) (internal citations omitted) (alteration in original).  Commerce essentially relied on speculation to conclude that this factor disfavored attribution, but "[g]uesswork is no substitute for substantial evidence."  *Id.* (quoting *China Nat'l Arts & Crafts Imp. & Exp. Corp. v. United States*, 15 CIT 417, 424, 771 F. Supp. 407, 413 (1991)).

Because Commerce's evaluation of certain factors considered on remand is unsupported by substantial evidence and reasoned explanation, this issue will be remanded for reconsideration or further explanation.

### D.  The Converter Vessel

Commerce also found that the converter vessel "is not primarily dedicated to the production of downstream product."  Remand Results at 66.  Commerce reached this conclusion despite finding that the converter vessel "could be used in the production of downstream product."  *Id*. at 67.

Commerce explained that the record did not support the finding that Plantec produced the converter vessel.  *Id.* at 68–69.  Commerce pointed to evidence demonstrating that Plantec's primary business purpose is "the construction of industrial plants," "steel producing facilities" and other "infrastructure."  *Id.* at 68.  Commerce also noted that Plantec provided the converter vessel along with other inputs that "can be used in the production of many different products in different industries."  *Id.* at 69. Commerce distinguished this case from *Cold-Rolled Steel From Brazil*, in which the

respondent "provided 'only steel mill equipment and services' to the producer."  *Id.* at 71

& n.222 (quoting Decision Mem. for Cold-Rolled Steel from Brazil, C-351-844 (July 20,

2016) at Cmt. 16, https://access.trade.gov/Resources/frn/summary/brazil/2016-17952-

1.pdf (last visited Aug. 21, 2023)).  Here, Commerce explained, "Plantec provided a

variety of types of equipment, the rest of which we found not primarily dedicated on the

basis that it was generic and not related to the production of downstream product."  *Id.*

at 71.

### 1.  Parties' Contentions

Nucor contests Commerce's conclusion that the record failed to establish that

Plantec produced the converter vessel, pointing to evidence that Plantec constructs

"steel producing facilities," the converter vessel is used to produce steel, and that,

during the investigation, Plantec produced steel-making equipment.  Pl.'s Opp'n Cmts.

at 24–25.  Nucor further contends that evidence indicates that POSCO used the

converter vessel in its production process.  *Id.* at 25 (citing POSCO's Initial

Questionnaire Resp. (Sept. 26, 2019) ("POSCO's Initial Questionnaire Resp."), Ex. 12,

CR 120–40, PR 39–44, CRJA Tab 2).  Nucor argues that Commerce's attempt to

distinguish *Cold-Rolled Steel From Brazil* fails because, in this case, Plantec also

supplied POSCO with scrap, which is "a direct input into its subject production."  *Id.* at

26.

The Government contends that Nucor's arguments are based on "outdated"

information from the investigation and that Commerce supported its determination with

record evidence showing that Plantec was not engaged in the production of steelmaking

equipment during the POR and did not produce the converter vessel.  Def.'s Supp.

Cmts. at 26–27.  The Government further contends that substantial evidence supports

Commerce's determination to treat the converter vessel as non-primarily dedicated

given Plantec's provision of the converter vessel along with several other items

Commerce found not to be primarily dedicated to steel production.  *Id.* at 27–29.  The

Government asserts that Commerce properly distinguished *Cold-Rolled Steel From

Brazil*.  *Id.* at 29.

### 2.  Analysis

In *Nucor I*, the court found substantial evidence to support Commerce's

determination that Plantec did not produce the converter vessel.  600 F. Supp. 3d at

1240.  The court, however, remanded Commerce's determination because the agency

went beyond that consideration to base its determination on the finding that the

converter vessel was not used in steelmaking when the record suggested otherwise.

*See id.* at 1238, 1240–41.

On remand, Commerce considered the aforementioned factors, i.e., whether

Plantec produced the converter vessel; whether the converter vessel could be used in

production of the downstream product; whether the converter vessel is a link in the

overall production chain; whether POSCO was the primary user of the converter vessel;

and Plantec's business activities.  Remand Results at 26, 32–33, 66–72.  Commerce

also stated that "[t]hese factors are not in hierarchical order."  *Id.* at 26.  As part of its

analysis, Commerce again found that substantial evidence did not support the finding

that Plantec produced the converter vessel, Remand Results at 68, and Nucor offers

nothing new to disturb that decision, *see* Pl.'s Opp'n Cmts. at 24–25 (offering mere

disagreement with Commerce's evaluation of the evidence).

Commerce's redetermination raises squarely the question whether the agency's

attribution regulation *requires* the supplier to produce the input, such that when the

supplier is not the producer, consideration of other factors is unnecessary.[18]  In the

Remand Results, Commerce emphasized the relevant portions of the regulation,

explaining:

> that, "if there is cross-ownership between an input supplier and a
> downstream producer, and *production* of the input product is *primarily
> dedicated to production* of the downstream product, the Secretary will
> attribute subsidies received by *the input producer* to the combined sales of
> the input and downstream products produced by both corporations
> (excluding the sales between the two corporations)[.]"

Remand Results at 67–68 (emphasis in original) (quoting 19 C.F.R. § 351.525(b)(6)(iv)).

