C-580-888
Remand
Slip Op 23-119
POR:  01/01/2018 – 12/31/2018
**Public Document**
E&C/OVIII:  CWM

*Nucor Corporation v. United States*,
**653 F. Supp. 3d 1295 (CIT 2023)**
*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO SECOND COURT REMAND**

## I.   SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of
redetermination pursuant to the second remand opinion and order of the U.S. Court of
International Trade (the Court) in *Nucor Corporation v. United States*, 653 F. Supp. 3d 1295
(CIT 2023) (*Second Remand Order*).  These final results of redetermination concern the final
results of the 2018 administrative review of the countervailing duty (CVD) order on certain
carbon and alloy steel cut-to-length plate from the Republic of Korea (Korea),[1] as amended by
Commerce's *First Remand Results*.[2]  In the *First Remand Results*,[3] Commerce provided further
explanation for:  (1) its decision not to initiate an investigation into the alleged provision of off-
peak electricity for less than adequate remuneration (LTAR); and (2) its decision not to treat
POSCO Plantec (Plantec) as a cross-owned input supplier of mandatory respondent POSCO.  On
August 21, 2023, the Court again remanded these issues for Commerce to reconsider or further

---

[1] *See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018*, 86 FR 15184 (March 22, 2021) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[2] *See Final Results of Redetermination Pursuant to Court Remand, Nucor Corporation v. United States*, Consol. Court No. 21-00182, Slip Op. 22-116 (CIT 2022), dated January 31, 2023 (*First Remand Results*); *see also Nucor Corporation v. United States*, 600 F. Supp. 3d 1225 (CIT 2022) (*First Remand Order*).
[3] The *First Remand Order* and *First Remand Results* present background information, familiarity with which is presumed.

explain.[4]  On November 21, 2023, we released our Draft Remand to interested parties.[5]  On November 29, 2023, we received comments from Nucor Corporation (Nucor) and POSCO.[6]

As set forth in detail below, consistent with the Court's *Second Remand Order* and after considering comments from interested partes, we continue to find that:  (1) the new subsidy allegation regarding off-peak electricity for LTAR did not satisfy the initiation threshold given Commerce's numerous investigations into the electricity system in Korea; and (2) Plantec does not meet the requirements for a cross-owned entity under 19 CFR 351.525(b)(6)(vi), and thus, does not qualify as a cross-owned input supplier as set forth in 19 CFR 351.525(b)(6)(iv).  Consequently, we have made no changes to the subsidy rates calculated for POSCO and the non-selected companies in the *Final Results*.[7]

## II.    ANALYSIS

### 1.   Off-peak Electricity for LTAR Allegation

Background

In the underlying administrative review, Commerce declined to initiate an investigation into Nucor's new subsidy allegation that the Government of Korea (GOK) provided off-peak electricity for LTAR during the period of review (POR), January 1, 2018, through December 31, 2018, because Nucor failed to adequately support the existence of a benefit.[8]  Commerce made no change to its decision for purposes of the *Final Results*.[9]

---

[4] *See Second Remand Order*, 653 F. Supp. 3d at 1313.
[5] *See* Draft Results of Remand Redetermination, *Nucor Corporation v. United States*, 653 F. Supp. 3d 1295 (CIT 2023), dated November 21, 2023 (Draft Remand).
[6] *See* Nucor's Letter, "Comments on Draft," dated November 29, 2023 (Nucor Draft Remand Comments); and POSCO's Letter, "Comments on Draft," dated November 29, 2023 (POSCO Draft Remand Comments).
[7] *See Final Results*, 86 FR at 15185.
[8] *See* Memorandum, "Decision Memorandum on New Subsidy Allegations," dated April 1, 2020 (NSA Memorandum), at 7-9; *see also* Nucor's Letter, "Request for Reconsideration of New Subsidy Allegation," dated April 9, 2020 (Request for Reconsideration); *First Remand Results* at 2-6.
[9] *See Final Results* IDM at Comment 1; *see also First Remand Results* at 6.

In its *First Remand Order*, the Court held that "{g}iven the substantial amount of information Nucor provided and the typically low bar for launching a CVD inquiry, Commerce's determination {was} unsupported by substantial evidence and lacking reasoned explanation."[10] As the Court explained, Nucor's allegation raised two questions:  (1) whether the pricing of off-peak electricity could constitute a subsidy program distinct from Nucor's prior allegation regarding the sale of electricity for LTAR; and (2) whether Nucor's allegation satisfied the threshold for initiating an investigation into any such program.[11]  The Court elaborated that Commerce's decision focused on the latter – "Nucor's asserted failure to provide a suitable benchmark to compare to the off-peak electricity prices POSCO paid," and "did not explicitly address whether the off-peak supply of electricity within {Korea's time-of-use (TOU)} system may constitute a distinct subsidy program."[12]  Consequently, "{t}he Court remanded Commerce's determination, explaining that although 'Commerce appeared to question the propriety of examining a segment of a time-of-use system, its discussion in this regard {was} cursory.'"[13]

In the *First Remand Results*, Commerce provided further explanation for the rationale underlying the agency's decision not to initiate an investigation into Nucor's off-peak electricity for LTAR allegation.[14]  In that regard, Commerce relied on the Court's prior holdings in *RZBC Group*, clarifying that "petitioners must allege a subsidy as defined by statute.  They also have to pad their allegations with any 'information reasonably available' to them at the time of filing.  If a petition meets these requirements, Commerce must proceed," but also stating that subsidy

---

[10] *See First Remand Order*, 600 F. Supp. 3d at 1234 (internal citations omitted).
[11] *Id.* at 1233.
[12] *Id.*
[13] *See Second Remand Order*, 653 F. Supp. 3d at 1300 (citing *First Remand Order*, 600 F. Supp. 3d at 1233).
[14] *See First Remand Results* at 11-21.

investigations must be initiated "unless the allegations 'are clearly frivolous, not reasonably supported by the facts alleged or … omit important facts which are reasonably available to the petitioner.'"[15]  Commerce also clarified that it analyzed Nucor's off-peak electricity for LTAR allegation as a subsidy program distinct from its prior examinations of the more general electricity for LTAR program.[16]  As Commerce elaborated, however, despite focusing on a distinct "subset" of the more general program, the newly alleged program could not be divorced from "the precise contours of the Korean electricity market … known to all parties, including Nucor."[17]  Ultimately, given the allegation was made in a proceeding where it would be reasonable to expect the petitioner to have an understanding of the relevant country's electricity market and cost system, Commerce determined that the information referenced in support of the benefit allegation was insufficient to satisfy the initiation standard.[18]

In its *Second Remand Order*, the Court held that there was inconsistency between the initiation standard articulated in the *First Remand Results* and the standard applied by Commerce therein.[19]  Specifically, the Court explained that Commerce's reliance on the low initiation standard described in *RZBC Group* was in contrast to a "heightened standard," described in *Delverde*, in which the Court held  "'{w}hen allegations concern a program previously held noncountervailable,' Commerce may 'require{} a petition to contain evidence of changed circumstances … before an investigation is initiated.'"[20]  As the Court explained:

