NON-CONFIDENTIAL VERSION

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **NUCOR CORPORATION,**<br><br>　　　　　Plaintiff,<br><br>v.<br><br>**UNITED STATES,**<br><br>　　　　　Defendant,<br><br>and<br><br>**POSCO,**<br><br>　　　　　Defendant-Intervenor. | Before: Hon. Mark A. Barnett,<br>　　　　　Chief Judge<br><br>Court No. 21-00182<br><br><u>NON-CONFIDENTIAL VERSION</u><br><br>Business Proprietary Information Removed from Pages 4, 11, 12 |

<u>NUCOR CORPORATION'S COMMENTS IN OPPOSITION TO<br>SECOND REMAND RESULTS</u>

　　　　　　　　　　　　　　　　　　　Alan H. Price, Esq.
　　　　　　　　　　　　　　　　　　　Christopher B. Weld, Esq.
　　　　　　　　　　　　　　　　　　　Maureen E. Thorson, Esq.
　　　　　　　　　　　　　　　　　　　Adam M. Teslik, Esq.

　　　　　　　　　　　　　　　　　　　W<small>ILEY</small> R<small>EIN</small> LLP
　　　　　　　　　　　　　　　　　　　2050 M Street, NW
　　　　　　　　　　　　　　　　　　　Washington, DC 20036
　　　　　　　　　　　　　　　　　　　(202) 719-7000

　　　　　　　　　　　　　　　　　　　*Counsel to Nucor Corporation*

Dated: January 18, 2024

Ct. No. 21-00182 NON-CONFIDENTIAL VERSION

**TABLE OF CONTENTS**

Page

| | | |
|---|---|---|
| I. | INTRODUCTION .................................................................................................... | 1 |
| II. | ARGUMENT ............................................................................................................ | 1 |
| | A. The Second Remand Redetermination's Treatment of Nucor's New Subsidy Allegation Remains Unlawful and Unsupported by the Record ............................................................................................................ | 1 |
| |     1. The Second Remand Redetermination Articulates the Same Initiation Standard ................................................................................ | 1 |
| |     2. Commerce Identifies No "Reasonably Available Information" That Undermines Nucor's Allegation ................................... | 3 |
| | B. Commerce Improperly Determined that POSCO and POSCO Plantec Are Not Cross-Owned Affiliates ................................................... | 9 |
| III. | CONCLUSION ....................................................................................................... | 13 |

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Fine Furniture (Shanghai) Ltd. v. United States*,
    748 F.3d 1365 (Fed. Cir. 2014) ............................................................................... 6-7

*RZBC Grp. Shareholding Co. v. United States*,
    100 F.Supp.3d 1288 (Ct. Int'l Trade 2015) ........................................................ 2, 6, 8

**Regulations**

19 C.F.R. § 351.525(b)(6)(vi) ............................................................................................ 11

**Administrative Materials**

*Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea*, 77
    Fed. Reg. 17,410 (Dep't Commerce Mar. 26, 2012) ......................................... 12, 13

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 88 Fed.
    Reg. 7,946 (Dep't Commerce Feb. 7, 2023) (final results and partial rescission
    of countervailing duty admin. rev.; 2020) ................................................................ 13

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,401 (Dep't Commerce Nov. 25,
    1998) ........................................................................................................................ 11

*Dynamic Random Access Semiconductors from the Republic of Korea*, 68 Fed.
    Reg. 37,122 (Dep't Commerce June 23, 2003) ....................................................... 12

I. **INTRODUCTION**

On behalf of Nucor Corporation ("Nucor"), we respectfully submit these comments on the U.S. Department of Commerce's ("Commerce") Second Remand Redetermination regarding the administrative review of the countervailing duty order on cut-to-length steel plate from the Republic of Korea. Nucor respectfully submits that Commerce's determination remains unlawful and unsupported by the record. Final Results of Remand Redetermination Pursuant to Ct. Remand Order (Dec. 19, 2023), ECF No. 93 ("Second Remand Redeter.").

