Slip Op. 24-49

## UNITED STATES COURT OF INTERNATIONAL TRADE

NUCOR CORPORATION,

        Plaintiff,

        v.

UNITED STATES,

        Defendant,

        and

POSCO,

        Defendant-Intervenor.

Before: Mark A. Barnett, Chief Judge
Court No. 21-00182

**PUBLIC VERSION**

## OPINION AND ORDER

[Remanding in part the U.S. Department of Commerce's second remand redetermination filed in connection with the 2018 administrative review of the countervailing duty order on certain carbon and alloy steel cut-to-length plate from the Republic of Korea.]

Dated: April 19, 2024

Alan H. Price, Christopher B. Weld, Maureen E. Thorson, and Adam M. Teslik, Wiley Rein LLP, of Washington, DC, for Plaintiff Nucor Corporation.

Elizabeth A. Speck, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. Also on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Tara K. Hogan, Assistant Director. Of counsel on the brief was W. Mitch Purdy, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Brady W. Mills, Donald B. Cameron, Julie C. Mendoza, R. Will Planert, Mary S. Hodgins, Eugene Degnan, Jordan L. Fleischer, Nicholas C. Duffy, and Ryan R. Migeed, Morris, Manning & Martin, LLP, of Washington, DC, for Defendant-Intervenor POSCO.

Barnett, Chief Judge: This matter is before the court following the U.S.

Department of Commerce's ("Commerce" or "the agency") second redetermination upon

remand.  *See* Final Results of Redetermination Pursuant to Second Ct. Remand ("2nd

Remand Results"), ECF No. 93-1.

Plaintiff Nucor Corporation ("Nucor") commenced this case challenging

Commerce's final results in the 2018 administrative review of the countervailing duty

order on certain carbon and alloy steel cut-to-length plate from the Republic of Korea

("Korea").  Compl., ECF No. 5; *Certain Carbon and Alloy Steel Cut-to-Length Plate*

*From the Republic of Korea*, 86 Fed. Reg. 15,184 (Dep't Commerce Mar. 22, 2021)

(final results and partial rescission of countervailing duty admin. review, 2018) ("*Final*

*Results*"), ECF No. 18-4, and accompanying Issues and Decision Mem., C-580-888

(Mar. 16, 2021), ECF No. 18-5.[1]  For the *Final Results*, Commerce calculated a 0.49

percent *ad valorem* subsidy rate for POSCO.  86 Fed. Reg. at 15,185.  POSCO's rate is

considered a *de minimis* rate.  *Id.*  Nucor challenged Commerce's determination not to

initiate an investigation into the alleged provision of off-peak electricity for less than

adequate remuneration (sometimes referred to as "LTAR") and Commerce's

---

[1] The administrative record for the 2nd Remand Results is contained in a Public
Remand Record ("2PRR"), ECF No. 94-1, and a Confidential Remand Record, ECF No.
94-2.  The administrative record for the *Final Results* is contained in a Public
Administrative Record ("PR"), ECF No. 18-1, and a Confidential Administrative Record
("CR"), ECF No. 18-2.  The parties submitted joint appendices containing record
documents cited in their comments.  [Confid. 2nd Remand] J.A. ("Confid. 2RJA"), ECF
No. 102; [Public 2nd Remand] J.A., ECF No. 103.  When necessary, the court cites to
confidential record documents contained in the previously filed joint appendices.
Confid. J.A. ("CJA"), ECF No. 43; [Confid. 1st Remand] J.A. ("Confid. 1RJA"), ECF No.
76.

determination that mandatory respondent POSCO and its affiliate POSCO Plantec

("Plantec") do not meet the requirements necessary to find a cross-owned input supplier

relationship.  *See generally* Confid. Nucor Corp.'s Mem. in Supp. of its Rule 56.2 Mot.

for J. on the Agency R., ECF No. 22.

      In *Nucor Corp. v. United States* (*Nucor I*), 46 CIT __, 600 F. Supp. 3d 1225

(2022), the court remanded Commerce's determination not to initiate an investigation

into off-peak electricity pricing and remanded in part Commerce's determination with

respect to Plantec.  Commerce had resolved the latter issue on the basis of its

regulation, 19 C.F.R. § 351.525(b)(6)(iv) (2018),[2] after finding that the inputs Plantec

supplied to POSCO[3] were not primarily dedicated to POSCO's steel production.  *See*

*Nucor I*, 600 F. Supp. 3d at 1235.  The court sustained Commerce's determination with

respect to certain services and equipment but remanded for reconsideration or further

explanation in relation to scrap and a converter vessel.  *Id.* at 1238, 1240–41.

