C-580-888
Remand
Slip. Op. 24-49
POR: 01/01/2018 – 12/31/2018
~~Business Proprietary Document~~
PUBLIC VERSION
E&C/OVIII:  TEAM

***Nucor Corporation v. United States*,**
**698 F. Supp. 3d 1310 (CIT 2024)**
***Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea***

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO THIRD COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the third remand opinion and order of the U.S. Court of International

Trade (the Court or CIT) in *Nucor Corporation v. United States*, 698 F. Supp. 3d 1310 (CIT

2024) (*Third Remand Order*).  These final results of redetermination concern *Certain Carbon*

*and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  Final Results and Partial*

*Rescission of Countervailing Duty Administrative Review; 2018*, 86 FR 15184 (March 22, 2021)

(*2018 AR Final Results*), and accompanying Issues and Decision Memorandum (IDM).  In the

*Third Remand Order*, the Court ordered Commerce to further examine information regarding the

Korean electricity market, particularly Nucor's addressing of KEPCO's power trading statistics,

that appeared to detract from Commerce's conclusion and which Nucor relied upon to

substantiate the cost side of its benefit comparison.[1]

As discussed below, pursuant to the Court's *Third Remand Order*, Commerce has

addressed the parties' comments regarding Commerce's further explanation of its decision not to

initiate on the alleged provision of off-peak electricity for LTAR in light of the prevailing market

conditions in the Korean electricity system and the information submitted by Nucor in its new

---

[1] *See Third Remand Order* at 13-14.

subsidy allegations (NSAs).  After considering the parties' comments, we have provided further explanation regarding our analysis in the Third Draft Remand Redetermination regarding our consideration of the information on the record and available regarding the Korean electricity market within the context of a tier-three market principles analysis and why we did not consider the information timely provided by Nucor in its NSAs to supply a sufficient allegation of benefit without further context or alteration.[2]  As explained below, in these final results of redetermination, we continue to find that the off-peak electricity for LTAR NSA made by Nucor did not provide sufficient evidence of a benefit in the form of an inconsistency with market principles in the Korean electricity system for Commerce to initiate on the allegation.

## II.    ANALYSIS

<u>Background</u>

In the underlying administrative review, Commerce declined to initiate an investigation into Nucor Corporation's (Nucor) NSA that the Government of Korea (GOK) provided off-peak electricity for LTAR during the period of review (POR), January 1, 2018, through December 31, 2018, because Nucor failed to adequately support the existence of a benefit.[3]  Commerce made no change to its decision for purposes of the *2018 AR Final Results*.[4]

In its *First Remand Order*, the Court held that "{g}iven the substantial amount of information Nucor provided and the typically low bar for launching a CVD inquiry, Commerce's determination {was} unsupported by substantial evidence and lacking reasoned explanation."[5]

---

[2] *See* Memorandum, "Draft Results of Redetermination Pursuant to Third Court Remand," dated July 5, 2024 (Third Draft Remand Redetermination).

[3] *See* Memorandum, "Decision Memorandum on New Subsidy Allegations," dated April 1, 2020 (NSA Memorandum), at 7-9; *see also* Nucor's Letter, "Request for Reconsideration of New Subsidy Allegation," dated April 9, 2020 (Request for Reconsideration); *Final Results of Redetermination Pursuant to Court Remand, Nucor Corporation v. United States,* Consol. Court No. 21-00182, Slip Op. 22-116 (CIT 2022), dated January 31, 2023 (*First Remand Results*), available at https://access.trade.gov/resources/remands/22-116.pdf, at 2-6.

[4] *See 2018 AR Final Results* IDM at Comment 1; *see also First Remand Results* at 6.

[5] *See Nucor Corporation v. United States*, 600 F. Supp. 3d 1225 (CIT 2022) (*First Remand Order*) at 1234 (internal citations omitted).

As the Court explained, Nucor's allegation raised two questions: (1) whether the pricing of off-peak electricity could constitute a subsidy program distinct from Nucor's prior allegation regarding the sale of electricity for LTAR; and (2) whether Nucor's allegation satisfied the threshold for initiating an investigation into any such program.[6] The Court elaborated that Commerce's decision focused on the latter: "Nucor's asserted failure to provide a suitable benchmark to compare to the off-peak electricity prices POSCO paid," and that Nucor "did not explicitly address whether the off-peak supply of electricity within {Korea's time-of-use (TOU)} system may constitute a distinct subsidy program."[7] Consequently, "{t}he Court remanded Commerce's determination, explaining that although 'Commerce appeared to question the propriety of examining a segment of a time-of-use system, its discussion in this regard {was} cursory.'"[8]

In the *First Remand Results*, Commerce provided further explanation for the rationale underlying the agency's decision not to initiate an investigation into Nucor's off-peak electricity for LTAR allegation.[9] In that regard, Commerce relied on the Court's prior holdings in *RZBC Group*, clarifying that "petitioners must allege a subsidy as defined by statute" and that the allegation must be supported by "information reasonably available to them at the time of filing."[10] Commerce determined that the information referenced in support of the benefit allegation was insufficient to satisfy the initiation standard, given the fact that the alleged subsidy program involved a portion of an electricity tariff schedule and consequently, a subsidy program already analyzed by Commerce in previous allegations of electricity for LTAR. With

---

[6] *Id.*, 600 F. Supp. 3d at 1233.

[7] *Id.*

[8] *See Nucor Corporation v. United States*, 653 F. Supp. 3d 1295 (CIT 2023) (*Second Remand Order*) at 1300 (citing *First Remand Order*, 600 F. Supp. 3d at 1233).

[9] *See First Remand Results* at 11-21.

[10] *Id.* at 12 (citing *RZBC Group Shareholding Co., Ltd, et al. v. United States*, 100 F. Supp. 3d 1288, 1295 (CIT August 5, 2015) (*RZBC Group*)).

this previous analysis publicly available, Commerce would reasonably expect the petitioner to have a basic understanding of the operational functions of Korea's electricity market and cost system in this context.[11]

In its *Second Remand Order*, the Court held that there was inconsistency between the initiation standard articulated in the *First Remand Results* and the standard applied by Commerce therein.[12]  Specifically, the Court explained that Commerce's reliance on the low initiation standard described in *RZBC Group* was in contrast to a "heightened standard," described in *Delverde*, in which the Court held "'{w}hen allegations concern a program previously held noncountervailable,' Commerce may 'require{} a petition to contain evidence of changed circumstances … before an investigation is initiated.'"[13]  Consequently, the Court remanded for Commerce to reconsider or further explain, "{i}n the absence of a clearly articulated standard and an application of that standard to the entirety of the allegation made by Nucor."[14]

In the *Second Remand Results*, Commerce continued to find that Nucor failed to adequately support its allegation of off-peak electricity for LTAR.[15]  Commerce noted that *RZBC Group* acknowledges that there are certain requirements for an allegation beyond describing a subsidy practice as countervailable, namely, that a subsidy allegation should not omit pertinent facts reasonably available to the petitioner.[16]  Based on the information available, Commerce found that a successful benefit allegation of off-peak electricity for LTAR required a reasonable proxy for determining what prices the Korea Electric Power Corporation (KEPCO) might have paid at the specific point of off-peak hours.  Commerce further found that the explanation by the

---

[11] *See First Remand Results,* at 12-13.
[12] *See Second Remand Order*, 653 F. Supp. 3d at 1302.
[13] *Id.* (citing *Delverde, SrL v. United States*, 989 F. Supp. 218, 222 (CIT 1997) (*Delverde*), vacated on other grounds by *Delverde, SrL v. United States*, 202 F.3d 1360 (Fed. Cir. 2000)).
[14] *Id.*, 202 F.3d at 1302-03.
[15] *See Final Results of Redetermination Pursuant to Court Remand, Nucor Corporation v. United States*, Consol. Court No. 21-00182, Slip Op. 23-119 (CIT 2023), dated December 19, 2023 (*Second Remand Results*), available at https://access.trade.gov/resources/remands/23-119.pdf, at 2.
[16] *Id.* at 5-6 (citing *RZBC Group*, 100 F. Supp. 3d at 1295).

petitioner did not account for readily available information, given the extensive amount of information on the record for the program and available in prior cases and the alleged benefit was therefore insufficient for initiation of the allegation.[17]  Commerce noted that a successful allegation did not require that Nucor provide hour-by-hour electricity costs but instead required a reasonable explanation by the petitioner regarding the known nuances of cost and pricing in the Korean electricity system and how they further affected both these factors, and in particular the cost and price of electricity at off-peak hours, considering potential differences in the generators in terms of operation, usage, *etc*. at different hours.[18]

In the *Third Remand Order*, the Court again remanded Commerce's decision not to initiate on Nucor's allegation of off-peak electricity for LTAR.[19]  In its decision, the Court referenced its prior holding in the *Second Remand Order*, where it held that "{t}he agency had failed, however, to address evidence concerning differences between KEPCO's off-peak prices and KEPCO's cost of acquiring electricity from the lowest-cost generator, Korea Hydro and Nuclear Power Company Ltd. (KHNP), or explain why such information constituted insufficient evidence of a benefit … pursuant to the low standard of *RZBC Group*."[20]  The Court elaborates that in the *Second Remand Results*, Commerce failed to address this evidence and otherwise explain how such information was insufficient evidence under the low standard of *RZBC Group*.[21]  Thus, the Court remanded for Commerce to "respond to this particular aspect of the allegation" and either "explain why it constitute{s} insufficient evidence of a benefit for Commerce to investigate the off-peak pricing in particular pursuant to the low standard of *RZBC Group*, or otherwise reconsider its decision not to conduct such an investigation."[22]

---

[17] *Id.* at 14-15.
[18] *Id.*
[19] *See Third Remand Order*, 698 F. Supp. 3d at 1320.
[20] *Id.* at 1314 (internal quotations omitted).
[21] *Id.*
[22] *Id.* at 1314 (internal quotations omitted).

<u>Analysis</u>

As explained above, Nucor contends that Commerce has failed to identify the "reasonably available information" that Commerce asserts undermines the allegation.[23]  Nucor argues that the benefit comparison information provided as support for its allegation suggests the existence of a benefit because the GOK has claimed that lower off-peak costs arise not from time-of-day variations in the prices KEPCO pays to individual generators, but from variations in the mix of generators supplying electricity over the course of a day such as the use of cheaper fuel like nuclear generated electricity during off-peak hours.[24]  According to Nucor, the apparent stability reflected in the system marginal price (SMP) over the course of the day suggests minimal fluctuation in KEPCO's costs for both on-peak and off-peak purchases.[25]  Nucor also raised additional arguments for a separate benefit allegation related to KHNP's power trading statistics in its Request for Reconsideration; as detailed below, Nucor's additional benefit allegation was not raised until five months after the deadline for the NSA and four months after the deadline for responding to Commerce's NSA supplemental questionnaire.[26]  Thus, Nucor had two separate opportunities to raise this potential benefit allegation or otherwise supplement its original benefit allegation with this additional analysis, but it failed to do so until after Commerce released its decision declining to initiate on the program.

The Court held that Nucor arguably provided an explanation to Commerce regarding the costs incurred by KEPCO at off-peak hours when Nucor provided a comparison that "demonstrated that POSCO's average off-peak unit price was [          ] than KEPCO's KHNP

---

[23] *Id.* at 1315.
[24] *Id.* at 1315-1316.
[25] *Id.* at 1316.
[26] *See* Commerce's Letter, "Request for Extension to Submit New Subsidy Allegations," dated October 28, 2019 (NSA Extension Letter) (establishing an extended deadline of November 4, 2019); *see also* Commerce's Letter, "New Subsidy Allegation Questionnaire," dated December 20, 2019 (NSA Supplemental Questionnaire) (establishing a deadline of January 3, 2020); and Request for Reconsideration (filed April 9, 2020).

acquisition cost," and Commerce addressed this information in a "conclusory and confusing fashion."[27]  The Court, then, concluded that while "Commerce faults Nucor for failing to place its LTAR allegation in the context of broader market-principles analysis that Commerce has applied in prior segments or other proceedings involving the Korean electricity market … it is Commerce that has failed to consider Nucor's allegation within that context."[28]  The Court has now remanded for Commerce "to respond to this particular aspect of the allegation and either explain why it constitute{s} insufficient evidence of a benefit for Commerce to investigate the off-peak pricing in particular pursuant to the low standard of *RZBC Group*, or otherwise reconsider its decision not to conduct such an investigation."[29]

Given the complicated history of this issue and the Court's analysis of Commerce's explanation in the *Second Remand Order* and *Third Remand Order*, at the outset, Commerce sets forth its legal standards and the fundamentals of its analyses with respect to its initiation standard and the provision of a good or service for LTAR.  Moreover, Commerce has reviewed the language of the NSA Memorandum, which served as the initial basis for the issue discussed in the Court's *Third Remand Order* four years later, as support for "why {Nucor's allegation} constitute{s} insufficient evidence of a benefit for Commerce to investigate the off-peak pricing, in particular pursuant to the low standard of *RZBC Group*, or otherwise reconsider {Commerce's} decision not to conduct such an investigation."[30]

*Initiation Standard*

Commerce applies the same initiation standard for a subsidy allegation made in a petition and for an NSA submitted during the course of the investigation or administrative review.  Section

---

[27] *See Third Remand Order,* 698 F. Supp. 3d at 1315.
[28] *Id.*
[29] *Id.* at 1317.
[30] *See* NSA Memorandum; *see also*, *generally*, *Third Remand Order*.