The *CVD Preamble* likewise discusses the purpose behind the regulation, which is to

account for "subsidy provided to the *input producer*" that is intended "to benefit the

*production* of both the input and downstream products."  63 Fed. Reg. at 65,401 (further

referencing "input and downstream production [that] takes place in separately

incorporated companies with cross-ownership").  Commerce, however, characterized

the question "whether an input supplier produced the input" as just "one of the factors [it]

considered."  Remand Results at 68.  Commerce therefore appeared to give equal

---

[18] The court does not mean to imply that "production" may require intentional production
as compared to the byproduct nature of scrap.  Rather, the court's question is directed
to the situation where a supplier may have instead [[              ]] inputs given
Commerce's finding that Plantec was engaged in [[                        ]].  *See* Remand
Results at 68.

weight to the factors.  Because it is not the court's role to assign weight or reweigh the evidence, remand is necessary for Commerce to explain why this factor is not dispositive of the inquiry.  *See Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015); *Usinor v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004) (the court "may not reweigh the evidence or substitute its own judgment for that of the agency").

Remand is also necessary because additional agency findings lack reasoned explanation.  Thus, to the extent that Commerce, on remand, finds consideration of these additional factors necessary, the agency must address the following issues.

First, Commerce appeared to equivocate on whether the converter vessel was used in steelmaking.  The agency acknowledged record evidence demonstrating that the converter vessel "*could* be used in the production of the downstream steel product," Remand Results at 32 & n.89 (citing POSCO's Resp. to Nucor's New Subsidy Allegations (Nov. 21, 2019) ("POSCO's Resp. to Allegation") at 10, CR 185, PR 88, CRJA Tab 6) (emphasis added), but did not address additional evidence indicating that the converter vessel was in fact used in POSCO's production process, *see* POSCO's Initial Questionnaire Resp., Ex. 12.[19]  Moreover, notwithstanding this evidence, Commerce continued to give some weight to POSCO's assertion that the converter vessel "is not actual machinery or equipment used to produce the downstream product" without explaining how much weight or why it did so.  Remand Results at 69.

---

[19] This exhibit contains a CTL plate production chart in which the first step begins with a "Converter" that appears to be a vessel containing molten steel.

Next, Commerce relied on Plantec's provision of the converter vessel along with other fixed assets that Commerce found to be too "generic" to be primarily dedicated to the production of the downstream product. *Id.* at 33, 69.  The court sustained Commerce's determination with respect to the other fixed assets because "such equipment could not 'be tied specifically to the production of any steel products' and was instead of a type 'used in a typical manufacturing process.'"  *Nucor I*, 600 F. Supp. 3d at 1240 (citation omitted).  That was not the case with respect to the converter vessel, however.  Insofar as Commerce found that production of the input was not essential to attribution, Commerce did not explain the significance of Plantec's provision of the converter vessel with the other more "generic" fixed assets sufficient for the court to discern why that fact matters.[20]

Finally, Commerce relied on the absence of "evidence demonstrating that POSCO's steel production is or could be the primary user of [the converter vessel]," or that Plantec supplied the converter vessel "exclusively for POSCO," to disfavor attribution.  Remand Results at 33.  As with scrap, however, Commerce's consideration

---

[20] Commerce explained that the converter vessel "was provided as part of [Plantec's] business functions related to [[

                                                                                        ]]."  Remand Results at 70.  Commerce did not contrast the supply of inputs as part of a business but not manufacturing function, and instead went on to state that an examination of the converter vessel "separate from the other equipment and services [Plantec] provided" would not account for "relevant facts" in the record.  *Id.* at 70–71.  Commerce did not, however, explain why the supply of multiple inputs is "relevant" to whether any particular input is "primarily dedicated."

of these factors—and corresponding inference favorable to POSCO—rests on speculation.[21]

In sum, Commerce must reconsider or further explain its reasons for considering factors other than "whether the supplier produced the input" and, if necessary, reconsider or further explain its decision on several other factors consistent with the foregoing.

### CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's Remand Results are remanded; it is further

**ORDERED** that, on remand, Commerce shall reconsider or further explain its determination not to investigate the alleged off-peak sale of electricity for less than adequate remuneration; it is further

**ORDERED** that, on remand, Commerce shall reconsider or further explain its determination not to treat Plantec as a cross-owned input supplier in connection with the supply of scrap and the converter vessel; it is further

**ORDERED** that Commerce shall file its remand redetermination on or before November 20, 2023; it is further

---

[21] As with scrap, Commerce found that Plantec's primary business activities did not support attribution based on the converter vessel.  *See* Remand Results at 70.  Nucor's only argument on this point is its disagreement with Commerce's distinction between the underlying facts and those of *Cold-Rolled Steel From Brazil*.  Pl.'s Opp'n Cmts. at 26.   Nucor instead seeks to analogize the proceedings based on Plantec's indirect provision of scrap.  *See id.*  Commerce, however, relied on the full range of Plantec's business functions and its decision in this regard is supported by substantial evidence.  *See* Remand Results at 70 & n.220 (citing POSCO's Resp. to Allegation at 10–11).

Court No. 21-00182                                                          Page 36

    **ORDERED** that subsequent proceedings shall be governed by USCIT Rule

56.2(h); if, however, Commerce determines to investigate whether off-peak electricity is

provided for less than adequate remuneration, the Parties may instead file a joint status

report addressing the timing of any necessary further administrative proceedings; and it

is further

    **ORDERED** that any comments or responsive comments must not exceed 4,000

words.


                         /s/     Mark A. Barnett
                         Mark A. Barnett, Chief Judge

Dated: August 21, 2023
       New York, New York