> {t}here need not be a strictly binary choice between the *RZBC Group* standard and the heightened standard of *Delverde*; however, the agency must be consistent with respect to the standard it articulates and that which it applies.  Here, when Nucor

---

[15] *Id.* at 12 (citing *RZBC Group Shareholding Co., Ltd, et al. v. United States*, 100 F. Supp. 3d 1288, 1295 (CIT August 5, 2015) (*RZBC Group*)).
[16] *See First Remand Results* at 12.
[17] *Id.* at 12-13.
[18] *Id.*
[19] *See Second Remand Order*, 653 F. Supp. 3d at 1302.
[20] *Id.* (citing *Delverde, SrL v. United States*, 989 F. Supp. 218, 222 (CIT 1997) (*Delverde*), vacated on other grounds by *Delvede, SrL v. United States*, 202 F. 3d 1360 (Fed. Cir. 2000)).

has previously alleged a countervailable subsidy through the provision of electricity to POSCO, without success, Commerce may reasonably require Nucor to take account of the agency's prior findings when Nucor seeks to have the agency again examine the provision of electricity for less than adequate remuneration, albeit limited to a particular time of day.  Whether Commerce applies the *RZBC Group* standard, the *Delverde* standard, or some hybrid standard, that decision is for Commerce to articulate in the first instance; however, the agency must be consistent in its statement of the applicable standard and its application of that standard.[21]

Consequently, the Court remanded for Commerce to reconsider or further explain, "{i}n the absence of a clearly articulated standard and an application of that standard to the entirety of the allegation made by Nucor."[22]

<u>Analysis</u>

As an initial matter, we agree that, in most cases, there is a low threshold for initiation. The Court in *RZBC Group* describes the standard as "easygoing," and elaborates that Commerce must begin investigating an allegation "even if the precise contours of the subsidy {are} still unknown."[23]  As the *RZBC Group* Court acknowledges, however, Commerce maintains *certain requirements* for an allegation beyond merely describing a subsidy practice as countervailable; in particular, a subsidy allegation should not "omit important facts which are reasonably available to the petitioner."[24]  Indeed, as the *Delverde* court elaborates, Commerce can require more of an allegation *and* seek to limit reinvestigations of certain facts; for example "{w}hen allegations concern a program previously held non-countervailable," and that "{t}he statute and legislative history are silent as to the initiation standard with regard to programs that previously have been found non-countervailable."[25]  In the proceeding underlying *Delverde*, "Commerce analyzed the

---

[21] *Id.* at 1302-03.
[22] *Id*. at 1304.
[23] *See RZBC Group*, 100 F. Supp. 3d at 1295; *see also Torrington Co. v. United States*, 772 F. Supp. 1284, 1288 (CIT 1991) ("Congress intended that Commerce decline to initiate investigations only where they are 'clearly frivolous' or where the petitioner has not provided information reasonably available to it" (internal citations omitted)).
[24] *Id.* (citing H.R. Rep. No. 96-317 (1979), at 51).
[25] *See Delverde*, 989 F. Supp. at 222.

evidence presented in the petition and decided not to investigate because plaintiffs had not provided a sufficient basis to believe that the programs had changed."[26]  In upholding Commerce's decision, the *Delverde* court explained that "Commerce's general requirement that petitions requesting the initiation of an investigation of programs previously found non-countervailable contain evidence of changed circumstances or disproportionality, {was} in accordance with law and past practice."[27]

Despite *minor* distinctions,[28] the facts, here, are analogous to those underlying *Delverde*. First, POSCO's off-peak electricity usage is a subset of the company's overall electricity usage and, accordingly, Nucor's allegation of off-peak electricity for LTAR is a distinct subset of a program Commerce has examined in earlier segments of this order and numerous other Korean CVD cases.  Indeed, much like the proceeding underlying *Delverde*, here, Commerce reasonably considered its prior decisions and understanding of the Korean electricity sector in examining Nucor's allegation.  As Commerce explained in the *First Remand Results*:

> {t}he facts with respect to the Korean electricity system, as a whole, were reasonably available to the petitioner.  Commerce had previously initiated investigations into the Korean electricity system based on such information, collected additional information on the record, and conducted the relevant analyses, not only in this proceeding, but also in numerous other Korean {CVD} proceedings to which Nucor is an interested party.  Moreover, the precise contours of the Korean electricity market are very well known to all parties, including Nucor, due to Commerce's previous investigations of the Korean electricity market through the electricity for LTAR program and other related electricity and energy subsidy programs.[29]

---

[26] *Id*.

[27] *Id*.

[28] Unlike in *Delverde*, here:  (1) the alleged program (*i.e.*, off-peak electricity for LTAR) is not the exact same program that was previously found non-countervailable (*i.e.*, electricity for LTAR (regardless of TOU)); and (2) Commerce's decision not to initiate in this case was based on an evaluation of information regarding benefit rather than specificity.

[29] *See First Remand Results* at 13.

In short, given Commerce's prior examination of Korea's electricity market in numerous proceedings, Nucor's off-peak electricity allegation failed to provide a sufficient basis to reexamine Commerce's findings that Korea's electricity market was consistent with market principles, including a fair rate of return, which have been upheld at the U.S. Court of Appeals for the Federal Circuit (Federal Circuit).[30]  In its *Second Remand Order*, the Court agrees that Commerce was reasonable in finding "Nucor overlooked relevant information about the Korean electricity pricing system."[31]  However, the Court does reference information submitted by Nucor "that appears to indicate that {the Korea Electricity Power Company's (KEPCO)} weighted-average off-peak prices paid by POSCO" differed from "KEPCO's cost of acquiring electricity from its lowest cost generator," in explaining that "Commerce did not respond to this particular aspect of the allegation or explain why it constituted insufficient evidence of a benefit."[32]  Nucor's comparison, however, was not on an apples-to-apples basis, a fact evident from information available to Nucor at the time of its allegation and Commerce's established methodologies for determining benefit in the Korean electricity system.[33]

As Commerce explained in the *First Remand Results*, Commerce had a reasonable expectation that Nucor would have the ability to make a benefit allegation which demonstrates inconsistency with market principles based accurately on the well-known parameters of the

---

[30] *See Nucor Corp. v. United States*, 827 F.3d 1243 (Fed. Cir. 2019) (*Nucor*); *see also POSCO v. United States*, Court No. 22-1525 (Fed. Cir. October 23, 2023) (*POSCO*).
[31] *See Second Remand Order*, 653 F. Supp. 3d at 1303-04.
[32] *Id*. at 1304.
[33] Specifically, the average price paid to Korea Hydro and Nuclear Power Company Ltd. that Nucor used in this comparison is not off-peak specific, but instead represents a power trading price across all hours, and the POSCO off-peak price Nucor used only represents the variable component of what POSCO paid, failing to take into account all items, fixed and variable, that Commerce accounts for when establishing benchmarks.  *See* POSCO's Letter, "POSCO's Second Supplemental Questionnaire Response," dated February 27, 2020, at Exhibit C-35; *see also* Nucor's Letter, "New Subsidy Allegation Supplemental Questionnaire Response," dated December 31, 2019 (Nucor NSA SQR), at Exhibit 1 (page 38).