II. **ARGUMENT**

    A. **The Second Remand Redetermination's Treatment of Nucor's New Subsidy Allegation Remains Unlawful and Unsupported by the Record**

        1. **The Second Remand Redetermination Articulates the Same Initiation Standard**

In its Second Remand Order, the Court asked Commerce to clarify and consistently apply the initiation standard under which the agency considered Nucor's new subsidy allegation ("NSA") regarding the provision of off-peak electricity for less than adequate remuneration ("LTAR"). *Nucor Corp. v. United States*, No. 21-00182, slip op. 23-119 at 12-15 (Ct. Int'l Trade Aug. 21, 2023). The Court explained that "{w}hether Commerce applies the *RZBC Group* standard, the *Delverde* standard, or some hybrid standard, that decision is for Commerce to articulate in the first instance." *Id.* at 14. But it emphasized that "the agency must be consistent in its statement of the applicable standard and its application of that standard." *Id.*

In response, Commerce discusses the *Delverde* case as analogous but also states the agency's understanding that

> {T}he initiation standard applied in *RZBC* and *Delverde* are one and the same – the allegation, and initiation decision, must be based on information reasonably available to the petitioner . . . . We do not necessarily consider *Delverde* to be a "heightened" standard of initiation; in that case there was simply more information reasonably available to the petitioner {that} had to be considered in the allegation and analysis of the allegation.

Second Remand Redeter. at 9 n.39. Nucor thus understands the agency's position to be that there is one, and only one, initiation standard as a legal matter, that standard is properly articulated in the *RZBC* case, and *Delverde* merely stands for the proposition that there may be more "reasonably available information" in situations where Commerce has previously investigated the same or similar subsidy being alleged.

In other words, Commerce once again does not appear to question the viability of an allegation targeting specifically off-peak electricity, Slip Op. 23-119 at 14. Commerce views the allegation as a subset of, but not the same as, the program that it has previously investigated. Second Remand Redeter. at 6 (describing the allegation as "a distinct subset of a program Commerce has examined . . . ."). And it has considered the allegation under what it explains as the one and only initiation standard that governs subsidy allegations, *i.e.*,:

> {P}etitioners must allege a subsidy as defined by statute. They also have to pad their allegations with any "information reasonably available" to them at the time of filing. If a petition meets these requirements, Commerce must proceed. The agency cannot refuse to investigate based on conjecture that the subsidy does not exist. This means that most subsidy petitions are granted unless the allegations "are clearly frivolous, not reasonably supported by the facts alleged or . . . omit important facts which are reasonably available to the petitioner.

*RZBC Grp. Shareholding Co. v. United States*, 100 F.Supp.3d 1288, 1295 (Ct. Int'l Trade 2015). Under *Delverde*, per Commerce's explanation, the agency applies this standard while considering

its previous determinations regarding the same or similar programs as part of the universe of information that is reasonably available to a petitioner. Second Remand Redeter. at 9 n.39.

Nucor does not dispute this explanation of the initiation standard, nor has it ever intended to suggest that Commerce's previous determinations and the public information in the records on which they were based should not constitute "reasonably available information." Commerce's treatment of Nucor's NSA, however, has been and remains flawed because the agency has not specified or properly explained which pieces of "reasonably available information" actually undermine the concrete and specific evidence of a benefit that Nucor included in its allegation. The agency has also improperly suggested, with sweeping and general references to its prior determinations, that the "reasonably available information" includes data that it has never collected or addressed and that, to the best of counsel for Nucor's knowledge, is not available at all in the public domain.

In this regard, the Second Remand Redetermination merely repackages the same explanations that the agency presented in its final determination and First Remand Redetermination, without addressing the Court's specific concerns. Issues and Decision Memorandum accompanying *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea*, 86 Fed. Reg. 15,184 (Dep't Commerce Mar. 22, 2021) (final results and partial rescission of countervailing duty admin. rev., 2018), P.R. 187 at 20-26; First Remand Redetermination (Jan. 31, 2023), ECF No. 60 at 11-21, 38-52 ("First Remand Redeter."). It should therefore be remanded once again for reconsideration.

    2.    **Commerce Identifies No "Reasonably Available Information" That Undermines Nucor's Allegation**

In its Second Remand Order, the Court addressed the evidentiary basis for the benefit allegation in Nucor's NSA, as well as Commerce's re-explained determination that this evidence

was insufficient to support initiation. Slip Op. 23-119 at 15-16. First, the Court found that Commerce reasonably addressed its rejection of the Korea Power Exchange's ("KPX") system marginal price ("SMP") data as an independent indicator of the Korea Electric Power Company's ("KEPCO") hourly cost of supply because there was evidence showing that "KEPCO paid certain generators for electricity at prices that were lower than the SMP." *Id.* at 16. The Court added, however, that Commerce had failed to adequately address the fact that "KEPCO's weighted-average off-peak prices paid by POSCO [          ] KEPCO's cost of acquiring electricity from its lowest cost generator." *Id.*

Commerce's terse attempt to address this fact in the Second Remand Redetermination suffers from the very same flaws as the agency's prior determinations. Broadly referencing the entire universe of "information available to Nucor at the time of its allegation and Commerce's established methodologies," the Second Remand Redetermination asserts that "Nucor's comparison . . . was not on an apples-to-apples basis . . . ." Second Remand Redeter. at 7. In a footnote, Commerce attempts to elaborate by noting that "the average price paid to Korea Hydro and Nuclear Power Company Ltd. that Nucor used in this comparison is not off-peak specific, but instead represents a power trading price across all hours . . . ." *Id.* at 7 n.33.