      On January 31, 2023, Commerce filed its redetermination.  Confid. Final Results

of Redetermination Pursuant to Ct. Remand ("1st Remand Results"), ECF No. 60-1.

---

[2] Section 351.525(b)(6)(iv) states that when

> there is cross-ownership between an input supplier and a downstream
> producer, and production of the input product is primarily dedicated to
> production of the downstream product, [Commerce] will attribute subsidies
> received by the input producer to the combined sales of the input and
> downstream products produced by both corporations (excluding the sales
> between the two corporations).

[3] The inputs consisted of steel scrap and various raw materials, fixed assets, and
services.

Therein, Commerce provided further explanation for its determinations and made no changes to POSCO's subsidy rate.  *Id.* at 11–33, 38–52, 55–72.

The court sustained Commerce's 1st Remand Results in part and remanded in part.  *Nucor Corp. v. United States* (*Nucor II*), 47 CIT __, 653 F. Supp. 3d 1295 (2023).[4] With respect to Commerce's determination not to investigate off-peak electricity pricing, the court found that Commerce was "[in]consistent in its statement of the applicable standard and its application of that standard."  *Id.* at 1302–03.  With respect to Plantec's supply of scrap, the court concluded that Commerce had identified factors relevant to the inquiry but failed to support its evaluation of certain of those factors with substantial evidence.  *Id.* at 1307, 1310.  The court also remanded Commerce's determination regarding the converter vessel for further explanation about the relevance of certain factors and, as necessary, further explanation of its findings with respect to those factors.  *Id.* at 1311–13.

On December 19, 2023, Commerce filed the 2nd Remand Results.  Therein, Commerce provided further explanation for its determination not to investigate off-peak electricity pricing.  2nd Remand Results at 5–15, 24–25.  Commerce asserted a different basis for declining to attribute subsidies received by Plantec to POSCO, now finding that the companies were not cross-owned pursuant to 19 C.F.R.

---

[4] *Nucor I* and *Nucor II* present background information, familiarity with which is presumed.

§ 351.525(b)(6)(vi)[5] because POSCO did not control Plantec's assets during the 2018 period of review ("POR").  *Id.* at 18–22, 28–30.

Nucor filed comments opposing Commerce's 2nd Remand Results.  Confid. Nucor Corp.'s Cmts. in Opp'n to Second Remand Results ("Nucor's Cmts."), ECF No. 96.  Defendant United States ("the Government") and Defendant-Intervenor POSCO each filed comments in support of the 2nd Remand Results.  Confid. Def.'s Resp. to Pl.'s Cmts. Regarding the Second Remand Redetermination ("Def.'s Cmts."), ECF No. 100; Confid. POSCO's Cmts. in Supp. of the Agency's Remand Redetermination ("POSCO's Cmts."), ECF No. 98.  For the following reasons, the court again remands Commerce's determination not to investigate off-peak electricity pricing but sustains Commerce's determination not to attribute subsidies received by Plantec.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018),[6] and 28 U.S.C. § 1581(c). The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

---

[5] Commerce's regulation states that

> [c]ross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets. Normally, this standard will be met where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations.

19 C.F.R. § 351.525(b)(6)(vi).

[6] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition unless otherwise stated.

Court No. 21-00182                                                                 Page 6

DISCUSSION

I.    **Off-Peak Electricity Pricing**

A.  **Additional Background**

The requirements that an interested party must meet for Commerce to

investigate an LTAR allegation are not onerous.  *See* 19 U.S.C. § 1671a(b)(1).  "[M]ost

subsidy petitions are granted unless the allegations 'are clearly frivolous, not reasonably

supported by the facts alleged or . . . omit important facts which are reasonably

available to the petitioner.'"  *RZBC Grp. Shareholding Co. v. United States*, 39 CIT __,

__, 100 F. Supp. 3d 1288, 1295 (2015) (citation omitted).  However, "[w]hen allegations

concern a program previously held non-countervailable," Commerce may "require[ ] a

petition to contain evidence of changed circumstances . . . before an investigation is

initiated."  *Delverde, SrL v. United States*, 21 CIT 1294, 1296–97, 989 F. Supp. 218,

222 (1997), *vacated on other grounds*, 202 F.3d 1360 (Fed. Cir. 2000).