702 of the Tariff Act of 1930, as amended (the Act) sets forth the procedures and initiation

standard for an alleged subsidy:

> When initiation of a CVD investigation is based upon the filing of a petition, section 702(b) states that "{a} countervailing duty proceeding shall be initiated whenever an interested party … files a petition with the administering authority, on behalf of an industry, which alleges the elements necessary for the imposition of the duty imposed by section 701(a), and which is accompanied by information reasonably available to the petitioner supporting those allegations."

> Section 702(c)(1)(A) also addresses initiation and states that "within 20 days after the date on which a petition is filed…the administering authority shall after examining, on the basis of sources readily available to the administering authority, the accuracy and adequacy of the evidence provided in the petition, determine whether the petition alleges the elements necessary for the imposition of a duty under section 701(a) and contains information reasonably available to the petitioner supporting the allegation … ."

A petitioner must allege the elements necessary for a potential countervailable subsidy,

including that an authority provides a financial contribution, a benefit is conferred, and the

alleged program is specific. In addition, a petitioner must support these allegations based on

"information reasonably available" to it. Moreover, the administering authority will examine the

accuracy and adequacy of the evidence provided by petitioner to support its allegation based on

the sources readily available to the administering authority. The SAA[31] and the legislative

history of the statute provide additional guidance on the initiation standard that should be applied

by Commerce.

The SAA[32] states: "{n}ew section 702(c)(1)(A)(I) … reflect{s} the requirements of the

Agreements that Commerce examine the accuracy and adequacy of the evidence provided in a

petition to determine whether the evidence is sufficient to justify initiation of an investigation.

---

[31] See Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA).
[32] Section 102(d) of the Uruguay Round Agreements Act states that "{t}he statement of administrative action approved by Congress under section 101(a) shall be regarded as the authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."

This amendment largely codifies existing Commerce practice, and the Administration believes that the amendment is consistent with the standards articulated in the legislative history of the Trade Agreements Act of 1979."[33] Despite the low threshold for initiation, both the statutory language and the legislative history of the Trade Agreements Act of 1979 establish that a petitioner must support each of the elements of a subsidy with information reasonably available to it. A review of the legislative history of the Trade Agreements Act of 1979 provides further understanding of our initiation standard. The House Report on the initiation provision states that:

> *... the Committee intends that {Commerce} will act on all petitions which, based upon the facts reasonably available to the petitioner, make reasonable allegations of the presence of the elements necessary for the imposition of a countervailing duty....*[34]

The Senate Report similarly indicates that investigations into alleged subsidies will be initiated except in unusual circumstances:

> *The Committee intends section 702(c)(1) to result in investigations being initiated unless the {administering} authority is convinced that the petition and supporting information fail to state a claim upon which relief can be granted under section 701 or the petitioner does not provide information supporting the allegation which is reasonably available to him.*[35]

Accordingly, the only standard for initiation of an alleged countervailable subsidy is that set forth in section 702 of the Act, addressed in the SAA and defined in the legislative history of the Trade Agreements Act of 1979. A petitioner is required by statute to allege the elements necessary for the imposition of a duty (*i.e.*, a countervailable subsidy) and to support that subsidy allegation with information reasonably available to it. In Commerce's understanding of the statute, there is only one standard for initiation of a subsidy allegation and that is the standard

---

[33] *See* SAA at 861.
[34] *See* Trade Agreements Act of 1979, H.R. Rep. No. 96-317 at 51 (1979) (The same cite to the House Report also states that Commerce can reject a subsidy allegation "not reasonably supported by the facts alleged *or which omit important facts which are reasonable available to the petitioner.*" (Emphasis added)).
[35] *See* S. Rep. No. 96-249 at 47 (1979) (emphasis added).

enacted by Congress under section 702 of the Act. We do not find another initiation standard in the statute. Indeed, the initiation standards set forth by the Court in both *RZBC Group* and *Delverde* support this view: the allegation must be supported by information reasonably available to the petitioner. In *Delverde*, there was more information reasonably available to the petitioner with respect to its subsidy allegation than in *RZBC Group*. Thus, the petitioner was required under the statute to support its allegation with that "reasonably available" information. As such, for this remand we will apply the standard established by the statute in section 702 of the Act and set forth in *RZBC Group* and examine Nucor's NSA under that standard.

<u>*Provision of Electricity for LTAR*</u>

Under section 771(5)(E)(iv) of the Act, with respect to the provision of a good or service, there is a benefit "if such goods or services are provided for less than adequate remuneration." In determining whether the government provision of a good or service is for adequate remuneration under 19 CFR 351.511(a)(2)(iii), if there are no in-country market-determined prices or world market price, Commerce will measure the adequacy of remuneration by assessing whether the government price is consistent with market principles.

In Commerce's view, many of the arguments submitted during this litigation relate to Commerce's interpretation of whether Nucor's NSA constitutes a "new subsidy" and the definition of a "program," especially given the nature of the allegation which is the provision of electricity. In these draft results of redetermination, we now clarify our understanding of how the proposed NSA relates to the previously reviewed, overarching subsidy program on Electricity for LTAR. Electricity is provided by KEPCO 24 hours a day, for every day of the year, and the rates that are charged by KEPCO are set forth in its industrial tariff schedule. Commerce has determined that KEPCO sets the rates in its tariff schedule to ensure that the aggregate revenue that it collects in a year covers all of its costs, including its operational costs for generating and

supplying electricity, as well as taxes and an investment return (profit).[36]  Moreover, at the time of the allegation, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) in *Nucor* ruled that KEPCO's aggregated-cost methodology for developing its tariffs was consistent with market principles and the standard of adequate remuneration as set forth within 19 CFR 351.511(a)(2)(iii) and section 771(5)(E)(iv) of the Act.[37]

The allegation by Nucor (*i.e.*, off-peak electricity rates), is part, or a subset of, KEPCO's overall electricity tariff schedule which, as noted above, has been determined to be consistent with market principles.  In essence, Nucor's off-peak allegation rests upon a fundamental principle or assertion:  the only valid, market-based tariff-setting methodology for electricity is one where for every period of the day for each day in the year, the rate charged must fully cover all of the utility's company's cost of generating and distributing electricity.  The implication of Nucor's argument is that a utility company setting its tariff schedule on the basis of yearly aggregated costs and revenue is not "market-based" or a recognized tariff-setting methodology within the utility sector.  Thus, in order for Nucor to support its off-peak allegation, it needs to provide evidence and information that:  (1) KEPCO's aggregated cost and revenue methodology used to set its tariff schedule is inconsistent with market principles; (2) KEPCO's aggregated costs and revenue methodology is not an acceptable or recognized methodology for the pricing of electricity; and (3) the only recognized tariff-setting methodology is one where the electricity company establishes tariffs which ensure that at every point during the 24 hours in a day, and for every day of the year, the company is providing electricity at a price which collects revenue to fully cover all of its costs.

---

[36] *See, e.g.*, *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Final Affirmative Determination*, 81 FR 49943 (July 29, 2016) (*Cold-Rolled Steel from Korea*), and accompanying IDM at 38 and Comment 2; *see also Countervailing Duty Investigation of Certain Hot Rolled Steel Flat Products from the Republic of Korea:  Final Affirmative Determination*, 81 FR 53439 (August 12, 2016) (*Hot-Rolled Steel from Korea*), and accompanying IDM at 25 and Comment 2.

Nucor has failed to provide any information in support of these basic assertions in a manner that is consistent with the standard for initiation set forth in the statute, *RZBC Group* and *Delverde*. The Federal Circuit in *Nucor* previously addressed the first two assertions, in particular whether KEPCO's aggregated cost and revenue methodology used to set its tariff schedule is inconsistent with market principles and whether KEPCO's aggregated costs and revenue methodology is not an acceptable or recognized methodology for the pricing of electricity.[38] In its opinion in *Nucor*, the Court upheld Commerce's findings that KEPCO's methodology for setting its tariff schedule is consistent with market principles and is an accepted and recognized methodology for the pricing of electricity.[39] Additionally, the third assertion, that electricity tariffs during every period during the day and year in which the utility is providing electricity, alleging the revenue collected at that point in time must fully cover all of the company's costs, is without merit. If Nucor's assertion is correct, the tariff schedule would either: (1) continuously change during the day and year, or (2) there would only be one tariff rate for the entire day and year commensurate with the period of the time within the calendar year where the costs of generating and delivering electricity are at their peak.

*NSA Memorandum*

In the NSA Memorandum, Commerce first explained why the benchmark information provided by Nucor did not support its benefit allegation for its off-peak time-of-day tariff allegation. However, Commerce provided additional explanation with respect to why Nucor's allegation failed to meet the legal standard for initiation; specifically, that Nucor failed to provide sufficient information that an examination of off-peak electricity in isolation would be consistent with the prevailing market conditions for electricity provision in Korea as required under section

---

[38] *See Nucor Corp. v. United States*, 927 F.3d 1243 (Fed. Cir. 2019) (*Nucor*).
[39] *Id.*

771(5)(E)(iv) of the Act.[40]  Commerce elaborated that the prevailing market condition in Korea is a TOU (time of usage) system which ensures that electricity is supplied consistently throughout a 24-hour period and that costs are recovered to the extent necessary to ensure future operations.[41]  Nucor failed to provide any information demonstrating that KEPCO's operations are outside the prevailing market conditions of an electricity utility in Korea, or that it would be appropriate to examine off-peak electricity in isolation of the overarching tariff schedule, as required by the statute.[42]

In hindsight, Commerce did not sufficiently focus on the key reason that Nucor's NSA ultimately fails.  Perhaps, before addressing whether Nucor's benchmark information supported its allegation that the "off-peak" tariff was lower than the costs of supply, Commerce should have first addressed the threshold issue, that Nucor failed to provide sufficient information that an examination of off-peak electricity in isolation of the entire market-based tariff schedule would be consistent with the prevailing market conditions for electricity provision in Korea as required under section 771(5)(E)(iv) of the Act.  Nucor was required to provide sufficient information to demonstrate KEPCO's operations are outside of "prevailing market conditions" as required under section 771(5)(E)(iv) of the Act and, thus, it could be appropriate to examine the off-peak electricity rate in isolation of the entire market-based tariff schedule.  However, *only if* Nucor could first demonstrate this condition would the off-peak tariff issue and benchmark data become relevant.  Nucor was thus required to properly allege and support these conditions with information reasonably available to it, to satisfy the initiation threshold set forth in the statute, *RZBC Group* and *Delverde*.

---

[40] *See* NSA Memorandum at 9.
[41] *Id.*
[42] *Id*.

*Commerce's Determinations on KEPCO's Provision of Electricity at the Time of Nucor's NSA*

Nucor submitted its NSA on off-peak electricity for LTAR on November 4, 2019.[43]  At the time, Commerce had extensive experience in the analysis of KEPCO's electricity operations and had verified KEPCO's costs and revenue data used to develop its industrial electricity tariffs. As Commerce stated prior to that date in *Hot-Rolled Steel from Korea*:[44]

> To develop the electricity tariff schedules that were applicable during the POI, KEPCO first calculated its overall cost, including an amount for investment return. This cost includes the operational cost for generating and supplying electricity to the consumers as well as taxes.  The cost for each electricity classification was calculated by (1) distributing the overall cost according to the stages of providing electricity (generation, transmission, distribution, and sales); (2) dividing each cost into fixed cost, variable cost, and the consumer management fee; and (3) then calculating the cost by applying the electricity load level, peak level, and the patterns of consuming electricity.  Each cost was then distributed into the fixed charge and the variable charge.  KEPCO then divided each cost taking into consideration the electricity load level, the usage pattern of electricity, and the volume of the electricity consumed.  Costs were then distributed according to the number of consumers for each classification of electricity.  For the POI, KEPCO more than fully covered its cost for the industry tariff applicable to our respondents.[45]

Moreover, on June 21, 2019, the Federal Circuit issued its decision in *Nucor*, wherein it reviewed the above description of KEPCO's methodology of using its annual aggregate costs and revenue to developed its tariff schedule.[46]  The Federal Circuit further explained that Commerce "also found, and gave specific reasons for finding, that KEPCO's pricing met familiar standards of cost recovery."[47]  The Federal Circuit in *Nucor* also elaborated on the meaning of section 771(5)(E)(iv) of the Act, holding that the statute commands that adequacy of remuneration be determined "in relation to prevailing conditions."[48]  According to the Federal Circuit, this

---

[43] *See* Nucor's Letter, "New Subsidy Allegations," dated November 4, 2019 (Nucor NSAs).
[44] *See Hot-Rolled Steel from Korea* IDM at Comment 2; *see also Cold-Rolled Steel from Korea* IDM at Comment 2, which made the same statement.
[45] *See Hot-Rolled Steel from Korea* IDM at Comment 2.
[46] *See Nucor*, 927 F. 3d at 1248.
[47] *Id.* at 1254.
[48] *Id.* at 1245, 1251.