Korean electricity system.[34]  Nucor acknowledged this existing analysis in its allegation, stating that it believed its off-peak electricity for LTAR allegation provided Commerce "with a sufficient basis to reconsider its previous determinations regarding the Korean government's provision of electricity for LTAR in light of the Federal Circuit's recent opinion in *Nucor*."[35]

Nucor based its off-peak electricity for LTAR allegation on a Federal Circuit ruling that affirmed Commerce's finding that the Korean electricity system was consistent with market principles, using the Federal Circuit's statement that in an LTAR analysis, the adequate remuneration standard must be tied to fair value, rather than merely finding that a government was not charging the producer a preferential rate.[36]  At the time of the allegation, the courts had reviewed Commerce's previous examinations of the electricity market in Korea and affirmed Commerce's determination that Korea's electricity market was consistent with market principles, including a fair rate of return.  The analysis included substantial information on how the Korean electricity system is organized among generators, the Korea Power Exchange (KPX), which is the system operator, and the supplier, KEPCO, as well as how the KPX and KEPCO set their prices and tariffs, and KEPCO's pricing methodology and cost recovery data.  Furthermore, Nucor was aware of Commerce's determinations regarding electricity for LTAR in the investigation segment of this proceeding, because Nucor not only requested that Commerce investigate an allegation of off-peak electricity for LTAR "notwithstanding {Commerce's findings} from the original investigation," but also attached documents from the investigation record as exhibits in its allegation.[37]  Furthermore, information regarding the Korean electricity

---

[34] *See First Remand Results* at 13.
[35] *Id.* at 13-14 (citing Nucor's Letter, "New Subsidy Allegations," dated November 4, 2019 (New Subsidy Allegations), at 8).
[36] *See* New Subsidy Allegations at 8 (citing *Nucor*, 827 F.3d at 1254 (Fed. Cir. 2019)).
[37] *See First Remand Results* at 15 (citing New Subsidy Allegations at 7 and Exhibits 3, 5, and 6).

system was available on the record of this specific segment because Commerce was already conducting analysis on multiple other energy programs, including electricity for more than adequate remuneration.[38]

Thus, evidence on the record demonstrates that interested parties that have participated in other proceedings involving the Korean electricity system, including Nucor, should be aware of the characteristics of the electricity market in Korea, including but not limited to its operations, price setting method, cost system, availability to consumers, the relationship between KEPCO and the KPX, and how the KPX sets pricing for generators within Korea.  Nucor's benefit claims, as alleged, pertained to the prices KEPCO paid to the generators through the KPX's pricing and KEPCO's electricity tariff schedule, both of which Commerce had previously investigated and made determinations.

When an alleged program is a subset of a previously investigated program, there is more information reasonably available to the petitioner and the legal standard for initiation requires that the petitioner address or account for that additional information; in this case, Commerce must consider all information reasonably available to the petitioner, as described in *Delverde*.[39] This is particularly relevant when the allegation implicates a market principles analysis under 19 CFR 351.511(a)(2)(iii), because a market principles analysis frequently requires an assessment of an entire "market" (*e.g.*, the Korean electricity market), which is significantly broader than the specific transactions that may be at issue in the allegation (*e.g.*, off-peak electricity purchases).

---

[38] *Id.* at 15 (citing, *e.g.*, GOK's Letter, "Response to the Initial Questionnaire," dated October 7, 2019, at Exhibits E-3 to E-5).
[39] In our view, the initiation standard applied in *RZBC* and *Delverde* are one and the same – the allegation, and initiation decision, must be based on information reasonably available to the petitioner.  Moreover, as the Court recognized in both instances, the initiation standard, while "low," by law, must be based on information reasonably available to a petitioner supporting the allegation.  We do not necessarily consider *Delverde* to be a "heightened" standard of initiation; in that case there was simply more information reasonably available to the petitioner regarding the allegation, and, as required by the statute and regulations, had to be considered in the allegation and analysis of the allegation.

As section 771(5)(E) of the Tariff Act of 1930, as amended (the Act), requires "the adequacy of remuneration shall be determined in relation to the prevailing market conditions … in the country which is subject to investigation or review."  Here, Nucor overlooked relevant information that we determine was reasonably available concerning the Korean electricity pricing system with regard to its allegation.[40]  Consequently, Nucor failed to satisfy the requirement under the "reasonably available" test.

Regarding Nucor's allegation of benefit for the provision of off-peak electricity for LTAR, Nucor alleged that the provision of off-peak electricity was inconsistent with market principles based on two overlaying themes:  (1) KEPCO's off-peak tariffs did not recover costs through an examination of publicly available information and POSCO's reported business proprietary data in the investigation; and (2) KEPCO recovers costs to the extent that it charges tariff rates above costs during on-peak hours that cross-subsidize large industrial companies (like respondent POSCO) who move production to off-peak hours.  Regarding the latter allegation, section 771(5)(C) of the Act and 19 CFR 351.503(c) are clear that Commerce is not required to consider altered firm behavior as a result of alleged subsidies, *i.e.*, to "consider the effect of the subsidy in determining whether a subsidy exists."  The hours at which POSCO, or any entity utilizing industrial electricity, chose to purchase electricity based on the existing tariff schedule are therefore immaterial unless the tariff schedule itself is found to be inconsistent with market principles.  Moreover, Commerce would rightly expect such an underlying allegation about cross-subsidization to be supported by substantial evidence and be based on facts that demonstrate why the electricity system is inconsistent with market principles or discriminatory in

---

[40] The Court has explained that prior determinations by Commerce constitute information that is reasonably available to a petitioner and can be considered by the agency for purposes of an initiation decision.  *See Delverde*, 989 F. Supp. at 222.

its pricing.  Commerce had previously determined through its examination of the Korean electricity market (including the organization, price setting methodology, and cost recovery of KEPCO) that the system was consistent with market principles and this determination has not been modified since the previous determinations.[41]  Further, this determination was upheld by the Federal Circuit in *Nucor*; and Commerce's analysis of whether the electricity system in Korea is consistent with market principles was also recently upheld by the Federal Circuit in *POSCO*.

Thus, within the context of the Korean electricity market, Nucor had the legal obligation to address this "reasonably available information" in its allegation.  When Commerce made the statement that "Nucor has not provided sufficient information demonstrating that KEPCO's operations are outside of the prevailing market conditions of an electricity utility in Korea," Commerce was stating that Nucor failed to provide sufficient information about the price setting methodology, terms of sale, *etc*. for off-peak electricity being reviewed in a tier three analysis.[42] Such information was needed to either call into question Commerce's previous determination that the Korean electricity system was consistent with market principles or demonstrate that the provision of electricity at specific, off-peak hours was inconsistent with market principles, including Commerce's previous findings of KEPCO's cost recovery.

Regarding the first theme of the benefit allegation that pertained to KEPCO's off-peak tariffs not recovering costs, Nucor made an allegation of benefit based on two comparisons to POSCO's weighted-average off-peak electricity price during the POR:  (1) the average system

---

[41] *See Nucor*, 827 F.3d at 1243.