This repeats the same rationale that the Court found insufficient in its First Remand Order. In its initial brief to the Court in this appeal, Nucor highlighted Commerce's rejection of multiple pieces of benefit evidence because they purportedly were not "isolated to off-peak hours." Nucor Opening Br. (Sept. 20, 2021), ECF No.22 at 29 ("Nucor Opening Br."). Nucor argued that "Commerce requested none of this information in its supplemental NSA questionnaire . . . nor did it explain how information at this level of detail and granularity could possibly be 'reasonably available' to a petitioner in a countervailing duty proceeding." *Id.* In its First Remand Order, the

4

Court remanded in part because "Commerce failed to address whether the time-period-specific data that Commerce preferred was 'reasonably available' to Nucor." *Nucor Corp. v. United States*, No. 21-00182, slip op. 22-116 at 16 (Ct. Int'l Trade Oct. 5, 2022). In its First Remand Redetermination, Commerce responded by claiming that it "did not fault Nucor for not providing KEPCO's hourly off-peak electricity costs, nor did we have an expectation for Nucor to provide that information." First Remand Redeter. at 20. Instead, the agency referred to Nucor's purported failure to "mak{e} reasonable adjustments to its submitted estimate of KEPCO's costs based on available information" to account for off-peak costs. *Id.*

Nucor argued again before both the agency and the Court that this reference to "reasonable adjustments" based on "available information" to account for off-peak costs provided no explanation with respect the nature of the adjustments that Commerce believed were necessary, the information on which any such adjustments should be based, and the reasonable availability of that information in the public domain. Nucor Cmts. on Draft Remand Results, C.R.R. 3, P.R.R. 5 at 5; Nucor Amended Cmts. on Final Results of Remand Redetermination (Mar. 2, 2023), ECF No. 74 at 12, 14 ("Nucor Cmts. Remand Redeter."). Referencing the reasonably available information regarding KEPCO's purchases from the lowest cost generators, Nucor emphasized that there were no such adjustments that could have possibly been made to undermine the factual assertions in Nucor's allegation. *Id.* at 12. In its Second Remand Order, the Court remanded for Commerce to account for this information that "appears responsive to Commerce's request that Nucor . . . directly address electricity pricing during off-peak hours . . . ." Slip Op. 23-119 at 16.

Commerce's Second Remand Redetermination returns this appeal to square one by explicitly faulting Nucor for failing to provide KEPCO's off-peak electricity costs without explaining how this information was reasonably available in the public domain. Second Remand

5

Redeter. at 7 n.33 ("{T}he average price paid to Korea Hydro and Nuclear Power Company Ltd. that Nucor used in this comparison <u>is not off-peak specific</u>, but instead represents a power trading price across all hours . . . .") (emphasis added).

Again, counsel for Nucor does not know how to obtain off-peak-specific transaction data for KEPCO's purchases from individual generators. Nucor Opening Br. at 29 (acknowledging the "substantial amount of information available to Nucor" but arguing that "{i}t is unreasonable for the agency to place the burden of producing . . . detailed, proprietary data on a petitioner making a subsidy allegation . . . ."); Nucor Cmts. Remand Redeter. at 11 (noting that Commerce has not "explain{ed} where information regarding the hourly mix of operational generators was reasonably available to Nucor"). Nor has Commerce, in any of its explanations to this point, cited any such data anywhere in the universe of "reasonably available information" to which it has broadly referred in defending its determinations.