In *Nucor II*, the court noted that Commerce, in the 1st Remand Results, claimed

to apply the *RZBC Group* standard and not the *Delverde* standard because the agency

"accepted Nucor's allegation to raise the existence of a subsidy program distinct from

Commerce's prior examination of the provision of electricity for less than adequate

remuneration."  *Nucor II*, 653 F. Supp. 3d at 1302.  The court concluded that Commerce

"reasonably found that Nucor overlooked relevant information about the Korean

electricity pricing system."  *Id.* at 1303–04.  The agency had failed, however, to address

evidence concerning differences between KEPCO's[7] off-peak prices and KEPCO's cost of acquiring electricity from the lowest-cost generator, Korea Hydro and Nuclear Power Company Ltd. ("KHNP"), or explain why such information "constituted insufficient evidence of a benefit . . . pursuant to the low standard of *RZBC Group*." *Id.* at 1304.[8] The court remanded for Commerce to articulate more clearly the standard the agency sought to apply to Nucor's allegation and explain the "application of that standard to the entirety of the allegation made by Nucor." *Id.*

In the 2nd Remand Results, Commerce clarified its position on the appropriate standard for its review of Nucor's allegation. Commerce explained that, in the agency's view, "the initiation standard applied in *RZBC* and *Delverde* are one and the same." 2nd Remand Results at 9 n.39. That is because allegations concerning a program that "is a subset of a previously investigated program" implicates "more information [that is] reasonably available to the petitioner and the legal standard for initiation requires that the petitioner address or account for that additional information." *Id.* at 9. Commerce noted that addressing this information is particularly important when, as here, "the allegation implicates a market principles analysis" pursuant to 19 C.F.R.

---

[7] Korea Electric Power Corporation ("KEPCO") purchases electricity from generators though the Korea Power Exchange ("the KPX"), which "is the system operator[ ] and the supplier" of electricity to KEPCO. 2nd Remand Results at 8. The KPX sets the prices that KEPCO pays the generators for electricity. *Id.* at 9.
[8] Specifically, the court observed that "KEPCO's weighted-average off-peak prices paid by POSCO [[                        ]] KEPCO's cost of acquiring electricity from its lowest cost generator." Am. Confid. Slip Op. 23-119 at 16, ECF No. 88.

§ 351.511(a)(2)(iii),"[9] because that analysis often requires Commerce to consider the entire market instead of specified transactions.  *Id.*

Commerce further explained its position that Nucor failed to address all available information.  Referencing the omission the court identified, Commerce explained that "Nucor's comparison" was not made "on an apples-to-apples basis."  *Id.* at 7.  The KHNP cost information that Nucor relied on was "not off-peak specific," and the price information contained only "the variable component of what POSCO paid" and did not account for all fixed and variable costs that Commerce would use to construct a benchmark.  *Id.* at 7 n.33 (citing POSCO's Second Suppl. Questionnaire Resp. (Feb. 27, 2020) ("POSCO's 2SQR"), Ex. C-35, CR 242–45, PR 135, Confid. 2RJA Tab 7; New Subsidy Allegations Suppl. Questionnaire Resp (Dec. 31, 2019) ("Nucor's Suppl. Allegation"), Ex. 1 at 38, PR 94, Confid. 2RJA Tab 6); *see also id.* at 14 (referring to "Nucor's comparison of the average full cost of sale to the variable price").

Commerce also addressed Nucor's additional reasons for alleging a benefit from off-peak electricity pricing.  In response to Nucor's allegation that KEPCO covers its costs only by charging higher rates during on-peak hours "that cross-subsidize large industrial companies (like respondent POSCO) who move production to off-peak hours,"

---

[9] Commerce first seeks to compare the government price to a market-based price for the good or service under investigation in the country in question.  19 C.F.R. § 351.511(a)(2)(i).  When an in-country market-based price is unavailable, Commerce will compare the government price to a world market price, when the world market price is available to purchasers in the country in question.  *Id.* § 351.511(a)(2)(ii).  When, as here, both an in-country market-based price and a world market price are unavailable, Commerce examines "whether the government price is consistent with market principles."  *Id.* § 351.511(a)(2)(iii).