statutory language means that an authority cannot charge "consistently low prices that no market participant could sustain."[49]  Nucor did not allege that KEPCO provides electricity at "consistently low prices that no market participant could sustain."[50]  The Federal Circuit relied on the Supreme Court's opinion in *Verizon* that "{t}he traditional legal criteria of proper public utility rates have always borne a strong resemblance to the criteria of the competitive market in long-run equilibrium."[51]  As the Federal Circuit elaborated, Commerce's market principles analysis set forth in 19 CFR 351.511(a)(2)(iii) is consistent with *that* standard.[52]

In *Nucor*, the Federal Circuit explained that satisfying the statutory standard of adequate remuneration and the implementing regulation requires showing that the government's price is not too low considering what the authority is selling.[53]  According to the Federal Circuit, this standard is significant but limited in constraining Commerce and  leaves a large range of potential implementation choices.[54]  The Federal Circuit concluded:

> {o}ne need only look outside the present statutory context to the familiar rate-regulation context to see the great variety of methodologies used over time to ensure that rates of a monopoly provider are not too low, some directly focus on value (such as 'fair value'), some on various measures of 'costs' (which may reflect value).  Commerce has considerable *prima facie* leeway to make a reasonable choice within the permissible range, and properly justify its choice, based on the language and policies of the countervailing duty statute as well as practicality and other relevant considerations.[55]

In deciding not to initiate an investigation into Nucor's allegation, Commerce explained that Nucor had failed to provide sufficient information that an examination of off-peak electricity in isolation would be consistent with the prevailing market conditions for electricity provision in

---

[49] *Id.* at 1251.
[50] *Id.* at 1251.
[51] *Id.* at 1252-54 (citing *Verizon Communications, Inc. v. FCC*, 535 U.S. 467, 505 (2002) (*Verizon*)).
[52] *Nucor*, 927 F. 3d at 1254.
[53] *Id.*, 927 F. 3d at 1255.
[54] *Id.*
[55] *Id.*, 927 F. 3d at 1254-55.

Korea as required under section 771(5)(E)(iv) of the Act.[56]  Commerce elaborated that the prevailing market condition in Korea is a TOU system which ensures that electricity is supplied consistently throughout a 24-hour period and that costs are recovered to the extent necessary to ensure future operations.[57]  In the NSA Memorandum, Commerce noted that Nucor failed to provide sufficient information demonstrating that KEPCO's operations are inconsistent with the prevailing market conditions in Korea – a TOU system, as required by the statute.[58]  Even if the evidence presented by Nucor supporting its benefit allegation of off-peak pricing *was* accurate, Commerce finds that it would be insufficient for the purposes of initiation, for the reasons explained below.

In the *First Remand Results*, Commerce explained that, at the time of the allegation, there was "information reasonably available" to Nucor on KEPCO's cost methodology used to develop its industrial tariff schedule.[59]  At the time of Nucor's allegation, Commerce had thoroughly examined KEPCO's electricity operations and its tariff-setting methodology.  As explained above, this analysis was set forth in prior determinations, including *Hot-Rolled Steel* and *Cold-Rolled Steel.*  Beyond the information placed on the record by Nucor itself regarding KEPCO's payments to the generators and cost recovery, the various decisions, both by Commerce and by the Federal Circuit, on KEPCO's provision of electricity constituted "information reasonably available" under the initiation standard mandated by the statute.  As discussed by Nucor in its subsidy allegation, the Federal Circuit in *Nucor* elaborated on both the meaning of section 771(5)(E)(iv) and Commerce's implementing regulation at 19 CFR 351.511(a)(2)(iii), such that

---

[56] *See* NSA Memorandum at 9.
[57] *Id.*
[58] *Id.*
[59] *See First Remand Results* at 17-21.

Nucor had the ability to understand what would be required to properly allege an Electricity for LTAR program in Korea.[60]

Moreover, verified data reviewed and discussed in Commerce decisions prior to Nucor's subsidy allegation showed that KEPCO develops its tariff schedule by calculating its overall aggregated costs, including an amount for investment return (profit), thereby ensuring the aggregated revenue garnered under its schedule will cover all of its costs and provide for an annual investment return.[61] In prior cases, Commerce had determined, as required by the statute, that the aggregated-costs methodology used by KEPCO to determine its electricity tariff schedule provided adequate remuneration in relation to the prevailing market conditions because this aggregated-costs methodology was consistent with market principles. Specifically, KEPCO's aggregated-costs methodology is consistent with market principles because the resultant electricity tariff schedule is designed to generate aggregated-yearly revenue to cover KEPCO's costs plus a return to ensure future operations. Considering Commerce's determinations in *Hot-Rolled Steel* and *Cold-Rolled Steel* were issued to the public in 2016, there is no doubt that this information was "reasonably available" to Nucor. Moreover, the Federal Circuit issued its judgment in *Nucor* three months prior to Nucor's filing of its off-peak electricity; therefore, the Federal Circuit's judgment in *Nucor* was information "reasonably available" to Nucor. In *Nucor*, the Federal Circuit addressed Commerce's market-principles analysis of KEPCO's provision of electricity and its tariff-setting methodology.[62] The Federal Circuit explained that, to satisfy the statutory standard of adequate remuneration, and the implementing regulation, provision of a good in a manner "consistent with market principles"

---

[60] *See* Nucor NSAs at 7-8 (citing *Nucor*, 927 F. 3d at 1243, 1254).
[61] *See Hot Rolled Steel from Korea* IDM at Comment 2; *see also Cold Rolled Steel from Korea* IDM at Comment 2, which made the same statement.
[62] *See Nucor*, 927 F.3d 1243.

requires that the government is not charging "consistently low prices that no market participant

could sustain."[63]

The Federal Circuit also addressed the context of the statutory requirement of "adequate

remuneration" in utility pricing with Supreme Court decisions.[64] According to the Federal

Circuit, for more than a hundred years, laws regulating the rates charged by utilities or common

carriers have stated requirements that rates be nondiscriminatory and that the rates be "just and

reasonable."[65] As the Federal Circuit explained, with respect to utility tariffs, "ensuring recovery

of value or costs was described by the Supreme Court in several decisions using the language of

guaranteeing adequate remuneration."[66] Referencing the Supreme Court's decision in *Verizon*,

the Federal Circuit also placed Commerce's statutory adequate remuneration analysis of

KEPCO's tariff-setting methodology in the "context to the familiar rate-regulation context to see

the great variety of methodologies used over time to ensure that rates of a monopoly provider are

not too low, some directly focused on value (such as 'fair value'), some on various measures of

'costs.'"[67] The Federal Circuit went further and ruled that Commerce "found, and gave specific

reasons for finding, that KEPCO's pricing met familiar standards of cost recovery."[68]

Therefore, in analyzing Nucor's off-peak electricity allegation, because Nucor was

alleging the provision of electricity for LTAR within the Korean market, we placed our initiation

analysis in the context of Commerce's prior adequate remuneration market principles analysis of

KEPCO's tariff-setting methodology, which were upheld by the Federal Circuit in *Nucor*. Within

this context, Commerce reviewed Nucor's allegation under the standards discussed by the Court

in *RZBC Group*, "subsidy petitions are granted unless the allegations 'are clearly frivolous, not

---

[63] *Id.* at 1251.
[64] *Id.* at 1252-54 (citing *Verizon*, 535 U.S. at 505).
[65] *Id.* at 1250.
[66] *Id.* at 1250.
[67] *Id.* at 1254-55.
[68] *Id.* at 1254.

reasonably supported by the facts alleged or ... omit important facts which are reasonably available to the petitioner.'"[69]  Even under the "low standard of the *RZBC Group*," a petitioner is required under the statute to provide "information reasonably available to the petitioner supporting the allegation" and cannot "omit important facts which are reasonably available to the petitioner."[70]

As explained in the NSA Memorandum, Commerce's decision was also based on Nucor's failure to provide sufficient information that an examination of off-peak electricity in isolation would be consistent with prevailing markets conditions for electricity in Korea as required under section 771(5)(E)(iv) of the Act.[71]  In its allegation, Nucor attempted to provide information that KEPCO may not be covering its costs during off-peak periods.  However, Nucor failed to provide any support for its allegation that KEPCO's tariff-setting methodology is not consistent with market principles and does not provide "adequate remuneration" with respect to the provision of electricity within the Korean market.  Instead, by focusing primarily on off-peak prices located within a TOU electricity system, Nucor ignored the overarching context that those off-peak prices existed in, and asked Commerce to review those prices devoid of such context in its allegation.[72]  In addition, Nucor provided no information to address or refute the Federal Circuit's ruling that KEPCO's costs methodology used to develop its tariff schedule "met familiar standards of costs recovery" in which there are a "great variety of methodologies" used to set tariffs/rates for a utility monopoly provider.[73]

---

[69] *See RZBC Group*, 100 F. Supp. 3d at 1295 (quoting H.R. Rep. No. 96–317 (1979), at 51).

[70] *See* Trade Agreements Act of 1979, H.R. Rep. No. 96-317 (1979), at 51.  The legislative history of the Trade Agreements Act of 1979 referenced in the SAA also states that Commerce can reject a subsidy allegation "not reasonably supported by the facts alleged or which omit important facts which are reasonable available to the petitioner."

[71] *See* NSA Memorandum at 9; *see also* 19 CFR 351.511(a)(2)(iii).

[72] *See* Nucor NSAs at 7 (wherein Nucor requested Commerce investigate the subsidy "notwithstanding {Commerce's findings} from the original investigation").

[73] *See Nucor*, 927 F.3d at 1254-55.

Nucor's off-peak allegation was made within the context of Commerce's decision that KEPCO's aggregated-cost methodology for setting its tariff schedule is consistent with market principles.[74]  In other words, Nucor failed to provide sufficient information demonstrating that KEPCO's pricing during off-peak hours was outside prevailing market conditions of an electricity utility in Korea, or otherwise inconsistent with respect to, "prevailing market conditions for the good or service being provided … in the country subject to the investigation or review."[75]  Therefore, even if, *arguendo*, Nucor had supported its contention that off-peak prices charged by KEPCO did not fully cover all of its cost of supply during off-peak hours, the allegation would have *still* failed given that the allegation ignored the electricity system in which those prices exist (*i.e.*, a TOU system).  In a TOU electricity system, KEPCO provides electricity 24 hours a day, 365 days a year, which KEPCO has accounted for by establishing an aggregated costs methodology to develop the electricity prices set in its tariff schedule.  Nucor has failed to demonstrate that Commerce's decision in the NSA Memorandum, that Commerce does not have to consider the off-peak allegation in isolation of KEPCO's overall tariff schedule, is inconsistent with the adequate remuneration standard set forth under section 771(5)(E)(iv) of the Act; and is also inconsistent with the decision made by the Federal Circuit in *Nucor*.

---

[74] *See* Nucor's Letter, "New Subsidy Allegations Questionnaire Response," dated December 31, 2019 (NSA Supplemental QR), at Exhibit 1, pp. 31, 53-57, which includes statements such as:  "Most importantly, the electricity tariff rate we {KEPCO} charge to our customers are regulated by the Government taking into account, among others, our need to recover the costs of operations, make capital improvements, and recoup a fair return on capital invested by us." (p.31); "We {KEPCO} apply time-of-use and seasonality tariff, which are structured so that higher tariffs are charged at the time of peak demand to select types of customers, and we also apply a progressive rate structure for residential use of electricity.  We have several demand management programs to control demand and induce power conservation during peak hours and peak seasons …" (p.54);  "… electricity rates are established at levels that would enable us {KEPCO} to recover our operating costs attributable to our basic electricity generation, transmission and distribution operations as well as receive a fair investment return on capital used on those operations." (p.55); and  "The tariff rates we {KEPCO} charge for electricity vary among the different classes of consumers, which principally consist of industrial, commercial, residential, educational and agricultural consumers.  The tariff also varies depending upon the voltage used, the season, the time of usage …" (p.56); *see also Cold-Rolled Steel from Korea* IDM at 38 and Comment 2; and *Hot-Rolled Steel from Korea* IDM at 25 and Comment 2.
[75] *See* section 771(E) of the Act.

<u>*Nucor's Request for Reconsideration*</u>

To comply with the *Third Remand Order*, Commerce now additionally addresses the questions presented by the Court regarding whether Nucor provided sufficient evidence that detracted from the weight of Commerce's determination.  First, the Court explained that Nucor compared KEPCO's cost of acquiring electricity from its lowest cost generator (*i.e.*, KEPCO's KHNP generation company), to KEPCO's weighted-average off-peak prices paid by POSCO, which Nucor claims demonstrated that POSCO's average off-peak unit price was [    ] than KHNP's acquisition costs, and that stability in the SMP across hours in the TOU system "also reflects stable prices paid to each individual generator."[76]  The Court remanded for Commerce to further consider Nucor's allegation within the context of the broader market principles analysis and engage specifically with Nucor's reasons for relying on KEPCO's KHNP acquisition cost. The Court explained that Commerce had not shown "that any hourly price variation for KHNP is available to Nucor," and if "much, if any, variation would exist," in the prices of electricity paid to the GENCOs at any given hour."  According to the Court, Commerce failed to explain why Nucor relied on the "variable component of the price POSCO paid" and how such information on the record did not further support Nucor's allegation for the purposes of the initiation standard set forth in *RZBC*.[77]  The Court held that Nucor's comments explained that the cost of acquiring electricity from KHNP represented only the variable cost to KEPCO because it did not include KEPCO's costs incurred in transmission and distribution, and that Commerce had not fully explained why that information did not sufficiently support a benefit allegation.[78]

As discussed above, section 702(b)(1) of the Act states that a petitioner must allege the elements necessary for the imposition of duty as set forth by section 701(a) of the Act.  In the

---

[76] *See Third Remand Order*, 698 F. Supp. 3d at 1316.
[77] *Id.* at 1316-1317.
[78] *Id*.