[42] *See, e.g.*, *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 81 FR 35310 (June 2, 2016), and accompanying IDM at Comments 1-3, *aff'd Nucor*, 927 F.3d at 1243, 1248 ("Commerce defends its decision in this case as consistent with the statute and regulation because Commerce found not only that KEPCO's pricing was non-discriminatory but also that the pricing ensured cost recovery. We reject the first position, but we conclude that Nucor has not shown error in the second.").

marginal price (SMP) at off-peak hours; and (2) KPX data showing that the annual average cost

of sale for industrial electricity was 106 Korean won per kilowatt hour in 2018.[43]  Nucor's

primary allegation focused on the SMP as evidence that KEPCO had provided electricity at

below cost during off-peak hours.

Information on how the KPX developed the SMP price and how an adjusted coefficient

was applied to certain generators' prices prior to the purchase by KEPCO is on the record of

numerous reviews[44] and was present on the record of the underlying proceeding at issue in this

case within the SEC Form 20-F filing for the POR that Nucor itself placed on the record.  The

SEC Form 20-F also contains financial disclosures and electricity power trading statistics from

KEPCO and its subsidiary generators, and purchase information from unaffiliated suppliers.[45]

Nucor cannot claim that it was unaware of such information.  Commerce gave Nucor the

opportunity to remedy the deficiencies in the allegation through its supplemental questionnaire,

specifically asking Nucor to discuss "factors that determine the price for electricity other than the

{SMP}"; however, Nucor continued to claim that the SMP was a "reasonably available and

conservative proxy for what the price of electricity should be at any specific time of day."[46]

Commerce found, based on evidence provided by Nucor, that Nucor's claim that the SMP was a

"conservative estimate" was a direct contradiction to other evidence on the record and

inconsistent with both Commerce's and KEPCO's published statements on Korean electricity

pricing and costs.[47]  We focused on the SMP in our analysis of Nucor's allegation because the

use of the SMP, without regard to other factors in KEPCO's Form 20-F filing, was the point at

---

[43] *See* New Subsidy Allegations at 14-15.
[44] *See Nucor*, 827 F.3d at 1243.
[45] *See* Nucor NSA SQR at Exhibit 1 (pages 38-40 and 44-47).
[46] *Id.* at 4-5.
[47] *Id.*

which the benefit allegation was not sufficient as it did not address reasonably available information on the record concerning why the SMP prices were not a good proxy to demonstrate a benefit was conferred.

Likewise, we addressed the fact that Nucor's benefit allegation cited to the annual average cost of sale for industrial electricity in the same manner, by noting that the annual average cost, without factoring in some measure to account for the subsidy limitation to off-peak hours, was insufficient evidence of a benefit. Commerce's statement that the annual average cost of sale for industrial electricity provided by Nucor as a suitable benchmark could be appropriate for the purposes of initiating an overall allegation of electricity for LTAR, but was not appropriate for a specific period of time within a TOU system, was a direct response to Nucor's benefit allegation.[48] This statement was not prescriptive, but merely meant to emphasize the fact that in the off-peak electricity allegation, Nucor needed to provide an adjustment or justification for the fact that its allegation compared certain hours (*i.e.*, off-peak hours) and certain electricity types (*i.e.*, industrial electricity), to an average price across all hours.

Because the crux of Nucor's argument centered around both the quantity and price of electricity provided at off-peak hours, we found those factors to be crucial to the allegation of benefit.[49] Such an allegation could only be compared to the full value of the fixed and variable prices, as in Commerce's electricity for LTAR calculations, rather than merely the variable

---

[48] *See* New Subsidy Allegations at 15.
[49] *See* NSA Memorandum at 4 ("Specifically, Nucor alleges, through control of KEPCO's tariff schedule, the GOK provides off-peak consumers electricity at prices substantially below cost and recoups losses by charging prices above cost for consumers primarily using electricity in the daytime. Nucor claims that recent data demonstrate that KEPCO's off-peak electricity prices are below the cost of production and supply, and do not accurately emulate supply and demand fluctuations."); *see also Final Results* IDM at Comment 1 ("We addressed the market principles Nucor included in its allegation, namely KEPCO's cost recovery, but also addressed industry preferentiality, *i.e.*, whether the GOK's provision of off-peak electricity for LTAR was consistent with market principles. The CIT decision upheld by *Nucor* elucidates that there is a place within this analysis for an examination of the tariff schedule and whether a government treats certain entities in a preferential manner …").

electricity rates in the GOK's tariff schedule.  Thus, although Nucor argued that there was

sufficient evidence on the record to "indicate that KEPCO's weighted-average off-peak prices

paid by POSCO" differed from "KEPCO's cost of acquiring electricity from its lowest cost

generator,"[50] as explained above, Nucor's comparison of the average full cost of sale to the

variable price does not constitute an apples-to-apples comparison.

 When Commerce noted that the average price of electricity at all hours could be an

appropriate benchmark for all hours, but was not for certain hours, it was merely noting that

Nucor was missing a step in its analysis that would allow a comparison to be made on an

equivalent basis for a reasonable estimation of KEPCO's cost recovery at those hours.[51]

Namely, Commerce found that a successful benefit allegation of off-peak electricity for LTAR

required a reasonable proxy for determining what the prices KEPCO paid might be at the

specific point of off-peak hours, and not just an overall average price for electricity.  This did not

require that Nucor provide hour-by-hour electricity costs but instead required an additional step

or reasonable explanation to demonstrate how the average price of electricity reflected the price

of electricity at off-peak hours, considering potential differences in the generators in terms of

operation, usage, *etc*. at different hours.

 In essence, initiating on Nucor's NSA regarding off-peak electricity would require

Commerce to ignore its previous understanding and findings regarding the Korean electricity

market, data on the record that contradicted Nucor's claims regarding the alleged benefit, and

information previously known and placed on the record regarding the Korean electricity system's

pricing and cost recovery.  Instead, Nucor would have Commerce initiate an LTAR investigation

---

[50] *See* Request for Reconsideration at 7-8.
[51] *See Final Results* IDM at Comment 1 ("{T}his benchmark cannot make an equivalent comparison to the tariff schedules' off-peak prices POSCO paid because it does not account for the demonstrated differences between TOU tariff rates during peak, mid-peak, and off-peak usage.").

on the basis of newspaper articles that claimed similar amounts of electricity usage at off-peak

and other hours of the day and speculation that the cost of provision of electricity would be

similar at off-peak and on-peak hours for KEPCO given the claims of usage.  The allegation was

made in the context of a proceeding in which Commerce could reasonably expect Nucor to have

an understanding of how the Korean electricity market and cost system functioned.  We,

therefore, determined that the information referenced in support of the allegation of benefit did

not sufficiently account for known information on the record and, thus, provided no viable

comparison to KEPCO's tariff schedule pricing of off-peak electricity.  Accordingly, it was not

sufficient to meet the standard for initiation.  Thus, we continue to find that Nucor failed to

provide a sufficient allegation of benefit for Commerce to initiate on the provision of off-peak

electricity for LTAR new subsidy allegation.