Generally conjuring "the well-known parameters of the Korean electricity system" is insufficient because, as Nucor has previously noted, the agency has never requested, let alone addressed, any information related to KEPCO's actual hourly cost of acquisition, or to the mix of generators supplying electricity at any given hour. Second Remand Redeter. at 7-8. *See also* Nucor Cmts. Remand Redeter. at 5-6; Nucor Reply Br. (Apr. 18, 2022), ECF No. 41 at 7 (noting that Commerce "did not identify or request, from any source, any of the information that was purportedly lacking from Nucor's allegation"). To the best of counsel for Nucor's knowledge, this information is not available in the public domain and can only be obtained from the Korean government. *See, e.g.*, *RZBC*, 100 F.Supp.3d at 1296 ("{W}hen a petition is drafted, domestic industry may lack the data it needs to make firm factual allegations."); *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1369-70 (Fed. Cir. 2014) ("Commerce often requires

information from the foreign government allegedly providing the subsidy" because "normally, those governments are in the best position to provide information regarding the administration of their alleged subsidy programs . . . .") (internal quotations omitted); Slip Op. 23-119 at 28 ("To the extent that Commerce finds relevant information missing from the record, it is incumbent on Commerce to solicit that information from the party in possession of the information.").

Regardless, the Court was correct in its Second Remand Order when observing that the information in Nucor's allegation "appears responsive to Commerce's request that Nucor . . . address electricity pricing during off-peak hours." Slip Op. 23-119 at 16. As Nucor has argued multiple times, the NSA was directed at the Korean government's previous explanations that purportedly lower off-peak costs arise not from time-of-day variations in the prices KEPCO pays to individual generators, but from variations in the mix of generators supplying electricity over the course of a day. Nucor Opening Br. at 20; Nucor Cmts. Remand Redeter. at 9-12. In this telling, KEPCO's cost of supply purportedly decreases during off-peak hours because "electricity could be generated by those using cheap fuels, e.g., nuclear power generators." Nucor NSA, C.R. 182-184, P.R. 76-78 at 9.

Nucor acknowledges that the Court has already sustained Commerce's rejection of hourly SMP data as an independent proxy for KEPCO's actual hourly cost of supply, Slip Op. 23-119 at 10-11, but this is not the only reason that Nucor's NSA presented the SMP data. As Nucor has argued, the SMP is the only variable in the KPX pricing formula that changes on an hourly basis, so a stable SMP over the course of a day also reflects stable prices paid to each individual generator. Nucor Cmts. Remand Redeter. at 10 (discussing Nucor NSA SQR, P.R. 94 at Exhibit 1, pp. 35-36). Because there was minimal hourly variation in the SMP during the period of review ("POR"), there was necessarily minimal variation in the prices that KEPCO paid to each generator,

including its lowest-cost nuclear generators. *Id.* Therefore, contrary to Commerce's suggestion, Second Remand Redeter. at 7 n.33, the POR average unit price at which KEPCO purchased electricity from the lowest cost generators reflects its cost for both on-peak and off-peak purchases. Nucor Cmts. Remand Redeter. at 10-11.

Commerce's additional assertion that "the POSCO off-peak price Nucor used only represents the variable component of what POSCO paid, failing to take into account all items, fixed and variable, that Commerce accounts for when establishing benchmarks" is unclear. Second Remand Redeter. at 7 n.33. The Second Remand Redetermination does not specify the "items, fixed and variable, that Commerce accounts for when establishing benchmarks;" explain how those items were not accounted for in the price that POSCO reported paying; or identify the "reasonably available information" with which Nucor could have accounted for them. The comparison that Nucor presented was between (i) the per-kWh unit price that KEPCO reported paying its lowest-cost generators during the POR, which is a variable cost not including any cost that KEPCO may incur in transmission and distribution; and (ii) the per-kWh unit price that POSCO reported paying KEPCO for off-peak electricity based on the tariff schedule that was in effect during the POR. *See* Nucor NSA at Exhibit 5; Nucor NSA SQR Exhibit 1, p. 38. This is an apples-to-apples comparison.

Regardless, the standard for initiation of a subsidy allegation does not require a precise quantification of the actual benefit amount that a respondent received during the POR. It requires a petitioner to allege that a benefit was conferred and to support that allegation with the information reasonably available to it, without omitting any important and reasonably available facts. *See, e.g., RZBC*, 100 F.Supp.3d at 1295. Commerce may not decline to initiate simply because an allegation does not anticipate and provide the exact calculations and data that Commerce would prefer to use

8

in determining a final benefit amount, especially without a concurrent finding that the data are reasonably available to the petitioner. *See id. See also* Slip Op. 22-116 at 16 ("While the KPX pricing data may not be a perfect benchmark, Commerce failed to address whether the . . . data Commerce preferred was 'reasonably available' to Nucor.").