Commerce explained that "[t]he hours at which POSCO . . . chose to purchase electricity . . . are . . . immaterial unless the tariff schedule itself is found to be inconsistent with market principles." *Id.* at 10.  Nucor offered insufficient evidence for Commerce to reconsider its prior determination that the Korean electricity market is consistent with market principles *or* to demonstrate that the off-peak pricing schedule is inconsistent with market principles.  *Id.* at 10–11, 25.

Commerce also concluded that neither the off-peak system marginal price ("SMP")[10] nor KPX's annual average cost of sale provided sufficient evidence of a benefit to investigate off-peak electricity pricing.  *Id.* at 11–15.  Commerce explained "that a successful benefit allegation of off-peak electricity for LTAR required a reasonable proxy for determining" KEPCO's off-peak-specific costs.  *Id.* at 14.  According to Commerce, Nucor failed to "demonstrate how the average price of electricity reflected the price of electricity at off-peak hours, considering the potential differences in the generators in terms of operation, usage, etc."  *Id.*

### B.  Analysis

Nucor does not dispute Commerce's characterization of the standard that applies to the agency's review of the underlying allegation.  Nucor's Cmts. at 3.  Nucor contends, however, that Commerce has again failed to identify the "reasonably

---

[10] The KPX sets electricity prices for each hour based "on estimated hourly power demand."  *Nucor II*, 653 F. Supp. 3d at 1298 n.5 (quoting 1st Remand Results at 41).  "[T]he KPX accepts bids from generators in ascending order of price 'until the projected demand for electricity for such hour is met.'"  *Id.* (quoting same).  The SMP represents "[t]he maximum bid value" for a given hour.  *Id.* (quoting same).

available information" the agency asserts undermines Nucor's allegation.  *Id.*  Nucor also argues that Commerce failed to comply with the court's remand order.  *Id.* at 4–8.

In the 2nd Remand Results, Commerce stated "that a successful benefit allegation of off-peak electricity for LTAR required a reasonable proxy for determining what the prices KEPCO paid might be at the specific point of off-peak hours, and not just an overall average price for electricity."  2nd Remand Results at 14.  Commerce further stated that although this does not require Nucor to provide hourly electricity costs, it does "require[] an additional step or reasonable explanation to demonstrate how the average price of electricity reflected the price of electricity at off-peak hours, considering potential differences in the generators in terms of operation, usage, etc. at different hours."  *Id.*

Arguably, however, Nucor provided this explanation when it compared "KEPCO's cost of acquiring electricity from its lowest cost generator" to "KEPCO's weighted-average off-peak prices paid by POSCO."  *Nucor II*, 653 F. Supp. 3d at 1304.  That comparison demonstrated that POSCO's average off-peak unit price was [[          ]] than KEPCO's KHNP acquisition cost.  *Id.*  Nucor argues now, as it did previously, that this comparison suggests the existence of a benefit because the Korean government has claimed that "lower off-peak costs arise not from time-of-day variations in the prices KEPCO pays to individual generators, but from variations in the *mix of generators* supplying electricity over the course of a day."  Nucor's Cmts. at 7 (citing previous Nucor submissions).  Nucor identifies statements by the Korean government that "KEPCO's cost of supply purportedly decreases during off-peak hours because

'electricity could be generated by those using cheap fuels, e.g., nuclear power generators.'" *Id.* (quoting New Subsidy Allegations (Nov. 4, 2019) ("Nucor's Allegation") at 9, CR 182–84, PR 76–78, Confid. 1RJA Tab 5, Confid. 2RJA Tab 3).[11]  While acknowledging that the court sustained Commerce's rejection of the SMP as a proxy benchmark for the cost of supplying off-peak electricity, Nucor argues that the apparent stability reflected in the "SMP over the course of a day also reflects stable prices paid to each individual generator." *Id.*  That stability, Nucor argues, suggests minimal fluctuation in KEPCO's "costs for both on-peak and off-peak purchases." *Id.* at 8.

The court directed Commerce to address this information.  *Nucor II*, 653 F. Supp. 3d at 1304.  Commerce did so in a conclusory and confusing fashion.  While Commerce faults Nucor for failing to place its LTAR allegation in the context of the broader market-principles analysis that Commerce has applied in prior segments or other proceedings involving the Korean electricity market, *see, e.g.*, 2nd Remand Results at 7–9, 11, it is Commerce that has failed to consider Nucor's allegation within that context.