NSA Memorandum, Commerce noted that the basis for Nucor's allegation of benefit for off-peak electricity for LTAR "confers a benefit to the extent that the price falls below a market-determined benchmark, pursuant to section 771(5)(E)(iv) of the Act … in the absence of market-based prices reflecting fair value, the supplier must cover its costs and earn a profit.  In this case, Nucor alleges that during the POR, KEPCO's off-peak industry electricity prices were significantly lower than the cost of supply … ."[79]  Thus, Nucor had a duty to submit an explanation supporting how, according to its allegation, a benefit was conferred in the form of the off-peak electricity prices being for LTAR.

As Commerce stated in the NSA Memorandum, "we examined the evidence provided to …support the allegation…including all exhibits referenced therein.  We relied on all information submitted."[80]  However, the reliance on the documentation is specifically for support of the allegation, made by the alleger of the subsidy, not for the purposes of Commerce creating or amending the allegation itself.  The nature of the allegation in question requires that, to provide support for a benefit, the alleger of the subsidy must establish that a benefit is conferred under section 771(5)(E) of the Act.  According to Nucor's allegation, the benefit was that the off-peak electricity prices paid by POSCO were lower than the cost of supply; thus, Nucor had a duty to establish this fact, to the extent information was reasonably available, at the time of the allegation.  Nucor originally made a benefit allegation by comparing the variable prices of electricity in the tariff schedule[81] and POSCO's reported cost of purchase for off-peak electricity,[82] *i.e.*, to the hourly SMP reported by Korea Power Exchange (KPX) data.[83]  Nucor argued that this comparison showed that the cost incurred by KEPCO, as evidenced by the SMP,

---

[79] *See* NSA Memorandum at 6.
[80] *Id.* at 7.
[81] *See* Nucor NSAs at 8-9 (ranging from 53.7 Korean won per kilowatt hour (KRW/kWh) to 68.6 KRW/kWh).
[82] *Id.* at 14 (POSCO's reported cost of purchase for off-peak electricity, as alleged in the Nucor NSAs, was an alleged weighted average price of [    ] KRW/kWh).
[83] *Id.* at 10-11.

was significantly higher than KEPCO's tariff schedule rates for off-peak electricity at an average of 93.17 KRW/kWh and varied "within a relatively narrow range of approximately 15 KRW/kWh."[84]  Nucor further argued that KPX data showed that the annual average cost of sale for industrial electricity was 106 KRW/kWh in 2018, and the benefit was likely greater than the value of the SMP.[85]  To the extent that Commerce has focused on these numbers during the Court's remand proceedings, we have done so because those were the allegations specifically made by Nucor, and the argument provided to support Nucor's benefit allegation.  Nucor's allegation was that "off-peak industrial electricity prices are significantly below the cost of supply;" to that end, when analyzing the support for the allegations, Commerce attempted to address the two factors of:  (1) the alleged cost of supply; and (2) the prices paid by POSCO, on the basis in which they were alleged.[86]

Commerce has extensively discussed the available information regarding the SMP and the Korean electricity system in previous remand redeterminations, and we have found that it is neither an appropriate proxy for the cost of electricity to KEPCO at any given hour, nor does a "similar" SMP across all hours necessarily indicate that the quantity of electricity purchased from KEPCO's generation companies was precisely the same at any given hour.  However, even if Commerce were to accept Nucor's assertion that similarities in the SMP across hours, and consistent usage of *industrial* electricity across all hours,[87] this would signify that KEPCO would have incurred a nearly identical cost of generation.  Instead, Nucor compares the variable price

---

[84] *Id.*

[85] *Id.* at 14-15.

[86] *Id.* at 14.

[87] We note that Nucor provided additional newspaper articles stating that *industrial* electricity use is similar or the same at on-peak or off-peak hours.  However, while Commerce is ultimately concerned with the price-to-cost comparison of off-peak industrial electricity to KEPCO's costs for the purposes of this allegation, accounting for KEPCO's costs of electricity generation at any given hour requires consideration of the total amount of electricity generated during off-peak versus on-peak hours, including usage of other types of electricity that do not have heavy usage at off-peak hours, such as residential and commercial electricity.  *See* Nucor NSAs at Exhibits 7 ("54 percent of *Large Companies* use Midnight Electricity,"), 10 ("Over half of the *manufacturing industry* uses midnight power … ."), and 12 ("*Industrial* Late-Night Electricity Rates Should Be Raised,") {emphasis added}.

23

of electricity paid by POSCO (*i.e.*, the off-peak industrial electricity KRW/kWh "energy charge") to the total average cost incurred by the generators at face value and does not account for the other fixed charges in the tariff schedule that POSCO pays in accordance with the industrial tariff schedule (*i.e.*, the KRW/kilowatt "demand charge" that companies in Korea pay as a fixed cost for electricity).[88]

Commerce clarifies that, when we referred to the "variable component of the price POSCO paid," we were referring to the use of the [    ] KRW/kWh off-peak electricity energy charge paid by POSCO, which Nucor relied on as a point of comparison without the further context that the demand charge in the tariff schedule would necessarily increase the per-unit value POSCO pays for electricity.[89] An apples-to-apples comparison of the full costs KEPCO incurs in paying to the generators requires the full cost of electricity paid by POSCO. Making such a comparison with just the off-peak "energy charge" is the equivalent to comparing the full benchmark cost, including taxes and freight, of a good for LTAR in a tier two world market price analysis (under 19 CFR 351.511(a)(2)(ii)) to a purchase price by a respondent that only reflects the value of the good.

More importantly, while the power trading statistics for KEPCO's six wholly-owned, government-operated subsidiary electricity generating companies (GENCOs) (*i.e.*, KHNP), were provided in KEPCO's Form 20-F filed to the U.S. Securities and Exchange Commission for the POR, and there was previously discussion of all of KEPCO's costs incurred in the provision of electricity from Commerce's verification of the investigation of *CORE from Korea* in 2016,

---

[88] *Id.* at Exhibit 4.
[89] This calculation and analysis of costs is common and Commerce accounts for the fixed and additional charges within the tariff schedule in every Korean electricity benchmark. The system of provision of electricity and KEPCO's cost recovery were established and verified in the investigation of *CORE from Korea* in 2016. *See Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Korea: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 81 FR 35310 (June 2, 2016) (*CORE from Korea*), and accompanying IDM at Comments 1-3.

which Nucor cited in its NSA allegation,[90] Nucor did not allege that any of these facts were pertinent to the provision of off-peak electricity for LTAR[91] until *after* Commerce had declined to initiate on the off-peak electricity for LTAR subsidy allegation.[92]

Nucor first argued that the use of KHNP's and other power trading statistics, rather than the SMP, could approximate representative prices of GENCOs received as a result of the KPX electricity pricing formula, in its Request for Reconsideration made after Commerce declined to initiate on the allegations, wherein it argued:[93]

> The lowest unit price was KRW 67.38 for KHNP, which supplied only 24.6% of total electricity in 2018. The lowest-priced generator, in other words, [
>
>
> ]. {Commerce's} conclusion is thus unsupported by substantial evidence even assuming that the lowest-cost generator supplied {one hundred percent} of off-peak electricity, with fair value measured as whatever price results from the KPX's pricing formula for that specific generator.

Commerce has no legal obligation to consider, or reconsider, realleged NSAs that were rejected as insufficient during the same administrative review. Under 19 CFR 351.301(c)(2)(iv)(B), Commerce need only consider timely filed allegations, *i.e.*, allegations filed 20 days after all responses to initial questionnaires are filed with Commerce.[94] Commerce provided an additional opportunity for Nucor to amend the allegation or provide additional information and, as discussed in the *First Remand Results*, found that Nucor failed to sufficiently amend its

---

[90] *See* Nucor NSAs at 7 ("The 'standard pricing mechanism' analysis that {Commerce} applied in the original investigation is the same analysis that it applied in the investigation of {*CORE from Korea*}.")

[91] We note, for instance, that KEPCO's fixed costs of transmission and distribution were established in *CORE from Korea*'s verification in 2016 but were not called into question by Nucor until these remand proceedings. Such information was available from the time of allegation and could have been used to accurately discuss an estimation of KEPCO's costs. *See CORE from Korea* IDM at Comments 2 and 3.

[92] *See*, *generally*, Nucor NSAs; *see also* NSA Supplemental QR.

[93] *See* Request for Reconsideration at 7-8.

[94] We note that, for the proceedings in question, Commerce extended this deadline an additional week per Nucor's request to allow them additional time to file its NSA. *See* NSA Extension Letter.

allegation of benefit to account for readily available information regarding the Korean electricity market that called the reasonability of its allegation of benefit into question.[95]

Nucor's arguments rest on the presumption that Commerce erred in not using the information on the record to create a new, sufficient benefit allegation for Nucor to replace the benefit allegation Commerce found insufficient.  However, Commerce has no such responsibility to amend the allegation itself in order to create a new allegation that satisfies the necessary elements of a benefit allegation.  As discussed above, both the statutory language and the legislative history of the Trade Agreements Act of 1979 establish that it is the petitioner that bears the burden to submit an adequate allegation and must support each of the elements of a subsidy.  In the case of Nucor's Request for Reconsideration, the information provided regarding KHNP specifically requires further adjustment to create a reasonable benchmark, and evidence on the record indicates it may not have demonstrated a benefit even had this benefit allegation been properly raised and the calculations were performed.[96]  More specifically, the values highlighted in Nucor's Request for Reconsideration were not incorporated into Nucor's explanation of alleged benefit in its NSA or raised in its supplemental responses to Commerce, required further explanation to support an allegation of benefit, and would require additional information or calculations to determine whether they were a reasonable comparison to POSCO's prices paid, whether they were reflective of off-peak hours, and how they were reflective of KEPCO's cost recovery.  Had Nucor timely alleged its realleged benefit explanation regarding KHNP, Commerce would have had to issue additional supplemental questionnaires to

---

[95] *See* NSA Memorandum at 7-9.

[96] We note that Nucor submitted both KEPCO's electricity tariff schedule and POSCO's electricity template, including demand charges, from the investigation on the record for use as a benchmark in its allegations and this information could have been used to create a full price paid at off-peak hours based on the electricity tariff schedule. *See* Nucor NSAs at Exhibits 4 and 6.  This information indicates that the program might still have not demonstrated a benefit if Nucor had properly adjusted its benchmark.

Nucor to modify these allegations to accurately create an apples-to-apples comparison for the prices paid by POSCO and the costs incurred by the GOK.

As discussed extensively in the *First Remand Results*, Nucor relied solely on its allegation regarding the SMP's lack of fluctuation and continued to maintain that the SMP was reasonably reflective of KEPCO's costs at any given hour, and did not account for the fact that the SMP alone is not an accurate reflection of the cost of electricity incurred by KEPCO.[97]  In essence, the benefit allegation based on KHNP's power trading statistics is separate and distinct and would require a proper allegation separate from Nucor's allegation based on the SMP, as it involves two different methods of comparison based on entirely separate points of comparison. Commerce is not statutorily obligated to make assumptions regarding what Nucor intended to allege to sufficiently support a benefit allegation in its NSA, or to otherwise fabricate a new benefit allegation based on other information on the record that was not timely referenced by Nucor in its NSA and supplemental responses.  The fact that these arguments submitted by Nucor regarding KHNP's power trading statistics were provided past the deadline for an NSA and the deadline for submitting supplemental responses to Commerce's supplemental NSA questionnaire does not constitute a failure on Commerce's part to identify evidence from supporting documentation on the record.  Addressing newly alleged arguments raised after the fact on rejected allegations in such a manner is not within the initiation standard of *RZBC Group*; to do so would invalidate the deadline set by Commerce's regulations under 19 CFR 351.301(c)(2)(iv)(B) for NSAs to be properly alleged 20 days after the filing of all initial questionnaire responses in an administrative review, and would create a scenario wherein petitioners could continue to submit different variations of their allegation until they find one that Commerce finds sufficient without regard for the regulatory deadline.  For these reasons, we

[97] *See* NSA Supplemental QR at 4-5.

continue to find that Nucor did not provide a timely and sufficient allegation of benefit for the alleged provision of off-peak electricity for LTAR program.