## 2.  Treatment of Plantec as a Cross-Owned Input Supplier

<u>Background</u>

In the underlying administrative review, Commerce determined that POSCO's affiliate

Plantec was not a cross-owned input supplier because various inputs were not "primarily

dedicated" to the production of the downstream product within the meaning of 19 CFR

351.525(b)(6)(iv).[52]  In its *First Remand Order*, the Court upheld Commerce's finding regarding

most of the inputs in question, but ordered Commerce to reconsider or further explain its

decisions regarding Plantec's provision of steel scrap and a "converter vessel" to POSCO.[53]  On

---

[52] *See Final Results* IDM at Comment 2.

[53] *See First Remand Order* at 27-30.  Note, in POSCO's Letter, "POSCO's Remand Order Supplemental Questionnaire Response," dated October 16, 2023 (First Remand SQR), at 4-5, POSCO clarified that the equipment in question is most accurately referred to as a "converter vessel shell."  For purposes of consistency of terminology with the *Second Remand Order* and brevity, we continue to refer to this equipment as a converter vessel in these final remand results.  Additionally, in POSCO's Letter, "POSCO's Remand Order Second Supplemental Questionnaire Response," dated November 6, 2023 (Second Remand SQR), at 2, POSCO agreed that "references to the manufacture, production, supply, and delivery of converters, converter steel skin, and trunnion ring to POSCO's facilities in Pohang and Gwangyang can be made public."

remand, Commerce, again, determined that the record contained insufficient evidence that either input was primarily dedicated to the downstream product in this case.[54]

Steel Scrap

In its *Second Remand Order*, the Court highlighted several flaws in Commerce's conclusion regarding steel scrap.  First, the Court referenced Commerce's treatment of Pohang Scrap Recycling Distribution Center Co., Ltd. (Pohang SRDC), which also provided scrap to POSCO, as a cross-owned input supplier, because Pohang SRDC processed the scrap in question.[55]  As the Court explained, Commerce "failed to support its finding that the unprocessed scrap at issue {was} more 'generic' than processed scrap," and the agency "offered no evidence to support the assertion that Pohang SRDC's scrap 'was specifically repurposed for POSCO's steel production.'"[56]  The Court elaborated that both Pohang SRDC and Plantec, at minimum, provided scrap to POSCO through POSCO Daewoo Corporation (PDC)), calling into question Commerce's finding that Plantec's provision of scrap did not constitute part of "an overall production chain."[57]  Consequently, the Court held that "Commerce's differential treatment of Pohang SRDC and Plantec appears arbitrary."[58]

The Converter Vessel

In its *Second Remand Order*, the Court highlighted several flaws in Commerce's conclusion that the converter vessel Plantec supplied to POSCO was not primarily dedicated to the production of downstream product.  As an initial matter, the Court referenced the list of factors, "not in hierarchical order," that Commerce considered in making its decision:  whether

---

[54] *See First Remand Results* at 27-31 (scrap) and 32-33 (converter vessel).
[55] *See Second Remand Order*, 653 F. Supp. 3d at 1306-07 and 1309-10.
[56] *Id.* at 1309.
[57] *Id*.
[58] *Id.* at 1310 (citing *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (stating that it is "well-established that an agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently")).

Plantec produced the equipment; whether the equipment could be used in production of the downstream product; whether the equipment is a link in the overall production chain; whether POSCO was the primary user of the equipment; and Plantec's business activities.[59]  The Court further explained that Commerce also emphasized portions of the relevant regulation and *CVD Preamble* that reference subsidies "to the input producer."[60]  Consequently, the Court remanded for Commerce to reconsider or further explain whether its "attribution regulation requires the supplier to produce the input, such that when the supplier is not the producer, consideration of other factors is unnecessary."[61]

Additionally, the Court explained that, Commerce, in its *First Remand Results,* "appeared to equivocate on whether the equipment was used in steelmaking," although still acknowledging that the converter vessel "could be used in the production of the downstream steel product."[62]  In so doing, the Court elaborated that Commerce "did not address additional evidence indicating that the equipment was in fact used in POSCO's production process," citing an exhibit in POSCO's initial questionnaire showing "a CTL plate production chart in which the first step begins with a 'Converter' that appears to be a vessel containing molten steel."[63]

Finally, the Court disagreed with Commerce's decision to group the converter vessel along with other Plantec-provided fixed assets.  Despite acknowledging prior agreement with the agency that the other fixed assets were reasonably sufficiently generic such that they were not primarily dedicated to the production of downstream product, the Court explained "{t}hat was not the case with respect to the {converter vessel}," and that "Commerce did not … explain why

---

[59] *Id.* at 1311.
[60] *Id.* at 1312 (citing *Countervailing Duties; Final Rule*, 63 FR 65348, 65401 (November 25, 1998) (*CVD Preamble*)).
[61] *Id.* at 1311.
[62] *Id.* at 1312.
[63] *Id.* at 1313 and n.20.

the supply of multiple inputs {was} 'relevant' to whether any particular input is 'primarily dedicated.'"[64]

Analysis

Commerce's regulations at 19 CFR 351.525(b)(6) set forth the attribution rules for corporations with cross-ownership, including 19 CFR 351.525(b)(6)(iv) which applies "{i}f there is cross-ownership between an input supplier and a downstream producer."  Regarding cross-ownership, 19 CFR 351.525(b)(6)(vi) states that:

> {c}ross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets.  Normally, this standard will be met where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations.

Thus, to attribute subsidies received by an input supplier to a downstream producer, the input(s) in question must satisfy *both* the primarily dedicated standard of 19 CFR 351.525(b)(6)(iv) and the cross-ownership standard of 19 CFR 351.525(b)(6)(vi).  In the *Final Results* and *First Remand Results*, it was administratively efficient for Commerce not to address its cross-ownership standard because, at that time, it found that none of the inputs and/or equipment in question satisfied Commerce's primarily dedicated standard.[65]  However, we note that in most cases, where Commerce has determined that a respondent is not cross-owned with its input supplier, it conversely does not analyze whether or not the inputs satisfied Commerce's primarily dedicated standard.[66]

---

[64] *Id.* at 1313 and n.21.

[65] *See Final Results* IDM at Comment 2; and *First Remand Results* at 27-33.

[66] *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review, 2020*, 87 FR 66648 (November 4, 2022), and accompanying Preliminary Decision Memorandum (PDM) at 7-9 (wherein Commerce found that Hyundai Steel could not use or direct the assets of its input supplier, Green Air, as if they were its own; accordingly, Commerce did not address its primarily dedicated standard), unchanged in *Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2020*, 88 FR 29889 (May 9, 2023) (*Hot Rolled Steel from Korea*).

We note that the factual record of the underlying administrative review contained a relative dearth of information regarding the converter vessel, in particular.  Thus, given the Court's concerns regarding whether steel scrap and the converter vessel are primarily dedicated, in the course of the instant remand proceeding, Commerce issued two supplemental questionnaires largely focused on Plantec's provision of scrap and the converter vessel to POSCO.[67]  The information POSCO provided in response to our supplemental questionnaires, coupled with the Court's concerns in the *Second Remand Order*, have called into question our prior findings regarding whether scrap and the converter vessel are primarily dedicated to the production of the downstream product within the meaning of 19 CFR 351.525(b)(6)(iv).  In light of these concerns, Commerce has reexamined the record of this proceeding and, as detailed below, now finds POSCO and Plantec were not cross-owned during the POR of the underlying administrative review.  Accordingly, although Commerce has gathered additional information related to the inputs supplied by Plantec in an effort to comply with the Court's order to further explain its findings regarding whether the inputs in question are primarily dedicated, upon further examination of the record *as a whole*, we determine that, because of the additional facts gathered through our supplemental questionnaires, it is more appropriate to *first* analyze whether Plantec and POSCO are cross-owned.  Our analysis with respect to this issue renders our primarily dedicated analysis moot.