The Second Remand Redetermination's treatment of Nucor's NSA thus remains unlawful and unsupported by the record for the very same reasons that have been presented to agency on multiple occasions during the course of this litigation, by both Nucor and the Court. Specifically, Commerce continues to fault Nucor for not providing the precise benchmark information that it believes would be necessary for a final benefit calculation, without explaining what exactly that information is or how it was reasonably available to Nucor. The Second Remand Redetermination should thus be remanded again for Commerce to either point to the specific, reasonably available information that it believes Nucor's NSA omitted, or to investigate the provision of off-peak electricity for LTAR if it is unable to do so.

### B. Commerce Improperly Determined that POSCO and POSCO Plantec Are Not Cross-Owned Affiliates

In its Second Remand Order, the Court again remanded Commerce's determination that certain inputs, in particular steel scrap and a steelmaking converter vessel, supplied by POSCO's affiliate POSCO Plantec ("Plantec") were not "primarily dedicated to production of the downstream product" within the meaning of 19 C.F.R. § 351.525(b)(6)(iv). Slip Op. 23-119 at 17-35. With respect to steel scrap, the Court remanded for Commerce (i) to further explain its differing treatment of scrap supplied by Plantec and scrap supplied by other cross-owned affiliates, *id.* at 26-28, and (ii) to further explain or collect additional information regarding its finding of insufficient evidence that Plantec's scrap was used primarily by POSCO. *Id.* at 28-29. With respect to the converter vessel, the Court remanded for Commerce to clarify whether actual

production of the input by a cross-owned affiliate is dispositive for the purpose of the cross-owned input supplier rule. *Id.* at 32-33. The Court also asked Commerce, if necessary, (i) to address information showing that the equipment was in fact used in the steel production process, (ii) to explain the relevance of the fact that Plantec supplied more generic inputs in addition to the steelmaking equipment, and (iii) to identify affirmative evidence regarding the "primary" or "exclusive" user of the equipment. *Id.* at 34.

The Second Remand Redetermination addresses none of these issues. It evades the questions presented to Commerce in the Court's Second Remand Order and suddenly changes course to determine that POSCO and POSCO Plantec were not "cross-owned" during the POR. Second Remand Redeter. at 18-22. Without further explanation or discussion, the Second Remand Redetermination explains that the Court's opinions and the supplemental questionnaire responses from POSCO during the second remand proceeding "have called into question our prior findings regarding whether scrap and the converter vessel are primarily dedicated to the production of the downstream input." *Id.* at 19. The agency claims to have instead "reexamined the record of this proceeding" to determine that "POSCO and Plantec were not cross-owned during the POR of the underlying administrative review." *Id.*

This determination is contrary to the agency's rules and unsupported by the underlying record. Commerce's rules provide that it will attribute subsidies to the combined sales of cross-owned input suppliers and the company producing the downstream product. 19 C.F.R. § 351.525(b)(6)(iv). "Cross-ownership exists . . . where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets" and "normally {exists} where there is majority voting ownership interest between two corporations . . . ." *Id.* § 351.525(b)(6)(vi). The purpose of the agency's cross-owned input supplier rule was

to close "a loophole whereby vertically integrated businesses could avoid countervailing duty exposure for input subsidies simply by separately incorporating the division that makes the input." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,401 (Dep't Commerce Nov. 25, 1998) (final rule).

There is no dispute that Plantec satisfies the requirement for presumptive cross-ownership under Commerce's rules. During the POR, POSCO owned 73.94% of Plantec's shares. POSCO Aff. Cos. QR, C.R. 4-15, P.R. 20-23 at Exhibit 2, p. 25. There was thus "majority voting ownership interest between" POSCO and Plantec. 19 C.F.R. § 351.525(b)(6)(vi). In the immediately preceding administrative review covering calendar year 2017, POSCO itself [

]. POSCO Aff. Cos. QR at Exhibit 9.

Commerce's decision to treat the relationship between POSCO and Plantec as an exception to the general cross-ownership rule is unreasonable because it turns on a Korean accounting technicality arising from participation by both POSCO and Plantec in the very subsidy program – *i.e.*, Plantec's debt restructuring – that Nucor alleged in its NSA. Nucor NSA at 2-7. According to Commerce, following Plantec's entry into the debt restructuring program, "the {POSCO Plantec Creditor Financial Institutions Committee ("PPCFIC")}, rather than POSCO, controlled Plantec during the POR," and "{i}f PPCFIC controls Plantec, then POSCO cannot." Second Remand Redeter. at 22. Commerce points to the Agreement for Compliance of Business Normalization Plan through which Plantec entered the debt restructuring program, because of which POSCO reclassified Plantec from a consolidated affiliate to a non-consolidated affiliate pursuant the "control" standards in the Korean International Financial Reporting Standards ("K-IFRS"). *Id.* at 21 (discussing POSCO Aff. Cos. QR at Exhibit 2; POSCO Remand SQR, 2C.R.R. 2-7, 2P.R.R. 4-7 at Exhibit 2). Through the agreement, the Korea Development Bank and the PPCFIC gained authority to approve certain management decisions related to Plantec's long-term financial