With respect to Nucor's reliance on KEPCO's KHNP acquisition cost, Commerce summarily dismissed this information as "not off-peak specific" and "instead represent[ing] a power trading price across all hours." *Id.* at 7 n.33.  Commerce failed to engage with Nucor's reasons, discussed above, for relying specifically on KEPCO's KHNP acquisition cost in light of the apparent absence of publicly available time-period-

---

[11] Nucor's Allegation, in turn, quotes from a previous submission by the Korean government to Commerce.  *See* Nucor's Allegation at 9 & n.34.  That submission is appended to the copy of Nucor's Allegation provided in the joint appendix accompanying the 1st Remand Results.  *See id.*, Ex. 6 at 8.

specific data.  *Cf. Nucor I*, 600 F. Supp. 3d at 1234 (noting that Commerce did not make

any finding that "the time-period-specific data that Commerce preferred was 'reasonably

available' to Nucor").

Nucor alleged, and Commerce appears to accept, that the SMP typically is not

set by the lowest-cost generator but by the higher-price generators whose percentage

share of the electricity KEPCO supplies varies throughout the day.  *See* Decision Mem.

on New Subsidy Allegations (Apr. 1, 2020) at 7 & n.57, PR 144, CJA Tab 12 (citing

Nucor's Suppl. Allegation, Ex. 1 at 35).  KEPCO's reliance on higher-cost generators

throughout the day (albeit in varying quantities) is consistent with the notion that the

lowest-price generator is a "base load" generator with full and consistent electricity

production and output throughout the day.  *See* Nucor's Suppl. Allegation, Ex. 1 at 35–

36, 38.  To that end, not only has Commerce not shown that any hourly price variation

for KHNP is available to Nucor, but it is also not clear that much, if any, variation would

exist.

Commerce also faulted Nucor for relying on "the variable component" of the price

POSCO paid.  2nd Remand Results at 7 n.33 (citing POSCO's 2SQR, Ex. C-35).

Commerce did not explain why this information constitutes a variable component of

POSCO's price, and the basis for that statement is not otherwise discernible.[12]  To the

extent that Commerce intended to refer to the variable portion of the price paid by

---

[12] The Government fails to shed light on Commerce's assertion, stating, without
elaboration or citation, that the fixed and variable items that Nucor failed to consider
"have been thoroughly addressed in numerous prior investigations."  Def.'s Cmts. at 6.

KEPCO, it would seem that any adjustments to that benchmark for costs in addition to the variable portion would only increase the benchmark and further support Nucor's allegation of subsidization.  *See* Nucor's Cmts. at 8 (explaining that KEPCO's cost of acquiring electricity from KHNP represented only the variable cost to KEPCO because it did not include KEPCO's costs "incur[red] in transmission and distribution").

The Government argues that the flaws in Nucor's comparison are "evident from Commerce's established methodologies for determining benefit with respect to the overarching Korean electricity system."  Def.'s Cmts. at 9.  To that end, the Government argues that Nucor "failed to connect its reliance on the SMP to the remainder of the factors incorporated into the pricing formula that Commerce found insufficient."  *Id.*  These assertions are misplaced, however, because Nucor's comparison between KEPCO's KHNP acquisition cost and POSCO's off-peak prices sought to address Commerce's concerns with Nucor's reliance on the SMP.  *See* Req. for Recons. of New Subsidy Allegation (Apr. 9, 2020) ("Req. for Recons.") at 7–8, CR 254, PR 148, Confid. 1RJA Tab 10.

POSCO contends that "Commerce did not base the [2nd Remand Results] on [Nucor's] inapt comparison alone."  POSCO's Cmts. at 4.  This assertion fails because the court remanded Commerce's 1st Remand Results precisely for Commerce to address this information that otherwise appears to detract from its conclusion.  *See Nucor II*, 653 F. Supp. 3d at 1304.  POSCO also contends that Commerce pointed to the information available to Nucor to support its allegation.  POSCO's Cmts. at 4 (citing 2nd Remand Results at 12).  While Commerce referenced generally the "financial

disclosures and electricity power trading statistics" on the record, 2nd Remand Results

at 12 & n.45 (citing Nucor's Suppl. Allegation, Ex. 1 at 38–40 and 44–47), Nucor relied

on certain of this information to substantiate the cost side of its comparison, *see* Req.

for Recons. at 7 & nn.25–26 (citing Nucor's Suppl. Allegation, Ex. 1 at 38).  Moreover,

Commerce discussed this information in connection with Nucor's reliance on the SMP

as a benchmark, 2nd Remand Results at 12, which was not the issue the court directed

Commerce to address, *see Nucor II*, 653 F. Supp. 3d at 1304.