*Summary*

The Court held that while "Commerce faults Nucor for failing to place its LTAR allegation in the context of broader market-principles analysis that Commerce has applied in prior segments or other proceedings involving the Korean electricity market … it is Commerce that has failed to consider Nucor's allegation within that context."[98]  The Court remanded for Commerce "to respond to this particular aspect of the allegation and either explain why it constitute{s} insufficient evidence of a benefit for Commerce to investigate the off-peak pricing in particular pursuant to the low standard of *RZBC Group*, or otherwise reconsider its decision not to conduct such an investigation."[99]

Consistent with the *Third Remand Order*, we have addressed Nucor's off-peak electricity allegation in the "context of broader market-principles analysis" that Commerce has applied to its analysis of the Korean electricity market.  We explained that in our broader market-principles analysis of the Korean electricity market, KEPCO develops its tariff schedule using a methodology that takes all of its yearly aggregated costs in generating and delivering electricity including accounting for taxes and a return on investment (profit) and then sets rates that will generate aggregated revenue from its tariff schedule to cover these aggregated costs, taxes and provide for a return on investment.

We have also addressed the arguments raised in Nucor's Request for Reconsideration as highlighted by the Court, explaining that Nucor's reliance on KHNP's power trading statistics in its filings before this Court constituted a new benefit allegation raised after the deadline for

---

[98] *See Third Remand Order,* 698 F. Supp. 3d at 1316.
[99] *Id.* at 1317.

submission of an NSA or supplemental responses supporting Nucor's already filed and rejected NSA. Thus, Commerce was under no obligation to reconsider its decision not to initiate on the original NSA based on a realleged variation of the same subsidy in a submission after the deadline had already passed.

Based on the standards set forth in section 702 of the Act and *RZBC Group*, Nucor's allegation failed because it was "not reasonably supported by the facts alleged" and "omit{ted} important facts which {were} reasonably available to the petitioner."[100] As explained above, Nucor alleged a subsidy of off-peak electricity for LTAR within Korea's TOU electricity system and the prevailing market conditions in Korea. An allegation that specific prices at certain hours do not fully recover costs at that time of day does not support a finding that KEPCO's pricing is inconsistent with market principles under 19 CFR 351.511(a)(2)(iii) when the reality is that KEPCO utilizes an aggregated-costs and revenue tariff setting methodology that takes lower prices at certain times of day into account in ensuring KEPCO recovers KEPCO's costs plus a return on investment (profit).

Furthermore, the standard set forth in 19 CFR 351.511(a)(2)(iii) states that adequacy of remuneration is measured based on an assessment of whether the government price is consistent with market principles. Thus, the mere fact that KEPCO did not recover its costs on all electricity sales during off-peak hours is insufficient to support an allegation that KEPCO was acting inconsistent with market principles. As explained previously, the Federal Circuit has upheld Commerce's determination that KEPCO's pricing methodology is consistent with market principles.[101] The Federal Circuit, citing the Supreme Court ruling in *Verizon*, also reviewed Commerce's statutory adequate remuneration analysis of KEPCO's tariff-setting methodology

---

[100] *See RZBC Group*, 100 F. Supp. 3d at 1295.
[101] *Id.* at 1254.

within "the familiar rate-regulation context to see the great variety of methodologies used over time to ensure that rates of a monopoly provider are not too low," where "some directly focused on value (such as 'fair value'), some on various measures of 'costs.'"[102]  The Federal Circuit went further and ruled that Commerce "found, and gave specific reasons for finding, that KEPCO's pricing met familiar standards of cost recovery."[103]

Thus, Nucor needed to support its allegation that off-peak electricity was being provided for LTAR by providing evidence, and submitting an allegation based on that evidence, that KEPCO's pricing at off-peak hours is inconsistent with market principles while taking into account the prevailing market conditions in Korea.  Instead, Nucor's allegation that certain subsets of KEPCO's pricing indicate that it did not recover its costs through its off-peak electricity prices completely ignores the broader context and prevailing market conditions in the country at issue, the Federal Circuit's prior decision on those prevailing market conditions, and the overarching methodology relied on by KEPCO to set those prices.  A comparison of KEPCO's cost of acquiring electricity from its lowest cost generator during off-peak hours to KEPCO's weighted-average off-peak prices paid by POSCO does not, alone, support a determination that those prices are providing a benefit in the form of electricity for LTAR.  This is particularly true given the fact that KEPCO relies on an aggregated-cost methodology, which Commerce has previously found is consistent with market principles and has been upheld by the Federal Circuit.  Instead, an allegation would need to discuss how those off-peak prices are inconsistent with market principles and take into account the prevailing market conditions in Korea, in which KEPCO provides electricity 24 hours a day, 365 days a year.

---

[102] *Id.* at 1256.
[103] *Id.* at 1254.

Nucor ultimately failed to support its allegation because the explanations it provided in alleging that KEPCO's off-peak electricity pricing was inconsistent with market principles was actively rebutted by other evidence on the record discussing KEPCO's aggregated-cost price setting methodology[104] and prior Federal Circuit decisions on that price setting methodology.[105] Commerce reviewed Nucor's allegation as it was alleged and supported in Nucor's NSA and supplemental responses. The first references to KHNP's power trading statistics as evidence of a benefit, which the Court references in its *Third Remand Order*, were not provided until Nucor's Request for Reconsideration, and constitute an entirely separate allegation of benefit that fails for several reasons. First, arguments based on this information would have been an appropriate response to Commerce's supplemental questionnaire but were not incorporated into those responses.[106] Second, this new benefit allegation was first provided after the deadline for any NSA subsidy allegations in Nucor's Request for Reconsideration.[107] Nucor cannot cite any statutory or regulatory provisions that allow it to reallege a benefit allegation to modify their NSA after the deadline for both the initial NSA and responses to Commerce's supplemental questionnaire have lapsed. Thus, the facts alleged and properly filed before the deadline for such information did not include Nucor's allegation regarding KHNP's power trading statistics, and Commerce's decision not to initiate was appropriate under the standards set forth in section 702 of the statute and *RZBC Group*. Commerce has no obligation under its regulations or the Act to create a new benefit allegation for the petitioner that it would find sufficient based on the information it provided in support of a different variation of potential benefit. Instead, as explained above, the burden to submit a subsidy allegation properly alleging each element of a

---

[104] *See, e.g.*, *Cold-Rolled Steel from Korea* IDM at 38 and Comment 2; *see also Hot-Rolled Steel from Korea* IDM at 25 and Comment 2.
[105] *See Nucor*, 927 F.3d at 1243.
[106] *See* NSA Supplemental QR at 4-5.
[107] *See* Request for Reconsideration at 7-8.

countervailable subsidy falls on Nucor, not Commerce, under 19 CFR 351.301(c)(2)(iv)(B) and section 702 of the Act.

Separate from this is Nucor's additional failure to include important facts that are reasonably available to Nucor at the time of the allegation. Nucor had available to it numerous decisions by Commerce analyzing the overarching electricity system in Korea, and having been a participant in those proceedings was aware that KEPCO utilized an aggregated-cost methodology to ensure it recovers costs plus a return on investment (profit). Nucor, having been a participant in the litigation, was also aware that the Federal Circuit had upheld Commerce's determination that such a methodology was consistent with market principles, as well as the Federal Circuit's discussion of how the Korean electricity system is consistent with other utility pricing methodologies and satisfies the standards for adequate remuneration expressed by the Supreme Court in *Verizon*.[108] Instead of including these facts and addressing them as a part of their analysis, Nucor focused solely on the fact that, for off-peak pricing of electricity, some prices indicated that KEPCO did not recover its costs *during that time period*.[109] It never demonstrated how this resulted in the provision of electricity for LTAR through the overarching electricity system or KEPCO's aggregated-cost methodology, and Nucor cannot allege that electricity is being provided for LTAR at off-peak hours without addressing the prevailing market conditions for electricity in Korea.

The prevailing market conditions in Korea are a TOU system in which electricity is provided 24 hours a day 365 days a year, and Nucor was readily aware that the Federal Circuit had already reviewed KEPCO's aggregated-cost methodology, *including the pricing of off-peak electricity*, within this context and held it was consistent with market principles.[110] Instead of

---

[108] *See Nucor*, 927 F.3d at 1250; *see also Verizon*, 535 U.S. at 477.
[109] *See* Nucor NSAs at 7 (where Nucor requested Commerce investigate the subsidy "notwithstanding {Commerce's findings} from the original investigation").
[110] *See Nucor*, 927 F.3d at 1243.

addressing all of the known features of the Korean electricity system and explaining how the off-peak electricity prices provided a benefit within that context such that it was inconsistent with market principles under 19 CFR 351.511(a)(2)(iii), Nucor merely pointed to the fact that KEPCO did not recover its costs for all prices during off-peak hours based on a comparison to the SMP. Whether a benefit allegation based on KHNP's power trading statistics would provide sufficient evidence of a benefit under *RZBC Group* to initiate if properly alleged is not before the Court here, as Nucor did not properly incorporate an allegation of benefit based on this information in its NSA and supplemental responses. Thus, under *RZBC Group*, Nucor did not include and incorporate into their allegation "facts which are reasonably available to the petitioner" that provide further context to their allegation and otherwise refute their claim that KEPCO is providing electricity for LTAR at off-peak hours. Therefore, for all of the foregoing reasons, and within the context of the "low standard" of initiation in *RZBC Group*, Commerce continues to find that Nucor failed to meet the legal initiation standard as enacted by Congress within section 702 of the Act for its off-peak electricity allegation.

## III.    INTERESTED PARTY COMMENTS

On July 5, 2024, we released our Third Draft Remand Redetermination to interested parties.[111]  On July 12, 2024, we received comments from Nucor and POSCO.[112]  The following is a verbatim summary of argument submitted by Nucor.  For further details, *see* Nucor's Draft Remand Comments.

*Nucor's Comments*:

> The Draft Third Remand Redetermination fails to articulate a coherent legal standard for a tier-three adequate remuneration benchmark analysis.  It creates, without explanation, new rules requiring a petitioner to establish (i) that a government electricity supplier's "costs and revenue methodology is not an

---

[111] *See* Third Draft Remand Redetermination.
[112] *See* Nucor's Letter, "Comments on Draft Remand Results," dated July 12, 2024 (Nucor Draft Remand Comments); *see also* POSCO's Letter, "Comments on Draft Results of Redetermination Pursuant to Third Court Remand," dated July 12, 2024 (POSCO Draft Remand Letter).

acceptable or recognized methodology for the pricing of electricity," or (ii) that "the only recognized tariff-setting methodology is one where the electricity company establishes tariffs which ensure that at every point during the 24 hours in a day, and for every day of the year, the company is providing electricity at a price with collects revenue to fully cover all of its costs."[113]   It adds an additional "threshold issue," requiring a showing that a government supplier's operations or prices are "inconsistent with" or "outside of" the "'prevailing market conditions'" in the country under investigation.[114]   There is no legal basis for any of these standards, which create an initiation threshold that is impossible to satisfy in this case or in any other case to which they may apply in the future.   They therefore potentially insulate an entire category of subsidized government input prices from application of the countervailing duty laws.

The Draft Third Remand Redetermination also improperly rejects certain additional information that was highlighted in Nucor's request for reconsideration before the agency.   This was not a seperate {sic} "new benefit allegation."[115]   To the contrary, Nucor highlighted it to establish that even the off-peak-specific benchmark data that {Commerce} unreasonably required could not have undermined the NSA.   The comparison was also on an apples-to-apples basis, and the Draft Third Remand Redetermination's attempt to find otherwise only highlights the unlawfully high initiation standard that continues to be applied to Nucor's NSA.[116]

*POSCO's Comments*:

POSCO provided a letter regarding Commerce's third draft remand determination that did not include an executive summary.   For further details, *see* POSCO's Draft Remand Letter.

**Commerce's Position:**

Nucor argues that the Third Draft Remand Redetermination creates new legal requirements without articulating "a rational basis for their existence in statute, regulation, case law, or agency practice."[117]   Specifically, Nucor asserts that Commerce has cited no authority in support of the fact that a successful allegation that the Korean electricity market is inconsistent with market principles would require either a substantiation that KEPCO's methodology of calculating aggregated costs and revenue is not an acceptable methodology for electricity

---

[113] *See* Third Draft Remand Redetermination at 12.
[114] *Id.* at 13-14 and 20-21.
[115] *Id.* at 28.
[116] *Id.* at 25.
[117] *See* Nucor Draft Remand Comments at 3.

pricing, or that the only valid tariff-setting methodology requires tariffs that ensure that the price is greater than the cost of producing electricity across all time periods. We disagree that Commerce has created new legal requirements; rather, Commerce's analysis in the Third Draft Remand Redetermination was conducted within its existing practice for LTAR analysis and was based on previous determinations regarding the Korean electricity system that were upheld by the Federal Circuit.[118] In accordance with section 702 of the Act, the petitioner must allege the elements necessary for a potential countervailable subsidy, including that an authority provides a financial contribution, a benefit is conferred, and the alleged program is specific. Thus, when reviewing a subsidy allegation for an LTAR program Commerce considers such allegations within the meaning of section 771(5)(E)(iv) of the Act and 19 CFR 351.511 to determine whether a benefit has been sufficiently alleged. This is the exact approach Commerce took when reviewing the benefit allegation submitted by Nucor for off-peak electricity for LTAR.[119]

Section 771(5)(E)(iv) of the Act states that a benefit will normally be treated as conferred where there is a benefit to the recipient, including:

> {I}n the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration.