As noted above, pursuant to 19 CFR 351.525(b)(6)(vi), cross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of another corporation in essentially the same ways it can use its own assets.  As this section of Commerce's regulations indicates, the standard will normally be satisfied where there is a

---

[67] *See* First Remand SQR; and Second Remand SQR.

majority of voting ownership interest between two corporations or through common ownership

of two (or more) corporations.[68]  The *CVD Preamble* to Commerce's regulations further clarifies

Commerce's cross-ownership standard, describing it as when:

> the interests of two corporations have merged to such a degree that one corporation
> can use or direct the individual assets (or subsidy benefits) of the other corporation
> in essentially the same way it can use its own assets (or subsidy benefits) … .  Cross-
> ownership does not require one corporation to own 100 percent of the other
> corporation.  Normally, cross-ownership will exist where there is a majority voting
> ownership interest between two corporations or through common ownership of two
> (or more) corporations.  In certain circumstances, a large minority voting interest
> (for example, 40 percent) or a "golden share" may also result in cross-ownership.[69]

Thus, Commerce's regulations make clear that the agency must look at the facts presented in

each case in determining whether cross-ownership exists.  The Court has upheld Commerce's

authority to attribute subsidies based on whether a company could use or direct the subsidy

benefits of another company in essentially the same ways it could use its own subsidy benefits.[70]

In September 2015, Plantec entered into a debt workout program with its creditors "in

order to improve its financial standing and normalize operations."[71]  As part of this process, the

POSCO Plantec Creditor Financial Institutions Committee (PPCFIC) was created.[72]  The

PPCFIC established the Agreement for Compliance of Business Normalization Plan (the

Agreement) under which Plantec was governed during the POR.[73]  Under this Agreement, the

PPCFIC, rather than POSCO, has the right to, among other things, call shareholder meetings, call

board meetings, appoint or replace directors, approve applications for recovery and bankruptcy

procedures, dispose of property, approve new financing and investment, approve mergers and

---

[68] *See* 19 CFR 351.525(b)(6)(vi).

[69] *See CVD Preamble*, 63 FR at 65401.

[70] *See Fabrique de Fer de Charleroi v. United States*, 166 F. Supp. 2d 593, 600-04 (CIT 2001).

[71] *See* POSCO's Letter, "Response to the Affiliated Companies Section of the Initial Questionnaire," dated August 19, 2019 (POSCO AQR), at Exhibit 2 (POSCO 2018 Consolidated Financial Statement at note 1(e)(1)(*2)).

[72] *See* POSCO's Letter, "Response to Nucor's New Subsidy Allegations," dated November 21, 2019, at 2-4.

[73] *Id*. at Attachment 1.

acquisitions, and provide borrowing guarantees.[74]  Notably, despite POSCO retaining its majority ownership, the Korean International Financial Reporting Standards (K-IFRS) required POSCO to treat Plantec as a non-consolidated "associate" rather than as a consolidated entity in its financial statements.  This is confirmed by Note 1(e)(1)(*2) of POSCO's 2018 consolidated financial statements, which states that as a result of the agreement with the PPCFIC, POSCO "*lost its control* and classified its shares {in Plantec} as investment in associate."[75]  Furthermore, Note 32(1)(*1) of Plantec's 2018 financial statements state that,

> POSCO Co., Ltd., who owns 60.84% of equity of Company, *lost the controlling interests* on the company in accordance with the conclusion of workout agreement for the implementation of management normalization plan with Committee of Creditor Financial Institutions on Sept. 30, 2015, so it is classified as a company to exercise a significant influence.[76]

As Commerce has previously explained, cross-ownership assessments are to be performed on a case-by-case basis, and consistent with the facts on each record.  At times, Commerce has deviated from its *general* practice, finding cross-ownership exists between entities even where there is limited or no ownership between entities.  For example, in *Hot Rolled Steel from Korea*, when faced with an argument that respondent could not have cross-ownership of an affiliate without a majority stake, Commerce stated that the respondent in that case "points to no evidence or information that demonstrates that Commerce has an obligation to base its cross ownership determination solely on whether one entity owns a controlling stake in another entity."[77]  In that case, Commerce addressed the fact that the respondent did not maintain a controlling stake in its affiliate by explaining that 19 CFR 351.525(b)(6)(vi) "is tempered with the condition that majority ownership is 'normally' how the cross-ownership standard is met, but

---

[74] *Id*. at Attachment 1 (Articles 5, 6, 7, and 10).
[75] *See* POSCO AQR at Exhibit 2 (emphasis added).
[76] *See* First Remand SQR at Exhibit 2 (emphasis added).
[77] *See Hot Rolled Steel from Korea* IDM at Comment 5.

that it is not a requirement," concluding that "{i}n fact, a cross-ownership assessment is a case-by-case analysis based on the facts on each record.  In prior cases, Commerce has deviated from its normal standard, finding cross-ownership exists between entities even where there is limited or no ownership between entities."[78]  Furthermore, Commerce has also found that control can be established by agreement between various entities.  For example, in *Rebar from Turkey*, Commerce found that "Habas and OSIT are cross-owned within the meaning of 19 CFR 351.525(b)(6)(vi) because, *under the relevant agreement*, Habas has the capacity to use or direct OSIT's assets in the same way it would use its own assets.  As such, within the framework of the 19 CFR 351.525(b)(6), any subsidies received by OSIT are attributable to Habas."[79]

A determination of cross-ownership under Commerce's regulations is a binary analysis—if one party can control the assets of an input supplier as if they were its own, another party cannot.  If PPCFIC controls Plantec, then POSCO cannot.  As discussed above, the record before the Court establishes that PPCFIC, rather than POSCO, controlled Plantec during the POR of the underlying administrative review.  Consequently, POSCO and Plantec were *not* cross-owned during the POR in accordance with 19 CFR 351.525(b)(6)(vi) and any subsidies that Plantec may have received *cannot* be attributed to POSCO under 19 CFR 351.525(b)(6)(iv) regardless of whether these inputs were primarily dedicated to the production of the downstream product.

## III.    INTERESTED PARTY COMMENTS

We analyze and address the comments received in the Nucor Draft Remand Comments and the POSCO Draft Remand Comments, below.

---

[78] *Id.*

[79] *See Steel Concrete Reinforcing Bar from the Republic of Turkey:  Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination*, 82 FR 12195 (March 1, 2017), and accompanying PDM at 7 (emphasis added), unchanged in *Steel Concrete Reinforcing Bar from the Republic of Turkey:  Final Affirmative Countervailing Duty Determination*, 82 FR 23188 (May 22, 2017) (*Rebar from Turkey*).