position (bankruptcy, termination of work-out program, liquidation of property, new borrowings, acquisitions or expansions of business scope, guarantees, etc.). *Id.* at 19-21 (discussing POSCO Resp. to Nucor NSA, C.R. 185, P.R. 88 at Attachment 1).

This partial loss of decision-making authority, however, does not represent a transfer of "control" over Plantec for the purpose of U.S. countervailing duty law. To the contrary, it was a temporary granting of oversight authority related to certain types of transactions, to which [                                                                                                  ] Korean government financial support to a majority-owned affiliate. *See* POSCO Resp. to Nucor NSA at Attachment 1 ([

]; POSCO Remand Supp. QR at Exhibit 2 (describing "{t}he major contents of agreement for the implementation of management normalization plan being concluded with its Company, POSCO, a large shareholder of its company, and the Committee of Creditor Financial Institutions," and noting that "POSCO Co., Ltd., a major shareholder of its Company, contributes to the management normalization of its Company by trying to order a project to the extent of permissible scope by related legislations").

In other words, to the extent that POSCO ceded any control over Plantec's operations, it was only by virtue of the manner in which the subsidy program itself operates and in exchange for the benefits that the subsidy program confers. Commerce's reasoning would effectively create a blanket exemption for any cross-owned affiliate participating in this type of subsidy program, which the Korean government regularly uses to prevent the bankruptcy and liquidation of industrial enterprises. *See, e.g.*, Issues and Decision Memorandum accompanying *Dynamic Random Access Semiconductors from the Republic of Korea*, 68 Fed. Reg. 37,122 (Dep't Commerce June 23, 2003) (final affirm. countervailing duty deter.) at 19-25; Issues and Decision

Memorandum accompanying *Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea*, 77 Fed. Reg. 17,410 (Dep't Commerce Mar. 26, 2012) (final affirm. countervailing duty deter.) at 95-109; Issues and Decision Memorandum accompanying *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 88 Fed. Reg. 7,946 (Dep't Commerce Feb. 7, 2023) (final results and partial rescission of countervailing duty admin. rev.; 2020) at 43-52.

Commerce's remand results interpret and apply the cross-owned input supplier regulation in a manner that is inconsistent with the regulation's purpose and that would effectively exclude an entire category of subsidy programs from the countervailing duty laws. The Second Remand Redetermination should thus be remanded for reconsideration of the cross-ownership issue in light of the fact that any limited restrictions on POSCO's control of Plantec arose only by virtue of POSCO's own participation in the agreement through which the alleged subsidy to Plantec was conferred, and given that POSCO maintained its majority ownership stake in Plantec throughout the POR. The Court should also reiterate its prior holdings regarding steel scrap and the converter vessel, and require Commerce to affirmatively address them if necessary based on any reconsideration of the cross-ownership issue.

### III. CONCLUSION

Nucor thus respectfully requests that the Court find Commerce's Second Remand Redetermination unlawful and unsupported by the record, and remand for reconsideration of the issues discussed herein.

Ct. No. 21-00182

NON-CONFIDENTIAL VERSION

        Respectfully submitted,

        */s/ Alan H. Price*
        Alan H. Price, Esq.
        Christopher B. Weld, Esq.
        Maureen E. Thorson, Esq.
        Adam M. Teslik, Esq.

        **WILEY REIN LLP**
        2050 M Street, NW
        Washington, DC 20036
        (202) 719-7000

        *Counsel to Nucor Corporation*

Dated: January 18, 2024

CERTIFICATE OF COMPLIANCE

Pursuant to the Court's Amended Opinion and Order (Sept. 5, 2023), ECF No. 88, the undersigned certifies that these comments comply with the word limitation requirement. The word count for Nucor Corporation's Comments in Opposition to Second Remand Results, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2021), is 3,953 words.

        */s/ Alan H. Price*
        (Signature of Attorney)

        Alan H. Price
        (Name of Attorney)

Nucor Corporation
(Representative Of)

January 18, 2024
(Date)