Accordingly, the court will again remand this matter for Commerce to "respond to

this particular aspect of the allegation" and either "explain why it constitute[s] insufficient

evidence of a benefit for Commerce to investigate the off-peak pricing in particular

pursuant to the low standard of *RZBC Group*," or otherwise reconsider its decision not

to conduct such an investigation.  *Id.*

## II.   Attribution of Plantec's Subsidies

### A.  Additional Background

On remand, Commerce concluded that "POSCO and Plantec were not cross-

owned" for purposes of 19 C.F.R. § 351.525(b)(6)(vi) "during the POR."  2nd Remand

Results at 19.  Although POSCO retained its majority ownership of Plantec, Commerce

based its decision on POSCO's inability to control Plantec by virtue of the debt workout

program into which Plantec entered.  *Id.* at 20.  That program resulted in the creation of

the POSCO Plantec Creditor Financial Institutions Committee ("PPCFIC") and the

establishment of an agreement pursuant to which PPCFIC, not POSCO, controlled

certain major decisions regarding Plantec.  *Id.* at 20–21.[13]  POSCO's financial

statements reflected this change, whereby POSCO reported losing its ability to control

Plantec and thus treated "Plantec as a non-consolidated 'associate' rather than a

consolidated entity."  *Id.* at 21.  Commerce explained that it considers cross-ownership

to constitute "a binary analysis" such that if, as Commerce concluded, "PPCFIC controls

Plantec, then POSCO cannot."  *Id.* at 22.  Commerce found that the absence of cross-

ownership meant that any subsidies received by Plantec could not be attributed to

POSCO.  *Id.*

Before Commerce, Nucor argued that POSCO's majority ownership satisfied the

cross-ownership requirement.  Cmts. on Draft Remand Results (Nov. 29, 2023)

("Nucor's Cmts. on Draft") at 3, 2PRR 15, Confid. 2RJA Tab 15.  Nucor further argued

that "[t]o the extent that POSCO did in fact lose any controlling interest in [Plantec], it

was only by virtue of the very subsidy that was being alleged."  *Id.*

Commerce rejected Nucor's arguments.  Commerce asserted that Nucor failed to

address the record evidence on which Commerce had based its determination that

POSCO did not control Plantec during the POR.  2nd Remand Results at 29.

Regarding Nucor's second argument, Commerce stated that Nucor failed to develop the

---

[13] Pursuant to the agreement, the PPCFIC "has the right to, among other things, call
shareholder meetings, call board meetings, appoint or replace directors, approve
applications for recovery and bankruptcy procedures, dispose of property, approve new
financing and investment, approve mergers and acquisitions, and provide borrowing
guarantees."  2nd Remand Results at 20–21.

argument or explain why attribution would be appropriate when control is transferred to a new entity.  *See id.*

### B. Analysis

Before the court, Nucor again points to POSCO's majority ownership stake in Plantec.  Nucor's Cmts. at 11.  Nucor contends that Commerce's determination "turns on a Korean accounting technicality arising from participation by both POSCO and Plantec" in the alleged subsidy program.  *Id.*  Nucor characterizes POSCO's "partial loss of decision-making authority" as "a temporary granting of oversight authority" that "does not represent a transfer of 'control' over Plantec for the purpose of U.S. countervailing duty law."  *Id.* at 12.

The Government contends that Nucor failed to develop before Commerce the arguments that Nucor now requests the court to consider; as such, those arguments are barred by the doctrine of administrative exhaustion.  Def.'s Cmts. at 11–12.  The Government further contends that Nucor's arguments fail on their merits.  *See id.* at 13–14; *cf.* POSCO's Cmts. at 8–11 (advancing similar arguments on the merits).