We agree with Nucor that adequate remuneration is not explicitly defined in the statute; determining whether a government authority has received adequate remuneration for a good or service is specific to the nature of the transaction and the circumstances in the market surrounding the transaction, *i.e.*, as explained by the statute "in relation to the prevailing market conditions" surrounding the sale, which the statute states should include both the provision and purchase of the goods in the market in question, and include "price, quality, availability,

---

[118] *See* Third Draft Remand Redetermination at 11-13 (citing *Cold-Rolled Steel from Korea* IDM at Comment 2; *Hot-Rolled Steel from Korea* IDM at Comment 2; and *Nucor*, 923 F.Supp 3d at 1243).
[119] *See*, *e.g.* NSA Memorandum at 9; *see also* Third Draft Remand Redetermination at 10-11.

marketability, transportation, and other conditions."[120]  The statute thus requires Commerce to consider the circumstances of sale and market in determining whether a good was sold for adequate remuneration.[121]

However, Commerce's regulations under 19 CFR 351.511(a)(2) define adequate remuneration explicitly within the context of the statute, and 19 CFR 351.511(a)(2)(iii) specifically defines adequate remuneration in circumstances in which a market price beyond that provided by the government authority is not available to the purchasers in the country in question, *i.e.*, an assessment of "whether the government price is consistent with market principles."  Such an assessment calls for an examination of the prevailing market conditions in the context of a market principles or tier-three analysis.[122]  In short, the statute and the regulations explicitly direct Commerce to consider the circumstances in which the government provides the good or service in a tier-three analysis.  As explained by the Court, "{t}he statute sets a standard of adequate remuneration, and the regulation explicates that standard in a variety of contexts."[123]  We, therefore, disagree with Nucor's argument that, "{b}ecause the 'prevailing market conditions' language is statutory, it is arbitrary and unreasonable for {Commerce} to define 'adequate remuneration' as turning on 'consistency with' or some degree of presence 'inside of' or 'outside of' the prevailing market conditions in the country under investigation for only a limited subset of tier-three benchmark analyses…."[124]  Instead, in the Third Draft Remand Redetermination, to further consider Nucor's allegation within the context of the broader market-

---

[120] *See* section 771(5)(E)(iv) of the Act ("For purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.").

[121] *Id.*

[122] *See* section 771(5)(E)(iv) of the Act; *see also* 19 CFR 351.511(a)(2)(iii).

[123] *See Nucor Corporation v. United States*, 286 F.Supp.3d 1364, 1371 (February 6, 2018).

[124] *See* Nucor Draft Remand Comments at 5.  We note that certain parts of this statement appear to be misquotes, as Commerce had no direct quotes in the draft remand redetermination regarding "consistency with" or "inside of" prevailing market conditions.

principles analysis as directed by the Court, we acknowledged that Commerce's regulations call for Commerce to consider whether the allegation provides sufficient evidence of an inconsistency with market principles.[125]  Such an analysis is made by considering the context of the prevailing market conditions as determined in the previously reviewed overarching subsidy program of electricity for LTAR, because we are considering a part of a tariff schedule in an electricity system that we found, and the Federal Circuit upheld, was consistent with market principles.[126]  Notably, Nucor fails to propose any alternative manner by which Commerce can determine whether a sufficient benefit allegation has been alleged under a tier-three analysis in Korea other than to simply accept their allegation on its face while ignoring the underlying factual information submitted by Nucor that refutes their theory of benefit.[127]  Based on Nucor's interpretation of the initiation standard, which they fail to support with relevant case law or statutory language, Commerce would be required to initiate on any new subsidy allegation that could theoretically be sufficient even if information on the record contradicted the allegation. This would directly contradict the standard set forth in the statute and *RZBC Group*, which establish that a petitioner must allege the elements necessary for the imposition of the duty and Commerce should not initiate an investigation where an allegation is "not reasonably supported by the facts alleged."[128]

Rather than creating a new legal standard, Commerce's analysis acknowledges that, at the time of the allegation, Commerce had previously assessed whether the prices charged by KEPCO were set in accordance with market principles through an analysis of the methodology by which KEPCO set its tariff schedule, within the context of section 771(5)(E)(iv) of the Act and 19 CFR

---

[125] *See* Third Draft Remand Redetermination.
[126] *Id.* at 11.
[127] *See, generally*, Nucor Draft Remand Comments.
[128] *See RZBC Group*, 100 F. Supp. 3d at 1295 (quoting H.R. Rep. No. 96–317 (1979), at 51); *see also* .

351.511.[129]  As noted above, this analysis was upheld by the Federal Circuit, which sustained, on appeal, the CIT's holding that Commerce's finding that KEPCO's electricity prices are consistent with market principles was supported by substantial evidence.[130]  The Federal Circuit also held that Commerce had considered KEPCO's cost recovery and determined that KEPCO more than fully covered its costs for the industry tariff applicable to the respondents.[131]  The Federal Circuit explained that where "the foreign government authority engaged in a uniform, non-discriminatory, tariffed practice of charging a price so low that the authority consistently lost large sums of money in a way no private seller could sustain, sales pursuant to that practice" the sales should be considered sales for LTAR, and Commerce should consider all the factors identified in the *1998 Final Preamble* (*i.e.*, the government's price setting philosophy, costs including rate of return sufficient to ensure future operations, and possible price discrimination) in determinations of adequate remuneration.[132]  However, the Federal Circuit further explained that Commerce had considered KEPCO's cost recovery in KEPCO's establishment of the electricity tariff schedule, and subsequently upheld "Commerce's decision about KEPCO's pricing," which "did not find only the absence of preferential rates," but "also found, and gave specific reasons for finding, that KEPCO's pricing met familiar standards of cost recovery."[133]  The off-peak electricity for LTAR subsidy allegation was, thus, made for a part, or subset of, the same electricity tariff schedule from KEPCO that Commerce already determined met the standards of adequate remuneration in accordance with section 771(5)(E)(iv) of the Act and 19 CFR 351.511(a)(2)(iii).

---

[129] *See CORE from Korea* IDM at Comment 2.
[130] *See Nucor*, 927 F.3d at 1248; *see also Countervailing Duties:  Final Rule*, 63 FR 65348, 65378 (November 25, 1998) (*1998 Final Preamble*).
[131] *Id.*
[132] *See Nucor*, 927 F.3d at 1248
[133] *Id*. at 1252.

Commerce noted in the Third Draft Remand Redetermination that Nucor did not address why Commerce should deviate from its determination that KEPCO's tariff schedule and examination of cost recovery in aggregate, including electricity provided at off-peak hours, was consistent with market principles, either by an allegation that some part of KEPCO's aggregated cost and revenue methodology was inconsistent with market principles, *i.e.*, "not an acceptable or recognized methodology for the pricing of electricity," or that the electricity tariff schedule must set prices above costs at all hours of the day in order to be consistent with market principles.[134]  These are not additional, new standards for an allegation, but rather an elaboration of Commerce's discussion in the NSA Memorandum regarding its statement that "Nucor failed to provide sufficient information that an examination of off-peak electricity in isolation would be consistent with the prevailing market conditions for electricity provision in Korea as required under section 771(5)(E) of the Act."[135]  Having previously determined that the Korean electricity market's tariff schedule was consistent with market principles through multiple prior administrative proceedings in which Nucor participated, in order to consider the subsidy allegation, Commerce must also consider whether it is appropriate to examine off-peak electricity in isolation of the tariff schedule.

Nucor claims that "the logical conclusion of {Commerce's} reasoning appears to be that no individual prices paid in the {TOU} system may be treated as subsidized prices if that broader system 'is designed to generate aggregated-yearly revenue to cover {the supplier's} costs plus a return to ensure future operations.'"[136]  While the recovery of aggregated costs plus a sufficient rate of return to ensure future operations is Commerce's established standard for cost recovery in the Korean electricity market, it does not follow that such a standard necessarily indicates that no

---

[134] *See* Third Draft Remand Redetermination at 12.
[135] *Id.* at 13 (citing NSA Memorandum at 9).
[136] *See* Nucor Draft Remand Comments at 6 (citing Third Draft Remand Redetermination at 17-18).

individual prices paid in the TOU system can be subsidized prices. Instead, Commerce explained in the Third Draft Remand Redetermination that the allegation should provide an explanation of why the off-peak electricity prices in Nucor's tariff schedule should be considered inconsistent with market principles. The only basis upon which Nucor alleged that KEPCO's off-peak pricing was inconsistent with market principles in its new subsidy allegations was on the presumption that, in allegedly not recovering its costs at off-peak hours, KEPCO would therefore subsidize the purchase of electricity at those hours. To that extent, as discussed further below, Commerce considered the specific allegation despite the fact that Nucor did not explain why it was necessary for KEPCO to recover costs at all hours in order for its prices to be consistent with market principles.

Nucor argues that its allegation did not rest upon the assertion that a valid, market-based tariff-setting methodology for electricity is one where the rate charged must fully cover the cost of generation and distribution of electricity at all times. However, Nucor fails to explain, in its draft remand comments, *where* Commerce erred in this interpretation, or *how* Commerce should have otherwise interpreted an allegation in which Nucor compared time-specific, per-unit variable prices sold to POSCO to what Nucor alleged was an appropriate approximation of KEPCO's per-unit, time-specific costs. Given Nucor claims it is impossible to establish that a TOU tariff schedule that charges different prices at different hours is inconsistent with market principles,[137] and further does not argue that KEPCO must charge consumers the same, presumably above-cost price for electricity at all hours to be consistent with market principles, we find no other rationale under which the allegation can be interpreted. While Nucor's subsidy allegation referred to an alleged "cross-subsidization," Commerce has previously explained how it is outside of our practice to consider the allegation of cross-subsidization in this instance, as

---

[137] *See* Nucor Remand Comments at 6.

the hours in which entities choose to purchase electricity constitute consumer behavior and are not established by the GOK; conducting such an analysis would presume that, by purchasing electricity at higher prices at on-peak hours and then purchasing electricity at lower prices during off-peak hours, POSCO could, in effect, be subsidizing itself.[138]  Thus, given Nucor's objections to Commerce's prior interpretations of Nucor's allegation in the Third Draft Remand Redetermination, what is left for Commerce to consider is if KEPCO allegedly selling electricity at below cost at certain hours is sufficient, on its own, to warrant an investigation regarding whether providing below-cost electricity on a selected portion of a tariff schedule constitutes subsidization.

Nucor argues that this analysis is circular because it "requires establishing that KEPCO's pricing methodology is somehow inconsistent with itself," and that it is impossible to establish that anything KEPCO does is outside prevailing market conditions in Korea because KEPCO owns the entirety of the electricity market.[139]  As an initial matter, when Commerce found that Nucor failed to establish that KEPCO's pricing methodology was inconsistent with prevailing market conditions, we were not finding that Nucor failed to explain how KEPCO was not in accordance with the operation of its own tariff schedule.  Rather, we found Nucor failed to provide a sufficient allegation, based on the specific circumstances found in the electricity market in Korea, that explained why the tariff schedule KEPCO was using did not meet Commerce's established and affirmed standards for evaluating price setting philosophy, cost recovery, or price discrimination, due to its provision of electricity at off-peak hours. Furthermore, Nucor's claim that establishing and supporting an allegation of inconsistency with market principles in the existing Korean electricity system is impossible is contradicted by

---

[138] *See First Remand Results* at 50.
[139] *See* Nucor Draft Remand Redetermination at 5-6.

multiple instances of Commerce practice; for example, Commerce has subsequently made determinations, including in a subsequent administrative review of this order, that the GOK is providing a countervailable subsidy in the form of electricity for LTAR because of the distinction between the Korean law and application of the law. Although we continued to find the system of electricity provision in Korea was designed to recover its aggregate costs plus a reasonable rate of return in total, we found that certain types of industrial electricity, in aggregate, failed to recover costs during the POR.[140] The distinguishing factor between that allegation, and the one here, is that in the 2019 administrative review of this order, Nucor properly supported its allegation that KEPCO's provision of electricity was inconsistent with market principles because KEPCO's provision of electricity had losses associated with KEPCO's *electricity operations in aggregate* during the POR, which was consistent with Commerce's practice regarding cost recovery in a tier-three market analysis.[141]

Nucor's off-peak electricity for LTAR allegation requested Commerce to re-examine the electricity market in Korea on the basis of a transaction specific price-to-cost comparison of cost recovery based on average hourly transactions. We note that Commerce does not utilize a transaction-specific standard of cost recovery in a tier-three market principles analysis. The hallmark principle of a tier-three market principles analysis is that it is necessary to examine whether the good or service is being provided by the government entity in a manner similar or consistent with the operations of other providers of the same good or service in competitive marketplaces, because there are no comparable, competitive market transactions that are