**Issue 1:  Whether Commerce Should Reconsider Its Decision Not To Initiate On Nucor's Off-Peak Electricity Allegation**

*Nucor's Comments*

- Nucor argues that Commerce's Draft Remand largely repeats its prior analysis, continues to fault Nucor for failing to address unspecified information from prior determinations that purportedly undermines its allegation, and suggests that the evidence it did supply was insufficient without addressing that information.[80]

*POSCO's Comments*

- POSCO states that Commerce reasonably explained that the apparent differing initiation standards articulated by the Court in *RZBC Group* and *Delverde* are actually one and the same standard.[81]  POSCO agrees that, given Commerce's prior decisions regarding the electricity for LTAR program and the availability of that information to Nucor, it was incumbent on Nucor to provide such "reasonably available" information to support its allegation.[82]  Because Nucor did not address this information, it did not meet the initiation standard.[83]

- POSCO notes that Commerce discussed in detail the information that was reasonably available to Nucor and how this information needed to be addressed in light of Commerce's prior findings that there was no countervailable benefit from the provision of electricity under a market principles analysis.[84]

---

[80] *See* Nucor Draft Remand Comments at 2.
[81] *See* POSCO Draft Remand Comments at 2.
[82] *Id*. at 2-3.
[83] *Id*. at 3.
[84] *Id*. at 3 (citing Draft Redetermination at 6-15).

**Commerce's Position:**

We disagree with Nucor.  Consistent with the Court's *Second Remand Order*, we have

discussed in additional detail above the information that was reasonably available to Nucor that

needed to be addressed in light of Commerce's prior findings regarding the electricity for LTAR

program in order for Nucor's allegation to satisfy Commerce's initiation standard.  As detailed

above, POSCO's off-peak electricity usage is a subset of the company's overall electricity usage

and, accordingly, Nucor's allegation of off-peak electricity for LTAR is a distinct subset of a

program Commerce has examined in earlier segments of this order and numerous other Korean

CVD cases.  Given Commerce's prior examination of Korea's electricity market in numerous

proceedings, Nucor's off-peak electricity allegation failed to provide a sufficient basis to

reexamine Commerce's judicially affirmed finding that Korea's electricity market was consistent

with market principles, including a fair rate of return.

A market principles analysis frequently requires an assessment of an entire "market"

(*e.g.*, the Korean electricity market), which is significantly broader than the specific transactions

that may be at issue in the allegation (*e.g.*, off-peak electricity purchases).  The analysis

Commerce has carried out numerous times with respect to the Korean electricity market included

substantial information on how the Korean electricity system is organized among generators, the

KPX, and KEPCO, as well as how the KPX and KEPCO set their prices and tariffs.  Commerce

has also investigated KEPCO's pricing methodology and cost recovery data.  Thus, all of the

analysis Commerce has carried out with respect to the Korean electricity market was available to

Nucor prior to Nucor filing the new subsidy allegation.  However, in the new subsidy allegation,

Nucor failed to provide sufficient information about the price setting methodology, terms of sale,

*etc*. for off-peak electricity being reviewed in a tier three analysis to support initiating on a subset

of a program that Commerce has already investigated and reviewed at length.[85]  Such

information is required to either call into question Commerce's previous determination that the

Korean electricity system was consistent with market principles or demonstrate that the provision

of electricity at specific, off-peak hours was inconsistent with market principles, including

Commerce's previous findings of KEPCO's cost recovery.

Evidence on the record demonstrates that interested parties that have participated in other

proceedings involving the Korean electricity system, including Nucor, should be aware of the

characteristics of the electricity market in Korea, including, but not limited to, its operations,

price setting method, cost system, availability to consumers, the relationship between KEPCO

and the KPX, and how the KPX sets pricing for generators within Korea.[86]  Nucor failed to

adequately address these characteristics as a part of its allegation and failed to explain why

Commerce should initiate on the new subsidy allegation despite Commerce's previous findings

on the overarching program.  Instead, Nucor's benefit claims, as alleged, pertained *only* to the

prices KEPCO paid to the generators through the KPX's pricing and KEPCO's electricity tariff

schedule.  As explained above, Commerce has previously investigated both of these issues

within the context of the overarching Korean electricity system.[87]  Consequently, Nucor's

allegation failed to provide a sufficient basis to reevaluate Commerce's prior findings.

---

[85] *See, e.g.*, *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 81 FR 35310 (June 2, 2016), and accompanying IDM at Comments 1-3, *aff'd Nucor*, 927 F.3d at 1243, 1248.
[86] *See First Remand Results* at 15 (citing New Subsidy Allegations at 7 and Exhibits 3, 5, and 6); *see also* GOK's Letter, "Response to the Initial Questionnaire," dated October 7, 2019, at Exhibits E-3 to E-5.
[87] *See, e.g., Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Final Affirmative Determination,* 81 FR 49946 (July 29, 2016), and accompanying IDM at 45; and *Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Affirmative Determination*, 81 FR 53439 (August 12, 2016), and accompanying IDM at 44.

**Issue 2:  Whether Commerce Reasonably Addressed POSCO and Plantec's Cross-Ownership**

*Nucor's Comments*

- Nucor points out that Commerce changed course in the Draft Remand and found that cross-ownership did not exist between POSCO and Plantec because these companies were not cross-owned during the POR.[88]  Nucor claims that the issue of cross-ownership was not within the scope of the Court's remand order, but that POSCO owned 60.84 percent of Plantec's shares, which it states is sufficient for a cross-ownership finding under 19 CFR 351.525(b)(6)(vi).[89]  Nucor states that to the extent that POSCO did in fact lose any controlling interest in POSCO Plantec, it was only by virtue of the very subsidy that was being alleged.[90]

*POSCO's Comments*

- POSCO agrees with Commerce's decision in the Draft Remand that POSCO is not cross-owned with Plantec and, consequently, the primary dedication inquiry is moot.[91]  POSCO points out that Commerce reasonably focused on the cross-ownership question because the record is clear on this point and obviates the need for additional discussion on the primary dedication issue and that judicial economy supports this approach.[92]

- While it agrees with Commerce's focus on the cross-ownership issue, POSCO claims that the record also supports a finding that the inputs in question were not primarily dedicated to the production of downstream product within the meaning of 19 CFR 351.525(b)(6)(iv), bolstered by the additional record developed in response to the *Second*

---

[88] *See* Nucor Draft Remand Comments at 2.
[89] *Id*. at 3.
[90] *Id*.
[91] *See* POSCO Draft Remand Comments at 3.
[92] *Id*. at 3-4.