As previously stated, "[c]ross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets."  19 C.F.R. § 351.525(b)(6)(vi).  While "[n]ormally, this standard will be met where there is a majority voting ownership interest between two corporations," *id.*, common ownership "is a fact-specific determination and calculating the percentage ownership of a company is not the end of the inquiry," *Nantong Uniphos Chems. Co. v. United States*, Slip Op. 18-78, 2018 WL

3134845, *3 (CIT June 25, 2018); *see also* 2nd Remand Results at 21 ("[C]ross-

ownership assessments are to be performed on a case-by-case basis, and consistent

with the facts on each record.").  Ultimately, Commerce is concerned with examining

whether "the interests of two corporations have merged to such a degree that one

corporation can use or direct the individual assets (or subsidy benefits) of the other

corporation in essentially the same ways it can use its own assets (or subsidy benefits)."

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,401 (Dep't Commerce Nov. 25, 1998)

(final rule).  Thus, Commerce may find that evidence of majority ownership is

outweighed by evidence demonstrating that the majority owner did not use or direct the

assets of the owned entity.  *See* Issues and Decision Mem. for Melamine from Trinidad

and Tobago, C-247-807 (Oct. 30, 2015) at 15 (declining to find cross-ownership despite

finding majority ownership); Issues and Decision Mem. for Stainless Steel Sheet and

Strip in Coils from the Republic of Korea, C-580-835 (Mar. 10, 2003) at 19–20 (majority

voting ownership insufficient when the owned entity was under court receivership).

      Nucor recognizes the limitations of its reliance on POSCO's majority ownership

when it asserts that "Plantec satisfies the requirement for *presumptive* cross-ownership

under Commerce's rules."  Nucor's Cmts. at 11 (emphasis added).  Presumptions may

be overcome, and, in this case, Commerce found that the "normal" manner in which

cross-ownership is found is outweighed by evidence regarding the transfer of rights to

the PPCFIC.  *See* 2nd Remand Results at 20–21.

      Nucor now seeks to challenge Commerce's interpretation of the record evidence.

Nucor's Cmts. at 11–13.  Nucor, however, had the opportunity to do just that when it

submitted comments on Commerce's draft remand results.  The doctrine of

administrative exhaustion is well-settled and requires a party to raise issues *with*

*specificity* and "at the time appropriate under [an agency's] practice."  *United States v.*

*L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 36–37 (1952).[14]  It is not enough for parties

to "mak[e] cryptic and obscure reference to matters that 'ought to be' considered and

then, after failing to do more to bring the matter to the agency's attention, seek[] to have

that agency determination vacated."  *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def.*

*Council, Inc.*, 435 U.S. 519, 554 (1978).

Nucor's argument on this issue to the agency consisted of one obscure

sentence: "To the extent that POSCO did in fact lose any controlling interest in

[Plantec], it was only by virtue of the very subsidy that was being alleged."  Nucor's

Cmts. on Draft at 3.  Commerce adequately addressed this assertion by explaining that

Commerce may not attribute a subsidy received by Plantec to POSCO unless it first

finds that the cross-ownership requirement is met.  2nd Remand Results at 29.  The

appropriate time for Nucor to further challenge Commerce's view of the record in the

first instance has passed.  Accordingly, Commerce's determination that Plantec did not

meet the requirements for cross-ownership pursuant to 19 C.F.R. § 351.525(b)(6)(vi) for

---

[14] "[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).

the POR, and, thus, did not qualify as a cross-owned input supplier pursuant to 19

C.F.R. § 351.525(b)(6)(iv) will be sustained.[15]

**CONCLUSION AND ORDER**

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's 2nd Remand Results are sustained in part and

remanded in part; it is further

**ORDERED** that Commerce shall reconsider or further explain its determination

not to investigate the off-peak sale of electricity allegedly for less than adequate

remuneration; it is further

**ORDERED** that Commerce shall file its remand redetermination on or before July

18, 2024; it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule

56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 3,000

words.

/s/    Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated: April 19, 2024
New York, New York

---

[15] In the event the court remanded this issue, Nucor requested the court to "reiterate its prior holdings regarding steel scrap and the converter vessel, and require Commerce to affirmatively address them if necessary based on any reconsideration of the cross-ownership issue." Nucor's Cmts. at 13. Because the court is sustaining Commerce's cross-ownership determination, the court need not further address Nucor's request.