---

[140] *See*, *e.g.*, *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2021*, 88 86318 (December 13, 2023) (*CTL Plate from Korea 2021 AR*), and accompanying IDM at Comment 1 ("This finding did not negate our analysis that KEPCO's pricing methodology is based upon '*laws, regulations, and processes* to fully recover costs and a rate of return;' it merely highlights the complexity of evaluating KEPCO's electricity pricing and that an examination of the actual application of the aforementioned laws and regulations, particularly with regard to cost recovery, is necessary to confirm the Korean electricity market was based on the market principles in both law and the application of law.").
[141] *See* Memorandum, "Decision Memorandum on New Subsidy Allegations," dated April 13, 2021, at 9 {pertaining to the electricity for LTAR allegation in the 2019 Administrative Review of this Order}.

available to consumers for the good or service either within the market or externally in the world market. Nucor thus substituted a market price with cost in its allegation to make a highly granular, transaction-specific price comparison,[142] but failed to explain why a power company not making a profit on every transaction is inconsistent with market principles, beyond noting that the Federal Circuit's findings that Commerce must account for cost recovery in its analysis, and the claim that, because certain, individual transactions might be below cost, the higher prices at which companies purchase electricity from KEPCO at on-peak hours were subsidizing purchases at off-peak hours. Again, Nucor's argument conflates cost recovery with Commerce's transaction-specific analysis of market price, which is an analysis carried out in tier-one and tier-two analyses, not in a tier-three analysis where such market prices are unavailable. Nucor argues that Commerce and the courts have previously explained that benefits from subsidized government prices are not offset by a government supplier's other sales at prices that are not subsidized.[143] Commerce has only applied this analysis under a tier-one or tier-two standard of market analysis; the analysis in *Solar Cells from China*, on which Nucor relies (for the determination regarding offsets), is a tier-two analysis comparing a world-market price to the price of actual input purchases.[144] Commerce's practice has been below market price sales may not be offset with above market price sales when making individual transactional comparisons. Again, even for the purposes of initiation, Nucor must establish why Commerce should consider such a standard that is not reflective of our usual practice in a tier-three market principles

---

[142] We note that this is not a standard Commerce considers in tier-one or two analyses either; we do not consider if the market price of a good purchased by a respondent company is below the cost the supplier company incurred to produce it. Even in antidumping duty proceedings, wherein Commerce accounts for below-cost subject merchandise in its analysis of normal value, more than twenty percent of the goods in any CONNUM must be sold below cost in order for Commerce to disregard the sales price of the merchandise.

[143] *See* Nucor Draft Remand Comments at 6-7 (citing *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2015*, 83 FR 34828 (July 23, 2018) (*Solar Cells from China*), and accompanying IDM at Comment 10; *see also Canadian Solar Inc. v. United States*, No. 18-00184, 2020 WL 898557, at 6-7 (CIT February 25, 2020)).

[144] *See Solar Cells from China* IDM at Comment 10.

analysis, particularly since the analysis on the Korean electricity market was already established at the time of the allegation. Thus, Nucor's allegation failed not only to take into account Commerce's past practice with respect to the Korean electricity market, but also alleged a benefit that was entirely outside of Commerce's tier-three market principles analysis as a general matter.

Finally, Nucor comments that its new subsidy allegations alleged that KEPCO had an operating loss of 621 billion KRW during the POR, and a subsequent operating loss in the first quarter of 2019, and that this information indicates that there is "no basis on which to conclude that the manner in which KEPCO 'designs' or 'develops' its tariff schedule 'ensures' that aggregate revenues will cover cost plus profit."[145] Nucor ignores any context surrounding its allegation in this argument. Commerce has previously determined that KEPCO's tariff schedule is designed to recover the costs incurred on the generation, distribution, and transmission of electricity plus and reasonable profit based on Commerce's verified analysis of the same tariff schedule upon which Nucor made its allegation.[146] In making its allegation, Nucor did not provide evidence of a change in the tariff schedule or the design of the Korean electricity system such that Commerce needed to reconsider its analysis that the electricity pricing system was intended to set a market-based price for electricity consumers. Accordingly, the only basis for an inconsistency with market principles was cost recovery for the specific POR. In fact, Commerce addressed this allegation regarding KEPCO's overall cost recovery in the NSA Memorandum, noting that we had an established practice that one year of financial losses experienced by a government-owned utility provider was insufficient to demonstrate that a good was sold for

---

[145] *See* Nucor Draft Remand Comments at 7 (citing Nucor NSAs at 12 and Exhibit 15; Nucor NSA Supplemental QR at Exhibit 1, p.F-39).
[146] *See CORE from Korea* at Comment 2; *see also Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 82 FR 16341 (April 4, 2017), and accompanying IDM at Comment 2.

LTAR, and that KEPCO had reported a profit in the previous four years.[147] Furthermore, Nucor did not offer an explanation as to why off-peak electricity, specifically, would be the cause of KEPCO's losses, or why an off-peak electricity for LTAR allegation is appropriate rather than an electricity for LTAR allegation based on KEPCO's overall losses.

Nucor argues that court cases are not reasonably available information that should be considered by Commerce in analyzing new subsidy allegations.[148] However, Commerce's analysis was based on the Federal Circuit's affirmation of Commerce's tier-three market principles analysis in *CORE from Korea*. Furthermore, in making its subsidy allegation, Nucor stated that its allegation "provides {Commerce} with sufficient basis to reconsider its previous determinations regarding the Korean government's provision of electricity for LTAR in light of the Federal Circuit's recent opinion in *Nucor*."[149] Thus, as is evidenced by their direct reference to the case in question at the time Nucor alleged the off-peak electricity for LTAR program, Nucor was both aware of the Federal Circuit's opinion in *Nucor* and was an active participant in that litigation and the underlying proceeding where Commerce found KEPCO's tariff setting methodology was consistent with market principles.[150]

At the time of the allegation, Commerce had previously reviewed in detail the overarching electricity system, in which Nucor's off-peak electricity allegation exists, and how the GOK had set the pricing for electricity, including at off-peak hours. Nucor submitted this allegation fully aware of Commerce's prior determination regarding the system, and instead of addressing how their allegation resulted in a potential benefit despite Commerce's prior

---

[147] *See* NSA Memorandum at 8-9. This analysis is distinguishable from Commerce's subsequent analysis regarding the annual cost recovery of certain types of industrial electricity, in aggregate; there are many potential drivers for a provider of a capital-heavy producer of a good to have a single year of losses, including infrastructure investment, lending, *etc.*, that do not necessarily pertain to losses from the sale of the good. This is consistent with the Federal Circuit's standard in *Nucor*, which espouses a standard of cost recovery sufficient to ensure future operations, as discussed above.

[148] *See* Nucor Draft Remand Comments at 8.

[149] *See* Nucor NSAs at 8.

[150] *Id.*

determination, Nucor requested Commerce to ignore that prior determination in its entirety and review a subset of that same system afresh and outside of the context of the electricity system as a whole.[151]  Nucor's assertion that off-peak prices provide a benefit necessarily requires Commerce to review the nature and system in which those prices exist, as the regulations and statute require Commerce to consider prevailing market conditions for the good being provided for LTAR as a part of its benefit analysis.  Where Nucor's alleged benefit has already been reviewed as a part of the broader system, it would be contrary to Commerce's statutory directive to accept an allegation that requires it to ignore the market conditions surrounding the alleged benefit it had previously found to be consistent with market principle and to find the allegation was now sufficiently supported.

Moreover, Commerce also considered the timely-filed allegation of whether a benefit was provided by the GOK  off-peak hours at face value and on its own merit.  We examined whether Nucor had provided sufficient evidence to support the fact that KEPCO was providing off-peak electricity for LTAR below cost.  Even when examining the benefit allegation in Nucor's subsidy allegation based on its own merit, we found it wanting because Nucor failed to consider information regarding the Korean electricity system included within the supporting factual information Nucor provided that explained KEPCO's calculations for electricity costs paid and prices charged (in short, the prevailing market conditions), which demonstrated the comparison Nucor was making between the prices charged to POSCO and the costs KEPCO paid for electricity was unreasonable.

At the time of the new subsidy allegations, Nucor identified variable, off-peak prices for industrial users in KEPCO's tariff schedule, noted that those prices were considerably below the

---

[151] *Id.* at 7 ("Notwithstanding this finding {regarding electricity for LTAR} from the original investigation, {Commerce} should initiate an investigation of the Korean government's provision of off-peak electricity for LTAR.")

prices that KEPCO charged industrial consumers at on-peak hours, and explained that, because "large companies spent 54 percent at night," the use of industrial electricity at low rates during off-peak hours indicated that the entire Korean electricity market was not operating on a supply and demand basis, and off-peak prices were accordingly below cost.[152]  Nucor then compared the KPX's SMP, which Nucor claimed "fluctuated within a relatively narrow range of approximately 15 KRW/kWh," and had an average-off peak price of 93.17 KRW/kWh to KEPCO's tariff rates at off-peak hours, noting that the SMP was not set by nuclear and bituminous coal generators during the POR.[153]  Commerce issued a supplemental questionnaire to Nucor requesting, amongst other information, that Nucor address the further information regarding KEPCO's electricity pricing at off-peak hours on the record, and how such information pertained to Nucor's allegation regarding the SMP.[154]  Nucor did not alter its allegation regarding the SMP or provide any separate or new comparisons for the price and cost of electricity at off-peak hours.[155]  Thus, in the NSA Memorandum and subsequent remand redeterminations, Commerce has focused its analysis on the comparison between the variable cost and price of electricity, as alleged, because KEPCO's alleged failure to recover its operational costs during the POR, and the support for both those allegations contained therein, are the bases under which Nucor made its cost recovery benefit allegation regarding off-peak electricity for LTAR.  As Commerce has stated throughout these proceedings, in addition to Nucor's allegation and the information on the record, we required clarification with respect to benefit in order to create a suitable benchmark comparison for the prices Nucor provided that were paid by POSCO for off-peak electricity.  We requested additional information because the information provided within the allegation itself

---

[152] *See* Nucor NSAs at 9-10.
[153] *Id.* at 11-12 and 14-15.
[154] *See* NSA Supplemental Questionnaire at 3.
[155] *See* Nucor NSA Supplemental QR at 4 ("{S}ince {the SMP} reflects the variable cost of electricity generation, it serves as a reasonably available and conservative proxy for what the price of electricity should be at any specific time of day.")

clearly indicated that there were additional factors affecting the cost of providing electricity that Nucor's allegation did not acknowledge, and the allegation contradicted general information established publicly by Commerce regarding the Korean electricity system in numerous Korean CVD cases.  Nucor cannot cite to any information or provide any demonstration to support its assertion that Commerce required Nucor to provide specific off-peak hourly prices in order to satisfy the initiation standard for the allegation; Commerce has never made or implied such a requirement.  Commerce emphasizes the underlying facts that refute Nucor's allegation not because it is applying a heightened standard or requiring a specific subset of data, as argued by Nucor, but to clarify why Nucor's benefit allegation is "not reasonably supported by the facts alleged" in accordance with the statute and *RZBC Group*.[156]

Furthermore, while arguing that Commerce would only accept off-peak specific hourly prices as sufficient evidence of benefit, Nucor simultaneously argues that its citation to KHNP's trading price indicates that the only possible conclusion is that off-peak electricity prices are below costs.  These two statements are contradictory.  If Nucor believes that the KHNP price indicates that the cost of electricity for KEPCO at off-peak hours cannot be lower than the price of electricity charged to consumers at those same hours, then it cannot argue it had no reasonable methodology or available information with which it was able to establish that off-peak electricity prices are below cost in its allegation.

Commerce notes that we did not contest, nor do we currently make a determination regarding, the potential viability of Nucor's argument regarding KHNP in the Third Draft Remand Redetermination.  Rather, we noted that the citation to KHNP provided a different form of comparison to the prices paid by POSCO than the timely filed allegation, which focused on the SMP (and thus a comparison of variable costs versus variable price, rather than total costs

---

[156] *See RZBC Group*, 100 F. Supp. 3d at 1295 (quoting H.R. Rep. No. 96–317 (1979), at 51).

versus total price), and we found in the Third Draft Remand Redetermination that the untimeliness of the argument was such that Commerce did not have an obligation to consider it, much less issue a supplemental questionnaire that would be necessary to further evaluate an apples to apples benchmark using that information.  Nucor does not contest that it first provided the information regarding KHNP after the allegation was rejected, nor does it argue that there are statutory or regulatory grounds under which Commerce should have considered this additional information based on its filing of a request for reconsideration.  Rather, Nucor claims that they "highlighted this information only in response to {Commerce's} improper attempt to require an off-peak-specific benchmark, and to establish that, even if such information were reasonably available, there was no way that it could have undermined the allegation."[157]  Disregarding the fact that Nucor claims an off-peak specific electricity for LTAR allegation should not require a benchmark that reflects the allegation made, and that it had no reason to believe that Commerce would require information that would support the specific allegation made, we disagree with Nucor's assertion that such information standing on its own provides support for the allegation. As explained in the Third Draft Remand Redetermination, the timely filed allegation and supplemental responses never included an analysis of the full price of the electricity *paid by POSCO*, and the KHNP and other power trading statistics, without adjustment, did not provide sufficient supporting evidence to find that POSCO paid off-peak electricity below cost.