*Remand Order*.[93]  Specifically, in one of its supplemental questionnaire responses in the

remand proceeding, POSCO states that it confirmed that "Plantec primarily operates in

the business of engineering, design, procurement, and installation, and Plantec sourced

parts and tools that were required for the converter vessel and did not manufacture or

produce those parts."[94]

- POSCO states that the converter vessel that Plantec provided to POSCO was not

  primarily dedicated.  POSCO cites the *CVD Preamble* that states "{t}he main concern

  {Commerce has} tried to address is the situation where a subsidy is provided to an input

  supplier whose production is dedicated almost exclusively to the production of a higher

  value added product – the type of input product that is merely a link in the overall

  production chain."[95]  POSCO claims that Plantec's provision of converter vessels that it

  did not manufacture or produce does not rise to the level of being "merely a link" in

  POSCO's overall production chain; instead it constitutes tangential procurement services

  as demonstrated by the record in the underlying proceeding and the additional

  information POSCO provided in the remand proceeding.[96]

- In addition, POSCO argues that the information collected in the remand proceeding

  further supports Commerce's prior conclusion that the unprocessed scrap Plantec sold to

  POSCO through PDC also was not primarily dedicated to the production of downstream

  product.[97]  POSCO notes that this scrap was sold to numerous unaffiliated customers, not

  just POSCO, and that the value of those unaffiliated sales far exceeded the value of scrap

---

[93] *Id*. at 4.

[94] *Id*. (citing POSCO's Letter, "POSCO's Remand Order Second Supplemental Questionnaire Response," dated November 6, 2023 (POSCO Remand 2SQR), at 4).

[95] *Id*. at 4-5 (citing *CVD Preamble*, 63 FR at 65348).

[96] *Id*. at 5 (citing POSCO's Letter, "POSCO's Remand Order Supplemental Questionnaire Response," dated October 16, 2023 (POSCO Remand SQR)).

[97] *Id*. at 5.

sales to POSCO via PDC.[98]  POSCO also notes that Commerce collected information in
the remand proceeding that confirms that unlike Pohang SRDC, Plantec did not process
the scrap that was sold to PDC and then to POSCO.[99]

**Commerce's Position:**

We disagree with Nucor that the issue of cross-ownership was outside the scope of the
Court's remand order.  The *Second Remand Order* instructed Commerce to "reconsider or
further explain its determination not to treat Plantec *as a cross-owned input supplier* in
connection with the supply of scrap and the converter vessel."[100]  In short, the *plain language* of
the remand order requires Commerce to address cross-ownership issues.  As addressed above, to
attribute subsidies received by an input supplier to a downstream producer, the companies in
question must satisfy *both* the primarily dedicated standard of 19 CFR 351.525(b)(6)(iv) and the
cross-ownership standard of 19 CFR 351.525(b)(6)(vi).  If either one of these provisions is not
satisfied, subsidies are not attributed.  Commerce's regulations at 19 CFR 351.525(b)(6)(vi) state
that:

> {c}ross-ownership exists between two or more corporations where one corporation
> can use or direct the individual assets of the other corporation(s) in essentially the
> same ways it can use its own assets.  Normally, this standard will be met where
> there is a majority voting ownership interest between two corporations or through
> common ownership of two (or more) corporations.

In the underlying administrative review and in the *First Remand Results*, Commerce did not
analyze or decide whether POSCO controlled Plantec and, consequently, whether Plantec was
cross owned with POSCO.[101]  An analysis of the attribution of input supplier subsidies pursuant

---

[98] *Id.*
[99] *Id.* (citing POSCO Remand SQR at 2-3; and POSCO Remand 2SQR at 2).
[100] *See Second Remand Order*, 653 F. Supp. 3d at 1313 (emphasis added).
[101] *See Final Results* IDM at Comment 2 (Commerce did not address whether POSCO controlled Plantec within the
meaning of 19 CFR 351.525(b)(6)(vi)); *see also* First Remand Redetermination at 21-33.

to 19 CFR 351.525(b)(6)(iv) is necessarily tied to an analysis of cross-ownership and control under 19 CFR 351.525(b)(6)(vi) and, thus, is reasonably a part of the Court-directed analysis of whether Plantec is a cross-owned input supplier.  While Nucor argues that POSCO was cross-owned with Plantec because it held over 60 percent of Plantec's shares, Nucor failed to address the information in POSCO and Plantec's financial statements and in the Agreement that establish that the PPCFIC, rather than POSCO, controlled Plantec during the POR.  As detailed above, PPCFIC, not POSCO, controlled Plantec within the meaning of 19 CFR 351.525(b)(6)(iv).  Nucor also cryptically claims that if POSCO did lose control of Plantec it was "only by virtue of the subsidy alleged."[102]  Nucor, however, fails to provide any further explanation of this point or explain why, even if the provision of the subsidy were to lead to the transfer of control of a company to a new controlling party, it would be appropriate to attribute subsidies to the previously controlling party under 19 CFR 351.525(b)(6)(iv).[103]  Commerce must first find that a company is a cross-owned input supplier prior to attributing subsidies provided to that company to the downstream producer, under 19 CFR 351.525(b)(6)(iv).  Because Plantec was the recipient of the alleged subsidy, Commerce can only attribute the subsidy to POSCO if it found that Plantec satisfied one of the attribution provisions contained in 19 CFR 351.525(b)(6).  Furthermore, section 771(5)(C) of the Act and 19 CFR 351.503(c) are clear that Commerce is "not required to consider the effect of the subsidy in determining whether a subsidy exists."

With regard to the scrap and the converter vessel, as addressed above, in the *Second Remand Order* the Court held that Commerce's "primarily dedicated" analysis and findings from the *First Remand Results* were not supported by substantial evidence.[104]  In light of the Court's

---

[102] *See* Nucor Draft Remand Comments at 3.
[103] *See, generally,* Nucor Draft Remand Comments.
[104] *See Second Remand Order*, 653 F. Supp. 3d at 1306-1313.

concerns, Commerce collected significant additional information regarding these inputs for these remand results.[105]  For example, the information gathered in the remand proceeding record builds significantly on the record of the underlying review regarding the nature of the converter vessel.[106]  In reviewing the record in light of this new information, Commerce determined it was necessary to review the question of whether Plantec was cross-owned, as required by Commerce's regulations in 19 CFR 351.525(b)(6)(iv) and (vi), given this question is a threshold matter that must be addressed prior to finding Plantec is a cross-owned input supplier.

Because of Commerce's finding in this remand redetermination that POSCO did not control Plantec during the POR within the meaning of 19 CFR 351.525(b)(6)(vi), and thus Plantec was not cross-owned, the arguments raised in POSCO's comments on whether the scrap or converter vessel are primarily dedicated inputs are moot.

## IV.     FINAL RESULTS OF REDETERMINATION

Consistent with the Court's *Second Remand Order*, and after considering comments from interested partes, on remand, we find that:  (1) the new subsidy allegation regarding off-peak electricity for LTAR did not satisfy the initiation threshold given Commerce's numerous investigations into the electricity system in Korea; and (2) Plantec does not meet the requirements for a cross-owned entity under 19 CFR 351.525(b)(6)(vi), and thus, does not qualify as a cross-owned input supplier as set forth in 19 CFR 351.525(b)(6)(iv).  Consequently,

---

[105] *See* POSCO Remand SQR; and POSCO Remand 2SQR.
[106] *Id*.

we have made no changes to the subsidy rates calculated for POSCO and the non-selected companies in the *Final Results*.[107]

12/19/2023

X  *James Maeder*

Signed by: JAMES MAEDER

James Maeder
Deputy Assistant Secretary
 for Antidumping and Countervailing Duty Operations

---

[107] *See Final Results*, 86 FR at 15185.