On remand, Commerce has provided further explanation for why we do not consider the availability of the power trading statistics in KEPCO's 20-F Form, including the KHNP average trading price cited by Nucor in its request for reconsideration, as sufficient, stand-alone evidence that would support the allegation of benefit made by Nucor in its new subsidy allegations.  As discussed above, within the new subsidy allegations and Nucor's supplemental questionnaire

---

[157] *See* Nucor Draft Remand Comments at 8-9.

response regarding the allegations, Nucor made two allegations with respect to benefit that alleged KEPCO was not recovering its costs on off-peak electricity: (1) that the hourly SMP, which Nucor maintained was reflective of KEPCO's hourly costs of electricity, was higher than the prices for off-peak industrial electricity in KEPCO's tariff schedule; and (2) that KEPCO had an overall operations loss during the POR.[158]  Commerce explained why it found these allegations insufficient to demonstrate a lack of cost recovery in its NSA Memorandum and *First Remand Results*.[159]  Notably, because the comparison between the SMP and off-peak electricity tariff prices were both the variable portion of the electricity costs and price, we did not request Nucor to provide further information regarding the full cost and price of electricity, as was necessary in an examination of KEPCO's power trading statistics, found in KEPCO's 20-F form to the SEC for the POR.  These two comparisons stand alone and require different inclusions of costs and pricing to create an apples-to-apples price comparison.  An analysis of the cost to price comparison would thus not be based on the same information as an analysis of a full cost and price of electricity to KEPCO's power trading statistics comparison.

At the outset, we note that Nucor misunderstands Commerce's discussion of the full price of electricity, including the purpose of the demand charge, in the Third Draft Remand Redetermination, stating that the charge is not related in any way to KEPCO's cost of acquiring electricity from its generators.  This, in itself, is a correct assertion because the demand charge is a charge incurred on electricity consumers and not KEPCO.  However, Nucor does not correctly define the demand charge in its comments; it is a fixed charge to electricity consumers, including industrial electricity consumers, that is included in KEPCO's tariff schedule.[160]  While Nucor is correct that this charge is a fixed charge for the purchase of electricity, it is nonetheless a part of

---

[158] *See* Nucor NSAs at 8-11 and 14-15.
[159] *See* NSA Memorandum at 7-9; *see also* First Remand Redetermination at 38-47.
[160] *See* Nucor NSAs at Exhibit 4.

the GOK's industrial electricity tariff schedule for the POR and therefore a part of the price POSCO pays for electricity, as demonstrated in both the tariff schedule in place during the POR and POSCO's own reported purchases of electricity, submitted in Nucor's subsidy allegation.[161] Including all the charges to electricity consumers within KEPCO's tariff schedule is a well-established practice by Commerce in calculating the LTAR benefit for Korean electricity because all of the charges in the tariff schedule are included in KEPCO's assessment of costs in the creation of its tariff schedule.[162]  In *CORE from Korea*, for instance, Commerce found that KEPCO separated the overall costs of electricity to KEPCO (including the cost of generation of electricity) by consumption patterns, electricity classifications, and cost type, and then "each cost was then distributed into the fixed charge {*i.e.*, the demand charge} and the variable charge {*i.e.*, the energy charge}.[163]

Nucor argues that both the energy charge and KEPCO's cost of acquisition are continuous, hourly prices on a per-kilowatt hour basis, and this makes them comparable.[164]  This, alone, does not establish an apples-to-apples comparison that would have, in and of itself, supported Nucor's allegation.  Rather, because the full value of electricity paid to the generators is reflected in KEPCO's power trading statistics (although presented on an average per-unit basis), the appropriate comparison is the full, per-unit value of electricity charged to electricity consumers, which includes both the fixed and variable costs in Commerce's tariff schedule, as established in *CORE from Korea*.  Still, Commerce had no obligation to consider the calculation of the full cost of electricity at the time of the new subsidy allegations, because Nucor only alleged comparisons to the variable cost of electricity in its timely filed allegation and subsequent supplemental responses.

---

[161] *Id.* at Exhibits 4 and 5.
[162] *See, e.g.*, *CTL Plate from Korea 2021 AR* IDM at Comment 1.
[163] *See CORE from Korea* at Comment 2.
[164] *See* Nucor Draft Remand Comments at 10.

We likewise disagree with Nucor's claim that "KEPCO's cost of acquisition from its lowest-cost generation subsidiary" (*i.e.*, KHNP) establishes a "floor under which KEPCO's cost of supply could not fall during the POR, at any time of day," and thus provides proof within the new subsidy allegations that KEPCO's costs were above POSCO's prices at off-peak hours.[165] The prices KEPCO paid" in its power trading statistics reflected in KEPCO's 20-F Form for the POR are average prices; by definition, fifty percent of the prices KEPCO paid to KHNP are below those reported in the power trading statistics.[166]  While we acknowledge that identifying the lowest costs incurred by KEPCO could have been a reasonable method by which to establish the floor for the costs KEPCO paid, any argument regarding the costs incurred by KEPCO that Nucor relies on must account for the fact that the allegation is only addressing a portion of KEPCO's electricity sales and costs.  Using the average KHNP price presumes that the total amount of electricity purchased, across all types of electricity, is the same at all hours, a fact that Commerce concluded Nucor has yet to successfully substantiate.[167]  Furthermore, there is no evidence on the record, timely filed or provided post-hoc, to suggest that, if correctly calculated to account for an applies-to-apples comparison, that even the *average* costs incurred to KEPCO to pay for KHNP's power generation would be below the full prices of electricity POSCO paid at off-peak hours.

Nucor argues that, because KHNP is the "lowest possible point of comparison available," that it does not matter whether a "component part of an electricity charge may render a price paid slightly higher" than the identified cost of electricity, and that because it "established KEPCO's reliance on higher-cost generators throughout the day," it has sufficiently alleged a benefit.[168]

---

[165] *Id.*

[166] *See* Nucor NSA Supplemental QR at Exhibit 1, p.38 (the average unit price is calculated by dividing the generation companies' sales to KEPCO by the volume provided by the generation company).

[167] *See* Third Draft Remand Redetermination at 24.

[168] *See* Nucor Draft Remand Comments at 10 (citing Nucor NSAs at Exhibit 4; Nucor NSA Supplemental QR at Exhibit 1, p.38).

However, even disregarding the lack of the timeliness of Nucor's allegation regarding KEPCO's power trading statistics, Commerce must follow the statutory language: a benefit is treated as conferred where there is a benefit to the recipient under section 771(5)(E) of the Act, and section 771(5)(B) of the Act states that a subsidy exists only if a benefit is conferred; section 702(b)(1) of the Act further states that a petitioner must allege the elements necessary for the imposition of the duty, presumptively including an allegation of benefit. Nucor argues that "there is no way that {the information} could have undermined the allegation," and that Commerce has not "presented a single piece of evidence or any explanation that actually undermines the substance of Nucor's allegation."[169] However, it is Nucor's responsibility to establish the evidence for the allegation is sufficient in the first place; Commerce does not have an obligation to accept an allegation at face value and find undermining evidence to disprove it in order to not initiate on the allegation.[170] The allegation made by Nucor in its request for reconsideration used KHNP's power trading statistics to argue that the cost of electricity to KEPCO was higher than the prices paid by POSCO. This allegation of benefit was not included in the original NSA and thus Nucor did not timely provide a sufficient allegation and full comparison using the power trading statistics.

Nucor's benefit allegation declares a benefit exists but does not explain how that assertion is supported by the evidence in their submission beyond a simple price to cost comparison. Without further explanation as to how their benefit allegation is supported by the underlying information and results in a subsidy despite Commerce's prior determinations, the benefit

---

[169] *Id.* at 9.
[170] *See TMK IPSCO v. United States*, 179 F. Supp. 3d 1328, 1341 (CIT 2016) ("Commerce is not obligated to initiate an investigation based on speculative allegations." Instead, "Commerce is required to 'examine the accuracy and adequacy of the evidence provided in the petition."); *see also SolarWorld Americas, Inc. v. United States*, 125 F. Supp. 3d 1318, 1329 (CIT 2015) (Explaining there is a "statutory requirement that not only must the Petitioner allege all of the necessary elements, but the allegations must also be accompanied with reasonably available evidentiary support.").

allegation remains unsupported.  As discussed above, the manner in which they attempted to

support the allegation was contradicted by the information in KEPCO's 20-F form on the record

of this proceeding, which Commerce specifically cited to when requesting Nucor amend its

allegation.[171]  Thus, Commerce requested further explanation regarding how their benefit

allegation was supported by the evidence submitted in light of the prevailing market conditions

in which the program existed, and Nucor failed to provide additional support for its allegation in

a timely manner.  Nucor referenced the KHNP power trading statistics as additional support, but

Commerce considered this allegation untimely as this explanation was not provided until after

the deadline for filing an NSA and responding to Commerce's questionnaires.  It would be

inappropriate for Commerce to reverse its NSA decision after the fact based on a new theory of

benefit provided past the deadline, as to do so would invalidate the established deadlines for

submission of NSAs and create a moving target in which petitioners can continuously submit

new theories of subsidization until it submits one Commerce finds sufficient.[172]

Nucor argues that its allegation only fails upon "procedural technicalities," but these

"procedural technicalities" are a failure to timely consider the known market conditions in which

Korean electricity operates, information that Nucor provided itself within the subsidy allegations,

and provide a sufficient allegation of benefit within the alleged timeline for filing the

allegations.[173]  Nucor only asserts the likelihood of off-peak electricity being below cost; it did

not successfully support this fact in any manner consistent with its allegation and the known

---

[171] *See* Nucor NSA Supplemental QR at 4 and Exhibit 1; *see also* Nucor NSAs at Exhibit 8; p. 35-36.
[172] *See POSCO v. United States*, 977 F.3d 1369, 1378 (Fed. Cir. 2020); *see also Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Preliminary Negative Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 80 FR 79567 (December 22, 2015), and accompanying Preliminary Decision Memorandum at 30, *unchanged in Cold-Rolled Steel from Korea* IDM; and *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1337-38 (Fed. Cir. 2016) (quoting *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)) ("{T}he burden of creating an adequate record lies with interested parties and not with Commerce.").
[173] *Id.*

contours of the Korean electricity market at the time Commerce considered the allegation such that it constituted a countervailable benefit.

Commerce found, based on the known and established conditions for the provision of electricity in Korea, that the initial numbers put forth by Nucor in its NSA did not provide a sufficient allegation of benefit.  Furthermore, when Commerce requested that Nucor discuss other factors involving the pricing of electricity in Korea in its supplemental questionnaire, Nucor again did not adequately provide the evidence necessary to support its benefit allegation.[174]  In reviewing the allegation as it was alleged in Nucor's NSA and supplemental questionnaire response, Commerce determined that the facts on the record did not sufficiently support Nucor's allegation of benefit without further revision.  Commerce must make its initiation decision on whether the allegation put forth by the alleger of the subsidy is sufficiently supported, and not merely the presumption that it is likely the subsidy may exist.  No benefit allegation based on the KHNP's trading price was raised until after the relevant deadlines for filing an NSA.  Furthermore, Nucor fails to cite to any relevant statutory or regulatory provision that requires Commerce to consider a novel benefit allegation submitted after the deadline for filing a new subsidy allegation.  For the aforementioned reasons, we continue to find that Nucor did not sufficiently support its allegation of benefit, and that Commerce properly considered the information presented on the record by Nucor in making our decision not to initiate on the off-peak electricity for LTAR new subsidy allegation.  Nucor claims that there is no "avenue for any allegation, regardless of how well supported, to clear the bar for initiation."[175]  Any reasonable and properly supported allegation that the provision of off-peak electricity by the GOK was inconsistent with market principles, regardless of whether it pertained to cost recovery or another

---

[174] *See* Nucor NSA Supplemental QR at 4-5.
[175] *See* Nucor Draft Remand Comments at 3.

aspect of the market principles analysis, was available to Nucor, and in this instance, the specific allegation failed because Nucor failed to properly establish evidence that either: (1) a lack of cost recovery at off-peak hours was inconsistent with market principles; or (2) that POSCO paid prices below cost in the first place.

## IV.    FINAL RESULTS OF REDETERMINATION

Consistent with the *Third Remand Order*, Commerce has re-examined Nucor's allegation within the context of the Korean electricity market and explained why it did not consider Nucor's comparison between KEPCO's KHNP acquisition cost and POSCO's off-peak prices in our determinations with respect to declining to initiate upon Nucor's provision of off-peak electricity for LTAR new subsidy allegation.  For the purposes of these final results of remand redetermination, Commerce continues to rely upon the *2018 AR Final Results*, finding that Nucor failed to sufficiently allege an inconsistency with market principles for the provision of off-peak electricity in the Korean electricity market in its subsidy allegation of the provision of off-peak electricity for LTAR.  Therefore, the CVD rates for POSCO and the non-selected companies under review from the *2018 AR Final Results* (*i.e.*, 0.49 percent, *de minimis*), for the period January 1, 2018, through December 31, 2018, will remain unchanged.

8/15/2024

X _Elouaradia_

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
 for Enforcement and Compliance